# EXHIBIT 1C

## IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND
### Civil Division

RS

CAPITOL RADIOLOGY LLC,
7350 Van Dusen Road, Suite B-10
Laurel, Maryland

Plaintiff

v.

Case No.: C-16-CV-24-003548

UNIVERSITY OF MARYLAND
MEDICAL SYSTEM,
250 W Pratt St
Baltimore, MD 21201

**JURY TRIAL
DEMANDED**

**AMENDED VERIFIED
COMPLAINT**

UM CAPITAL REGION HEALTH INC.
901 Harry S. Truman Drive North
Largo, MD 20774

ADVANCED RADIOLOGY AT CAPITAL REGION, LLC
7140 Contee Road
Suite 2000
Laurel MD 20707-9527

and

RADNET, INC.,
1510 Cotner Ave
Los Angeles, California 90025

Defendants.

_____

## COMPLAINT

Plaintiff Capitol Radiology LLC ("Plaintiff"), by and through its undersigned counsel,

hereby files this Complaint against Defendants University of Maryland Medical System

1

("UMMS"), UM Capital Region Health Inc. ("UM Capital"), Advanced Radiology at Capital

Region, LLC ("Advanced Radiology") and RadNet, Inc. ("RadNet") (collectively,

"Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.       Dr. Doriann Thomas is an African American woman, and a board-certified

radiologist.  Approximately twenty years ago, she was able to marshal the resources to purchase

the radiology facility at which she worked from Radiologix, Inc.  Radiologix is the corporate

predecessor to defendant RadNet, Inc. ("RadNet").

2.       Dr. Thomas' company, Capitol Radiology LLC ("Capitol Radiology"), is now the

only  African American owned radiology facility in Prince George's County, in the entire State of

Maryland, and on information and belief, on the entire Eastern Seaboard.  It has been providing

radiology services to community members on the Laurel campus (off of Van Dusen Road) for

nearly twenty years. To better serve the community, Capitol Radiology keeps its doors open

seven days a week; when Covid hit, Dr. Thomas, CFO Larry McKenney, and the Capitol

Radiology team came into the office regularly, unlike many national providers, to make sure that

local residents had access to necessary services.

3.       Defendants RadNet is a multi-billion-dollar national company based in Los

Angeles that is in the business of purchasing and owning local radiology centers.  It uses private

financing to establish a foothold in the market for radiology services in a few, selected locations,

and then drives small, local providers out of business by aggressive and unlawful practices,

creating a monopoly position for its own business.  It has identified the State of Maryland as one of seven states targeted for its control.

4.      RadNet found a willing partner for its schemes in the University of Maryland Medical System ("UMMS"), a formerly public entity that was privatized by the General Assembly in 1984.

5.      After privatization, the UMMS Board of Directors engaged in wholesale self-dealing.  When the self-dealing was revealed to the general public in 2019-20, one board member went to jail and all of the others were forced to resign.  It was during this same 2019-20 time period that the corruption riddled UMMS and monopoly-driven RadNet entered into a joint venture with the apparent purpose and effect of driving Capitol Radiology out of business.

6.      Dr. Richard Bartlett, the Chief Medical Officer of UMMS, had visited Capitol Radiology on a number of occasions and come away impressed; he advised Capitol Radiology that there was no need for additional outpatient radiology services on the small, Laurel campus, and that Capitol Radiology would make an excellent service provider for UMMS.

7.      But amidst the scandal, the respected Dr. Bartlett resigned.  UMMS and RadNet then secretly entered a joint-venture agreement to build a new outpatient radiology center on the Laurel campus – just 50 yards away from the doors of Capitol Radiology.

8.      There was no public need for an outpatient radiology center at that location because Capitol Radiology already was providing services there.

9.      The statute authorizing UMMS privatization imposed on it a duty to conduct procurement activities consistent with minority purchasing standards applicable to State

3

government agencies, and prohibited it from discriminating based on race.  UMMS awarded

RadNet with a joint-venture, sole-source partnership in violation of those requirements.

10.     UMMS did not offer Capital Radiology an opportunity to bid on a contract for the

provision of outpatient radiology services on the Laurel campus, even though it had been

exclusively providing such services at that exact location for nearly twenty years.

11.     UMMS later admitted that it had purposely excluded Capitol Radiology from the

bidding process, with the excuse that it did not have a pre-existing relationship with UMMS.  But

State bidding law, as applied to UMMS, bars precisely this type of cronyism, since it perpetuates

historic racism by putting small, black owned establishments lacking this type of pre-existing

relationship out of business.

12.     UMMS knew that locating an outpatient radiology facility on the Laurel campus

would have a substantially adverse effect on the black- and female-owned  Capitol Radiology.

On information and belief, it excluded Capitol Radiology from bidding on the joint venture

opportunity precisely *because* it was black- and female-owned, and therefore likely to prevail

under State bidding rules.  Creating a competing outpatient radiology center on the Laurel

campus, and excluding Capitol Radiology from the bidding process, violated the applicable anti-

discrimination laws.

13.     UMMS also admitted to another illicit purpose for entering its joint venture

agreement with RadNet: to obtain patient referrals.  According to UMMS, it determined that it

would only enter an agreement with a radiology facility if the facility promised to refer and

4

direct patients for the medical component of the service to University of Maryland School of Medicine physicians (who also serve as physicians at UMMS).

14. Thus, the joint venture benefited RadNet by eliminating a competitor and further monopolizing the market, and benefiting UMMS by eliminating competition for physician services – both in violation of the antitrust laws.

15. The UMMS-RadNet Joint Venture also is in breach of the Asset Purchase Agreement by which Capitol Radiology purchased the Laurel facility from RadNet. That agreement provided Capitol Radiology with a right-of-first refusal for certain outpatient services at the Laurel campus. A public bidding process by UMMS would have revealed this contractual obligation, as would any reasonable due diligence performed by UMMS. Instead, the project went forward in breach of the Asset Purchase Agreement.

16. Plaintiffs therefore bring this action *inter alia* for violation of the State bidding laws, discrimination, antitrust, and breach of contract, and seeking preliminary and permanent injunctive relief, compensatory damages, treble and punitive damages, attorneys' fees and costs, and such other relief as the court deems appropriate.

**PARTIES**

17. Plaintiff Capitol Radiology LLC is a limited liability company organized under the laws of Maryland, with its principal place of business in Prince George's County, Maryland. Plaintiff brings this suit in its own right; as a property owner whose property rights have been affected by the acts of defendants; and as a taxpayer, and on behalf of other taxpayers, who have

suffered harm through the *ultra vires* acts of defendants which will cause Plaintiff pecuniary harm or an increase in taxes.

18.    Defendant University of Maryland Medical System is a not-for-profit corporation established under the laws of Maryland, with its principal place of business located at 250 W. Pratt St., Baltimore, MD 21201.

19.    Defendant UM Capital Region Health Inc. ("UMCAP") is a not-for-profit corporation established under the laws of Maryland, with its principal place of business located at 901 Harry S. Truman Drive North Largo, MD 20774.  UMMS is the sole member of UMCAP, and pays all of its executives and employees.  UMCAP has an independent board of directors.

20.    Defendant Advanced Radiology at Capital Region, LLC, is a limited liability company with its principal place of business at 7140 Contee Road, Suite 2000, Laurel MD 20707-9527.  On information and belief, it is associated with defendant RadNet, and intended to play a role in the operation of the radiology facility at issue in this action.

21.    Defendant RadNet, Inc. is a corporation organized under the laws of Delaware, with its principal place of business located at 1510 Cotner Ave., Los Angeles, California 90025. It is the legal successor to the contractual obligations of Radiologix, Inc.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over this matter pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-102(a) and § 6-103(b), as the causes of action arose in Prince George's County, Maryland, and Defendants conduct substantial business in Maryland.  Additionally, this Court has jurisdiction under Md. Code Ann., Cts. & Jud. Proc. § 6-104(a) because the Agreement between Plaintiff and Defendant RadNet's predecessor-in-interest contains a forum selection

6

clause designating the courts of Prince George's County, Maryland, as the exclusive forum for any disputes arising out of or related to the Agreement.

23.     Venue is proper in this Court pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6201(a) and § 6-202(3), as a substantial part of the events giving rise to the claims occurred in Prince George's County, Maryland, and under Md. Code Ann., Cts. & Jud. Proc. § 6-104(b), and as the Agreement between Plaintiff and Defendant RadNet contains a forum selection clause designating Prince George's County, Maryland, as the venue for any disputes arising out of or related to the Agreement.

## FACTUAL BACKGROUND

**A. Capital Radiology Is a Small, Woman and Minority-Owned Business at the Mercy of a National, Monopolizing Billion Dollar Radiology Company and a Corrupt, Off-the-Books Government Entity.**

**1. Capitol Radiology Is a Black and Women-Owned Radiology Facility That Has Served as a Backbone to the Larger Prince George's Community.**

24.     Capitol Radiology is the only black- and woman-owned Radiology Facility in the Mid-Atlantic region.  Headquartered in Laurel, Maryland, it has served over 700,000 patients from Prince George's, Montgomery, Howard, and Anne Arundel Counties during its 17 years of existence.  It has performed more than 170,000 Medicare and Medicaid procedures, and sees more than  3,000 uninsured patients annually.  It is the only non-hospital imaging facility that is open seven days a week, which it does to better serve its patients.

25.     Capitol Radiology has been an indispensable asset to Prince George's County and the community of Laurel for more than 19 years.   For example, Capitol Radiology played a leading role in providing community healthcare during the COVID emergency when the hospital

systems were overwhelmed and treating only COVID patients.  While some nationally run radiology centers suspended or sharply curtailed operations, Capitol Radiology's 50-plus employees, drawn from the community, went into the facility every day, risking their lives to make sure community members had access to radiology services during this difficult time.

26.      Capitol Radiology also provides jobs and workplace development services to students at UMBC, Prince George's Community College, Howard Community College, and Montgomery Community College.  Capitol Radiology trains the students and provides entry level job opportunities for the students to begin their careers in the healthcare industry.  Capitol Radiology's programs have encouraged minority members and women to enter medical school and health-related fields, with the effect of partially mitigating the harmful effects that racial disparities have imposed on community health.

**2. Capitol Radiology Purchased Its Assets Including Condominium Rights at the Laurel Campus through an Asset Purchase Agreement with RadNet that Included Exclusive Rights in the Laurel Campus.**

26.      Capitol Radiology began its life with the purchase of an existing radiology facility from *inter alia* RadNet's predecessor entity Radiologix, Inc.  A copy of the Asset Purchase Agreement is attached hereto as Exhibit A.

27.      Dr. Thomas, an African American woman, is a board-certified radiologist.  Dr. Thomas had been a party to a Service Agreement with the facility.  Through the Asset Purchase Agreement, she realized a lifelong dream and became a part owner.

28.      An important feature of the purchase was that it enabled Capital Radiology and Dr. Thomas to provide exclusive outpatient imaging services at the Laurel campus.  The campus

is small, and in a neighborhood lacking sufficient access to healthcare, there was no reason for a second radiology center at that location.

29.     At the time of the agreement, there was an MRI machine on the Laurel campus for which Dr. Thomas was providing services.  Accordingly, consistent with the general intent and other provisions of the contract, the parties agreed that if RadNet were to engage physicians to provide MRI supervision and interpretation services at the Laurel MRI facility located at 7400 Van Dusen Road, then Capitol Radiology would have a right of first refusal to provide such services at that location under commercially reasonable terms.  Exhibit A, ¶ 6.11 at p. 15.

30.     The right of first refusal reflected the parties' intention that Radiologix would not compete with Capitol Radiology by situating a competing outpatient imaging center on the small, Laurel campus.

> **3.     Provision of Radiology Services by Capitol Radiology Helps Mitigate Healthcare Disparities.**

31.     Large and persistent racial differences in healthcare quality are well documented.  In 2005, for example, the Institute of Medicine—a not-for-profit, non-governmental organization that now calls itself the National Academy of Medicine (NAM)—released a report documenting that poverty cannot account for the fact that black people are sicker and have shorter life spans than their white complements.

32.     It found that "racial and ethnic minorities receive lower-quality health care than white people—even when insurance status, income, age, and severity of conditions are comparable."

33.     Researchers therefore have concluded that a "critical goal of medical education should be to increase the number of minority professionals.  Research clearly indicates that black and Hispanic physicians are much more likely than other physicians to care for the uninsured." Williams DR, Rucker TD. Understanding and addressing racial disparities in health care. Health Care Financ Rev. 2000 Summer;21(4):75-90. PMID: 11481746; PMCID: PMC4194634.  Exhibit B.

34.     In radiology, there are widespread racial health disparities related to access to screening, which ultimately impact patient health outcomes. Goldberg, et al, *How We Got Here: The Legacy of Anti-Black Discrimination in Radiology*, Radiology Society of North America, Vol. 43, No. 2.  *See* Exhibit C.  *See also* M. Stempniak*, RSNA Apologizes for Organization's Contributions to Structural Racism in Radiology*, Radiology Business, March 3, 2023 (Exhibit J); J. Kenen and E Batchlor, *Racist Doctors and Organ Thieves: Why So Many Black People Distrust the Health Care System*, Politico Magazine, December 18, 2022 (Exhibit K); K.M. Bridges,  *Implicit Bias and Racial Disparities in Health Care*, Human Rights Magazine Vol. 43, No. 3: The State of Healthcare in the United States (Exhibit L).

26.     For breast, lung, and colorectal cancer, all of which have imaging-based screening guidelines, Black patients have up to a 42% higher mortality rate compared with that of White patients.  *See* Exhibit C.

27.     There is a 41% higher mortality rate from breast cancer among Black women compared with that among White women.  *Id.* There is a higher mortality rate from lung cancer for Black patients.  *Id.*  Black patients on average have a higher risk for lung cancer than do

10

White patients with a similar smoking history and demonstrate earlier disease onset and more advanced stage at lung cancer diagnosis. *Id.* Even so, Black patients are less likely to undergo screening for lung cancer. *Id.*

28.     Black physicians are significantly underrepresented in the radiology workforce relative to their representation in the general U.S. population. *Id.* In the United States, Black physicians make up 6.2% of medical school graduates, 3.1% of diagnostic radiology residents, 2.1% of diagnostic radiology practicing physicians, and 2.0% of diagnostic radiology faculty. For reference, 13.6% of the United States population is Black. *Id.*

29.     Health care interventions on the structural level are necessary to address the marked disparities in cancer mortality rates. *Id.* Within the professional environment, expanding diversity is crucial for both radiologists and patients alike. *Id.* Increased diversity in the professional workforce has been tied to performance improvement and innovative practices and has also been associated with professional efforts to expand access and challenge racial barriers to care. Improving diversity within the medical workforce has thus been associated with improved patient care. *Id.*

**B. RadNet Is a California Company in the Business of Monopolizing Radiology Services in Targeted Regions.**

31.     RadNet is a $2.6 billion publicly traded company operating out of its headquarters in Los Angeles. It derives nearly all of its income from operating radiology and imaging centers in concentrated regional networks.

32.     The Federal Trade Commission recently filed suit against a similar company, financed by a private equity company, for monopolizing the market for anesthesiology services.

11

The reasoning of the FTC complaint demonstrates the deleterious effects of RadNet's monopolization of the outpatient radiology market in Maryland as well.

33.     As the FTC complaint explained, "anesthesia services are critical to modern surgery; hospitals need to offer anesthesia services, and patients, their employers, and insurers must pay for them, even if choices dwindle and prices go up.  [The defendants] saw that eliminating competitors—by acquiring or conspiring with them, instead of competing on the merits—would give them the power to raise prices, raking in tens of millions of extra dollars." *FTC v. U.S. Anesthesia Partners*, Southern District of Texas, at ¶ 3.  Exhibit D.

34.     The result of these monopolistic practices, as alleged by the FTC, was higher prices for insurers (and therefore local businesses and citizens) and monopoly profits for the company.

35.     In its complaint, the FTC noted that the same business model was being employed in the market for radiology services.  *Id.*, at ¶ 339.  As the FTC alleged, "when preparing to enter the radiology market, the defendant explained that 'given our success to date with anesthesia and in emergency medicine we would like to deploy a similar strategy to consolidate the radiology market . . . .' By all appearances, the defendant did just that." (*Id.*, cleaned up).

36.     RadNet has adopted the same model of "rolling up" small radiology centers with the goal of monopolizing the market that the FTC has challenged in its case against U.S. Anesthesia Partners.  According to RadNet's Annual Report, "Our diagnostic imaging centers are strategically organized into regional networks concentrated in major population centers in

seven states, providing a density that offers unique benefits to . . . us."  RadNet 2023 Annual

Report, at p. 4.

37.     Those unique benefits include the opportunity to monopolize local markets and

increase prices, with the effect of improperly or unreasonably increasing the cost of healthcare

for employers and ordinary citizens.

**3. UMMS Is an Off-the-Books Government Entity Whose Board of Directors Was Forced to Resign for Self-Dealing Based on Emergency State Remedial Legislation.**

38.     Prior to 1984, the entity that became UMMS was part of the University of

Maryland. UMMS was created in 1984 when the State privatized its founding hospital.

39.     As part of the privatization process, the Maryland General Assembly passed

legislation transferring the major health care delivery components from the University System to

UMMS. The legislation provides for certain level of oversight by the State of Maryland to ensure

UMMS' functions and operating practices were consistent with its founding purposes.

40.     Members of the UMMS Board of Directors are appointed by the Governor, and its

mission is for the benefit of the public.  It also maintains a continuing partnership with the

University of Maryland School of Medicine.

41.     UMMS is a multi-billion-dollar corporation with annual revenues of nearly $5

billion.  Its president receives a salary in excess of $3.5 million annually, and it has more than 15

executives with salaries in excess of $500,000 annually.

42.     UMMS is structured so that its multi-billion-dollar operations would be governed

by political appointees who operate independently of State government, and were not accountable

to anyone for their actions.  This structure resulted in a shocking scandal involving self-dealing

that resulted in the Mayor of Baltimore going to jail, and the Board's members forced to resign for corruption.  The UMMS joint venture with RadNet was approved at the very time that the Board's self-dealing was coming to light, but before the corrupt board members were forced to resign.

43.    More specifically, in March 2019, the Baltimore Sun reported that a third of the Board's 30 members had entered into more than $115 million worth of for-profit deals with UMMS, many of which were not competitively bid.  Exhibit E.

44.    Under one of the deals, UMMS paid Mayor Catherine Pugh of Baltimore, a Board Member, $500,000 to produce her "Healthy Holly" children's books. Those deals, federal prosecutors said, allowed Pugh to begin a "seven-year scheme to defraud, multiple years of tax evasion, election fraud and attempted cover-ups, including brazen lies to the public." *Id.*

45.    After The Sun's revelations, Pugh resigned from the board and as mayor.  The FBI raided her houses and City Hall in late April 2019, and she later pleaded guilty to conspiracy and tax evasion. She was sentenced to three years in prison. *Id.*

46.    In response to the scandal, state lawmakers passed sweeping reform legislation, which included requiring an audit of UMMS.  A copy of the audit is attached as Exhibit F.

47.    The audit described a pervasive system of self-dealing.  The auditors wrote "there was a lack of transparency, policies and procedures, and documentation to support the source, nature, and the overall propriety of many of these payments" made to board members.

48.    The auditors also described the UMMS board and executive as obstructing their audit. The review was due in December 2019, but auditors requested an extension until March 2020, based on what they said was interference from UMMS.  Legislative Auditor Gregory Hook

14

told lawmakers in November 2019 that UMMS "delayed and hindered" his office's work.  That concern was reflected in the final report, in which auditors said UMMS officials refused to make certain documents or employees readily available - so much so that they did not even consider their review an "audit" under the generally accepted standards of their office. They called their product a "Special Review."

49.      The UMMS-RadNet joint venture was the product of this very Board of Directors.

## C.  UMMS Violated Its Governing Statute by Failing to Offer Capitol Radiology the Opportunity to Bid on the Radiology Joint Ventures.

### 1.  UMMS Assumed the Operations of Dimensions Health.

50.      Prior to 2010, Dimensions Healthcare System was a not-for-profit entity closely linked with Prince George's County.  Prince George's County played a significant role in its financial and operational oversight, including through board membership and funding.

51.      Dimensions was said to be struggling with outdated facilities, financial deficits, and an inability to meet the growing healthcare needs of the community.  In response, Prince George's County, the State of Maryland, the University System of Maryland, and UMMS began discussions about the future of healthcare in the county, culminating in a Memorandum of Understanding signed in 2011 to develop a comprehensive plan to strengthen healthcare services in the area.

52.      By 2018, UMMS officially took over the operations of Dimensions Healthcare System, renaming it the University of Maryland Capital Region Health.

15

53.     A centerpiece of the transition was the construction of the University of Maryland Capital Region Medical Center in Largo.  The takeover also included the Dimensions facility in Laurel, when UMMS closed the hospital at the site and converted it into ambulatory care site.

**2.  UMMS Was Aware that Capitol Radiology Was a Black-Owned Facility on the Laurel Campus and Concluded there was No Need to Build a Competing Radiology Facility there.**

54.     Dr. Stephen Bartlett served at the University of Maryland Medical System (UMMS) for nearly three decades.  He began his tenure there in the early 1990s and held several key positions, including executive vice president and chief medical officer.  Dr. Bartlett resigned from his leadership roles in December 2018 after just six months service as CMO, marking the end of his long-standing association with UMMS.

55.     In seeking to implement the MOU for healthcare services in Prince George's County, Dr. Bartlett met with Capitol Radiology several times in his office in Baltimore and also performed his own site visits to the Laurel office as well.

56.     Dr. Bartlett expressed during his first site visit that he was pleased to see the amount of diagnostic equipment and the depth of program management available at Capitol Radiology.  Dr. Bartlett thought a collaboration between UMMS and Capital Radiology was a natural fit since Capitol Radiology already was on the campus supporting the community.

57.     Dr. Bartlett also expressed his conviction that it would be value added for UMMS to have at least one black-owned radiology group in the University of Maryland family since it serves the largest majority minority community in the state.  He also said that it would make no

16

sense to waste resources on the Laurel site that already was adequately covered for radiology services.

58.     Dr. Bartlett assured Capitol Radiology that there would not be any negative impact of what Capitol was doing on the campus.  He said he wanted to incorporate Capitol Radiology into other projects of UMMS, since UMMS had only limited minority physician participation and no minority radiology group participation.

59.     Dr. Bartlett acknowledged that there was no clinical, or medical reason for UMMS to duplicate the radiology services that Capitol was already providing on the campus.

**3.  Under Its Governing Statute, UMM Was Required to Provide the Minority- and Woman- Owned Capitol Radiology the Opportunity to Bid on the Radiology Joint Ventures.**

60.     At the time the Joint Venture was awarded, Maryland law required that the UMMS Board of Directors "conduct procurement activities consistent with minority purchasing standards applicable to State government agencies." Md Code Ann, Educ § 13-303.

61.     The Maryland Procurement Code explained the purpose of the minority purchasing standards included therein.  As the statute explained:

(3)  the General Assembly has received and carefully reviewed the disparity study entitled "Business Disparities in the Maryland Market Area" commissioned by the General Assembly and published on February 8, 2017 (the Study), and finds that the Study provides a strong basis in evidence demonstrating persistent discrimination against minority- and women-owned businesses;

(4)  based on its review of the Study, the General Assembly finds that:

(i)     there are substantial and statistically significant adverse disparities that are consistent with discrimination against minorities and nonminority women in wages, firm formation, entrepreneurial earnings, and access to capital in the

17

private sector in the same geographic markets and industry categories in which the State does business;

(ii)     the State would become a passive participant in private sector racial and gender discrimination if it ceased or curtailed its remedial efforts, including the operation of the Minority Business Enterprise Program;

(iii)    there are substantial and statistically significant adverse disparities that are consistent with discrimination against minorities and nonminority women in State procurement;

(iv)    there are substantial and statistically significant adverse disparities that are consistent with discrimination against all individual minority groups and for nonminority women in most major industry categories in State procurement;

(v)     there is ample evidence that discrimination in the private sector has depressed firm formation and firm growth among minority and nonminority women entrepreneurs; and

(vi)    there is powerful and persuasive qualitative evidence, both statistical and anecdotal, of discrimination against minority and nonminority women business owners in both the public and private sectors;

(5)     as a result of ongoing discrimination and the present day effects of past discrimination, minority- and women-owned businesses combined continue to be very significantly underutilized relative to their availability to perform work in the overwhelming majority of the procurement categories in which the State does business;

(6)     minority prime contractors also are subject to discrimination and confront especially daunting barriers in attempting to compete with very large and long-established nonminority companies;

(7)     despite the fact that the State has employed, and continues to employ, numerous and robust race-neutral remedies, including aggressive outreach and advertising, training and education, small business programs, efforts to improve access to capital, and other efforts, there is a strong basis in evidence that discrimination persists even in public sector procurement where these efforts have been employed;

MD State Fin & Proc § 14-301.1.

61.     The statute concluded that "State efforts to support the development of competitively viable minority- and women-owned business enterprises will assist in reducing discrimination and creating jobs for all citizens of Maryland." *Id.*

62.     UMMS itself purports to comply with its statutory bidding requirements by making its projects available for public bidding and applying statutory standards to those bids.

63.     UMMS maintains a website devoted to making Requests for Proposals available to woman- and minority-owned businesses.

64.     The website includes a drop-down menu listing open RFPs and an adjacent menu for minority and woman-owned businesses to become certified for bidding.



**4. Through a Process Unknown to Capitol Radiology, UMMS Entered a Joint Venture Agreement with RadNet for Multiple Radiology Sites, Including One on the Laurel Campus.**

65.     The Laurel campus is essentially a medical campus with a small number of buildings, separated by parking lots and some green spaces.  The new joint-venture outpatient radiology facility is visible from Capitol Radiology's building and noise from patient arrivals at that facility can be heard in Capitol Radiology's building.

66.     As alleged above, the UMMS Chief Medical Officer determined in conjunction with the MOU for providing UMMS services in Prince George's County that no additional outpatient radiology services were necessary, and that Capitol Radiology was adequately providing services at that location.

67.     How it came about that UMMS and RadNet entered a joint venture agreement to develop and open a competing outpatient radiology facility on the Laurel campus is not publicly known, and is not known to Capitol Radiology.

68.     When Capitol Radiology learned of the joint venture, it wrote to UMMS and elected government officials to learn how the result had come about.  UMMS completely ignored its communications.

69.     Eventually, Congressman Ivey wrote to UMMS on behalf of Capitol Radiology. UMMS wrote back to the Congressman in response.

**D.  UM Capital Region Ignored the Mayor of Laurel's Communications in Support of Capitol Radiology.**

70.     On April 4, 2023, Laurel Mayor Craig Moe wrote to Nathaniel Richardson, Jr., President and CEO of UM Capital Region.  A copy of the letter is attached hereto as Exhibit G.

20

71.     In his letter, Mayor Moe expressed his displeasure with UM Capital for breaking its promise that local businesses would not be adversely impacted by its takeover of Dominion Health.  As the letter expressed:

> Capital Radiology was formed in 2005 and has long been a pillar in this community, meeting the needs of many. This business, Capital Radiology, continued to operate even as "Dimensions Leadership" tore the Laurel Regional Hospital apart and failed the community. Capital Radiology is a small business, a local business, and the only black and women-owned radiology business in the Mid-Atlantic. The University of Maryland Capital Region Health System has failed to protect and support this local minority-owned business, in fact, with no support from Capital Region Health, they may even begin to fail due to Capital Region Health taking business from them.

> It concerns me that even Dr. Stephen Bartlett, whose name is no longer mentioned as part of the University of Maryland Healthcare System, saw that a small Laurel business such as Capital Radiology had to be protected. What has changed? Dr. Bartlett many times said to me that "Laurel Businesses would not be impacted" and that the University of Maryland Capital Region Health was committed to further diversity; what has changed?

**E.  In an Exchange of Letters with Congressman Ivey, UMMS Revealed that It Had Engaged in an Illegal, Exclusionary Process to Enter the Joint Venture Agreement with RadNet.**

72.     According to UMMS' own letter to Congressman Ivey, UM Capital made plans to undertake a joint venture for the development of two outpatient Imaging Centers to be located in Laurel, Maryland and Largo, Maryland.

73.     The outpatient center was not the subject of public bidding.  Instead, acting through UM Capital, UMMS issued what it termed a "Request for Information" only to particular imaging services companies that met its criteria. Exhibit H.  ("UM Capital decided to issue the RFI to imaging services companies that met several key criteria.")

21

74.     Among the criteria that UMMS used to pre-screen potential partners was that it have a pre-existing relationship with UMMS.  This form of cronyism is anathema to the public bidding process because it results in the selection of companies based on pre-existing relationships rather than merit.  It also serves to perpetuate discrimination by freezing out previously excluded groups.

75.     Capitol Radiology was fully qualified to meet the criteria identified by UMMS in its letter.   It had a pre-existing relationship with UMMS through the UMMS health plan, with which it had a provider agreement.  It had experience and wherewithal to develop, outfit and staff new imaging centers, and it previously had done so successfully.  Capitol has already outfitted and staffed two imaging centers with more equipment than that on offer at UMMS Laurel facility.

76.     In any event, UMMS was not permitted to use backroom apparatchiks to determine which potential bidders were qualified and which were not, and to exclude qualified, minority- and female-owned businesses from the bidding process.  Under State law, the question of whether or not Capitol Radiology or other potential bidders were qualified was a decision for a neutral bid-review committee, not back-room operatives.

77.     UMMS letter confirms that UMMS did not offer Capital Radiology an opportunity to bid on a contract for the provision of outpatient radiology services on the Laurel campus, even though it had been exclusively providing such services at that exact location for nearly twenty years.

78.     Capitol Radiology also was a qualified subcontractor for any joint venture at the facility.  UMMS also did not structure the contract in a manner that would have allowed Capitol

Radiology to participate in the Joint Venture as a qualified subcontractor, as required under state bidding rules.

**F. UMMS and RadNet Conspired to Enable RadNet to Monopolize Outpatient Radiology Services in Prince George's County for their Mutual Benefit.**

**1. RadNet Entered into the Unlawful Joint Venture with UMMS to Advance Its Monopolization of the Prince George's County and Maryland State Outpatient Radiology Market.**

78.     RadNet's Maryland activities match and exceed the FTC's description of the monopolization of the anesthesia markets.  For this complaint, the relevant marketplaces are the markets for outpatient radiology services in Prince George's county, and in the State of Maryland.

79.     First, RadNet purchased the company that was the administrator of the United Health Care Network.  That company determined who could participate in insurance networks. RadNet cancelled Capitol Radiology's participation agreement, and locked Capitol Radiology out of the network.

80.     RadNet also consolidated ownership of the small, physician-owned and operated radiology facilities in the State of Maryland and Prince George's County.  It opened radiology centers near its rival in Maryland, American Radiology, and siphoned off enough patient volume to make the centers agree to sell to them.  RadNet has now cornered the market in Prince George's County and the State of Maryland with ownership of more than 55 imaging centers.

81.     There are only two independent radiology facilities in Prince George's County and Capitol Radiology is one of the two left.

23

82.    Large out of state business now controls ninety-seven percent of the radiology

centers in the State of Maryland.

**2. UMMS Entered the Unlawful JV Arrangement with RadNet to Advance Its Unlawful Interest in Obtaining Fees for Medical Referrals.**

83.    According to the UMMS letter, UMMS limited its search to a partner that would

provide imaging services only. As the letter explained:

> UM Capital would need a partner to contribute capital, personnel, and
> technology and provide imaging services only. UMSOM radiologists
> would provide the professional radiologist services to read and interpret
> images.

84.    This type of self-referral has negative health effects because it leads to overuse

and higher costs.  Exhibit I.

85.    The UMMS-RadNet joint venture thus has the intent and effect of eliminating

competition for the professional services of reading and interpreting images, to the detriment of

patients, consumers and employers.

**G.  The UMMS-RadNet Joint Venture Violates the Asset Purchase Agreement, a Violation that Should have been known to UMMS.**

84.    Under Capital Radiology's Asset Purchase Agreement, RadNet is required to offer

Capitol Radiology the exclusive rights to services on commercially reasonable terms if it decides

to provide such services on the Laurel campus.

85.    Despite this obligation, RadNet has not offered Capitol Radiology the right of first

refusal required under the Agreement.

86.    UMMS has entered into a joint venture with RadNet to provide outpatient

radiology services on the Laurel campus without following the proper public bidding procedures.

Had UMMS conducted a proper public bidding process, RadNet's contractual obligations would have been known to it.  Had UMMS conducted appropriate due diligence, RadNet's contractual obligations would have been known to it.

**CAUSES OF ACTION**
**Count I:**
**Violation of UMMS Bidding Requirement**
**(Md Code Ann, Educ § 13-303(e))**
**(against UMMS, UM Capital and RadNet )**

87.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.  Plaintiff alleges violations UMMS bidding requirements under UMMS Education Law § 13-303(e) directly, as a property owner, and as and on behalf of taxpayers.

88.     Plaintiff holds an ownership right in the condominium building that is in close proximity to the UMMS-RadNet joint venture outpatient radiology facility in the Laurel campus. Plaintiff's ownership interest is adjoining, confronting and nearby the property on which the joint venture is built and to be operated, and within view and sound distance of the facility.

89.     Plaintiff is a limited liability company registered and operated in Maryland that pays taxes to the State of Maryland.

90.     UMMS violated Maryland's public bidding laws by entering into agreements with RadNet in violation of the laws governing the bidding of contracts by UMMS, including but not limited to the requirement that the UMMS Board of Directors "conduct procurement activities consistent with minority purchasing standards applicable to State government agencies." Md Code Ann, Educ § 13-303(e).

25

91.     RadNet knew or should have known that the contract was offered to it in violation of the State bidding rules.

92.     As a result of UMMS's actions, Plaintiff has suffered and continues to suffer harm and damages, in its business capacity, as a property owner, and as a taxpayer, including but not limited to lost business opportunities and revenues. UMMS actions especially aggravate Plaintiff in a manner different from that of other property owners and taxpayers.  Taxpayers will generally suffer from the loss of tax revenue resulting from, among other things, increased health care costs to businesses, and Capitol Radiology being driven out of business.

**Count II:**
**Violation of Md Code, Educ § 13-303(d)**
**(Race and Sex Discrimination)**
**(against UMMS and UM Capital)**

93.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

94.     Md Code, Educ § 13-303(d) is titled "Violation of Discrimination based upon race, creed, sex, or national origin prohibited."  It provides that "The Board of Directors shall operate the medical system without discrimination based upon race, creed, sex, or national origin."

95.     UMMS' actions as described herein were in violation of Md Code, Educ § 13-303(d).

96.     As a result of UMMS's discriminatory actions, Plaintiff has suffered and continues to suffer damages, including but not limited to lost business opportunities and revenues.

26

### Count III: Violation of Maryland Equal Protection Law
### (against UMMS, UM Capital and RadNet)

97.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

98.     UMMS's actions alleged herein, including its siting, building and entering into a secret joint-venture agreement for outpatient radiology services with RadNet within 50 yards of RadNet's front door, and its excluding Capitol Radiology, a black- and female-owned business, from the bidding process, violate Maryland's equal protection laws.

99.     RadNet operated under color of State law when siting, building and entering a secret joint venture agreement with UMMS as described herein.

100.    As a result of UMMS's actions, Plaintiff has suffered and continues to suffer damages, including but not limited to lost business opportunities and revenues.

### Count IV:
### Violation of Maryland Antitrust Law
### (against UMMS, UM Capital and RadNet)

101.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

102.    Defendants' actions in entering into a joint venture and excluding Capitol Radiology from the market for radiology services on the Laurel campus and in Prince George's County  constitute an unlawful restraint of trade in violation of Maryland antitrust law.

103.    The unlawful restraint of trade will have an adverse effect on consumers in Prince George's County because it will provide RadNet with the power to set rates for radiology and

27

imaging services that reflect its monopoly power.  The increased rates will be passed through in the form of higher insurance rates for employers and individuals.

104.    As a result of Defendants' antitrust violations, Plaintiff has suffered and continues to suffer damages, including but not limited to lost business opportunities and revenues.

**Count V:**
**Breach of Contract (against RadNet)**

105.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

106.    RadNet breached the Agreement by failing to offer Capitol Radiology the right of-first refusal for providing services on the Laurel campus.

107.    Capitol Radiology has complied with the necessary pre-conditions of assuming its rights under the Asset Purchase Agreement.

108.    As a result of RadNet's breach, Plaintiff has suffered and continues to suffer damages, including but not limited to lost business opportunities and revenues.

**Count VI: Tortious Interference with Contract**
**(against UMMS and UM Capital)**

109.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

110.    RadNet breached the Agreement by failing to offer Capitol Radiology the right of-first refusal for providing radiology services on the Laurel campus.

111.    As a result of RadNet's breach, Plaintiff has suffered and continues to suffer damages, including but not limited to lost business opportunities and revenues.

**PRAYER FOR RELIEF**

28

WHEREFORE, Plaintiff Capitol Radiology LLC prays for judgment against Defendants

as follows:

A.      For compensatory damages in an amount to be determined at trial;

B.      For punitive damages in an amount to be determined at trial;

C.      For injunctive relief enjoining Defendants from commencing outpatient radiology

services on the Laurel campus until such time as Plaintiff's rights are restored;

D.      For attorneys' fees and costs of this action;

E.      For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Martin Bienstock Esq.
BIENSTOCK PLLC
BAR No. 1702170002
10770 Columbia Pike
Silver Spring, MD 20901
(202) 908-6600
MBienstock@BienstockPLLC.com

Clayborne E. Chavers, Sr. Esq.
THE CHAVERS FIRM, LLC
5335 Wisconsin Ave. NW.,
Suite 440
Washington DC 20015
(202) 467-8324
Chavlawfirm@gmail.com

Attorneys for Plaintiff Capitol Radiology LLC

===============================================================

# ASSET PURCHASE AGREEMENT

by and among

CAPITOL RADIOLOGY, LLC
as Purchaser

and

WB&A IMAGING PARTNERS, INC.
as Seller

and

RADIOLOGIX, INC.

pertaining to
7350 Van Dusen Road, Suite B-10
Laurel, Maryland

===============================================================

Closing Effective as of
the Close of Business on March 2, 2005

Laurel Pavilion APA v9

# TABLE OF CONTENTS

ARTICLE I-SALE AND PURCHASE OF ASSETS ................................................................................1
    Section 1.01  Assets to be Acquired ...........................................................................................1
        (a)  Equipment ...................................................................................................1
        (b)  Supplies .......................................................................................................1
        (c)  Leases, Real Property Lease and Contracts .............................................2
        (d)  Other Promotional Rights ........................................................................2
        (e)  Other Intangible Assets ............................................................................2
        (f)  Seller's Prepayments ................................................................................2
        (g)  Telephone and Fax Numbers ....................................................................2
        (h)  Computer Products ....................................................................................2
        (i)  Permits........................................................................................................2
        (j)  Books and Records ....................................................................................2
        (k)  Claims Relating to Purchased Assets ......................................................2
        (l)  Patient Records..........................................................................................3
        (m)  Name; Goodwill ........................................................................................3
    Section 1.02  Assumed Obligations.............................................................................................3
        (a)  Equipment Leases.....................................................................................3
        (b)  Real Property Lease ..................................................................................3
        (c)  Contracts.....................................................................................................3
    Section 1.03  Excluded Assets.....................................................................................................4
        (a)  Books and Records ....................................................................................4
        (b)  Cash, etc. ....................................................................................................4
        (c)  Claims Against Third Parties....................................................................4
        (d)  Prepaid Insurance Premiums ...................................................................4
        (e)  Rights Hereunder.......................................................................................4
        (f)  Prepaid Expenses.......................................................................................4
        (g)  Records Required to be Retained by Seller .............................................4
        (h)  Contracts not Assigned .............................................................................4
        (i)  Intellectual Property .................................................................................5
        (j)  Accounts Receivable .................................................................................5
        (k)  Credit Card Machine and Patient Satisfaction Equipment ....................5
        (l)  Server-Based Software .............................................................................5

ARTICLE II- PURCHASE PRICE ....................................................................................................5
    Section 2.01  Purchase Price.........................................................................................................5
    Section 2.02  Allocation of Purchase Price..................................................................................5

ARTICLE III - CLOSING; DOCUMENTS OF CONVEYANCE.................................................................5
    Section 3.01  Closing.....................................................................................................................5
    Section 3.02  Bill of Sale; Assumption Agreements....................................................................6
    Section 3.03  Allocation of Closing Costs ...................................................................................6
    Section 3.04  Prorations at Closing ..............................................................................................6
    Section 3.05  Transfer of Possession ...........................................................................................6
    Section 3.06  Termination and Related Employee Matters.........................................................6
    Section 3.07  Other Actions and Instruments ..............................................................................6
    Section 3.08  Medical Records .....................................................................................................7
    Section 3.09  Prompt Handling of Payments Received in Error.................................................7
    Section 3.10  Release ....................................................................................................................7

ARTICLE IV- REPRESENTATIONS AND WARRANTIES OF PURCHASER...........................................8
    Section 4.01  Due Organization; Power and Authority................................................................8
    Section 4.02  Enforceability...........................................................................................................8

Section 4.03    Validity of Contemplated Transactions ..................................................................8
Section 4.04    Regulatory Approvals ...........................................................................................8
Section 4.05    Litigation; Compliance with Laws .........................................................................8
Section 4.06    Purchaser's Obligations .......................................................................................9
Section 4.07    Brokers' or Finders' Fees .....................................................................................9

ARTICLE V-REPRESENTATIONS AND WARRANTIES OF SELLER AND RADIOLOGIX...........................9
Section 5.01    Organization, Good Standing and Qualification ....................................................9
Section 5.02    Power and Authority .............................................................................................9
Section 5.03    Validity of Contemplated Transactions ...............................................................10
Section 5.04    Regulatory Approvals .........................................................................................10
Section 5.05    Legal Compliance ...............................................................................................10
Section 5.06    Title and Condition of the Purchased Assets .......................................................10
Section 5.07    Employees ...........................................................................................................10
Section 5.08    Assumed Leases, Real Property Lease, and Assumed Contracts.........................11
Section 5.09    Certain Tax Matters ............................................................................................11
Section 5.10    Ad Valorem Tax Matters .....................................................................................12
Section 5.11    Records ...............................................................................................................12
Section 5.12    Environmental Matters........................................................................................12
Section 5.13    Brokers' or Finders' Fees....................................................................................12
Section 5.14    Disclosure ...........................................................................................................12

ARTICLE VI- COVENANTS .............................................................................................................13
Section 6.01    Confidentiality ....................................................................................................13
Section 6.02    Cooperation .........................................................................................................13
Section 6.03    Regulatory and Other Approvals .........................................................................14
Section 6.04    Reasonable Efforts .............................................................................................14
Section 6.05    Actions After the Closing ...................................................................................14
Section 6.06    Bulk Transfer Provisions ....................................................................................14
Section 6.07    Seller's Consent ..................................................................................................14
Section 6.08    Liability for Transfer Taxes ................................................................................15
Section 6.09    Hiring of Seller's Employees ..............................................................................15
Section 6.10    Non-Solicitation .................................................................................................15
Section 6.11    Future MRI Reading Agreement..........................................................................15

ARTICLE VII- INDEMNIFICATION....................................................................................................16
Section 7.01    Indemnification by Seller and Radiologix ...........................................................16
Section 7.02    Indemnification by Purchaser ..............................................................................16
Section 7.03    Survival of Obligation to Indemnify ...................................................................17
Section 7.04    Notice and Procedure ..........................................................................................17

ARTICLE VIII - MISCELLANEOUS ...................................................................................................18
Section 8.01    Parties in Interest ................................................................................................18
Section 8.02    Notices ................................................................................................................18
Section 8.03    Non-Assignability; Binding Effect .....................................................................19
Section 8.04    Exhibits and Schedules .......................................................................................20
Section 8.05    Waiver.................................................................................................................20
Section 8.06    Independent Covenants.......................................................................................20
Section 8.07    Severability .........................................................................................................20
Section 8.08    Entire Agreement................................................................................................20
Section 8.09    Modifications and Amendments ..........................................................................21
Section 8.10    Time of Essence..................................................................................................21
Section 8.11    Governing Law ...................................................................................................21
Section 8.12    Exclusive Jurisdiction; Venue.............................................................................21
Section 8.13    Waiver of Jury Trial............................................................................................21
Section 8.14    Construction........................................................................................................21

Section 8.15    Section Headings ............................................................................................21
Section 8.16    Counterparts ...................................................................................................22
Section 8.17    Expenses .........................................................................................................22
Section 8.18    Further Assurances .........................................................................................22
Section 8.19    Attorneys' Fees ..............................................................................................22
Section 8.20    Arm's Length Negotiations ............................................................................22
Section 8.21    Rules of Interpretation ...................................................................................23
Section 8.22    Certain Defined Terms ...................................................................................23
Section 8.23    Recitals ...........................................................................................................24

## LIST OF SCHEDULES

Schedule 1.01(a) – Equipment

Schedule 1.01(g) – Telephone and Fax Numbers

Schedule 1.01(h) – Computer Products

Schedule 1.02(a) – Assumed Leases

Schedule 1.02(b) – Real Property Lease

Schedule 1.02(c) – Assumed Contracts

Schedule 3.10 – Form of Release

Schedule 5.05 – Litigation

Schedule 5.06 – Permitted Encumbrances

Schedule 5.07 – Center Employees

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into as of March 2, 2005, by and among **CAPITOL RADIOLOGY, LLC,** a Maryland limited liability company ("Purchaser"); **WB&A IMAGING PARTNERS, INC.,** a Delaware corporation ("Seller"); and **RADIOLOGIX, INC.,** a Delaware corporation ("Radiologix").

## R E C I T A L S:

**WHEREAS,** Seller is a wholly owned subsidiary of Radiologix (Seller, Radiologix and their Affiliates are hereafter referred to collectively as "Seller Affiliates"); and

**WHEREAS,** Seller is the owner and operator of a diagnostic imaging center located at 7350 Van Dusen Road, Suite B-10 in Laurel, Maryland (the "Center"); and

**WHEREAS,** Seller desires to sell or cause to be sold to Purchaser, and Purchaser desires to purchase from Seller, all of the assets, properties and business of Seller relating to the Center as described herein, upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** for the reasons set forth hereinabove, and in consideration of the foregoing premises and of the mutual promises, covenants, representations, warranties, and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement do hereby agree as follows:

## ARTICLE I

## SALE AND PURCHASE OF ASSETS

Section 1.01    Assets to be Acquired.    Subject to the terms and conditions set forth herein, at the Closing (but effective as of the Closing Date) (as set forth in Section 3.01), Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, all of the right, title and interest in and to the following assets of Seller and/or Seller Affiliates which are utilized in the Center, whether real, personal or mixed, and whether tangible or intangible (hereafter collectively referred to as the "Purchased Assets"); provided, however, that the definition of Purchased Assets shall not include any items defined as Excluded Assets in Section 1.03:

(a)    Equipment.    All equipment, machinery, fixtures and leasehold improvements, instruments, furniture, furnishings and other similar assets, owned by Seller as of the Closing Date and utilized in the Center, all of which are set forth in **Schedule 1.01 (a)** attached hereto (the foregoing items to be purchased by Purchaser are hereafter collectively referred to as the "Equipment");

(b)    Supplies.    All usable supplies including, without limitation, all chemicals, sacks, bags, containers, office supplies, cleaning supplies and medical related supplies owned by

Seller as of the Closing Date and utilized in the Center (the foregoing items to be purchased by Purchaser are hereafter collectively referred to as the "Supplies");

(c)     Leases, Real Property Lease and Contracts. All of Seller's rights arising under the personal property leases, the real property lease and the contracts set forth on **Schedules 1.02(a), 1.02 (b) and 1.02(c)**, respectively;

(d)     Other Promotional Rights.  All marketing or promotional designs, brochures, advertisements, concepts, literature, books, signs, displays, media rights and all other promotional properties, in each case exclusively used or useful or developed or acquired by Seller for use in connection with the ownership and operation of the Purchased Assets;

(e)     Other Intangible Assets. All vendor lists; and, to the extent assignable, all supplier and manufacturers' warranties (including, without limitation, pending warranty claims) and manuals in Seller's possession relating to the Purchased Assets in each case owned by Seller as of the Closing Date;

(f)     Seller's Prepayments. All of Seller's credits and prepayments connected in any fashion to the operation of the Center existing as of the Closing Date (including, without limitation, any "yellow page" or other advertisement, but excluding prepaid and rebatable insurance premiums, credits to any accounts receivable, and utility deposits);

(g)     Telephone and Fax Numbers. The telephone and fax numbers assigned to Seller and/or its employees (other than telephone numbers assigned to employees for personal use) which are set forth in **Schedule 1.01(g)**;

(h)     Computer Products.  The licensed computer program materials and software, including, without limitation, all enhancements and all manuals and documentation relating thereto that is not proprietary to Radiologix or Seller, relating to the operation of the Center which are set forth in **Schedule 1.01(h)** hereto;

(i)     Permits. Subject to applicable laws and regulations, all permits, licenses, approvals or other authorizations required for the operation of the Center as presently operated ("Permits"), to the extent such Permits are transferable and whether or not all action necessary to effect such transfer has been taken prior to the Closing (as defined in Section 3.01);

(j)     Books and Records. Copies of all papers, documents, computerized databases and Records of Seller relating to the Purchased Assets and the operation of the Center, subject to applicable laws and regulations, including, without limitation, all personnel, labor relations and workers' compensation records relating to employees hired by Purchaser, environmental control records, sales records, marketing records, physician referral list, accounting and financial records and maintenance records;

(k)     Claims Relating to Purchased Assets. All claims, causes of action, rights of recovery and rights of set-off of every type and kind relating to the Purchased Assets and any supplier and manufacturer warranties issued with respect to the Purchased Assets, and all claims, causes of action, rights of recovery and rights of set-off of every type and kind relating to the

2

Assumed Obligations (as defined in Section 1.02 below), in each case whether accruing before or after the Closing;

        (l)     <u>Patient Records</u>.  Patient records of patients serviced by Seller at the Center; and

        (m)     <u>Name; Goodwill</u>.  The right to use the name "Laurel Radiology" and all goodwill associated therewith and with the Center.

Section 1.02   <u>Assumed Obligations</u>.  Subject to the terms and conditions set forth herein, at the Closing (but effective as of the Closing Date), Seller shall assign to Purchaser, and Purchaser shall assume, pay and discharge in full when due all of the liabilities and obligations under, the following leases and contracts of Seller (hereafter collectively referred to as the "<u>Assumed Obligations</u>"):

        (a)     <u>Equipment Leases</u>.  The operating leases and capital leases for machinery and equipment located in the Center which are set forth in **Schedule 1.02(a)** (hereafter collectively referred to as the "<u>Assumed Leases</u>");

        (b)     <u>Real Property Lease</u>.  The real property lease for the Center which is set forth in **Schedule 1.02(b)** (hereinafter referred to as the "<u>Real Property Lease</u>"); and

        (c)     <u>Contracts</u>.  The contracts and agreements which are set forth in **Schedule 1.02(c)** (hereafter collectively referred to as the "<u>Assumed Contracts</u>").

Except as expressly set forth in this Section 1.02, Purchaser shall have no responsibility for any of Seller's obligations and Liabilities and all such obligations and Liabilities shall remain with Seller and are herein referred to as the "<u>Excluded Obligations</u>."  Without limiting the generality of the foregoing, it is hereby agreed that the Excluded Obligations include Liabilities and obligations of Seller Affiliates in respect of:  (i) any current and deferred federal and state income tax and franchise Liabilities, including any interest or penalties related thereto, any inter-company accounts or notes payable by or to any Seller Affiliate; (ii) income, franchise, personal property, employment or sales, use or any other taxes, Liabilities or similar imposts, including any interest or penalties related thereto (other than any of the foregoing attributable to the Center to the extent that the same are accrued after the Closing Date); (iii) employees of Seller Affiliates, whether or not subsequently hired by Purchaser, to the extent such Liabilities and obligations pertain to periods of employment by Seller Affiliates; (iv) any obligation or Liability of Seller Affiliates to pay any amounts arising out of any legal action, suit or proceeding based upon an event occurring or a claim arising (a) prior to the Closing Date or (b) after the Closing Date in the case of claims relating or attributable to acts that occurred prior to the Closing Date; (v) the obligations or Liabilities of Seller Affiliates to purchase or pay for materials or Supplies incurred prior to the Closing Date; (vi) billing and claims submitted by Seller Affiliates to any federal or state healthcare payment program; (vii) all bank debt, senior debt or other debt obligations of Seller Affiliates; (viii) Liabilities which are secured by Encumbrances to which the Purchased Assets are subject; (ix) any Liability or obligation of Seller Affiliates or any other Person, absolute or contingent, known or unknown, not expressly agreed to be assumed pursuant to the provisions of Section 1.02; (x) any Liability or obligation that is inconsistent with Seller's

or Radiologix's representations and warranties in this Agreement, including, without limitation, the schedules and exhibits hereto; (xi) any Liability or obligation relating to any breach or nonperformance under any of the Assumed Obligations to the extent such breach or nonperformance existed on or prior to the Closing Date; (xii) any legal, accounting, brokerage, finder's fee or other expenses incurred by Seller or Radiologix in connection with this Agreement or the consummation of the transactions contemplated hereunder; (xiii) any obligation relating to overpayments, billing errors or similar adjustments with respect to payments received by Seller or Radiologix prior to the Closing Date; (xiv) any warranty or performance Liability, whether based upon the performance of Seller or Radiologix or any subcontractor or agent of either Seller or Radiologix, under any performance or contract deliverable that has or will be performed or delivered prior to the Closing Date; and (xv) any Liability payable to an Affiliate of either Seller or Radiologix.

Section 1.03    Excluded Assets. The Purchased Assets shall not include any of Seller's rights, privileges, title or interest in or to any of the following assets (hereafter referred to as the "Excluded Assets"):

(a)    Books and Records. (i) The originals of Seller's books and Records referred to in Section 1.01(j) hereof; (ii) all of Seller's minute books, stock books, tax returns and books and Records directly relating to the Excluded Assets and the Excluded Obligations; and (iii) all personnel, labor relations and workers' compensation Records relating to employees not hired by Purchaser;

(b)    Cash, etc. Cash, currency, coins or balances in checking or other demand deposits, securities or money market accounts or other liquid investments or cash equivalents, and utility deposits, in each case owned by Seller as of the Closing Date;

(c)    Claims Against Third Parties. Any claim of Seller against any Person unless such claim is a Purchased Asset under Section 1.01 hereof;

(d)    Prepaid Insurance Premiums. Any claim for refund of prepaid and rebatable insurance premiums, it being understood and agreed that Seller may cancel all policies insuring the Purchased Assets as of the Closing Date;

(e)    Rights Hereunder. All rights and claims of Seller under this Agreement;

(f)    Prepaid Expenses. Prepaid expenses not assignable to Purchaser under Section 1.01(f), including, without limitation, prepaid insurance premiums, whether or not they are assignable;

(g)    Records Required to be Retained by Seller. Notwithstanding anything to the contrary set forth in this Agreement, all records that Seller is required by law to retain, including, without limitation, Medicare and Medicaid billing records;

(h)    Contracts not Assigned. All rights of Seller in, to and under those leases, purchase orders, contracts and other agreements not being assigned to Purchaser pursuant to Section 1.02 hereof;

(i)     <u>Intellectual Property</u>.  Except as provided in Section 1.01(m), all of Seller's and Radiologix's trademarks, trade secrets and proprietary information, patents, service marks, copyrights and trade names (including the name of Seller identified in the preamble hereto or any variation thereof) and all goodwill associated therewith, applications therefor or registrations thereof and rights against any other Person in respect thereof;

(j)     <u>Accounts Receivable</u>.  All of Seller's accounts receivable, including any credits thereto, as of the Closing Date and the proceeds thereof after the Closing Date resulting from the operations of Seller as of the Closing Date;

(k)     <u>Credit Card Machine and Patient Satisfaction Equipment</u>.  Seller's credit card machine and Seller's electronic, touch-screen system designed to measure or survey patient satisfaction; and

(l)     <u>Server-Based Software</u>.  All server-based software, such as the radiology information system (RIS) and dictation system, and all computer program materials and software that are not set forth in **Schedule 1.01(h)**.

## ARTICLE II

## PURCHASE PRICE

Section 2.01   <u>Purchase Price</u>.  In consideration of the sale and purchase of the Purchased Assets, Purchaser shall:  (a) assume or pay the Assumed Obligations as herein provided; and (b) pay to Seller at the Closing the amount of One Hundred Twenty-Five Thousand Dollars ($125,000.00) in immediately available funds.

Section 2.02   <u>Allocation of Purchase Price</u>.  Purchaser and Seller each shall, if required by Internal Revenue Service rules or regulations, with respect to the transactions provided for in this Agreement, prepare and file Internal Revenue Service Form 8594 and any required exhibits thereto.   Purchaser and Seller each shall allocate any purchase price with respect to the transactions contemplated hereby to the tangible personal property transferred, and Purchaser, Seller and Radiologix will refrain from filing any return or report or otherwise taking any position inconsistent with such allocation with any taxing authority.

## ARTICLE III

## CLOSING; DOCUMENTS OF CONVEYANCE

Section 3.01   <u>Closing</u>.   The purchase and sale contemplated hereby shall be consummated at a closing (referred to herein as the "<u>Closing</u>") to be held at the offices of Samek, McMillan & Metro, P.C., a professional corporation, at 1901 Research Boulevard, Suite 500, Rockville, Maryland  20850 or in such other manner as the parties mutually agree and on such date as the parties mutually agree (but no later than March 2, 2005); <u>provided</u> that for purposes of this Agreement and terms and conditions set forth herein, the close of business on March 2, 2005, shall be deemed to be the effective time and date of the Closing and is referred to herein as the "<u>Closing Date</u>."

5

Section 3.02    Bill of Sale; Assumption Agreements.    The parties hereby confirm that this Agreement shall be sufficient as a bill of sale in respect of the Purchased Assets and as an assignment and assumption agreement in respect of the Assumed Obligations; provided, however, that if, as and when required, or reasonably requested by any party, the parties shall execute and deliver such supplemental agreements, instruments, and other documents as may be necessary or appropriate in order to give effect to the transfer of the Purchased Assets to Purchaser and the assignment to and assumption by Purchaser of the Assumed Obligations.

Section 3.03    Allocation of Closing Costs.    At or promptly after the Closing, Purchaser shall pay all sales and transfer taxes, if any, arising out of the transaction contemplated by this Agreement.  Except as otherwise provided in this Agreement, each party shall be responsible for and bear all of its own transactional costs and charges relating to the purchase and sale contemplated herein.  Purchaser shall be responsible for all fees and costs associated with obtaining any financing for the transactions contemplated by this Agreement.  Purchaser and Seller shall each pay one-half of the landlord's attorneys' fees in connection with the assignment of the Real Property Lease.

Section 3.04    Prorations at Closing.    All rent, additional rent, utilities, personal property taxes, general and special real property taxes, and special district levies and assessments, if any, relating to the Purchased Assets for the 2005 calendar year shall be allocated as of the Closing Date (and, with respect to tax items, shall be based upon the most recent tax bills received by Seller as of the Closing).  All other operating expenses and liabilities relating to the ownership and operation of the Purchased Assets attributable to the period ending at the Closing Date (other than expenses included in the Assumed Obligations) shall be paid by Seller as they fall due.  All operating and other expenses relating to the ownership and operation of the Purchased Assets attributable to periods commencing after the Closing Date and all of the Assumed Obligations shall be the sole responsibility of Purchaser.

Section 3.05    Transfer of Possession.    As of the Closing Date, but subject to and only upon the fulfillment of all obligations of Purchaser hereunder, Seller shall give Purchaser full possession and enjoyment of the Purchased Assets.

Section 3.06    Termination and Related Employee Matters.    Simultaneously with the Closing, Seller shall terminate all of its employees engaged in the operation of the Center and pay all wages, accrued paid time off, severance in Seller's sole discretion, benefits, tax withholdings and tax payments and any other sums attributable to all such employees in the time and manner prescribed by Maryland law.  Notwithstanding anything to the contrary set forth in this Agreement, nothing herein constitutes a promise or agreement by Purchaser to provide employment for any of Seller's employees, specifically administrative personnel, for any period of time after the Closing Date, and Purchaser shall have no obligation under this Agreement to employ any Person other than on an "at will" basis and shall have no obligation with respect to any salary or benefits, including, without limitation, any severance or termination benefits, payable by Seller or Radiologix to Seller's employees except as set forth herein.

Section 3.07    Other Actions and Instruments.    Purchaser and Seller, at no cost to Purchaser, shall take such other actions and shall execute and deliver such other instruments, documents and certificates at the Closing as are required to effectuate the transfer of the

6

Purchased Assets to Purchaser, to remove all Encumbrances and/or otherwise required by the terms of this Agreement or as may be reasonably requested by Purchaser or Seller in connection with the Closing of the transactions contemplated by this Agreement. Purchaser and Seller further agree to execute and deliver such other instruments, documents and certificates which arise post-Closing for any of the foregoing reasons in order to effectuate the intent of this Agreement. At Closing, Purchaser and Seller shall jointly develop a list of items which need to be completed post-Closing in order to effectuate the intent of this Agreement.

Section 3.08   <u>Medical Records</u>. Purchaser agrees to preserve medical records relating to the patients treated at the Center prior to the Closing Date, at its own expense, for Seller's benefit for as long as such medical records are required to be maintained by applicable law, but in no event less than seven years. Purchaser agrees to, during normal business hours, afford Seller, its counsel, its accountants, or agents who have reasonable need for such access, full access to such medical records as Seller may reasonably request at Seller's sole expense (including without limitation charges for the copying of medical records in accordance with Section 4-304(c)(3) of the Health-General Article of the Annotated Code of Maryland). Purchaser and Seller shall each, with respect to those medical records that are then under their dominion and control, maintain the security and confidentiality of any individually identifiable health information and the security and confidentiality of the records relating to the patients treated at the Center prior to the Closing Date as required by applicable state and federal laws. The parties agree that notwithstanding anything to the contrary set forth in this Agreement, the obligations of Purchaser (and Seller, to the extent Seller accesses such medical records) to retain medical records pursuant to the terms of this Section 3.08 shall survive the Closing for as long as such medical records are required to be maintained by applicable law, but in no event less than seven years.

Section 3.09   <u>Prompt Handling of Payments Received in Error</u>. In the event Seller or Radiologix receives payment for services performed at the Center after the Closing Date, or Purchaser receives payment for services performed at the Center on or prior to the Closing Date (in either case, such party referred to as the "<u>Party in Receipt</u>" for purposes of this Section), the Party in Receipt shall within fifteen (15) business days forward the payment received in error to the other party. In the event a party determines through retrospective review or audit that the other is believed to be a Party in Receipt of certain payments, such party shall notify the other party of the details of such payment with sufficient specificity to permit the other party to determine whether such payment was, in fact, received in error, and if so, the Party in Receipt shall pay over undisputed amounts within fifteen (15) business days after such determination. If a party receives payment and cannot determine whether it applies to the period before or after the Closing Date, such party shall make good faith efforts to determine the proper service dates, notify the other party of the issue and remit any payments received in error to the other party in accordance with this Section.

Section 3.10   <u>Release</u>. Prior to or at the Closing, Seller shall deliver to Purchaser a release in the form attached hereto as **Schedule 3.10**, executed by Seller and Radiologix, jointly and severally, releasing Purchaser and Purchaser's owner, Dr. Doriann Thomas ("<u>Dr. Thomas</u>"), from the terms and conditions of that certain Service Agreement, dated on or about September 1, 1998, entered into by and between Seller, Radiologix and WB&A Imaging, P.C.

7

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser makes the following representations and warranties to Seller and Radiologix, each of which is true and correct in all material respects on the date hereof, and at the Closing, as though made at and as of the Closing:

Section 4.01    Due Organization; Power and Authority. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Maryland. Purchaser has all requisite limited liability company power and authority to own, lease and operate its respective properties and to conduct its respective business as it is presently being conducted and as it has been conducted in the past.

Section 4.02    Enforceability.    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been authorized by all requisite limited liability company action on the part of Purchaser. Purchaser has full limited liability company power, authority and legal right to enter into this Agreement and to consummate the transactions contemplated hereby. This Agreement and all documents required under the terms of this Agreement to be executed and delivered by Purchaser in connection herewith will be duly executed and, assuming the due authorization, execution and delivery of this Agreement by Seller and Radiologix of this Agreement, upon Purchaser's execution and delivery thereof will be the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles.

Section 4.03    Validity of Contemplated Transactions.    The execution, delivery and performance of this Agreement and all documents executed and delivered in connection herewith, and the consummation of the transactions contemplated hereby do not and will not: (a) violate any material provision of any law, rule, regulation, order, license of any governmental authority, administrative body or agency applicable to Purchaser; or (b) violate any judgment, order, writ, prohibition, injunction or decree of any court, governmental body or arbitrator specifically applicable to Purchaser.

Section 4.04    Regulatory Approvals. All consents, waivers, approvals, authorization or exemptions from governmental entities and other third parties and other material requirements prescribed by any law, rule or regulation which must be obtained or satisfied by Purchaser in order to permit the consummation of the transactions contemplated by this Agreement have been obtained and satisfied.

Section 4.05    Litigation; Compliance with Laws.    (a) There is no suit, action, claim, investigation, arbitration, administrative or legal or other proceeding or governmental investigation pending or, to Purchaser's knowledge, threatened against Purchaser which would prevent or delay the consummation of the transaction contemplated hereby; (b) Purchaser has complied with all laws, including, without limitation all ordinances, requirements, regulations, or orders applicable to Purchaser, which noncompliance might have a material adverse effect on the

8

ability of Purchaser to consummate the transaction contemplated hereby; and (c) Purchaser has not violated any order, writ, injunction, judgment, or decree of any court or federal, state or local department, official, commission, authority, board, bureau, agency, or other instrumentality which was issued against or is pending against Purchaser, which violation might have a material adverse effect on the financial condition, business or results of operations of Purchaser.

Section 4.06   Purchaser's Obligations.   Purchaser has not contracted or incurred any liability in connection with this transaction for which Seller may or could become liable, including but not limited to obligations related to: Supplies, Equipment or other personal property orders not done in the ordinary course of Seller's business or specifically approved and agreed to be purchased by Seller, new personnel, inspections, appraisals, tests, real estate or business broker fees, mortgagee or lending fees, or repairs and/or improvements to the Center.

Section 4.07   Brokers' or Finders' Fees.   No broker, person or firm acting on behalf of Purchaser or under its authority is or will be entitled to any commission, broker's or finder's fee or financial advisory fee from Seller or Radiologix in connection with any of the transactions contemplated herein.  Purchaser agrees to indemnify Seller and Radiologix against, and to hold each of them harmless from, any claim for brokerage or similar commission or other compensation which may be made against Seller or Radiologix by a third party in connection with the transactions contemplated herein, which claim is based upon any action by Purchaser.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLER AND RADIOLOGIX

Seller and Radiologix, jointly and severally, make the following representations and warranties to Purchaser, each of which is true and correct in all material respects on the date hereof, and at the Closing, as though made at and as of the Closing:

Section 5.01   Organization, Good Standing and Qualification.   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and properly qualified to do business in the State of Maryland.  Radiologix is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Seller and Radiologix each has all necessary power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

Section 5.02   Power and Authority.   Seller and Radiologix each has the requisite power and authority to execute, deliver and perform its respective obligations under and pursuant to this Agreement, and all documents executed and delivered by Seller and Radiologix in connection herewith, including without limitation, the requisite corporate power and authority to sell the Purchased Assets and transfer the Assumed Obligations upon the terms and conditions set forth herein.  The execution and delivery of this Agreement and all documents executed and delivered by Seller and Radiologix in connection herewith and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Seller, Radiologix and Seller Affiliates.  This Agreement and all documents required under the terms of this Agreement to be executed and delivered by Seller and Radiologix in connection herewith will be duly executed and upon the execution and delivery thereof will be

9

legal, valid and binding obligations of Seller and Radiologix enforceable against Seller and Radiologix in accordance with their respective terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other laws affecting the enforcement of creditors' rights generally and by general equitable principles.

Section 5.03   Validity of Contemplated Transactions.   The execution, delivery and performance of this Agreement and all documents executed and delivered in connection herewith, and the consummation of the transactions contemplated hereby do not and will not:  (a) contravene any provision of the organizational documents of Radiologix and Seller; (b) violate, be in conflict with, constitute a default under, result in the termination of, cause the acceleration of any payments pursuant to, or otherwise impair the good standing, validity and effectiveness of any agreement, contract, commitment, indenture, lease or mortgage applicable to Radiologix, Seller and Seller Affiliates; (c) violate any material provision of any law, rule, regulation, order, license of any governmental authority, administrative body or agency applicable to Radiologix, Seller or Seller Affiliates; (d) violate any judgment, order, writ, prohibition, injunction or decree of any court, governmental body or arbitrator specifically applicable to Radiologix, Seller or Seller Affiliates or the Purchased Assets; or (e) constitute a preference in the event of a bankruptcy filing by any person or entity.

Section 5.04   Regulatory Approvals.   All consents, waivers, approvals, authorizations or exemptions from governmental entities and other material requirements prescribed by any law, rule or regulation which must be obtained or satisfied by Radiologix or Seller in order to permit the consummation of the transactions contemplated by this Agreement have been obtained or satisfied.

Section 5.05   Legal Compliance.   Except as set forth in **Schedule 5.05**, (a) there is no suit, action, claim, investigation, arbitration, administrative or legal or other proceeding or governmental investigation pending or, to Radiologix or Seller's knowledge, threatened against Seller or involving the Purchased Assets; (b) Seller has complied with all laws including, without limitation, all ordinances, requirements, regulations, or orders applicable to such Seller, which noncompliance might have a material adverse effect on the financial condition, business or results of operations of Seller or the Center; and (c) Seller has not violated any order, writ, injunction, judgment, or decree of any court or federal, state or local department, official, commission, authority, board, bureau, agency, or other instrumentality which was issued against or is pending against Seller, which violation might have a material adverse effect on the financial condition, business or results of operations of Seller or the Center.

Section 5.06   Title and Condition of the Purchased Assets.   Seller has and owns good and marketable title to the Purchased Assets, in each case free and clear of all Encumbrances other than as set forth in **Schedule 5.06**.  The Purchased Assets are in good operating condition and repair (reasonable wear and tear excepted), and are adequate for their use in the operation of the Center as presently operated.   The Purchased Assets listed in Sections 1.01(d)-(e) and 1.01(g)-(h) do not infringe upon the intellectual property rights of any Person or entity.

Section 5.07   Employees.   Seller is not a party to or bound by any collective bargaining agreement, employment agreement, consulting agreement or other commitment for the employment or retention of any person, and no union is now certified or has claimed the right to

be certified as a collective bargaining agent to represent any employees of Seller. Seller has not received notice of any unfair labor practice charges against Seller or any actual or alleged violation by Seller of any law, regulation, or order affecting the collective bargaining rights of employees, equal opportunity in employment, or employee health, safety, welfare, or wages and hours. **Schedule 5.07** contains a complete and correct list of all employees of Seller whose work time is, as of the date of this Agreement, devoted primarily to the operation of the Center (the "Center Employees") and not any other facility owned or operated by any Seller Affiliate, and also lists the current compensation rate of each of the Center Employees. Except as set forth in **Schedule 5.07**, (i) the terms of employment or engagement of all of the Center Employees are such that their employment or engagement may be terminated at will, (ii) there are no severance payments which are or could become payable by Seller to any of the Center Employees under the terms of any oral or written agreement or commitment or any law, custom, trade or practice, except for severance payments to be made in Seller's sole discretion as contemplated by Section 3.04, and (iii) there are no agreements, contracts or commitments, oral or written, between Seller and any employee, consultant or independent contractor pertaining specifically to the Center.

Section 5.08   Assumed Leases, Real Property Lease, and Assumed Contracts. Subject to receipt of all necessary third party and/or lessor consents and except as set forth in **Schedules 1.02(a), (b), and (c)**, at the Closing (but effective as of the Closing Date), Purchaser will receive Seller's entire right, title and interest in the Assumed Leases, the Real Property Lease, and the Assumed Contracts, free and clear of all Encumbrances other than as set forth in **Schedule 5.06**. Each of the Assumed Leases, the Real Property Lease, and the Assumed Contracts is valid, binding, in full force and effect, and enforceable by or against Seller in accordance with its respective terms and conditions, and upon assignment and assumption by Purchaser, will be enforceable by Purchaser in accordance with its respective terms, subject to bankruptcy, insolvency and laws affecting the rights of creditors generally. There is no existing material default by Seller thereunder, material breach by Seller thereof or condition which, with the passage of time or notice or both, might constitute a material default by Seller thereunder. There has been no termination or, to either Seller's or Radiologix's knowledge, threatened termination or notice of default (not heretofore cured) relating to any such lease. Prior to the Closing, Seller will:  (a) obtain all necessary consents to the assignment and assumption of the Real Property Lease; (b) obtain all necessary consents to the assignment and assumption of the Assumed Leases and the Assumed Contracts which have a material effect on the financial condition, business or results of operations of Seller or the Center; and (c) use its best efforts to obtain the necessary consents to the assignment and assumption of all other Assumed Leases and all other Assumed Contracts.

Section 5.09   Certain Tax Matters. Seller has duly filed all federal, state, and local tax returns and reports required to be filed by it and all taxes for which Seller is or could be liable have either been paid, withheld or reserved. Seller's income tax returns have not been audited within the past three years and all such returns have been properly completed and filed on a timely basis and such returns are true and correct in all material respects. As of the time of filing, all such returns correctly reflected in all material respects the facts regarding the income, business, assets, operations, activities, status or other matters of Seller or any information required to be shown thereon. Seller has not:  (a) entered into any agreements for the extension of time or for the assessment of any tax or tax delinquency which would adversely affect Purchaser or the Purchased Assets; or (b) received any outstanding or unresolved notices from

11

the Internal Revenue Service or any taxing body of any proposed deficiency or assessment. Seller has properly paid all sales and use taxes due with respect to its business operations and withheld all amounts, if any, required by law to be withheld for income taxes and unemployment taxes, including without limitation, social security and unemployment compensation, relating to its employees, and remitted such withheld amounts to the appropriate taxing authority.

Section 5.10    Ad Valorem Tax Matters.    There are no taxes, fees, or assessments of any kind or nature whatsoever which are presently due or, to Seller's knowledge, which will or may become due pertaining to the Purchased Assets in respect of any period prior to the Closing Date, except for ad valorem personal property taxes and special district levies and assessments, if any, for the current calendar year, which have been prorated and accrued for in accordance with Section 3.04. Any taxes, fees or assessments of any kind or nature arising out of Seller's business activities prior to the Closing Date shall be the responsibility of Seller, except to the extent assumed by Purchaser in the Assumed Obligations.

Section 5.11    Records.    All Records are accurate and complete in all material respects, and have been maintained in the ordinary course of Seller's business at the Center, and all material transactions of Seller at the Center are properly reflected therein in all material respects.

Section 5.12    Environmental Matters.    To Seller's or Radiologix's knowledge, there have been no Releases of any Hazardous Materials at, on or under any facility or property currently leased pursuant to a Real Property Lease. Seller is not the subject of any pending or, to Seller's or Radiologix's knowledge, threatened investigation or proceeding under any Environmental Law relating in any manner to the treatment, storage or disposal of any Hazardous Materials generated at any facility or property currently leased pursuant to a Real Property Lease. Neither Seller nor Radiologix has received any written communication from a governmental authority, citizens group or otherwise that alleges that Seller is not or were not in compliance with any Environmental Law. The term "Environmental Law" means any and all applicable laws or regulations or other requirements of any governmental authority concerning the protection of human health or the environment. The term "Hazardous Materials" means all explosive or radioactive materials, hazardous or toxic substances, wastes or chemicals, petroleum or petroleum distillates, asbestos or asbestos containing materials, biohazardous and medical waste, and all other materials or chemicals in each case regulated under any Environmental Law. The term "Release" means any spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching, emanation or migration in, into, onto, or through the environment.

Section 5.13    Brokers' or Finders' Fees.    No broker, Person or firm acting on behalf of Seller or Radiologix or under their authority is or will be entitled to any commission, broker's or finder's fee or financial advisory fee from Purchaser in connection with any of the transactions contemplated herein. Seller and Radiologix agree to indemnify Purchaser against, and to hold it harmless from, any claim for brokerage or similar commission or other compensation which may be made against Purchaser by any third party in connection with the transactions contemplated hereby, which claim is based upon any action by Seller or Radiologix.

Section 5.14    Disclosure.    No representation or warranty by Seller or Radiologix contained in this Agreement, and no representation, warranty or statement by Seller or Radiologix contained in any list, certificate or schedule or other instrument, document,

12

agreement or writing furnished or to be furnished to, or made with, Purchaser pursuant hereto or in connection with the negotiation, execution or performance hereof, contains or will contain any untrue statement by Seller or Radiologix of a material fact or omits or will omit to state any material fact necessary to make any statement herein or therein not misleading.

## ARTICLE VI

## COVENANTS

Section 6.01    Confidentiality.

(a)     Seller and Radiologix recognize and acknowledge that they have in the past, currently have, and in the future may possibly have, access to certain confidential information of Purchaser, such as lists of customers, operational policies, and pricing and cost policies, that are valuable, special and unique assets of Purchaser's business.  Seller and Radiologix agree that they will not disclose confidential information with respect to Purchaser to any Person for any purpose or reason whatsoever (except to counsel and other advisors, provided that such advisors (other than counsel) agree to the confidentiality provisions of this Section 6.01), unless (i) such information becomes known to the public generally through no fault of Seller or Radiologix, (ii) disclosure is required by law or the order of any governmental or regulatory authority under color of law, or (iii) the disclosing party reasonably believes that such disclosure is required in connection with the defense of a lawsuit against the disclosing party or for certification or state licensure purposes; provided that, prior to disclosing any information pursuant to clauses (ii) or (iii) above, Seller or Radiologix, shall, if possible, give prior written notice thereof to Purchaser and provide Purchaser with the opportunity to contest such disclosure.

(b)     Purchaser recognizes and acknowledges that it has in the past, currently has, and in the future may possibly have, access to certain confidential information of Seller and/or Radiologix, such as lists of customers, operational policies, and pricing and cost policies, that are valuable, special and unique assets of Seller's or Radiologix's businesses. Purchaser agrees that it will not disclose confidential information with respect to Seller and/or Radiologix to any Person, for any purpose or reason whatsoever (except to counsel and other advisors, provided that such advisors (other than counsel) agree to the confidentiality provisions of this Section 6.01), unless (i) such information becomes known to the public generally through no fault of Purchaser, (ii) disclosure is required by law or the order of any governmental or regulatory authority under color of law, or (iii) Purchaser reasonably believes that such disclosure is required in connection with the defense of a lawsuit against Purchaser or for certification or state licensure purposes; provided that, prior to disclosing any information pursuant to clauses (ii) or (iii) above, Purchaser, shall, if possible, give prior written notice thereof to Seller and/or Radiologix and provide Seller and/or Radiologix with the opportunity to contest such disclosure.

Section 6.02    Cooperation.  Purchaser, Seller and Radiologix shall cooperate fully, as and to the extent reasonably requested by the other party (but at the requesting party's expense), in connection with the filing of tax returns and any audit, litigation or other proceeding with respect to taxes. Such cooperation shall include the retention and (upon reasonable request) the

13

provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding.

Section 6.03    Regulatory and Other Approvals. Subject to the terms and conditions of this Agreement, each of Seller and Purchaser will proceed diligently and in good faith to, as promptly as practicable, (a) obtain all consents, approvals or actions of, make all filings with and give all notices to governmental or regulatory authorities or any other public or private third parties required of Purchaser, Seller or Radiologix to consummate this Agreement and the other matters contemplated hereby, and (b) provide such other information and communications to such governmental or regulatory authorities or other public or private third parties as the other party or such governmental or regulatory authorities or other public or private third parties may reasonably request in connection therewith. Without limiting the generality of the foregoing, each of Purchaser, Seller, and Radiologix shall promptly take such actions as are reasonably requested by any other party to this Agreement in order to effectuate the timely transfer to Purchaser of the Radioactive Material License pertaining to the Center (License No. MD-33-172-01 issued by the Department of the Environment of the State of Maryland).

Section 6.04    Reasonable Efforts. Subject to the terms and conditions of this Agreement, each of the parties hereto agrees to use all reasonable efforts promptly to take, or cause to be taken, all actions and do or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.

Section 6.05    Actions After the Closing. Following the Closing, Purchaser shall have the right to receive and open all mail addressed to Seller and deal with the contents thereof in its discretion to the extent that such mail and the contents thereof relate to the Purchased Assets and any of the Assumed Obligations. Purchaser shall promptly deliver to Seller any mail that does not relate to the Purchased Assets or the Assumed Obligations. Seller and Radiologix shall promptly transfer and deliver to Purchaser any cash or property which Seller or Radiologix may receive in respect of the Purchased Assets after the Closing. Purchaser shall promptly transfer and deliver to Seller any cash or property which Purchaser may receive not in respect of the Purchased Assets after the Closing.

Section 6.06    Bulk Transfer Provisions.    Seller and Purchaser hereby waive compliance with the provisions of any applicable bulk transfer law; provided, however, that Seller agrees (i) to pay and discharge when due or to contest or litigate all claims of creditors which are asserted against Purchaser or the Purchased Assets (other than the Assumed Obligations) by reason of such noncompliance, (ii) to indemnify, defend and hold harmless Purchaser from and against any and all such claims in the manner provided in Article VII and (iii) to take promptly all necessary action to remove any Encumbrance which is placed on the Purchased Assets by reason of such noncompliance.

Section 6.07    Seller's Consent. Seller covenants that it will forever waive any rights it has with respect to the Purchased Assets under any non-competition, non-disclosure, non-solicitation or similar provisions under any employment, non-compete or other arrangements with any of such Seller's former employees who are to be employed by Purchaser after the Closing.

14

Section 6.08    Liability for Transfer Taxes.  Purchaser shall be responsible for the timely payment of, and shall indemnify and hold harmless Seller and its Affiliates against, all sales (including, without limitation, bulk sales), use, value added, documentary, stamp, gross receipts, registration, transfer, conveyance, excise, recording, license and other similar taxes and fees ("Transfer Taxes"), arising out of. or in connection with or attributable to the transactions effected pursuant to this Agreement.  Purchaser shall prepare and timely file all tax returns required to be filed in respect of Transfer Taxes (other than any elective notices permitted to be given to creditors as provided in any applicable bulk transfer laws), provided that Seller shall be permitted to prepare any such tax returns that are the primary responsibility of. Seller under applicable law.

Section 6.09    Hiring of. Seller's Employees.  Each of Seller and Radiologix agrees that until one month after the Closing Date, it will allow Purchaser to take applications of any of. the Center Employees and to interview any of. the Center Employees for prospective employment with Purchaser after the Closing.  Purchaser shall be permitted to hire any of the Center Employees as determined in Purchaser's sole discretion.

Section 6.10    Non-Solicitation.  Each of. Seller and Radiologix agrees and represents that for a period of. twelve (12) months following the date of. this Agreement, it will not, directly or indirectly, on its own behalf, or in the service of. or on behalf. of any other individual or entity, solicit or attempt to solicit, to or for any individual or entity, any Center Employee, whether or not such Center Employee is employed by Purchaser, whether or not such Center Employee, if. employed, is employed pursuant to written agreement and whether or not such Center Employee, if employed, is employed for a determined period or at-will.

Section 6.11    Future MRI Reading Agreement.  The parties acknowledge the existence of that certain Laurel MRI Physician Services Agreement dated as of February 1, 2005, between Dr. Thomas and Korsower & Pion Radiology, P.C., pursuant to which Dr. Thomas has agreed to provide MRI supervision and interpretation services at the Laurel MRI facility located at 7400 Van Dusen Road in Laurel, Maryland ("Laurel MRI").  If, after the date of this Agreement, Seller and/or Radiologix desire to enter into an agreement to engage one or more physicians to provide MRI supervision and interpretation services at Laurel MRI (a "Future MRI Reading Agreement"), then (i) Seller and/or Radiologix (as applicable) shall inform Purchaser of such opportunity, and (ii) Purchaser shall have the exclusive right, for a period of thirty (30) days after being informed of. such opportunity, to negotiate with Seller and/or Radiologix (as applicable) a Future MRI Reading Agreement upon commercially reasonable terms and conditions (or such other terms and conditions as may be required by customers of. Seller and/or Radiologix to provide competitive outpatient imaging services, such as, by way of example and not limitation, terms and conditions concerning turn-around times and other service standards required by Laurel Regional Medical Center).  If the parties are unable to finalize a Future MRI Reading Agreement within the thirty (30) day period contemplated by the preceding sentence, then Seller and/or Radiologix (as applicable) may negotiate and enter into a Future MRI Reading Agreement with any other physician or physician group.  The exclusive negotiation right set forth in this Section 6.14 shall terminate at such time as either Dr. Thomas or Purchaser ceases to provide professional radiology services on the campus of. Laurel Regional Medical Center.

## ARTICLE VII

## INDEMNIFICATION

Section 7.01   <u>Indemnification by Seller and Radiologix</u>.  Seller and Radiologix, jointly and severally, hereby agree to indemnify and hold harmless Purchaser against and in respect of:

(a)   Any loss, claim, liability, obligation, or damage which Purchaser may suffer or incur during the twelve (12) month period after the Closing Date resulting from or arising in connection with any misrepresentation, breach of warranty or non-fulfillment of any covenant or agreement on the part of Seller or Radiologix contained in this Agreement;

(b)   Notwithstanding the terms of Subsection 8.01(a) hereinabove, any loss, claim, liability, obligation, or damage which Purchaser may suffer or incur at any time resulting from or arising in connection with: (i) any third party payer reimbursement claims, or (ii) state, local or federal tax claims alleging fraud or gross misrepresentation on the part of Seller or Radiologix, which claims relate to periods on or prior to the Closing Date (provided, however, that the indemnification contemplated by this Section 8.01 shall not encompass claims alleging malfeasance on the part of Purchaser or any physician affiliated with Purchaser);

(c)   Any loss, claim, liability, obligation, or damage which Purchaser may suffer or incur at any time resulting from or arising in connection with Seller's ownership of the Purchased Assets or operation of the Center on or prior to the Closing Date or termination of Seller's employees;

(d)   Any liability or claim asserted against Purchaser arising at any time in connection with Seller's or Radiologix's or its Affiliate's failure to perform its obligations with respect to the Excluded Obligations; and

(e)   All actions, suits, investigations, proceedings, demands, assessments, judgments, reasonable attorneys' fees, costs and expenses incident to the foregoing, including, but not limited to, any audit or investigation by any governmental entity.

Section 7.02   <u>Indemnification by Purchaser</u>.  Purchaser hereby agrees to indemnify and hold harmless Seller and Radiologix against and in respect of:

(a)   Any loss, claim, liability, obligation or damage which Seller or Radiologix may suffer or incur during the twelve (12) month period after the Closing Date resulting from or arising in connection with any misrepresentation, breach of warranty or non-fulfillment of any covenant or agreement on the part of Purchaser contained in this Agreement;

(b)   Notwithstanding the terms of Subsection 8.02(a) hereinabove, any loss, claim, liability, obligation, or damage which Seller or Radiologix may suffer or incur at any time alleging malfeasance on the part of Purchaser or any physician affiliated with Purchaser;

(c)   Any loss, claim, liability, obligation, or damage which Seller or Radiologix may suffer or incur at any time resulting from or arising in connection with

16

Purchaser's ownership of the Purchased Assets or operation of the Center subsequent to the Closing Date that does not arise from the Excluded Obligations;

(d)    Any liability or claim asserted against Seller or Radiologix arising at any time in connection with Purchaser's or its Affiliate's failure to perform its obligations with respect to: (i) the Assumed Obligations; or (ii) any medical records pursuant to the terms of Section 3.08; and

(e)    All actions, suits, investigations, proceedings, demands, assessments, judgments, reasonable attorneys' fees, costs and expenses incident to the foregoing, including, but not limited to, any audit or investigation by any governmental entity.

Section 7.03    Survival of Obligation to Indemnify.    The obligation of each party hereto to indemnify the other party hereto shall survive the Closing, the transfer of the Purchased Assets and the payment of the consideration therefor for such time period after the Closing Date as Seller and Purchaser have agreed to as set forth in Sections 7.01 and 7.02 above.

Section 7.04    Notice and Procedure.    Any party claiming indemnity hereunder (hereinafter referred to as the "Indemnified Party") shall give the party against whom indemnity is sought (hereinafter referred to as the "Indemnifying Party") prompt written notice after obtaining knowledge of any claim or the existence of facts as to which recovery may be sought against it in respect of which the Indemnifying Party may be liable because of the indemnity provisions set forth in this Article VII. If such claim for indemnity arises in connection with a legal action instituted by a third party (hereinafter a "Third Party Claim"), the Indemnified Party hereby agrees that, within five business days after it is served with notice of the assertion of any Third Party Claim for which it may seek indemnity hereunder, the Indemnified Party will notify the Indemnifying Party in writing of such Third Party Claim.

The Indemnifying Party shall, within ten business days after the date that the Indemnified Party gives notice of a claim (whether a Third Party Claim or otherwise) as provided above, notify the Indemnified Party in writing whether it accepts or contests its obligation of indemnity hereunder as claimed by the Indemnified Party.

If the claim for indemnity arises in connection with a Third Party Claim and the Indemnifying Party accepts its indemnity obligation hereunder, the Indemnifying Party shall conduct the defense of such action at its sole expense through counsel reasonably acceptable to the Indemnified Party. The Indemnified Party shall cooperate in such defense as reasonably necessary to enable the Indemnifying Party to conduct its defense, including, without limitation, providing the Indemnifying Party with reasonable access to such records as may be relevant to its defense. The Indemnifying Party shall be entitled to settle any such Third Party Claim without the prior written consent of the Indemnified Party provided that the Indemnifying Party provides the Indemnified Party with reasonable assurances that the Indemnified Party will be fully indemnified by the Indemnifying Party in connection with any such Third Party Claim and the Indemnifying Party secures as a part of such settlement a general release of the Indemnified Party. The Indemnified Party shall be entitled to retain its own counsel at its own expense in connection with any Third Party Claim that the Indemnifying Party has elected to defend.

If the claim for indemnity arises in connection with a Third Party Claim and the Indemnifying Party contests or does not accept its indemnity obligation hereunder, the Indemnified Party shall have the right to either (i) seek from a court of competent jurisdiction (A) a declaratory judgment that the Indemnifying Party is obligated to indemnify the Indemnified Party pursuant to this Article VII and (B) a decree of specific performance ordering the Indemnifying Party to fulfill its indemnity obligations under this Article VII, or (ii) defend and/or settle such Third Party Claim and thereafter seek indemnity from the other party pursuant to this Article VII; provided, however, that the Indemnified Party shall not settle any such claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld.

If the claim for indemnity arises other than in connection with a Third Party Claim and the Indemnifying Party accepts its indemnity obligation hereunder, the Indemnifying Party shall, upon the request of the Indemnified Party, pay the full amount of such claim to the Indemnified Party or to the third party asserting such claim as directed by the Indemnified Party. If the claim for indemnity arises other than in connection with a Third Party Claim and the Indemnifying Party contests its indemnity obligation hereunder, the Indemnified Party shall have the right to either (i) seek from a court of competent jurisdiction (A) a declaratory judgment that the Indemnifying Party is obligated to indemnify the Indemnified Party pursuant to this Article VII and (B) a decree of specific performance ordering the Indemnifying Party to fulfill its indemnity obligations under this Article VII, or (ii) defend, settle or take any other action with respect to such claim and thereafter seek indemnity pursuant to this Article VII; provided, however, that the Indemnified Party shall not settle any such claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   Parties in Interest.   Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligations or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over or against any party to this Agreement.

Section 8.02   Notices.   Any notice, demand, request, offer, consent, approval or communications (collectively, a "Notice") to be provided under this Agreement shall be in writing and sent by one of the following methods:  (a) postage prepaid, United States certified or registered mail with a return receipt requested, addressed to the appropriate party at the addresses set forth below; (b) overnight delivery with a nationally recognized and reputable air courier (with electronic tracking requested) addressed to the appropriate party at the addresses set forth below; (c) personal delivery to the appropriate party at the addresses set forth below; or (d) by confirmed facsimile or telecopier transmission to the appropriate party at the facsimile numbers set forth below and in such case of facsimile transmission, a copy must also be contemporaneously sent by one of the methods described in the preceding clause (a), (b) or (c) of

this Section (it being understood and agreed, however, that such Notice shall be deemed received upon receipt of electronic transmission). Any such Notice shall be deemed given upon receipt thereof, or, in case of any Notice sent pursuant to clause (a), (b) or (c) above, the refusal thereof by the intended receipt. Notwithstanding the foregoing, in the event any Notice is sent by overnight delivery or personal delivery and it is received (or delivery is attempted) during non-business hours (*i.e.*, other than during 8:30 a.m. to 5:30 p.m. local time at the place of delivery Monday through Friday, excluding holidays), then such Notice shall not be deemed to have been received until the next business day. Either party may designate a different address for receiving Notices hereunder by notice to the other party in accordance with the provisions of this Section 8.02. Further notwithstanding the foregoing, if any Notice is sent by either party hereto to the other and such Notice has not been sent in compliance with this Section but has in fact actually been received by the other party, then such Notice shall be deemed to have been duly given by the sending party and received by the recipient party effective as of such date of actual receipt.

        (a)     If to Purchaser:

              Doriann Thomas, M.D.
              1625 Colonial Hill Drive
              McLean, Virginia 22102

              With a copy to:

              Samek, McMillan & Metro, P.C.
              1901 Research Boulevard, Suite 500
              Rockville, Maryland  20850
              Attn: Roger C. Samek, Esquire

        (b)     If to Seller and Radiologix:

              Radiologix, Inc.
              3600 JPMorgan Chase Tower
              2200 Ross Avenue
              Dallas, Texas 75201
              Attention:  General Counsel

or to such other address as either party shall have specified by notice in writing given to the other party. Notwithstanding anything in this Section to the contrary, any Notice delivered in accordance herewith to the last designated address of any person or party to which a Notice may be or is required to be delivered pursuant to this Agreement shall not be deemed ineffective if actual delivery cannot be made due to a change of address of the person or party to which the Notice is directed or the failure or refusal of such person or party to accept delivery of the Notice.

      Section 8.03  <u>Non-Assignability; Binding Effect</u>.  Neither this Agreement, nor any of the rights or obligations of the parties hereunder, shall be assignable by any party hereto without the prior written consent of all other parties hereto, which such consent may be granted or withheld in such other party's sole and absolute discretion. The rights and obligations of this

Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns. Nothing expressed or implied herein shall be construed to give any other person any legal or equitable rights hereunder.

Section 8.04   Exhibits and Schedules. All exhibits and schedules attached hereto (the "Exhibits") shall be construed with and deemed an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein. Any matter disclosed pursuant to the Exhibits shall be deemed to be disclosed for all purposes under this Agreement, and all references to this Agreement herein or in any such Exhibits shall be deemed to refer to and include all such Exhibits.

Section 8.05   Waiver. No failure to exercise, and no delay in exercising, any right, power or privilege under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege hereunder preclude the exercise of any other right, power or privilege. No waiver of any breach of any provision shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision, nor shall any waiver be implied from any course of dealing between the parties. No extension of time for performance of any obligations or other acts hereunder or under any other agreement shall be deemed to be an extension of the time for performance of any other obligations or any other acts. No waiver shall be effective unless in writing, and signed by the party or parties to which the performance of duty is owed. The rights and remedies of the parties under this Agreement are in addition to all other rights and remedies, at law or equity, that they may have against each other except as may be specifically limited herein.

Section 8.06   Independent Covenants. The parties agree that each of the covenants, clauses and provisions contained in this Agreement shall be deemed severable and construed as independent of any other covenant, clause or provision.

Section 8.07   Severability. If all or any portion of a covenant, clause or provision in this Agreement is held to be illegal, invalid, or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision, the remaining covenants, clauses and provisions shall remain valid and enforceable. In lieu of each covenant, clause or provision of this Agreement that is held to be illegal, invalid or unenforceable, there shall be added as a part of this Agreement a covenant, clause or provision as nearly identical as may be possible and as may be legal, valid and enforceable, and the parties expressly agree to be bound by any such added covenant, clause or provision as if the resulting covenant, clause or provision were separately stated in, and made a part of this Agreement.

Section 8.08   Entire Agreement. This Agreement contains and represents the entire and complete understanding and agreement concerning and in reference to the arrangement between the parties hereto. The parties hereto agree that no prior statements, representations, promises, agreements, instructions, or understandings, written or oral, pertaining to this Agreement, other than those specifically set forth and stated herein, shall be of any force or effect. The parties agree that prior drafts of this Agreement shall not be deemed to provide any evidence as to the meaning of any provision hereof or the intent of the parties with respect thereto.

Section 8.09   <u>Modifications and Amendments</u>. This Agreement may not be, and shall not be construed to have been, modified, amended, rescinded, canceled, or waived, in whole or in part, except if done so in writing and executed by the parties hereto.

Section 8.10   <u>Time of Essence</u>. The parties to this Agreement acknowledge and agree that time is of the essence with respect to each and every provision of this Agreement.

Section 8.11   <u>Governing Law</u>. The validity, interpretation and enforcement of this Agreement shall be governed by, and construed and enforced in accordance with the local laws of the State of Maryland without giving effect to its conflicts of laws provisions, and to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

Section 8.12   <u>Exclusive Jurisdiction; Venue</u>. **EACH PARTY HERETO AGREES TO SUBMIT TO THE EXCLUSIVE PERSONAL JURISDICTION AND VENUE OF THE STATE AND/OR FEDERAL COURTS LOCATED IN PRINCE GEORGE'S COUNTY, MARYLAND FOR RESOLUTION OF ALL DISPUTES ARISING OUT OF, IN CONNECTION WITH, OR BY REASON OF THE INTERPRETATION, CONSTRUCTION, AND ENFORCEMENT OF THIS AGREEMENT, AND HEREBY WAIVES THE CLAIM OR DEFENSE THEREIN THAT SUCH COURTS CONSTITUTE AN INCONVENIENT FORUM.**

Section 8.13   <u>Waiver of Jury Trial</u>. **AS A MATERIAL INDUCEMENT FOR THIS AGREEMENT, EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES ALL RIGHTS TO A TRIAL BY JURY OF ANY ISSUES SO TRIABLE.**

Section 8.14   <u>Construction</u>. The parties agree and acknowledge that they have jointly participated in the negotiation and drafting of this Agreement and that this Agreement has been fully reviewed and negotiated by the parties and their respective counsel. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. If any party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty, or covenant. The mere listing (or inclusion of copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty relates solely to the existence of the document or other items itself).

Section 8.15   <u>Section Headings</u>. The titles to the numbered sections in this Agreement and the ordering or position thereof are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of said covenants or provisions set forth herein.

21

Section 8.16   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. A telecopy signature of any party shall be considered to have the same binding legal effect as an original signature.

Section 8.17   <u>Expenses</u>. Except as otherwise provided herein, the parties shall pay their own fees and expenses, including their own counsel fees, incurred in connection with this Agreement or any transaction contemplated hereby.

Section 8.18   <u>Further Assurances</u>. The parties hereto agree to execute such instruments and documents as may be required to carry out the intent of this Agreement, so long as such instruments and documents do not alter the rights and obligations of the parties under this Agreement.

Section 8.19   <u>Attorneys' Fees</u>. In the event either party brings an action against the other arising out of the terms of this Agreement, the prevailing party (whether such prevailing party has been awarded a money judgment or not) shall receive from the other party (and the other party shall be obligated to pay) the prevailing party's reasonable legal fees and expenses (including, without limitation, the reasonable fees and expenses of experts and para-professionals), whether such fees and expenses are incurred before, during or after any trial, re-trial, re-hearing, mediation or arbitration, administrative proceedings, appeals, bankruptcy or insolvency proceedings, and irrespective of whether the prevailing party would have been entitled to such fees and expenses under applicable law in the absence of this Section. Without limiting the generality of the foregoing, the term "<u>expenses</u>" shall include, without limitation, reasonable expert witness fees, bonds, filing fees, administrative fees, transcriptions, depositions or proceedings, costs of discovery and travel costs. The term "<u>prevailing party</u>" as used in this Section shall mean that party whose positions substantially prevail in such action or proceeding, and any action or proceeding brought by either party against the other as contemplated in this Section may include a plea or request for judicial determination of the "prevailing party" within the meaning of this Section. In the event neither party substantially prevails in its positions in such action or proceeding, each party shall be responsible for its own fees and expenses in connection therewith. In addition, the fees and expenses for the services of "in-house" counsel (if any) shall be included within the prevailing party's fees and expenses as fully as if such in-house legal services were provided by an "outside" attorney or law firm as contemplated within this Section, irrespective of whether "outside" legal services are obtained in connection with such matter. The fees and expenses on the part of in-house counsel as aforesaid shall be determined based upon the prevailing hourly rates, fees and expenses for an attorney(s) of comparable experience in the Dallas, Texas area.

Section 8.20   <u>Arm's Length Negotiations</u>. Each party herein expressly represents and warrants to all other parties hereto that: (a) before executing this Agreement, said party has fully informed itself of the terms, contents, conditions and effects of this Agreement; (b) said party has relied solely and completely upon its own judgment in executing this Agreement; (c) said party has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement; (d) said party has acted voluntarily and of its own free will in executing this Agreement; (e) said party is not acting under duress, whether economic or physical, in executing

22

this Agreement; and (f) this Agreement is the result of arm's length negotiations conducted by and among the parties and their respective counsel.

Section 8.21    Rules of Interpretation.  Except as otherwise expressly provided in this Agreement, the following rules shall apply hereto: (a) the singular includes the plural and plural includes the singular; (b) "or" is not exclusive and "include" and "including" are not limiting; (c) a reference to any agreement or other contract includes any supplements and amendments; (d) a reference to a section or paragraph in this Agreement shall, unless the context clearly indicates to the contrary, refer to all sub-parts or sub-components of any said section or paragraph; (e) words such as "hereunder", "hereto", "hereof", and "herein", and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Agreement and not to any particular clause hereof; (f) a reference in this Agreement to a "person" or "party" (whether in the singular or the plural) shall (unless otherwise indicated herein) include both natural persons and unnatural persons (including, but not limited to, corporations, partnerships, limited liability companies or partnerships, trusts, *etc.*); (g) all accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with GAAP; and (h) any reference in this Agreement to a "business day" shall include each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which national banks in Dallas, Texas are closed.

Section 8.22    Certain Defined Terms.  Except as otherwise defined in this Agreement, the following defined terms whether used in upper or lower case shall have the respective meanings set forth below:

(a)     The term "Affiliate" shall mean in respect to any person or entity, any other person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first person or entity.

(b)     The term "Encumbrance" shall mean any claim, lien, pledge, option, charge, easement, security interest, right-of-way, encumbrance, mortgage or other right which would grant rights in property to other than the owner of such property.

(c)     The term "Liabilities" shall mean any direct or indirect liability, indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, either accrued, absolute, contingent, mature, unmature or otherwise and whether known or unknown, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured.

(d)     The term "Person" shall mean an individual, partnership, corporation, trust, any other organization, or a federal, state, local or foreign governmental body or agency.

(e)     The term "Records" shall mean any paper, document, file or record of any kind, whether recorded in writing or on magnetic, optical, or any other storage medium, and including without limitation all computer records in whatever form.

Section 8.23   <u>Recitals</u>.   The recitals set forth at the beginning of this Asset Purchase Agreement, as well as the definitions contained therein, are by this reference incorporated herein and made a part of this Agreement.

*[Signatures on following page]*

24

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the date first set forth above.

**PURCHASER:**

CAPITOL RADIOLOGY, LLC

By: _Doriann R. Thomas, M D_

Name:   Doriann Thomas, M.D.
Title:     President

**SELLER:**

WB&A IMAGING PARTNERS, INC.

By: _____

Name: _____
Title: _____

**DR. THOMAS:**

_____
DORIANN THOMAS, M.D.

**RADIOLOGIX:**

RADIOLOGIX, INC.

By: _____

Name: _____
Title: _____

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the date first set forth above.

PURCHASER:                                SELLER:

CAPITOL RADIOLOGY, LLC                    WB&A IMAGING PARTNERS, INC.

By:  _Doriann R Thomas M.D_              By:_____
Name:    Doriann Thomas, M.D.             Name:_____
Title:    President                       Title:_____


                                          RAD_IOLOGIX:

                                          RADIOLOGIX, INC.


                                          By:_____
                                          Name:_____
                                          Title:_____


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the date first set forth above.

PURCHASER:

CAPITOL RADIOLOGY, LLC

By:_____
Name:        Doriann Thomas, M.D.
Title:        President

SELLER:

WB&A IMAGING PARTNERS, INC.

By:_____
Name:        Sami S. Abbasi
Title:        President & CEO

RADIOLOGIX:

RADIOLOGIX, INC.

By:_____
Name:        Sami S. Abbasi
Title:        President & CEO

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**Schedule 1.01(a)**

**Equipment**

GE Lunar Bonedensity
Siemens Emotion CT
X-Rite 331 Densitometer
Siemens Sireskop Fluoro
Medrad ECT700 CT injector
GE Senograph 800T mammo
Rad-X MV4000A viewer
Rad-X MV4000A viewer
Panaramoscope mammo alternator
Siemens Orbiter Nuclear Camera
Kodak Dryview 8700
Kodak M6B processor
Kodak Min-R mammo processor
Kodak PACS Link 9410
Siemens Multix X-ray room
X-Rite 334 Densitometer
Capentec Uptake Counter
ATL HDI3500 ultrasound
ATL HDI3500 ultrasound
Leasehold Improvements
Furniture
Fixtures
NSC 1000 phone system
CRC 15W EOES calibrator
Siemens collimater
Siemens pinhole collimater

## Schedule 1.01(g)

## Telephone and Fax Numbers

| Description | Phone Number |
| --- | --- |
| Lines on PRI | (301)362-4523 |
| Lines on PRI | (301)362-4524 |
| Lines onPRI | (301)393-2521 |
| Modem - NucMed | (301)604-1576 |
| Active | (301)725-5398 |
| Outgoing trunk | (301)725-7707 |
| Outgoing trunk | (301)725-8740 |
| Fax | (301)725-8968 |

## Schedule 1.01(h)

## Computer Products

| Item | Manufacturer | Model |
|------|--------------|-------|
| Switch | Cisco | Catalyst 2950 |
| CSU | Paradyme | |
| MUX | | |
| Router | Cisco | 2600 |
| PC | Compaq | Deskpro SFF Celeron |
| PC | Compaq | Deskpro Pentium II |
| PC | Compaq | EVO Pentium IV |
| PC | Compaq | EVO Pentium IV |
| PC | Compaq | Deskpro Pentium II |
| PC | Compaq | Deskpro SFF Celeron |
| PC | Compaq | Deskpro Pentium II |
| PC | Compaq | Deskpro Pentium II |
| Printer | HP | 4100 |
| Printer | HP | 4100 |
| Printer | HP | 960 |
| Printer | Kodak | 8300 |

## Schedule 1.02(a)

### Assumed Leases

| Description | Vendor | Term Date | Monthly Cost |
|---|---|---|---|
| ATL HDI3500 Ultrasound | GE Healthcare Finance | 5/31/2006 | $1,937.00 |
| Copier | CopyWorld | 3/6/2005 | ~$155.00 |

## Schedule 1.02(b)

### Real Property Lease

| Landlord | Term Date | Monthly Rent |
|---|---|---|
| EVA Partners, LLC | 9/30/2011 | $9,795.64 |

Also payable in connection with the Real Property Lease is a "condo fee" payable to Laurel Medical Arts Pavilion Condominium Association in the amount of $1,770.09 per month.

## Schedule 1.02(c)

### Assumed Contracts

| Vendor | Service Provided | Monthly Amount |
|--------|------------------|----------------|
| Laurel Medical Arts Pavilion | Utilities | ~$900.00 |

Schedule 3.10

Form of Release

## RELEASE

THIS RELEASE (this "Release") is made as of March 1, 2005, by WB&A IMAGING PARTNERS, INC., a Delaware corporation ("WB&A Imaging Partners"), and RADIOLOGIX, INC., a Delaware corporation ("Radiologix"), for the benefit of CAPITOL RADIOLOGY, LLC, a Maryland limited liability company ("Capitol Radiology"), and DORIANNE THOMAS, M.D., an individual ("Dr. Thomas").

WHEREAS, Radiologix, WB&A Imaging Partners, and WB&A Imaging, P.C. were parties to that certain Service Agreement dated as of September 1, 1998 (the "Service Agreement");

WHEREAS, the Service Agreement has been terminated pursuant to that certain Termination Agreement dated as of January 27, 2005, among Radiologix, WB&A Imaging Partners, and WB&A Imaging, P.C.; and

WHEREAS, in connection with the consummation of the transactions contemplated by that certain Asset Purchase Agreement dated as of March 1, 2005, among Capitol Radiology, WB&A Imaging Partners, Dr. Thomas, and Radiologix, Capitol Radiology and Dr. Thomas have requested that WB&A Imaging Partners and Radiologix, jointly and severally, release Capitol Radiology and its owner, Dr. Thomas, from the terms and conditions of the Service Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, WB&A Imaging Partners and Radiologix, jointly and severally, hereby release Capitol Radiology and Dr. Thomas from the terms and conditions of the Service Agreement.

IN WITNESS WHEREOF, WB&A Imaging Partners and Radiologix have executed this Release as of the date first set forth above.

WB&A IMAGING PARTNERS, INC.          RADIOLOGIX, INC.


By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____

**Schedule 5.05**

**Litigation**

NONE

# Understanding and Addressing Racial Disparities in Health Care

David R. Williams, Ph.D., M.P.H., and Toni D. Rucker, Ph.D.

Racial disparities in medical care should be understood within the context of racial inequities in societal institutions. Systematic discrimination is not the aberrant behavior of a few but is often supported by institutional policies and unconscious bias based on negative stereotypes. Effectively addressing disparities in the quality of care requires improved data systems, increased regulatory vigilance, and new initiatives to appropriately train medical professionals and recruit more providers from disadvantaged minority backgrounds. Identifying and implementing effective strategies to eliminate racial inequities in health status and medical care should be made a national priority.

## INTRODUCTION

National data reveal that over the past 50 years, the health of both black and white persons has improved in the United States as evidenced by increases in life expectancy and declines in infant and adult mortality (National Center for Health Statistics, 1998). However, black persons continue to have higher rates of morbidity and mortality than white persons for most indicators of physical health. Hispanics and American Indians also have elevated dis-

ease and death rates for multiple conditions. Although the role of medical care as a determinant of health is somewhat limited, medical care (especially preventive care, early intervention and the appropriate management of chronic disease) can play an important role in health (Bunker, Frazier, and Mosteller, 1995). Thus, racial and ethnic differentials in the quantity and quality of care are a likely contributor to racial disparities in health status. Compared with white persons, black persons and other minorities have lower levels of access to medical care in the United States due to their higher rates of unemployment and under-representation in good-paying jobs that include health insurance as part of the benefit package (Blendon et al., 1989; Trevino et al., 1991).

More striking, and disconcerting to many is the large and growing number of studies that find racial differences in the receipt of major therapeutic procedures for a broad range of conditions even after adjustment for insurance status and severity of disease (Harris, Andrews, and Elixhauser, 1997; Wenneker and Epstein,1989). Especially surprising to many are the racial disparities in contexts where differences in economic status and insurance coverage are minimized such as the Veterans Health Administration System (Whittle et al., 1993) and the Medicare program (McBean and Gornick, 1994). Other research indicates that, although physicians' ability to detect the severity of pain does not differ for Hispanic versus non-Hispanic white patients (Todd, Lee, and

The authors are with the University of Michigan. Preparation of this article was supported by the Agency for Health Care Policy and Research (AHCPR) under Contract Number 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, Grant MH-57425, from the National Institute of Mental Health and by the John D. and Catherine T. MacArthur Foundation Research Network on Socioeconomic Status and Health. The opinions expressed are those of the authors and do not necessarily represent the views of the University of Michigan, the Department of Health and Human Services, or the Health Care Financing Administration (HCFA).

Hoffman, 1994), Hispanic patients are markedly less likely than non-Hispanic white patients to receive adequate analgesia (Todd et al., 1993; Cleeland et al., 1997). Recent studies document that these differences in the receipt of therapeutic procedures have adverse effects on the health of minority group members (Peterson et al., 1997; Hannan, van Ryn, and Burke, 1999). How do we make sense of these differences and how do we move forward with an effective policy and research agenda to eliminate these disparities?

## RACE, RACISM, AND DISCRIMINATION

Many observers are surprised and perplexed by these findings. However, we can only regard these findings as surprising if we take an ahistorical and decontextualized view of the data. In compliance with Article 1, Section 2, and Paragraph 3 of the Constitution of the United States, the very first Census in 1790 enumerated three racial groups: whites, blacks as three-fifths of a person, and only "civilized Indians"—those who paid taxes (Anderson, 1988). New racial categories were added in the late 19th Century and beyond (Chinese in 1870, Japanese in 1890, Mexican in 1930) as the need arose to track new marginalized immigrant groups (Anderson and Feinberg, 1995). Race was and is a social category that captures differential access to power and desirable resources in society (Williams, 1997). Throughout the history of the United States, non-dominant racial groups have, either by law or custom, received inferior treatment in major societal institutions. Medical care is no exception.

Thus, understanding racial disparities in medical care requires an appreciation of the ways in which racism has operated and continues to operate in society. The term "racism" refers to an organized system, rooted in an ideology of inferiority that categorizes, ranks and differentially allocates societal resources to human population groups (Bonilla-Silva, 1996). It may or may not be accompanied by prejudice at the individual level. We will illustrate the complex nature of race, racism, and discrimination in society by considering access to housing and employment.

First, Table 1 indicates that there have been important positive changes in the racial attitudes of white persons towards black persons in recent decades and broad current support for the principle of equality in housing and employment (Schuman et al., 1997). In 1963, 60 percent of white persons agreed with the statement that "White people have a right to keep Negroes out of their neighborhoods if they want to, and Negroes should respect that right." In 1996, only 13 percent of white persons agreed with that statement, documenting a substantial positive attitudinal shift within the white population. Similarly, in 1944, a majority of white persons (55 percent) indicated that white people should have the first chance at any kind of job but, by 1972, only 3 percent of white persons endorsed that view with 97 percent indicating that black persons should have as good a chance as white persons to get any kind of job.

Second, these positive sentiments were given the force of law. In 1968, the Fair Housing Act (Title VIII) made it illegal to refuse to sell or rent a dwelling to any person because of race. Earlier, the Civil Rights Act of 1964 (Title VII) prohibited employers from firing, refusing to hire or promote, or in any way limiting an employee's compensation or job conditions because of race.

Third, Table 1 also indicates that there is considerably less support for policies that would actually implement equal access to housing and jobs (Schuman et al., 1997).

**Table 1**

**Racial Attitudes of White Persons in the United States: Selected Years, 1944-1996**

| Question | Year of Survey | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1944 | 1963 | 1964 | 1972 | 1973 | 1980 | 1983 | 1990 | 1996 |
| | Percent in Agreement | | | | | | | | |
| **Access to Housing** | | | | | | | | | |
| **Principle Item** | | | | | | | | | |
| White persons have a right to keep black persons out of neighborhood. | — | 60 | — | 41 | — | 34 | — | 24 | 13 |
| **Implementation Item** | | | | | | | | | |
| They would support a law to let homeowners discriminate if they want to. | — | — | — | — | 67 | 60 | 54 | 47 | 33 |
| **Access to Employment** | | | | | | | | | |
| **Principle Item** | | | | | | | | | |
| White persons should have the first chance at any job. | 55 | 15 | — | 3 | — | — | — | — | — |
| **Implementation Item** | | | | | | | | | |
| Government should ensure no discrimination in jobs. | — | — | 38 | 40 | — | — | — | — | 28 |
| No interest in issue. | — | — | 13 | 18 | — | — | — | — | 36 |

SOURCE: (Schuman, Steeh, Bobo, and Krysan, 1997.)

In 1973, 67 percent of a national sample of white persons indicated that they would support a law that would guarantee a homeowner the right to decide for himself whom to sell his house to even if he preferred not to sell to black persons. In 1996, one-third of white persons would still grant a homeowner that right. In a similar vein, there is only weak support for policies to eradicate employment discrimination. In 1964, 38 percent of white persons indicated that the government in Washington should see to it that black people get fair treatment in jobs, and 13 percent indicated that they lacked enough interest in the question to favor one side over another. In 1996, the percentage of white persons supporting Federal intervention to ensure fair treatment in jobs declined to 28 percent, while the percentage expressing no interest in the question increased to 36 percent.

Fourth, national data on stereotypes reveal that white persons continue to view black persons negatively, which presumably would make them undesirable as neighbors and employees. For example, 56 percent of white persons believe that black persons prefer to live off welfare, 51 percent believe that black persons are prone to violence, 29 percent view black persons as unintelligent, and 44 percent view them as lazy (Davis and Smith, 1990). Comparatively, white persons believe that only 4 percent of white persons prefer to live off welfare, 16 percent are prone to violence, 6 percent are unintelligent, and 5 percent are lazy. Instructively, white persons viewed black persons, Hispanics, and Asians more negatively than themselves, but black persons were viewed more negatively than all other groups, and Hispanics twice as negatively as Asians. It is possible that these reported levels of negative stereotypes of minority groups are understated due to social desirability concerns.

Such high levels of the acceptance of negative stereotypes of minority groups is an ominous harbinger of widespread societal discrimination. A large body of psychological research indicates that the endorsement of negative racial stereotypes leads to discrimination against minority groups (Devine, 1995; Hilton and von Hippel, 1996). Moreover, well-learned

stereotypes are resistant to disconfirmation (Stangnor and McMillan, 1992), and their activation is an automatic process with individuals spontaneously becoming aware of relevant stereotypes after encountering someone to whom the stereotypes are applicable (Devine, 1989; Hilton and von Hippel, 1996).

In the United States, racial stereotypes have real-life consequences for minority groups' access to housing and employment. Based on negative stereotypes of black persons, the majority of white persons express a strong preference for living in racially segregated neighborhoods (Williams et al., 1999; Bobo and Zubrinsky, 1996), and black persons in search of housing are still systematically steered toward neighborhoods having a greater number of minorities, lower home values, and lower median income (Fix and Struyk, 1993). A review of the data on the persistence of housing discrimination in the United States concluded that, "On any given encounter between a black home-seeker and a realtor, the odds are at least 60 percent that something will happen to limit that black renter or buyer's access to housing units that are available to white persons" (Massey, Gross, and Shibuya, 1994).

Studies of white employers reveal that racial stereotypes are used to deny employment opportunities to black applicants (Kirschenman and Neckerman, 1991; Neckerman and Kirschenman, 1991). Additionally, both U.S.-based and foreign companies explicitly use the racial composition of labor market areas in their decisionmaking process regarding where to locate new plants (Cole and Deskins, 1988). Not surprisingly, a **Wall Street Journal** analysis of the employment records of more than 35,000 U.S. companies found that black persons had a net job loss of 59,000 jobs during the 1990-1991 economic downturn, compared with net gains of 71,100 for white persons, 55,100 for Asians, and 60,000 for persons of Latin extraction (Sharpe, 1993). These job losses reflected the relocation of employment facilities to areas of lower black concentration. Audit studies of employment discrimination also find racial differences in being allowed to submit an application, in obtaining interviews, and in being offered a job. In these studies, when trained black and white job applicants with identical qualifications applied for jobs, discrimination favored the white over the black applicants in one in every five audits (Fix and Struyk, 1993).

The bottom line is that the policies designed to eliminate racial discrimination in housing and employment have failed. The degree of residential racial segregation in 1990 was virtually identical to what it was when Congress passed the Fair Housing Act in 1968 (Massey, 1996). Similarly, the unemployment rate for black persons has been consistently about twice that of white persons from 1950 to the present (Economic Report of the President, 1998). Thus, the advent of civil rights legislation and changes in the racial attitudes of white persons have not been sufficient to eradicate discrimination. In spite of these changes, there has been remarkable stability over time on multiple dimensions of racial inequality. For example, the median income of black persons was 59 cents for every dollar earned by white persons in 1996—identical to what it was in 1978 (Economic Report of the President, 1998).

## Lessons for Racial Disparities in Medical Care

The larger literature on societal discrimination suggests that, although racism has changed over time from a blatant "Jim Crow racism" to a more subtle "laissez-faire racism" (Bobo, Kluegel and Smith,

1997), it persists in contemporary America. As painful as it may be to acknowledge, we must begin with the recognition that discrimination is routine and commonplace in society and likely to be similarly prevalent in medicine. With few exceptions (Smith, 1998; Geiger. 1996; Council on Ethical and Judicial Affairs, 1990), the literature on racial disparities in medical care is reluctant to admit and address racial bias among providers as a critical causal factor. In contrast, the evidence is abundant and clear that racial discrimination is not the aberrant behavior of a few "bad apples" but a widespread societal problem.

It is unlikely that personal discrimination on the part of providers is the sole cause of disparities in health care. In any area of societal evaluation, the causes of racial differences are complex and multi-dimensional, with discrimination being only one of them. Moreover, institutional discrimination is often at least as important as individual discrimination. In the case of racial disparities in medical care, other potential explanations include the geographic maldistribution of medical resources, racial differences in patient preferences, pathophysiology, economic status, insurance coverage, as well as in trust, knowledge, and familiarity with medical procedures (Horner, Oddone, and Matchar, 1995; Smith, 1998). On the surface, patient preferences would be the alternative explanation that would be most consistent with all of the available evidence. However, recent research indicating that patient preferences do not account for these disparities (Hannan, van Ryn, and Burke, 1999) suggests that discrimination remains as a central plausible explanation.

Probably most important, much discrimination today occurs through behaviors that the perpetrator does not subjectively experience as intentional. Much contemporary discriminatory behavior is uncon-scious, unthinking, and unintentional (Allen, 1995; Johnson, 1988; Lawrence, 1987; Oppenheimer, 1993). As noted earlier, biases based on racial stereotypes occur automatically and without conscious awareness even by persons who do not endorse racist beliefs (Devine, 1989). Recent psychological research indicates that persons who do not see themselves as prejudiced will make health care allocation decisions that adversely affect black persons when other negative characteristics are also present (Murphy-Berman, Berman, and Campbell, 1998). For example, respondents expressed greater resentment, gave lower health care priority scores and were more reluctant to make a financial contribution to the health care costs of patients presented as black and unemployed than as white and unemployed. In real-life medical encounters, the automatic activation of stereotypes may provide the negative characterization that triggers unconscious bias. Most legislation, intervention programs, and policy regarding discrimination have been ineffective because of their focus on purposeful or intentional discrimination (Allen, 1995). Relatedly, our review also suggests that one cannot rely on the stated racial attitudes of white persons or the mere existence of laws prohibiting discrimination to ensure that it does not occur in health care settings.

## POLICY AND RESEARCH DIRECTIONS

### Improving Equity in Access to Medical Care

Although this article centrally addresses racial differences in the quality of care, a comprehensive approach to address inequities must begin by ensuring parity in access to care. Effectively addressing

health care disparities will require comprehensive efforts by multiple sectors of society to address larger inequities in major societal institutions.  There is clearly a need for concerted societal-wide efforts to confront and eliminate discrimination in education, employment, housing, criminal justice, and other areas of society which will improve the socioeconomic status (SES) of disadvantaged minority populations and indirectly provide them greater access to medical care. The United States also needs to make the moral and political commitment to guarantee access to medical care as a fundamental right of citizenship.

However, efforts to ensure equitable access to care must go beyond the elimination of financial barriers. A broad range of system barriers such as long waiting time, complex bureaucratic procedures, and the failure to treat patients with dignity and respect can lead to patient alienation and the avoidance of contact with the health care system unless absolutely necessary. Research has long indicated that poor persons and racial minorities are not viewed as desirable patients and health care providers deliver inferior care to persons of low SES (Duff and Hollingshead, 1968; van Ryn and Burke, 2000).   Problems of patient-provider communication are exacerbated among persons of low SES, with higher SES patients receiving better technical and interpersonal care, and more positive communication than their lower SES peers (Hall, Roter, and Katz, 1988).

Efforts to ensure equitable access to care are urgently needed to counteract two forces that could potentially exacerbate racial disparities in access to care. First, there are closures of a growing number of health care facilities with hospitals located in low income and minority communities being more likely to close than those located in other areas (Whiteis, 1992;

McLafferty, 1982). Second, and more important, the movement from a fee-for-service (FFS) system to a managed care system is likely to adversely impact access to medical care for minorities and other vulnerable populations (Schlesinger, 1987; Randall, 1994; McClellan, 1999; **Harvard Law Review**, 1995).

Critics argue that managed care is likely to exacerbate current racial inequalities in access to medical care in multiple ways. The new competitive pressures in the financing and delivery of medical care can reduce profits generated by treating privately insured patients, leading to cutbacks in the provision of uncompensated care (Schlesinger, 1987). In addition, managed care plans often limit access to minority physicians and other doctors who primarily care for disadvantaged populations (**Harvard Law Review**, 1995).   Managed care plans look for cost effective physicians who order few procedures, write limited prescriptions, and make limited referrals.  In contrast, given the high morbidity, comorbidity and greater severity of disease at time of diagnosis in minority and low income populations, these patients require intense management of chronic illness which can involve more medical services and thus higher costs.  Accordingly, managed care plans are likely to view physicians who work in minority communities as undesirable and may also limit the physicians that their enrollees, including poor patients and residents of poor communities, can consult. The net result could be that many physicians who work in minority communities may have a smaller patient load and some may be even unable to maintain a financially viable practice (**Harvard Law Review**, 1995).

However, it is not clear if these fears have materialized.  A 1994 survey of black physicians at a national conference found that 92 percent believed that managed care

plans terminated the contracts of black doctors more often than those of white doctors (Lavizzo-Mourey et al., 1996). In fact, 88 percent had been refused a contract by a managed care organization (MCO) and 71 percent had lost patients to a MCO with which they were not affiliated. At the same time, 71 percent had at least one managed care contract and 75 percent indicated that their practice had grown or remained stable in the previous year. Some observers also note that it is not inevitable that access to medical care will worsen for minority populations under managed care arrangements. Increased competition could provide a financial incentive for some health care providers to provide treatment to segments of the community that they may have earlier viewed as undesirable (Schlesinger, 1987).

## Improved Data Systems and Monitoring the Quality of Medical Care

Any concerted effort to address racial bias in the medical arena requires systematic and routine data of its occurrence. As noted, important changes are taking place in the organization and delivery of health care services in the United States and it is critical to monitor the impact of these changes on the health care access and quality for vulnerable populations. Major efforts are currently under way to identify the data elements that should be included in national uniform standardized data sets. It is essential that racial and ethnic status are uniformly and comprehensively assessed in these minimum core data sets. Comprehensive assessment means that data systems should include identifiers for major ethnic subgroups within the standard racial/ethnic categories (Williams, 1996). For example, among Hispanics, it is necessary to distinguish the three largest groups: Mexicans, mainland Puerto Ricans, and Cubans. Given the central role of SES in health and the strong relationship between race/ethnicity, and SES, it is important that indicators of SES are also included in any uniform data set (Krieger, Williams, and Moss, 1997; Williams, 1996).

The pervasiveness of discrimination suggests that racial data should be available for every medical encounter. The National Committee of Vital and Health Statistics, a public advisory body to the Department of Health and Human Services has called for the assessment of race/ethnicity and SES (National Committee of Vital and Health Statistics, 1993) in an enrollment database which could then be linked to data on medical encounters. Years of formal education was suggested as the most practical and convenient SES indicator in this context. The presence of these identifiers in an enrollment database would eliminate the resource intensive ordeal of attempting to request racial data at every medical encounter. Stringent efforts to ensure patient privacy and confidentiality would have to be implemented and the necessary training would have to be provided to health care workers to ensure the uniform collection of racial/ethnic and SES data. The analyses of racial disparities in the HCFA data files illustrate that administrative databases can be very helpful in providing findings that shed light on the nature and magnitude of the problem. However, these analyses have focused only on black-white differences because "black, white and other" were the only racial identifiers present. In the early 1990s, HCFA and the Social Security Administration (SSA) went to considerable effort to improve racial/ethnic identifiers in the SSA and Medicare data systems. What is needed now is the routine analysis and reporting of data for all racial/ethnic groups.

Routine reporting of data would identify which health care institutions, if any, demonstrate racial parity in terms of the delivery of medical care. It is likely that there is considerable variation in racial disparities across multiple settings. This kind of data can be used to establish benchmarks —levels of excellence achieved by industry leaders that could enhance our understanding of these best practices and facilitate their replication (Weissman et al., 1999).

Research is also needed to identify the optimal specific strategies that health care institutions can implement, at least on a periodic basis if not continuously, to detect and respond to patterns of discrimination in medical treatment. It has been suggested that hospitals could develop an anonymous reporting system to facilitate the detection of incidents of systematic patterns of biased medical decisionmaking (Noah, 1998). However, it will be crucial to create an environment that encourages reporting as part of a strategy of constructive problem-solving (Leape, 1997). In general, the five strategies for detecting inappropriate medical treatment, in order of yield and intensity of effort are direct observation, chart review, computer screening, focus groups and voluntary reporting (Leape, 1997).

The availability of data on racial differences in medical care would also facilitate at least some civil rights enforcement efforts. One of the limitations of current antidiscrimination laws is that they often rely on proving subjective discriminatory intent (Allen, 1995). Given that the vast majority of white Americans favor non-discrimination in principle, it is often difficult to prove discriminatory intent. In the legal arena, disparate impact claims require statistical data to document the differential effect of policies on racial groups. It is not a frequently used strategy by individuals seeking relief under civil rights statutes because it usually requires the compilation and analysis of large quantities of data to prove a discriminatory effect. However, routine collection of racial data would facilitate the assessment of racial group disadvantage in the medical arena.

Smith (1998) notes that the emphases on monitoring both clinical and financial information in the managed care environment also provides new opportunities for enhanced civil rights monitoring of health care delivery. He indicates that the addition of racial identifiers to existing data systems would facilitate the creation of report cards that could be used to monitor disparities in health plans, health care institutions, and communities. These report cards would include broadly accepted indicators of health and health care delivery (such as mortality rates and the use of specific screening tests) that have been recommended by various standards organizations for the comparative evaluation of medical care. Smith (1998) indicates that similar reporting requirements in the banking industry have led to a dramatic increase in the number of loans approved for racial minorities. However, in order for report cards to work, they must be a part of a larger system.

## Renewed Regulatory Vigilance

Another policy strategy to address the problem of discrimination in medicine would be increased regulatory vigilance. The history of overt discrimination in medical care indicates that legal mandates and Federal regulations were ineffective until the institutional commitment and capacity to enforce them was created (Smith, 1998). Some legal scholars argue that there are existing statutes that are not now being enforced. For example, Title VI of the Civil Rights Act of 1964 is a promising statutory avenue for dealing with discrimination in

health care delivery (Noah, 1998). Title VI prohibits any entity that receives Federal financial assistance from discriminating on the basis of race in providing goods or services to the beneficiaries of that Federal program. Since Federal financial assistance includes Medicare and Medicaid funds, this prohibition against discrimination applies to virtually all hospitals, nursing homes, and other health care facilities in the United States. Given that the courts have held that Title VI prohibits both intentional discrimination and disproportionate adverse impact (Noah, 1998), the documentation of adverse impact would provide a powerful strategy for addressing and correcting discrimination in care.

Noah (1998) also notes that many neutral policies that may have a disproportionate impact on racial and ethnic minorities receiving medical treatment could also be addressed if disparate impact were documented. For example, some hospitals admit only those patients whose physicians have staff privileges at the hospital, require substantial deposits before admission for inpatient care, refuse to deliver babies if their mothers had not received a certain amount of prenatal care, and create other barriers to the admission of Medicaid patients. Minority patients are more likely to be disadvantaged by these policies, although the policies are not specifically racial in content or intent. Thus, the application of a disparate impact analysis of these policies could be an effective avenue for attacking them. At the same time, Noah (1998) warns that, because Title VI covers institutional policies that are causing disproportionate impact, they would not cover the behavior of individual physicians who either consciously or unthinkingly discriminate as long as the health care entity can prove that it is not its institutional policy.

The Joint Commission on Accreditation of Health Care Organizations (JCAHO) is another regulatory organization that could play a larger role in addressing the question of racial inequities in health care. It could, for example, insist that health care entities establish procedures for the monitoring and correction of unexplained disparities in the delivery of services as one of the requirements for continued accreditation (Noah, 1998). Historically, the JCAHO has played an important role in encouraging progressive change in the health care industry. A recent example is the efforts to encourage hospitals to develop and implement policies to address communication problems with patients who do not speak English. HCFA might also review its current utilization review methods to see if better methods can be developed to identify and correct observed patterns of racial inequalities and delivery of services to beneficiaries of Medicare and Medicaid (Noah 1998).

## Monitoring Managed Care

Increased regulatory efforts must also specifically focus on managed care plans given that managed care creates an environment conducive to discrimination and some have argued that there will be more widespread discrimination under managed care (*Harvard Law Review*, 1995). Unlike the FFS system where a physician's income increases as the number of services provided increases, in managed care there are often pressures to limit the number and cost of services delivered to members of the prepaid health plan. Many managed health care plans offer financial incentives to providers for limiting referrals to specialists. Often a pool of money is reserved for specialists and diagnostic tests, with the provider sharing in the

unexpended portion of this pool (McClellan, 1999). Some managed care systems hold individual physicians financially liable when their patients use a higher than average amount of hospital care irrespective of whether the costs were medically justified (Hillman, 1987). These financial incentives have been shown to shape decisionmaking by providers (Pauly, Hillman, and Kerstein, 1990).

Currently available research does not clearly indicate whether medical care overall is better under the FFS system or under managed care plans. Some evidence suggests that enrollees in managed care plans are more likely to receive cancer screening tests than persons in FFS plans (Potosky et al., 1998). Recent national data from 35,000 non-elderly persons revealed that there were no differences between health maintenance organizations (HMOs) and other types of insurance in the use of inpatient care, emergency room and surgeries (Reschovsky et al., 2000). At the same time, patients in HMOs reported less satisfaction, less trust in physicians, lower ratings of physician visits and more unmet medical need. This study found that, while HMOs provided more primary and preventive services, they provided less specialist care and had higher administrative barriers to care. Other evidence suggests that health care for vulnerable populations, such as the elderly and the chronically ill, is worse in managed care plans (McClellan, 1999; Wallace, Enriquez-Haass, and Markides, 1998).

Several solutions have been proposed to the potential threat to minority health posed by managed care organizations (**Harvard Law Review**, 1995). First, there is need for more systematic auditing of the services of managed care providers by the Government, consumer groups, and professional medical organizations. Currently, there is little Federal oversight and moni-

toring of fairly rapid changes in health care delivery. There is also the need to develop new legislation or regulations that can ensure the appropriate inclusion of physicians who practice in minority communities in managed care plans. For example, managed care plans that recruit from minority communities could be required to hire a certain proportion of medical providers who previously practiced there. Similarly, laws could be established to ensure that the categorical exclusion of providers in poor communities does not occur. For example, they could prohibit the exclusion of providers from managed care plans based on the health, racial composition, or SES of their patients. Finally, sanctions can be utilized to prevent MCOs, and health care entities more generally, from engaging in discrimination. Systematic evidence of ongoing discrimination could be met with substantial fines or even the threat of the loss of the right to practice.

Wallace, et al. (1998) emphasize that managed care has the potential to improve the quality of medical care for minority populations. Given the greater bureaucratic oversight present in MCOs, there is the potential for greater coordination of care that could ensure that individuals received appropriate medical care. That is, if the appropriate incentives were built into managed care plans they could help reverse the trends of minorities receiving less aggressive treatment and fewer medical procedures across a broad range of illnesses.

Similarly, organizations such as the National Committee for Quality Assurance (NCQA) that currently provides voluntary accreditation to almost one-half of the HMOs in the United States could add racial inequities in care to the more than 60 standards that currently provide the basis for the evaluation of health plans. NCQA has also managed the development of the Health plans Employer Data and Information

Set (HEDIS) which is the principal performance assessment for managed care. It uses a set of standardized measures to compare health plans. Currently HEDIS evaluates what a health plan actually does in key areas of care such as immunization rates and member satisfaction. The extent of racial/ethnic disparities should be added as a performance indicator.

## Education and Training

There is also a need for intensive and systematic educational campaigns about the problem of racial inequities in health care. The awareness levels of the public and professional community, especially the medical community, must be raised. Research is needed to identify strategies that are most effective to raise awareness of and increase sensitivity to the issues of race in medical practice. Although education has its limits, it is also instructive to know that educational campaigns can accomplish much. For example, in the case of tobacco there has been a per capita decline in tobacco consumption in the United States over the course of the last century whenever there was a major media campaign on the negative effects of cigarette smoking (Warner, 1985). Efforts are clearly needed to impact the medical school curriculum to ensure that issues of race and sensitivity towards these issues are adequately addressed. As Geiger (1996) indicates, "awareness of the dilemmas associated with race and health care should be a part of every physician's training."

It is not clear that the current emphases and approaches to cultural sensitivity will address the systemic problem of discrimination. Even model cultural sensitivity programs for medical students and residents (Robins et al., 1998; Zweifler and Gonzalez, 1998) do not address unconscious discrimination. Cultural sensitivity programs may enhance and accentuate negative stereotypes. Some cultural sensitivity training focuses on the distinctive behavioral patterns of subgroups in the population and appears to focus primarily on the "strange" behavior of patients. More research is also needed on provider attitudes and behavior (King, 1996) and especially the identification of the strategies that may be most effective in identifying and reducing unconscious discrimination among medical professionals.

Another critical goal of medical education should be to increase the number of minority professionals. Research clearly indicates that black and Hispanic physicians are much more likely than other physicians to care for the uninsured and those with Medicaid and to practice in urban and rural underserved areas where the percentage of residents of their racial/ethnic group is high (Komaromy et al., 1996). A recent study reported that in order to reach racial and ethnic population parity, the United States needs to double the number of black and Hispanic first-year residents and triple the number of Native American residents (Libby, Zhou, and Kindig, 1997). White first-year residents would need to be reduced by two-fifths and Asians by two-thirds.

Current trends do not suggest that these goals are likely to be reached. There has been relatively little increase in the proportion of physicians from underrepresented minority backgrounds in medicine in the last 30 years. For example, black physicians have increased from 2.5 percent of all U.S. physicians prior to 1968 (Carlisle, Gardner, and Liu, 1998) to 2.9 percent currently (Editorial, 1999). The number of underrepresented minorities (black Americans, Mexican Americans, mainland Puerto Ricans, and American Indians) increased in

medical schools starting in the late 1960s. Minority enrollment peaked in 1974 at 10 percent of total enrollment but subsequently declined in the wake of reverse discrimination lawsuits (Carlisle, Gardner, and Liu, 1998; Nickens and Cohen, 1996). To reverse this trend the Association of American Medical Colleges launched a new campaign to have 3000 first-year minority medical students by the year 2000. This project was initially successful with enrollment reaching a high of 2014 underrepresented minorities (12 percent of all new entrants) in 1994 (Carlisle, Gardner, and Liu, 1998). In 1996, there was a large drop in applications from underrepresented minorities to medical schools (Editorial, 1999) with more than one-half of all U.S. medical schools experiencing a decline in minority enrollment (Carlisle, Gardner, and Liu, 1998). The decline was largest in public medical schools and in the four States (California, Texas, Louisiana, and Mississippi) where affirmative action programs have been banned.

More research is needed to identify what are the most effective strategies for the recruitment and retention of physicians from disadvantaged backgrounds. However, we should also capitalize on the currently available evidence on effective strategies. Affirmative action programs (Federal initiatives that allowed schools and employers to take into consideration a qualified applicant's race, sex, national origin, or disability) have been successful. It is estimated that affirmative action is responsible for 40 percent of all U.S.-trained physicians from underrepresented minority backgrounds (Editorial, 1999). Although underrepresented minority students tend to have lower test scores than other medical students, they do not differ on clinical performance suggesting that other non-cognitive variables are essential

in the recruitment of competent physicians (Tekian, 1997). In addition, despite their current unpopularity, affirmative action programs are defensible on multiple grounds including the societal obligation to meet the health care needs of all segments of the population (Nickens and Cohen, 1996). Moreover, recent research documents that racial prejudice, especially contemporary subtle prejudice, is the single most important source of opposition to affirmative action (Williams et al., 1999). These fingings emphasize the critical need to confront and eradicate societal racism in order to develop effective strategies to overcome America's painful history of exclusion and discrimination.

However, McClellan (1999) notes that simply matching physician race with client race is not enough. He cites an uncomfortable but insightful example from the Tuskegee Syphilis Study. In 1969, the Macon County Medical Society endorsed the continuation of the Tuskegee Syphilis Study. At that time, the Society was virtually all-black. McClellan (1999) argues that social class provides an explanation of those black physicians' behavior. That is, because most of the patients in the Tuskegee study were poor and illiterate, the study was not a threat to middle class physicians, their families, or friends. He argues that educational and professional socialization may lead health care professionals to distance themselves in terms of emotional attachment and self-interest from their groups of origin. Unthinking discrimination is likely to occur whenever medical professionals, irrespective of race, endorse negative societal stereotypes of their patients. Research is needed to identify the extent to which these processes operate and what may be the most effective strategies to counter them.

Rather than focusing only on individual

characteristics, efforts to reduce racial/ethnic disparities in the quality of medical care should seek to reform the systems for the delivery of care. Is it possible to design and implement systems for the delivery of medical care that can ensure appropriate behavior irrespective of effect and unconscious stereotypes? A definitive answer to this question awaits the necessary research, but Leape (1997) emphasizes that in medicine, as in other occupations, conditions of work can be managed, tasks and processes can be designed, and workers can be trained in ways that minimize undesirable outcomes.

## CONCLUSION

It is a national embarrassment that there are large and persisting racial differences in health. National data reveal, for example, that black persons had an overall mortality rate that was 1.6 times higher than white persons in 1995—identical to the black/white mortality ratio in 1950 (Williams, 1999). Moreover, for multiple causes of death (heart disease, cancer, diabetes, and cirrhosis of the liver) the racial discrepancy was larger in 1995 than in 1950. These inequities fly in the face of cherished American principles given the public's commitment to principles of equal treatment in society. As a society, we need to make it a national priority to build on the cultural support for egalitarian principles and develop strategies to eradicate racial inequities in medical care.

The United States President and other leaders in the executive branch of Government should use the "bully pulpit" to place this issue on the national agenda. President Clinton has drawn much national and media attention to the problem of health disparities by making it a topic of one of his Saturday morning radio addresses and by the establishment of his

Commission on Race. Relatedly, in 1994, President Clinton issued an executive order on environmental justice that could be a model of the kind of effort that is needed (Noah, 1998). This executive order created an interagency working group to address questions of environmental justice and to provide guidelines to Federal agencies for coordinating research, collecting data, and developing effective strategies to address inequities. A similar working group on racial disparities in medical care could monitor and coordinate data from multiple sources and provide a coordinated picture of the nature and prevalence of inequities in multiple health care settings. A commitment to the eradication of racial disparities also requires the creation of the institutional capacity to effectively monitor and enforce all existing laws and regulations.

Our review indicates that racism appears to be a technological hazard in the practice of medicine. Much of it may be unthinking and careless and not deliberately hateful behavior. However, regardless of motive, there are pervasive adverse consequences. As a society, we lack data on effective strategies to reduce racism at both the individual and institutional levels. While there are many books published on the topic and many programs on cultural diversity and tolerance, there is little systematic data available about the conditions under which particular strategies are more or less effective. Given the growing body of evidence that indicates that racism adversely affects health in multiple other ways (Krieger, 1999; Williams, 1999), more systematic efforts to develop and assess the impact of various strategies to reduce racism is warranted. Well-funded research centers for excellence should be established to foster interdisciplinary research on understanding and eliminating racial/ethnic disparities in medical care. Courageous moral and

political leadership is also needed to take the necessary steps to apply all of the knowledge that we currently have for reducing racial/ethnic disparities in health, and more generally.

## REFERENCES

Allen, J.: A Remedy for Unthinking Discrimination. **Brooklyn Law Review** 61:1299-1345, Winter, 1995.

Anderson, M.J.: **The American Census:** A Social History. New Haven, CT. Yale University Press, 1988.

Anderson, M., and Feinberg, S.E.: Black, White, and Shades of Gray (and Brown and Yellow). **Chance** 8(1):15-18, 1995.

Blendon, R., Aiken, L., Freeman, H., and Corey, C.: Access to Medical Care for Black and White Americans. **Journal of the American Medical Association** 261(2):278-281, 1989.

Bobo, L., Kluegel, J.R., and Smith, R.A.: Laissez Faire Racism: The Crystallization of a "Kinder, Gentler" Anti-Black Ideology. In Tuch, S.A., and Martin, J.K., eds.: **Racial Attitudes in the 1990s: Continuity and Change.** Westport, CT. Praeger; 1997.

Bobo, L., and Zubrinsky, C.L.: Attitudes on Residential Integration: Perceived Status Differences, Mere In-Group Preference, or Racial Prejudice? **Social Forces** 74(3):883-909, 1996.

Bonilla-Silva, E.: Rethinking Racism: Toward a Structural Interpretation. **American Sociological Review** 62(3):465-480, 1996.

Bunker, J. P., Frazier, H.F., and Mosteller, F.: The Role of Medical Care in Determining Health: Creating an Inventory of Benefits. In Amick, B.C.I., Levine, S., Tarlov, A.R., and Walsh, D.C., eds.: **Society and Health.** New York. Oxford University Press, 1995.

Carlisle, D.M., Gardner, J.E., and Liu, H.: The Entry of Underrepresented Minority Students Into U.S. Medical Schools: An Evaluation of Recent Trends. **American Journal of Public Health** 88(9):1314-1318, 1998.

Cleeland, C.S., Gonin, R., Baez, L., et al.: Pain and Treatment of Pain in Minority Patients with Cancer: The Eastern Cooperative Oncology Group Minority Outpatient Pain Study. **Annals of Internal Medicine** 127(9):813-816, 1997.

Cole, R.E., and Deskins, D.R., Jr.: Racial Factors in

Site Location and Employment Patterns of Japanese Auto Firms in America. **California Management Review** 31(1):9-22, 1988.

Council on Ethical and Judicial Affairs: Black-White Disparities in Health Care. **Journal of the American Medical Association** 263(17):2344-2346, 1990.

Davis, J.A., and Smith, T.W.: **General Social Surveys, 1972-1990.** Chicago. National Opinion Research Center, 1990.

Devine. P.G.: Prejudice and Out-Group Perception. In A. Tesser. **Advanced Social Psychology.** New York. McGraw-Hill, 1995.

Devine, P.G.: Stereotypes and Prejudice: Their Automatic and Controlled Components. **Journal of Personality and Social Psychology** 56:5-18, 1989.

Duff, R., and Hollingshead, A.: **Sickness and Society.** New York. Harper and Row, 1968.

Economic Report of the President. Washington, DC. U. S. Government Printing Office; 1998.

Editorial. Affirmative Action. Lancet 353(9146):1, 1999.

Fix, M., and Struyk, R.J.: **Clear and Convincing Evidence: Measurement of Discrimination in America.** Washington, DC. Urban Institute Press, 1993.

Geiger, H.J.: Race and Health Care - An American Dilemma? **New England Journal of Medicine** 335(11):815-816, 1996.

Hall, J.A., Roter, D.L., and Katz, N.R.: Meta-Analysis of Correlates of Provider Behavior in Medical Encounters. **Medical Care** 26(7):212-229, 1988.

Hannan, E.L., van Ryn, M., Burke, J., et al.: Access to Coronary Artery Bypass Surgery by Race/Ethnicity and Gender Among Patients Who Are Appropriate for Surgery. **Medical Care** 37(1):68-77, 1999.

Harris, D.R., Andrews, R., and Elixhauser, A.: Racial and Gender Differences in Use of Procedures for Black and White Hospitalized Adults. **Ethnicity and Disease** 7(2):91-105, 1997.

**Harvard Law Review:** The Impact of Managed Care on Doctors Who Serve Poor and Minority Patients. 108:1625-1642, May 1995.

Hillman, A.: Financial Incentives for Physicians in HMOs. Is There a Conflict of Interest? **New England Journal of Medicine** 317(27):1743-1748, 1987.

Hilton, J.L., and von Hippel, W.: Stereotypes. **Annual Review of Psychology** 47(250):237-271, 1996.

Horner, R.D., Oddone, E.Z., and Matchar, D.B.: Theories Explaining Racial Differences in the Utilization of Diagnostic and Therapeutic Procedures for Cerebrovascular Disease. **Milbank Quarterly** 73(3):443-462, 1995.

Johnson, S.L.: Unconscious Racism and the Criminal Law. **Cornell Law Review** 73:1016-1037, July 1988.

King. G.: Institutional Racism and the Medical/Health Complex: A Conceptual Analysis. **Ethnicity and Disease** 6(1,2):30-46, 1996.

Kirschenman, J., and Neckerman, K.M.: "We'd Love to Hire Them, But...": the Meaning of Race for Employers. In Jencks, C., and Peterson, P.E., eds. **The Urban Underclass.** Washington, DC.: The Brookings Institution. Pp 203-232, 1991.

Komaromy, M., Grumbach, K., Drake, M., et al.: The Role Of Black And Hispanic Physicians In Providing Health Care For Underserved Populations. **Black and Hispanic Physicians and Underserved Populations** 334(20):1305-1310, 1996.

Krieger, N.: Embodying Inequality: A Review of Concepts, Measures, and Methods for Studying Health Consequences of Discrimination. **International Journal of Health Services** 29(2):295-352, 1999.

Krieger, N., Williams, D.R., Moss, N.: Measuring Social Class in U.S. Public Health Research: Concepts, Methodologies, and Guidelines. **Annual Review of Public Health** 18:341-378, 1997.

Lavizzo-Mourey, R., Clayton, L.A., Byrd, M., et al.: The Perceptions of African-American Physicians Concerning Their Treatment By Managed Care Organizations. **Journal of the National Medical Association** 88(4):210-214, 1996.

Lawrence, C.R.I.: The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism. **Stanford Law Review** 39:317-38, January 1987.

Leape, L.L.: A Systems Analysis Approach to Medical Error. **Journal of Evaluation in Clinical Practice** 3(3)213-222, 1997.

Libby, D.L., Zhou, Z., and Kindig, D.A.: Will Minority Physician Supply Meet U. S. Needs? **Health Affairs (Millwood)** 16(4):205-214, 1997.

Massey, D.A., Gross, A.B., and Shibuya, K.: Migration, Segregation, and the Geographic Concentration of Poverty. **American Sociological Review** 59(3):425-445, 1994.

Massey, D.S.: The Age of Extremes: Concentrated Affluence and Poverty in the Twenty-First Century. **Demography** 33(4):395-428, 1996.

McBean, A.M., and Gornick, M.: Differences by Race in the Rates of Procedures Performed in Hospitals for Medicare Beneficiaries. **Health Care Financing Review** 15(4):77-90, 1994.

McClellan, F.M.: Is Managed Care Good for What Ails You? Ruminations on Race, Age and Class. **Villanova Law Review** 44:227-255, 1999.

McLafferty, S.: Neighborhood Characteristics and Hospital Closures: A Comparison of the Public, Private, and Voluntary Hospital Systems. **Social Science Medicine** 16(19):1667-1674, 1982.

Murphy-Berman, V.A., Berman, J.J., and Campbell, E.: Factors Affecting Health-Care Allocation Decisions: A Case of Aversive Racism? **Journal of Applied Social Psychology** 28(24):2239-2253, 1998.

National Center for Health Statistics: **Health, United States and, Socioeconomic Status and Health Chartbook** Hyattsville, MD. U.S. Department of Health and Human Services. Washington, DC. 1998.

National Committee on Vital and Health Statistics: 1. Diversity and Health Care Data Base: A Preamble for Policymakers. DHHS Publication PHS 93-1205:3-19, 1993.

Neckerman, K.M., and Kirschenman, J.: Hiring Strategies, Racial Bias, and Inner-City Workers. **Social Problems** 38(4):433-447, 1991.

Nickens, H.W., and Cohen, J.J.: On Affirmative Action [Policy Perspectives]. **Journal of the American Medical Association** 275(7):572-574, 1996.

Noah, B.A.: Racial Disparities in the Delivery of Health Care. **San Diego Law Review** 35:135-178, Winter 1998.

Oppenheimer, D.B.: Negligent Discrimination. **University of Pennsylvania Law Review** 141:899-972, January 1993.

Pauly, M.V., Hillman, A.L., and Kerstein, J.: Managing Physician Incentives in Managed Care: The Role of For-Profit Ownership. **Medical Care** 28(11):1013-1024, 1990.

Peterson, E.D., Shaw, L.K., DeLong, E.R., et al: Racial Variation in the Use of Coronary-Revascularization Procedures--Are the Differences Real? Do They Matter? **New England Journal of Medicine** 336(7):480-486, 1997.

Potosky, A.L., Breen, N. Graubard, B. I., and Parsons, P.E.: The Association Between Health Care Coverage and the Use of Cancer Screening Tests. Results from the 1992 National Health Interview Survey. **Medical Care** 36(3):257-70, 1998.

Randall, V.R.: Impact of Managed Care Organizations on Ethnic Americans and Under Served Populations. **Journal of Health Care for the Poor Underserved** 5(3):224-226, 1994.

Reschovsky, J.D., Kemper, P., Tu, H.T., et al.: Do HMOs Make a Difference?: Comparing Access, Service Use and Satisfaction Between Consumers in HMOs and Non-HMOs. **Issue Brief: Findings From Health System Change** 28:1-8, March 2000.

Robins, L.S., Fantone, J.C., Hermann, J., et al.: Culture, Communication, and the Informal Curriculum: Improving Cultural Awareness and Sensitivity Training in Medical School. **Academic Medicine** 73(10):S31-S34, 1998.

Schlesinger, M.: Paying the Price: Medical Care, Minorities, and the Newly Competitive Health Care System. **Milbank Quarterly** 65(2):270-296, 1987.

Schuman, H., Steeh, C., Bobo, L., and Krysan, M.: **Racial Attitudes in America: Trends and Interpretations, Rev. Edition**. Cambridge, MA. Harvard University Press, 1997.

Sharpe, R.: In Latest Recession, Only Blacks Suffered Net Employment Loss. **Wall Street Journal.** p. A-1, September 14, 1993.

Smith, D.B.: Addressing Racial Inequities in Health Care: Civil Rights Monitoring and Report Cards. **Health Politics, Policy, and Law** 23(1):75-105, 1998.

Stangnor, C., and McMillan, D.: Memory for Expectancy-Congruent and Expectancy-Incongruent Information: A Review of the Social and Social Development Literatures. **Psychological Bulletin** 111(1):42-61, 1992.

Tekian, A.: A Thematic Review of the Literature on Under Represented Minorities and Medical Training, 1981-1995: Securing the Foundations of the Bridge to Diversity. **Academic Medicine** 72(10):S140-S146, 1997.

Todd, K.H., Lee, T., Hoffman, J.R.: The Effect of Ethnicity on Physician Estimates of Pain Severity in Patients With Isolated Extremity Trauma. **Journal of the American Medical Association** 271(12):925-928, 1994.

Todd, K.H., Samaroo, N., and Hoffman, J.R.: Ethnicity as a Risk Factor for Inadequate Emergency Department Analgesia. **Journal of the American Medical Association** 269(12)1537-9, 1993.

Trevino, F.M., Moyer, M.E., Valdez, R.B., and Stroup-Benham, C.A.: Health Insurance Coverage and Utilization of Health Services by Mexican Americans, Mainland Puerto Ricans, and Cuban Americans. **Journal of the American Medical Association** 265(2):233-237, 1991.

van Ryn, M., and Burke, J.: The Effect of Patient Race and Socio-Economic Status on Physicians' Perceptions of Patients. **Social Science & Medicine** 50(6):813-828, 2000.

Wallace, S.P., Enriquez-Haass, V., and Markides, K.: The Consequences of Color-Blind Health Policy for Older Racial and Ethnic Minorities. **Stanford Law and Policy Review** 9(2):329-346, 1998.

Warner, K.: Cigarette Advertising and Media Coverage of Smoking and Health. **New England Journal of Medicine** 312(6):384-388, 1985.

Weissman, N.W., Allison, J.J., Kiefe, C.I., et al.: Achievable Benchmarks of Care: the ABC's of Benchmarking. **Journal of Evaluation in Clinical Practice** 5(3):269-281, 1999.

Wenneker, M.B., and Epstein, A.M.: Racial Inequalities in the Use of Procedures for Patients with Ischemic Heart Disease in Massachusetts. **Journal of the American Medical Association** 261:253-257, 1989.

Whiteis, D.G.: Hospital and Community Characteristics in Closures of Urban Hospitals, 1980-87. **Public Health Reports** 107(4):409-416, 1992.

Whittle, J., Conigliaro, J., Good, C.B., and Lofgren, R.P.: Racial Differences in the Use of Invasive Cardiovasular Procedures in the Department of Veterans Affairs. **New England Journal of Medicine** 329(9):621-626, 1993.

Williams, D.R.: Race and Health: Basic Questions, Emerging Directions. **Annals of Epidemiology** 7(5):322-333, 1997.

Williams, D.R.: Race/Ethnicity and Socioeconomic Status: Measurement and Methodological Issues. **International Journal of Health Services** 26(3):483-505, 1996.

Williams, D.R.: Race, SES, and Health: The Added Effects of Racism and Discrimination. **Annals of New York Academy of Sciences** 896:173-188, 1999.

Williams, D.R., Jackson, J.S., Brown, T.N., et al.: Traditional and Contemporary Prejudice and Urban Whites' Support for Affirmative Action and Government Help. **Social Problems** 46(4):503-527, 1999.

Zweifler, J., and Gonzalez, A.M.: Teaching Residents to Care for Culturally Diverse Populations. **Academic Medicine** 73(10):1056-1061, 1998.

Reprint Requests: David R. Williams, Ph.D., Institute for Social Research, University of Michigan, P.O. Box 1248, Ann Arbor, MI 48106-1248. E-Mail: wildavid@umich.edu

# How We Got Here:
# The Legacy of Anti-Black Discrimination in Radiology

*Julia E. Goldberg, MD, MBA • Vinay Prabhu, MD, MS • Paul N. Smereka, MD • Nicole M. Hindman, MD*

Author affiliations, funding, and conflicts of interest are listed at <u>the end of this article</u>.
See the invited commentary by <u>Scott</u> in this issue.



Current disparities in the access to diagnostic imaging for Black patients and the underrepresentation of Black physicians in radiology, relative to their representation in the general U.S. population, reflect contemporary consequences of historical anti-Black discrimination. These disparities have existed within the field of radiology and professional medical organizations since their inception. Explicit and implicit racism against Black patients and physicians was institutional policy in the early 20th century when radiology was being developed as a clinical medical field. Early radiology organizations also embraced this structural discrimination, creating strong barriers to professional Black radiologist involvement. Nevertheless, there were numerous pioneering Black radiologists who advanced scholarship, patient care, and diversity within medicine and radiology during the early 20th century. This work remains important in the present day, as race-based health care disparities persist and continue to decrease the quality of radiology-delivered patient care. There are also structural barriers within radiology affecting workforce diversity that negatively impact marginalized groups. Multiple opportunities exist today for antiracism work to improve quality of care and to apply standards of social justice and health equity to the field of radiology. An initial step is to expand education on the disparities in access to imaging and health care among Black patients. Institutional interventions include implementing community-based outreach and applying antibias methodology in artificial intelligence algorithms, while systemic interventions include identifying national race-based quality measures and ensuring imaging guidelines properly address the unique cancer risks in the Black patient population. These approaches reflect some of the strategies that may mutually serve to address health care disparities in radiology.

©RSNA, 2023 • *radiographics.rsna.org*



©RSNA, 2023

## PRACTICE POLICY
## AND QUALITY INITIATIVES

This copy is for personal use only. To order copies, contact *reprints@rsna.org*



Invited Commentary

Supplemental Material



CME

RadioGraphics 2023; 43(2):e220112
https://doi.org/10.1148/rg.220112

Content Codes: HP, PR, SQ

Abbreviations: ABR = American Board of Radiology, ACR = American College of Radiology, AMA = American Medical Association, NMA = National Medical Association, RSNA = Radiological Society of North America

Quiz questions for this article are available in the supplemental material.

## TEACHING POINTS

- From slavery to "Jim Crow" laws, legalized racism in the United States complemented the scarcity of medical ethical guidelines during the 19th and 20th centuries.

- While legislation of the Civil Rights Act of 1964 made structural segregation illegal, the consequences of its preceding years are seen today through health care disparities and professional barriers to inclusion.

- Imaging screening and diagnostic oncologic evaluation tend to be less accessible for Black patients, who tend to present for imaging with more aggressive cancers at later points in the disease course.

- Increased diversity in the professional workforce has been tied to performance improvement and innovative practices and has also been associated with professional efforts to expand access and challenge racial barriers to care.

- Radiology is a central piece of the provision of health care today, and ensuring equitable access to and engagement with imaging may improve health outcomes for all patients.

| Table 1: Terminology for Understanding Health Care Disparities and Discrimination | |
|---|---|
| Term | Definition |
| Race | Socially constructed organization of people according to physical characteristics perceived to have biologic derivation |
| Underrepresented in medicine (URiM) | Racial or ethnic groups who are underrepresented in the field of medicine relative to their proportion in the general population |
| Social justice | Fair distribution of privilege and economic resources across social groups |
| Health equity | Social justice in health; fair opportunities to attain optimal level of health across social groups |
| Health care disparities | Preventable differences between optimal health levels experienced by marginalized social groups |
| Unconscious bias | Stereotypes that are held outside of a person's conscious awareness against certain social groups |
| Antiracism | Active practice of opposing racism within systems and organizational structures |

## Introduction

Current disparities in access to diagnostic imaging for Black patients and the underrepresentation of Black physicians among radiology trainees and practicing radiologists reflect contemporary consequences of a history of anti-Black discrimination in the United States. In the late 19th century, leaders and institutions in the emerging field of radiology had both actively instituted and passively accepted discrimination against minority professionals and patients since the development of diagnostic and therapeutic applications of radiography. This discrimination is intimately tied with health care disparities seen today. Table 1 defines terms that are useful for understanding the study of health care disparities. While race is a socially constructed concept, the health care implications of racial bias are materially established through health care disparities. Social determinants of health, including racism, wealth inequality, and other social factors such as career opportunities and housing, are all implicated in disparities seen in medicine (1,2).

In comparison with the study of health disparities in many other patient-facing clinical fields, the study of health disparities in radiology is relatively sparse. Although diagnostic radiology is often not a patient-facing field, it has become a key structural component of a patient's diagnostic and therapeutic health care journey. Identifying and addressing race-based health care disparities in radiology has impacts far beyond imaging and ultimately on patient health outcomes. Therefore, understanding radiology's history and resultant structural racism is crucial to strive toward health equity for both patients and radiologists alike. We note that this article reviews only a few significant episodes of anti-Black discrimination and is not inclusive of all episodes of discrimination within the history of medicine.

## Anti-Black Discrimination in Medicine and Radiology during the 19th and 20th Centuries

### Anti-Black Discrimination in Medical Education

Throughout American history, medical education has been ingrained within the social structures of its time, and systemic exclusion of certain racial groups has been widespread. Among the earliest known Black applicants to American medical schools were Daniel Laing, Jr, Martin Delany, and Isaac H. Snowden, all of whom were accepted to Harvard Medical School, Boston, Massachusetts, in 1850 (3). Almost a quarter of Harvard's White medical students subsequently signed a letter protesting the Black students' presence on campus, referencing society's discrimination toward Black people, and claiming that the same exclusionary structures should apply to the medical school. Harvard leadership responded by expelling the three Black students (3).

After the end of the American Civil War, many Black people began migrating from the South to cities such as Washington, DC. To accommodate the large influx of Black patients into the city, Howard University College of Medicine was founded in 1868 and was the first medical school focused specifically on the education of Black students (Fig 1) (4). Six other medical schools for Black students were opened within the next few decades. However, many did not survive past the early 20th century as a result of the Flexner Report published in 1910. Dr Abraham Flexner reviewed the contemporaneous state of medical education in the United States and argued to focus resources on stronger medical schools. The Flexner Report led to the closure of 71% (5 out of 7) of medical schools for Black students, compared with the closure of 40% of medical schools overall. The Flexner Report stated "the practice of the negro doctor will be limited to his own race" while "the medical care



**Figure 1.** Photograph shows the Howard University campus in 1867, a year before its College of Medicine was founded. (Library of Congress, https://www.loc.gov/item/2017657067/.)

of the negro race will never be wholly left to negro physicians" (5), which limited the scope of a Black physician's practice to only Black patients. The Flexner Report therefore accepted limiting the number of Black physicians by allowing the closure of medical schools for Black students through the justification that non-Black physicians would care for Black patients.

Howard University College of Medicine and Meharry Medical College in Nashville, Tennessee, were the only two medical schools for Black students that remained open after the Flexner Report was published (6) and became responsible for training the majority of Black physicians throughout the 20th century (7). For example, 94% of the 369 Black medical students in 1935–1936 were enrolled at Howard or Meharry, and the other 6% were enrolled at medical schools in Northern states (8). Today, there are only four historically Black medical schools in operation: Meharry Medical College; Howard University College of Medicine; Morehouse School of Medicine in Atlanta, Georgia; and Charles R. Drew University of Medicine and Science in Los Angeles, California.

The widespread use of admissions quotas in medical schools during the mid 20th century limited the number of Black, Jewish, and female students along with other underrepresented identity groups in medicine. In 1942, for example, 86% of medical schools did not accept any Black applicants and others had quotas to accept one Black applicant every 1–4 years (9). After medical school graduation, physician training was also limited for Black physicians. Only 10% of hospitals in Northern states and 5% of hospitals in Southern states accepted Black interns and residents into their training programs in the 1950s (8).

## Anti-Black Discrimination in Medical Research and Health Care Provision

There was limited application of medical ethics in research and the provision of health care before the mid 20th century. Ethical guidelines became more widespread with the development of the Nuremberg Code in 1947 after the investigation into the Holocaust and Nazi atrocities (10,11). Before these

guidelines and the general acceptance of justice, beneficence, nonmaleficence, and autonomy, medical experimentation often targeted the most marginalized social groups.

Anti-Black racism and slavery in the United States, along with the widespread belief of racial medical inferiority, led to the unethical maltreatment of Black patients. During the early 19th century, Ephraim McDowell, MD, regarded as the "father of ovariotomy," and J Marion Sims, MD, known as the "father of modern gynecology" and a slaveholder himself, operated and experimented on enslaved women without their consent and without anesthesia (12). Slaves were forced to be experimental subjects in research studies ranging from genitourinary operations to heatstroke therapy and ophthalmology research (12). Samuel A. Cartwright, MD, described psychiatric conditions such as "drapetomania" to try to characterize slaves' attempts to escape their captivity as a pathologic condition (12). In fact, physicians in Southern states developed thriving businesses treating slaves with the goal of maintaining a workforce for slaveholders. Many Southern physicians were also slaveholders themselves (12).

Racist research studies and medical treatments continued in the 20th century after slavery was made illegal by the Emancipation Proclamation in 1863. A federally funded involuntary sterilization program ran during the 1920s to the 1980s and was based on eugenics ideas tied to white racial supremacy theories that led to the annual sterilization of up to 150 000 people. This program, colloquially termed "The Mississippi Appendectomy," initially targeted institutionalized women as well as poor and Black women in the South, including civil rights activist Fannie Lou Hamer (12). The Tuskegee Syphilis Study was also taking place in Alabama during this time (1932–1972). Investigators passively observed the syphilis disease course in impoverished Black men, and these patients were not offered treatment of syphilis once it became readily available in 1943.

Another well-known example of unethical research took place in 1951 when physicians took cancer cells from Henrietta Lacks, a Black woman dying from cervical cancer, without



**Figure 2.** Newspaper article clippings from 1904 show articles on the attempted use of radiation to lighten a Black person's skin color. (Images courtesy of the William J. Hammer Collection, Archives Center, National Museum of American History, Smithsonian Institution, Washington, DC.)

her consent. These cells are today known as the HeLa cell line and are used by thousands of research laboratories around the world and have been involved in the research published in over 60 000 scientific papers. While pharmaceutical companies have made millions of dollars from research involving HeLa cells, there has not been financial compensation to Henrietta Lacks' family (13). On a broader scale, over 90% of hospitals in Southern states during the 1950s either refused to care for Black patients or treated them only in segregated racial wards (8).

From slavery to "Jim Crow" laws, legalized racism in the United States complemented the scarcity of medical ethical guidelines during the 19th and 20th centuries. This created a legacy of, at best, indifference and, at worst, direct harm to Black Americans by individual physicians and by the medical establishment.

### Brief History of Anti-Black Discrimination in the Emerging Field of Radiology

Wilhelm Röntgen first published research on x-rays in 1895, and within a few decades the use of x-rays became part of what was considered a comprehensive physical examination (14). In 1898, Marie and Pierre Curie discovered radium, which led to further public fascination with the potential benefits of radiation. Radium was put into water, dining ware, and toothpaste and was considered a possible substitute for gas and electricity.

Radiation was also hailed as a potential tool to further racist and eugenics activities. Radium was studied at university laboratories in an attempt to lighten a Black person's skin color (Fig 2) (14). Radiologists also published on the potential sterilization of "degenerates" and women with mental illnesses (15,16).

### Structural Discrimination within Early Medical and Radiology Societies

The American Medical Association (AMA) was established in 1847 and engaged early with scientific racism. For example, an AMA committee in 1850 reported a subsequently disproved study on the smaller size of brains in individuals from Africa compared with those in individuals from Europe (7). On the professional side, Black physician membership to the AMA was in effect only permitted in Northern states (7). Members of the racially integrated Washington, DC, National Medical Society were specifically excluded from AMA membership in 1870. In 1872, the AMA decided to change its policy of accepting delegations from any medical institution or society and instead only recognized delegations sent from state societies, effectively instituting Black physician exclusion in Southern states since Black physicians were often not allowed to join Southern state societies. Through the 1950s, the Louisiana State Medical Society and other medical societies in counties across Southern states continued to exclude Black physicians from membership (8). Even as late as 1963, the AMA denied a policy proposal to exclude racially segregated societies.

The Radiological Society of North America (RSNA) was established in 1915 and required two current members to sponsor a new applicant. For over 20 years, all of RSNA's members were White (Fig 3) (17). The first known Black applicant for RSNA membership was William Edward Allen, Jr, MD, who was rejected in 1934 (17). The first known Black RSNA member whose admission application was accepted was Lawrence D. Scott, MD, in 1939; Dr Scott subsequently sponsored Dr Allen's admission application.



**Figure 3.** Photograph shows attendees at the 1933 RSNA Annual Meeting. Charles Humbert, MD, a Black radiologist, who was not a member of the RSNA at the time, is sitting on the right side of this image within a group of majority White radiologists. (Reprinted, with permission, from Nancy Knight, PhD, University of Maryland School of Medicine, Baltimore, Md.)

The American Board of Radiology (ABR) was established in 1934. Membership to the RSNA or the American Roentgen Ray Society was required to apply to the ABR, both of which initially had no Black members, or physicians could apply through the Canadian Medical Association or the AMA (which excluded Black physicians in Southern and border states) (17). Despite these limitations, Dr Allen was the first Black member to be certified by the ABR in 1935. When attending the ABR examination, he was forced to take the freight elevator because of his race instead of the hotel guest elevator that his White colleagues used (Fig 4). In 1962, Sarah Ewell Payton, MD (1931–1992), became the first Black woman certified by the ABR (18).

In response to this systematic discrimination and exclusion, the National Medical Association (NMA) was established in 1895 by Black physicians who were denied admission to the AMA (Fig 5). Its goal was to provide a professional medical space for Black physicians and to focus on the health of minority patient populations (19).

## Pioneering Black Radiologists and Their Work to Advance the Field of Radiology

The field of radiology has both a long history of anti-Black discrimination and a long history of Black radiologists succeeding despite these limitations. Marcus F. Wheatland, MD (1868–1934), is recognized as the first Black radiologist (Fig 6) who started using x-rays in his medical practice in Newport, Rhode Island, in 1902 (Fig 7) (20). His scholarly work includes "The Therapeutic Application of the X-Rays" in *The American X-Ray Journal* (1903) and "A Case of Ainhum" in *JAMA* (1905) (20,21).

Rudolph Fisher, MD (1897–1934), was a New York City radiologist who was also a singer, a writer, and a leader of the Harlem Renaissance (Fig 8) (20). He was the first Black radiologist to be a member of Phi Beta Kappa and led the Black-



**Figure 4.** Illustration shows Dr William E. Allen, Jr, being forced to use the hotel freight elevator in 1935 to take his ABR examination.

owned International Hospital in Manhattan, New York. In the scientific realm, he published on the therapeutic application of radiation. Dr Fisher was also an esteemed nonscientific



**Figure 5.** Photograph of the NMA Welcome Group, undated. (Image courtesy of Xavier University of Louisiana Archives and Special Collections, New Orleans, Louisiana.)



**Figure 6.** Marcus F. Wheatland, MD (1868–1934). Photograph taken by W. W. Ernst. (Image courtesy of Howard University.)

writer and published novels set in Harlem, New York, including the first Black detective novel (17,20).

As previously discussed, Dr Allen (1903–1981) was the first Black member certified by the ABR in 1935, the first Black member of the American College of Radiology (ACR) in 1940, and the second known Black member of RSNA in 1948 (Fig 9) (20). He published articles in many esteemed medical journals, including *Radiology* and the *American Journal of Roentgenology*, even before he was initially rejected for RSNA membership. In 1974, Dr Allen was the first Black member to receive ACR's highest honor, the Gold Medal Award (20).

Many Black radiologists worked to expand diversity and equity within the field of radiology and within medicine and American society at large. Dr Wheatland was very active in the NMA, serving as President in 1910, and delivered NMA's first lecture in radiology, "The Diagnostic Value of the X-ray in General Practice, with Lantern Slides." Dr Scott, after he became the first known Black member of the RSNA, was able to successfully sponsor Dr Allen's second admission application after he had been initially rejected from membership when there were no other Black member sponsors. Dr Allen was also active in the NMA, founding and chairing the NMA's Section on Radiology in 1949.

Dr Allen also created various training programs and scholarships in radiology for Black students in the 1930s. The first Black registered radiology technologist, Rose Marie Pegues, RT, RN (1913–1992), attended a training program for Black x-ray technologists created by Dr Allen (Fig 10). Outside of radiology, Dr Fisher published articles for the National Association for the Advancement of Colored People (NAACP).



Figure 7.    Photograph shows Bellevue Avenue in Newport, Rhode Island, in 1871. Marcus Wheatland, MD, is recognized as the first Black radiologist who started using x-rays in his medical practice in Newport. Photograph taken by Clarence Stanhope. (Image courtesy of the Collection of the Newport Historical Society, Newport, Rhode Island.)



Figure 8.    Rudolph Fisher, MD (1897–1934). (Reprinted, with permission, from Alan E. Oestreich, MD, FACR.)



Figure 9.    William E. Allen, Jr, MD (1903–1981). (Reprinted, with permission, from Alan E. Oestreich, MD, FACR.)

There have been numerous other Black radiologists who were pioneers in the field, some of whom are listed in Table 2. We note that this discussion is by no means complete nor a thorough review of all the pioneering Black radiologists in the field. We hope that future authors are able to build on this work with a more comprehensive list of important Black radiologists in our history.

### Era of the Civil Rights Movement
The era of the Civil Rights Movement saw the application of racial justice in the legal sphere applied to the medical sphere. NMA became involved in civil rights activism within health care through publishing articles on the racial integration of medicine and by organizing conferences and civil rights protests (7). In 1958, Drs Hubert A. Eaton, Daniel C. Roane, and Samuel James Gray, all Black physicians at the James Walker Memorial Hospital in Wilmington, North Carolina, sued their hospital employer for denying them staff privileges because of their race (22). The suit was dismissed on technical grounds, but it paved the way for other legal challenges to employment discrimination in health care. In 1963, Dr George Simkins won his lawsuit against the Moses H. Cone Memorial Hospital in Greensboro, North Carolina, for denying medical care to one of his Black patients. Anti-Black discrimination and "separate but equal" policies in the provision of medical care were found to be unconstitutional within federally funded hospitals (22).

February 2023



**Figure 10.**   Rose Marie Pegues, RT, RN (1913–1992). (Reprinted, with permission, from Alan E. Oestreich, MD, FACR.)

Title VI of the Civil Rights Act of 1964, passed the following year, outlawed racial segregation in all federally funded programs (23). The Social Security Amendments of 1965 created Medicare and Medicaid, specifically allowing funding only to racially desegregated hospitals (22). Through these legislative acts, anti-Black discrimination was finally found unconstitutional in the legal sphere, with expanded protections for Black patient medical care and Black physician employment (22,23).

## Current Effects of Anti-Black Discrimination on Radiology-delivered Health Care Disparities

The interplay between the scarcity of medical ethical guidelines and widespread legalized racism in the United States created a legacy of both indifference and direct harm to Black Americans by the medical establishment. Although the Civil Rights Act of 1964 made structural segregation illegal, the consequences of the years preceding it are seen today through health care disparities and professional barriers to inclusion.

### Health Care Disparities in Cancer-related Imaging

Imaging-based cancer screening demonstrates widespread racial health disparities related to access to screening and ultimately patient health outcomes. For breast, lung, and colorectal cancer, all of which have imaging-based screening guidelines, Black patients have up to a 42% higher mortality rate compared with that of White patients (24). Imaging screening and diagnostic oncologic evaluation tend to be less accessible for Black patients, who tend to present for imaging with more aggressive cancers at later points in the disease course.

There is a 41% higher mortality rate from breast cancer among Black women compared with that among White women (25). Black female patient populations also demon-

strate lower rates of undergoing screening mammography (26) and screening MRI (27). Screening accessibility may be a major factor, as breast imaging facilities with higher proportions of non-White patients were found to have longer delays for biopsy workup, longer wait times, and fewer radiologists (28). Digital breast tomosynthesis (DBT), now representing the mainstream screening modality, has had lower rates of adoption in geographic areas with higher Black patient populations (29). Black women also have longer travel times overall to access breast MRI examinations (30).

There is a higher mortality rate from lung cancer for Black patients (31). Black patients on average have a higher risk for lung cancer than do White patients with a similar smoking history (32,33) and demonstrate earlier disease onset and more advanced stage at lung cancer diagnosis (34). Even so, Black patients are less likely to undergo screening for lung cancer (35,36). Screening recommendations are largely based on the results of the National Lung Cancer Screening Trial, in which the research population was only 4.4% Black (34). Comparing eligibility for lung cancer screening by using the U.S. Preventive Services Task Force (USPSTF) 2013 recommendations, 68% of Black smokers with lung cancer versus 44% of White smokers with lung cancer were not initially eligible for screening (37). There were, therefore, reasonable concerns that the screening guidelines did not adequately address the lower smoking rates and earlier onset of cancer that Black patients face, and thus excluded a portion of the population that should be screened (24,32). The USPSTF expanded the lung cancer screening guidelines in March 2021 in part to address the screening eligibility disparity experienced by Black patients (38). Racial disparities were also seen with the use of PET/CT for evaluation of non–small cell lung cancer; the use and diagnostic application of PET/CT has been correlated with improved patient outcomes (39).

The Black patient population also has a higher mortality rate (40) and lower screening rate (40,41) for colorectal cancer than non-Black patients. Regarding prostate cancer, Black men were less likely than White men to undergo evaluation with multiparametric MRI, a modality that improves detection of clinically significant prostate cancer (12). Certain barriers to care were found to affect Black men's access to multiparametric MRI, including limited medical communication and insurance coverage issues (42). Black men were also less likely to undergo multiparametric MRI-US fusion biopsy to improve prostate cancer biopsy yield at earlier stages (43).

### Other Health Care Disparities in Imaging

Published imaging guidelines are not followed uniformly across racial groups. One study found that Black patients, compared with White patients, were less likely to have incidental pulmonary nodules followed up according to established imaging guidelines (44). Regarding the overall use of imaging, a review of the literature demonstrated decreased use of imaging for racial minorities (45). Specifically examining emergency imaging, Payne and Puumala (46) showed a decreased use of imaging in pediatric emergency departments for Black patients compared with White patients, and Schrager et al (47) showed similar imaging disparities in adult

**Table 2: Selection of Pioneering Black Radiologists**

| Name (Life Span) | Contributions |
|---|---|
| William Edward Allen, Jr, MD (1903–1981) | First Black member certified by the ABR (1935)<br>First Black member of the ACR (1940)<br>Second known Black member of the RSNA (1948)<br>First Black member to receive the ACR's highest honor, the Gold Medal (1974) |
| Claudius DeWitt Bell, MD (1875–1918) | Wrote the first article that included x-ray images in the *Journal of the National Medical Association*<br>Served as Provident Hospital's x-ray therapeutist (Chicago, Illinois) starting in 1911<br>Historical documents suggest that Dr Bell interpreted United States President Teddy Roosevelt's chest radiograph after an assassination attempt in 1912 |
| Ivy O. Roach Brooks, MD (1916–1986) | First recognized Black female leader in radiology<br>Served as Chief of Radiology at the Tuskegee Veterans Administration Hospital (1966–1986) |
| John W. Coleman, MD (1920–2004) | Chicago radiologist whose lawsuit against discriminatory hiring practices in 1961 led to the racial integration of Chicago hospitals |
| Rudolph Fisher, MD (1897–1934) | Radiologist in New York City<br>Researcher and writer who was a leader of the Harlem Renaissance |
| Albert Chambers Johnston, MD (1900–1988) | Joined the RSNA in 1938, became an ABR diplomat in 1940<br>Hid his racial identity until he was rejected by the United States Navy because of his race<br>Was the subject of the book and movie *Lost Boundaries* |
| John W. Lawlah, MD, MS, DSc (1904–1976) | First Black member of the American Roentgen Ray Society<br>Professor of Radiology and Dean of Howard University College of Medicine |
| Louis B. Levy, PhD, FACR (1934) | First Black radiation oncologist certified by the ABR in 1968 |
| Esmond M. Mapp, MD (1928–1991) | Chief of Gastrointestinal Radiology at Episcopal Hospital of Philadelphia, Pennsylvania<br>Professor of Radiology at Jefferson Medical College, Philadelphia, Pennsylvania<br>Secretary of the Pennsylvania Radiological Society |
| Russell F. Minton, MD (1900–1997) | Radiologist at Mercy Hospital, Philadelphia, Pennsylvania, starting in 1940; later became Chief of Radiology<br>Taught chemistry, assisted George Washington Carver |
| Jesse J. Peters, MD (1895–1966) | Chief of Radiology at Tuskegee Veterans Administration Hospital for >30 years<br>Second Black diplomate of the ABR after passing the board examination in 1937 |
| Bernard W. Robinson, MD (1918–1972) | Radiologist and administrator in the Veterans Administration system<br>First Black Navy ensign (1945)<br>First obituary of a Black radiologist to be published in *Radiology* |
| Lawrence Disraeli Scott, MD (1907–1980) | First known Black member of the RSNA (1939)<br>Early research in x-ray therapeutics |
| Marcus F. Wheatland, MD (1868–1934) | First Black radiologist; started using x-rays in his medical practice in Newport, Rhode Island (1902)<br>Published on radiology topics starting in 1903<br>11th president of the NMA |

Source.—Reference 20.

emergency rooms. In the interventional radiology sphere, Brinjikji et al (48) found a significantly lower rate of mechanical thrombectomy for treatment of stroke in Black patients compared with that in White patients.

Early in the COVID-19 pandemic, the disease severity on chest radiographs in patients who were admitted with COVID-19 was significantly higher among non-White patients (49). Another study found decreased use of outpatient imaging services for Black patients after a Massachusetts statewide shutdown of nonemergent medical services in 2020 (50), which is likely reflective of current unequal access to diagnostic imaging services.

## Physician-related Professional Disparities within Radiology

Black physicians are significantly underrepresented in the radiology workforce relative to their representation in the general U.S. population (51,52). In recent years in the United States, Black physicians make up 6.2% of medical school graduates, 3.1% of diagnostic radiology residents, 2.1% of diagnostic radiology practicing physicians, and 2.0% of diagnostic radiology faculty (51,52). For reference, 13.6% of the United States population is Black (53). Diagnostic radiology ranks 18th for Black physician representation across all specialties despite being ranked 9th in specialty size (54,55). Among the radiology subspecialties, neuroradiology and interventional radiology fellowships have the least Black physician representation (56). Within interventional radiology, there has been virtually no change in the underrepresentation of Black physicians over the past 2 decades (57).

This underrepresentation has palpable effects on the culture of radiology. In a survey of ACR members, 28% of physicians from marginalized racial groups described "unfair or disrespectful treatment" because of their race (58). A study of letters of recommendation for radiology residency applicants revealed that letter writers were less likely to use terms

| Table 3: High-Yield Strategies and Resources to Address Health Care Disparities in Radiology | | |
|---|---|---|
| Topic | Main Points | Resources |
| Education | Contemporary race-based health care disparities<br>Differential use of cancer screening and follow-up imaging examinations<br>Differential imaging access | Safdar (1)<br>DeBenedectis et al (17) |
| Access to imaging examinations and facilities | Cancer screening guidelines may not capture increased risk of certain cancers for Black populations<br>Increased travel distance for certain imaging facilities<br>Limited insurance coverage for CT colonography | Berland et al (24)<br>Fiscella et al (32)<br>Onega et al (30) |
| Community-based outreach | Patient navigators for scheduling, transportation difficulties, and follow-up recommendations<br>Community-based health care partners<br>Education about imaging-based screening modalities | Betancourt et al (2)<br>Waite et al (64)<br>Neal et al (65) |
| Technology and informatics | Artificial intelligence antibias methodology<br>Evidence-based guidelines in electronic medical records to combat potential racial bias in the ordering of imaging examinations | Allen and Dreyer (70)<br>Wang et al (71) |
| Racial diversity within the professional radiology sphere | Expansion of mentoring for URiM with a focus on the professional pipeline into radiology<br>Antiracist workforce policies<br>Antiracist employment training | Lightfoote et al (60)<br>Allen and Garg (73) |
| Additional innovations | Encourage and fund health care disparities research<br>Cultivate antiracist workplace culture, especially from leadership<br>Incentivize diversity and antiracist work through linking quality measures to improving health care disparities | Harrington and Harvey (66)<br>Brink (76) |
| Note.—Numbers in parentheses are references. URiM = underrepresented in medicine. | | |

reflecting an individual's agency (eg, "ambitious," "self-motivated," "competent," "confident") for Black and Latinx applicants compared with White and Asian applicants (59). Such attitudes coupled with limited "exposure and mentorship" to academics and research activities likely serve as current barriers for Black trainees and early-career radiologists engaging in scholarly activity (60).

In an attempt to combat such challenges, several initiatives have been advanced by radiology societies; some representative examples include the ACR Committee for Women and Diversity to support professional radiology diversity and inclusion (23) and the RSNA Committee on Diversity, Equity, and Inclusion. However, diversity promotion in radiology remains an issue, as research performed in 2020 showed that 54% of radiology professional society websites did not include diversity statements and 46% did not have diversity initiatives (61).

## Potential Solutions to Address Health Care Disparities and Anti-Black Bias in the Field of Radiology

The history of anti-Black discrimination in radiology should directly inform the solutions that are developed today to achieve health equity and confront racial bias in the field. There are several ways to challenge the racial barriers faced by Black patients accessing radiologic care, as summarized in Table 3. A recommended first step is listening, learning, and educating about health equity and antiracist work (1,62).

It is important to identify and address the barriers to care for patients in each radiology practice, which often include longer waiting and transportation times for racial minority patients (63). Targeted interventions may involve expanding outreach efforts, spreading awareness of screening guidelines, and easing scheduling and transportation difficulties (2,24,35,36,64). The addition of patient navigators was found to increase adherence to imaging guidelines and follow-up recommendations specifically for marginalized patient populations (65). Considering the history of injustices by the medical community against Black patients, these individual-level interventions may foster patient trust in the provision of equitable and comprehensive care (2). However, some of these interventions may not be feasible for financially challenged radiology institutions (eg, addition of patient navigators, expanding outreach efforts, and spreading awareness of imaging guidelines). Health care disparities arose within a context of societal and governmental anti-Black racism, and as such, effective interventions must also stem from large-scale structural and governmental efforts.

Health care interventions on the structural level are necessary to address the marked disparities in cancer mortality rates (64). Imaging screening guidelines may be reexamined given the increased likelihood for Black patients to develop certain cancers at an earlier age, following the example of the U.S. Preventive Services Task Force (USPSTF) updated lung cancer screening guidelines in 2021 (24,38). Expanded insurance coverage for CT colonography may also increase colorectal cancer screening rates among Black patients (24,40). Another proposed structural intervention is to link certain Medicare quality measures to observed health disparities to financially incentivize health equity work in radiology (66). Regardless, addressing health disparities is a moral, ethical,

and also financial concern (55,64). Black health care disparities are estimated to contribute an additional $35 billion of unnecessary health care costs annually (67), specifically considering "excess direct medical care expenditures" related to increased disease and comorbidity rates within Black patient populations.

Race-based algorithms have historically been present within the radiology landscape and are now being challenged. Race-based algorithms affect the decision to pursue imaging, including predicting the presence of a ureteral stone in the context of flank pain (STONE score), the frequency of surveillance for breast cancer in non-White patients (Breast Cancer Surveillance Consortium Risk Calculator), and the risk of osteoporosis or fracture in Black patients (Osteoporosis Risk SCORE and Fracture Risk Assessment Tool [FRAX]) (68). Race-based algorithms for the estimation of glomerular filtration rate (GFR) have been widely used in decision making regarding contrast material administration for CT examinations. In 2022, the National Kidney Foundation–American Society of Nephrology (NKF-ASN) Task Force published recommendations eliminating race from this calculation (69).

Newer artificial intelligence (AI) algorithms should similarly be developed with explicit antibias methodology. Algorithms that involve race as a stand-alone factor for clinical decision making should be disputed (70). Since AI learns from existing health care data that already include race-based health care disparities, an antiracial bias approach must be actively undertaken when developing new imaging algorithms and technology.

Technologic solutions may instead be applied to ensure equitable access to imaging. One informatics approach developed a clinical decision-making support tool to offer evidence-based guidelines to referring physicians (71). This tool seeks to promote appropriate imaging and combat potential racial bias in the decision-making process for screening or diagnostic workup.

Within the professional environment, expanding diversity is crucial for both radiologists and patients alike (1,2,64). Increased diversity in the professional workforce has been tied to performance improvement and innovative practices (62) and has also been associated with professional efforts to expand access and challenge racial barriers to care (55). Improving diversity within the medical workforce has thus been associated with improved patient care (23,55,72). Techniques to increase racial diversity in radiology include acknowledging and mitigating unconscious racial bias in hiring decisions (73), supporting mentoring programs for underrepresented minorities throughout the medical training pipeline (60), and maintaining explicit antiracist workforce policies and employment training (74). While there is still widespread underrepresentation of Black radiologists throughout the professional field, there is increased visibility of Black physicians within radiology leadership. Notably, in addition to several Black radiologists recently rising to prominent board and leadership positions in national and subspecialty radiology societies, Beverly Coleman, MD, FACR, was elected president of the ACR in 2021, the first Black physician to serve in this position (75).

At the systemic level, social determinants of health and anti-Black racism play a role in the persistence of health care disparities (64). There are now multiple opportunities to get involved with antiracism and social justice radiology efforts through the ACR and AMA and in advocacy through other local and national social justice organizations. Continued health care disparities research, especially in radiology, is needed to ascertain how radiology can better serve its patient population (1,72). Funding for such radiology initiatives is critical, especially when it comes from radiology leadership (62,76).

## Conclusion

The responsibility for improving health equity is no longer limited to primary care or to referring physicians but rather relates to everyone in the professional radiology community. Radiology is a central piece of the provision of health care today, and ensuring equitable access to and engagement with imaging may improve health outcomes for all patients (72). The provision of imaging screening, diagnostic tests, and interventions can be inclusive of radiology's diverse patient population and directly address Black health care disparities. Acknowledging the discriminatory history of radiology and striving to improve diversity and health equity will ultimately work to improve patient outcomes.

***Author affiliations.***—From the Department of Radiology, NYU Langone Health, 550 1st Ave, New York, NY 10016. Recipient of a Certificate of Merit award for an education exhibit at the 2021 RSNA Annual Meeting. Received May 3, 2022; revision requested July 21 and received August 4; accepted August 5. **Address correspondence to** J.E.G. (email: *Julia.Goldberg@nyulangone.org*).

***Acknowledgment.***—We are deeply indebted to Dr Alan Oestreich for freely sharing his work and photographs with us and for having the initial vision and fortitude to document this information before it became invisible.

***Disclosures of conflicts of interest.***—The authors, editor, and reviewers have disclosed no relevant relationships.

## References

1. Safdar NM. An Introduction to Health Disparities for the Practicing Radiologist. J Am Coll Radiol 2019;16(4 Pt B):542–546.
2. Betancourt JR, Tan-McGrory A, Flores E, López D. Racial and Ethnic Disparities in Radiology: A Call to Action. J Am Coll Radiol 2019;16(4 Pt B):547–553.
3. Gewertz K. Against all odds: Students of African descent at HMS before affirmative action. The Harvard Gazette. https://news.harvard.edu/gazette/story/2004/11/against-all-odds/. Published November 18, 2004. Accessed February 22, 2022.
4. Overview and History: Howard University College of Medicine—About Us. http://medicine.howard.edu/about-us. Accessed April 2, 2022.
5. Flexner A. The Flexner Report: Medical Education in the United States and Canada. Princeton, NJ: Carnegie Foundation for the Advancement of Teaching, Science and Health Publications, 1910.
6. Halperin EC, Perman JA, Wilson EA. Abraham Flexner of Kentucky, his report, Medical Education in the United States and Canada, and the historical questions raised by the report. Acad Med 2010;85(2):203–210.
7. Baker RB, Washington HA, Olakanmi O, et al. African American physicians and organized medicine, 1846-1968: origins of a racial divide. JAMA 2008;300(3):306–313.
8. Cornely PB. Segregation and discrimination in medical care in the United States. Am J Public Health Nations Health 1956;46(9):1074–1081.
9. Mansfield C. African American Radiation Oncologists. In: Gagliardi R, Wilson JF, eds. A History of the Radiological Sciences: Oncology. Leesburg, Va: American Roentgen Ray Society, 1996; 263–275.
10. Beecher HK. Ethics and clinical research. N Engl J Med 1966;274(24):1354–1360.
11. National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. The Belmont Report: Ethical Principles and

Guidelines for the Protection of Human Subjects of Research. Federal Register, 1979.

12. Washington HA. Medical Apartheid: The Dark History of Medical Experimentation on Black Americans from Colonial Times to the Present. New York, NY: Anchor, 2008.

13. Skloot R. The Immortal Life of Henrietta Lacks. New York, NY: Crown Publishing Group, 2010.

14. DiSantis DJ, DiSantis DM. Wrong turns on radiology's road of progress. RadioGraphics 1991;11(6):1121–1138.

15. Wiesloch AH. Sterilization in the Interests of Race Betterment. Am J Roentgenol Radium Ther Nucl Med 1916;3(46):46–47.

16. Rollins W. Notes on X light: On the importance of treating the generative organs of degenerates by X light to prevent their increase. Arch Roentgen Ray 1905;9(8):180–181.

17. Oestreich AE. Radiologic history exhibit. 1934: fateful year in the history of African-Americans in radiology. RadioGraphics 1995;15(4):1013–1020.

18. Webster R. African American Firsts in Science and Technology. Detroit, Mich: Gale Group, 1999.

19. Oestreich AE. Early radiology and the National Medical Association. J Natl Med Assoc 2011;103(1):46–49.

20. Oestreich AE. Glen W. Hartman Lecture: Radiology Section of the National Medical Association. Centennial history of African-Americans in radiology. AJR Am J Roentgenol 1996;166(2):255–258.

21. Wheatland MF. A Case Of Ainhum. J Am Med Assoc 1905;XLV(9):631.

22. Tu RK. Legislative, Payment Policy Milestones of Racial Inequality in Health Care: Medicare and Medicaid as the Final Catalyst. J Am Coll Radiol 2018;15(9):1346–1348.

23. Mcintosh-Clarke DR, Zeman MN, Valand HA, Tu RK. Incentivizing Physician Diversity in Radiology. J Am Coll Radiol 2019;16(4 Pt B):624–630.

24. Berland LL, Monticciolo DL, Flores EJ, Malak SF, Yee J, Dyer DS. Relationships Between Health Care Disparities and Coverage Policies for Breast, Colon, and Lung Cancer Screening. J Am Coll Radiol 2019;16(4 Pt B):580–585.

25. Richardson LC, Henley SJ, Miller JW, Massetti G, Thomas CC. Patterns and Trends in Age-Specific Black-White Differences in Breast Cancer Incidence and Mortality: United States, 1999-2014. MMWR Morb Mortal Wkly Rep 2016;65(40):1093–1098.

26. Ahmed AT, Welch BT, Brinjikji W, et al. Racial Disparities in Screening Mammography in the United States: A Systematic Review and Meta-analysis. J Am Coll Radiol 2017;14(2):157–165.e9.

27. Haas JS, Hill DA, Wellman RD, et al. Disparities in the use of screening magnetic resonance imaging of the breast in community practice by race, ethnicity, and socioeconomic status. Cancer 2016;122(4):611–617.

28. Karliner LS, Kaplan C, Livaudais-Toman J, Kerlikowske K. Mammography facilities serving vulnerable women have longer follow-up times. Health Serv Res 2019;54(suppl 1):226–233.

29. Richman IB, Hoag JR, Xu X, et al. Adoption of Digital Breast Tomosynthesis in Clinical Practice. JAMA Intern Med 2019;179(9):1292–1295.

30. Onega T, Lee CI, Benkeser D, et al. Travel Burden to Breast MRI and Utilization: Are Risk and Sociodemographics Related? J Am Coll Radiol 2016;13(6):611–619.

31. Borondy Kitts AK. The Patient Perspective on Lung Cancer Screening and Health Disparities. J Am Coll Radiol 2019;16(4 Pt B):601–606.

32. Fiscella K, Winters P, Farah S, Sanders M, Mohile SG. Do Lung Cancer Eligibility Criteria Align with Risk among Blacks and Hispanics? PLoS One 2015;10(11):e0143789.

33. Haiman CA, Stram DO, Wilkens LR, et al. Ethnic and racial differences in the smoking-related risk of lung cancer. N Engl J Med 2006;354(4):333–342.

34. Annangi S, Nutalapati S, Foreman MG, Pillai R, Flenaugh EL. Potential Racial Disparities Using Current Lung Cancer Screening Guidelines. J Racial Ethn Health Disparities 2019;6(1):22–26.

35. Carter-Harris L, Slaven JE Jr, Monahan PO, Shedd-Steele R, Hanna N, Rawl SM. Understanding lung cancer screening behavior: Racial, gender, and geographic differences among Indiana long-term smokers. Prev Med Rep 2018;10:49–54.

36. Japuntich SJ, Krieger NH, Salvas AL, Carey MP. Racial Disparities in Lung Cancer Screening: An Exploratory Investigation. J Natl Med Assoc 2018;110(5):424–427.

37. Aldrich MC, Mercaldo SF, Sandler KL, Blot WJ, Grogan EL, Blume JD. Evaluation of USPSTF Lung Cancer Screening Guidelines Among African American Adult Smokers. JAMA Oncol 2019;5(9):1318–1324.

38. Shusted CS, Evans NR, Kane GC, Juon HS, Barta JA. Analysis of Lung Cancer Screening by Race After USPSTF Expansion of Screening Eligibility in 2021. JAMA Netw Open 2022;5(6):e2217578.

39. Morgan RL, Karam SD, Bradley CJ. Ethnic Disparities in Imaging Utilization at Diagnosis of Non-Small Cell Lung Cancer. J Natl Cancer Inst 2020;112(12):1204–1212.

40. Moreno CC, Mittal PK, Sullivan PS, et al. Colorectal Cancer Initial Diagnosis: Screening Colonoscopy, Diagnostic Colonoscopy, or Emergent Surgery, and Tumor Stage and Size at Initial Presentation. Clin Colorectal Cancer 2016;15(1):67–73.

41. Wilkins T, Gillies RA, Harbuck S, Garren J, Looney SW, Schade RR. Racial disparities and barriers to colorectal cancer screening in rural areas. J Am Board Fam Med 2012;25(3):308–317.

42. Walton EL, Deebajah M, Keeley J, et al. Barriers to obtaining prostate multi-parametric magnetic resonance imaging in African-American men on active surveillance for prostate cancer. Cancer Med 2019;8(8):3659–3665.

43. Hoge C, Verma S, Lama DJ, et al. Racial disparity in the utilization of multiparametric MRI-ultrasound fusion biopsy for the detection of prostate cancer. Prostate Cancer Prostatic Dis 2020;23(4):567–572.

44. Schut RA, Mortani Barbosa EJ Jr. Racial/Ethnic Disparities in Follow-Up Adherence for Incidental Pulmonary Nodules: An Application of a Cascade-of-Care Framework. J Am Coll Radiol 2020;17(11):1410–1419.

45. Colwell RL, Narayan AK, Ross AB. Patient Race or Ethnicity and the Use of Diagnostic Imaging: A Systematic Review. J Am Coll Radiol 2022;19(4):521–528.

46. Payne NR, Puumala SE. Racial disparities in ordering laboratory and radiology tests for pediatric patients in the emergency department. Pediatr Emerg Care 2013;29(5):598–606.

47. Schrager JD, Patzer RE, Kim JJ, et al. Racial and Ethnic Differences in Diagnostic Imaging Utilization During Adult Emergency Department Visits in the United States, 2005 to 2014. J Am Coll Radiol 2019;16(8):1036–1045.

48. Brinjikji W, Rabinstein AA, McDonald JS, Cloft HJ. Socioeconomic disparities in the utilization of mechanical thrombectomy for acute ischemic stroke in US hospitals. AJNR Am J Neuroradiol 2014;35(3):553–556.

49. Joseph NP, Reid NJ, Som A, et al. Racial and Ethnic Disparities in Disease Severity on Admission Chest Radiographs among Patients Admitted with Confirmed Coronavirus Disease 2019: A Retrospective Cohort Study. Radiology 2020;297(3):E303–E312.

50. Lacson R, Shi J, Kapoor N, Eappen S, Boland GW, Khorasani R. Exacerbation of Inequities in Use of Diagnostic Radiology During the Early Stages of Reopening After COVID-19. J Am Coll Radiol 2021;18(5):696–703.

51. Chapman CH, Hwang WT, Both S, Thomas CR Jr, Deville C. Current status of diversity by race, Hispanic ethnicity, and sex in diagnostic radiology. Radiology 2014;270(1):232–240.

52. Association of American Medical Colleges. Diversity in Medicine: Facts and Figures 2019. https://www.aamc.org/data-reports/workforce/report/diversity-medicine-facts-and-figures-2019. Accessed 2022.

53. United State Census Bureau. QuickFacts United States. https://www.census.gov/quickfacts/fact/table/US/PST045221. Updated July 1, 2021. Accessed November 15, 2022.

54. Sieck L, Chatterjee T, Birch A. Priming the Pipeline: Inspiring Diverse Young Scholars in the Radiologic Sciences Begins During Early Childhood Education. J Am Coll Radiol 2022;19(2 Pt B):384–388.

55. Lightfoote JB, Fielding JR, Deville C, et al. Improving diversity, inclusion, and representation in radiology and radiation oncology part 1: why these matter. J Am Coll Radiol 2014;11(7):673–680.

56. West DL, Nguyen H. Ethnic and Gender Diversity in Radiology Fellowships. J Racial Ethn Health Disparities 2017;4(3):432–445.

57. Higgins MC, Hwang WT, Richard C, et al. Underrepresentation of Women and Minorities in the United States IR Academic Physician Workforce. J Vasc Interv Radiol 2016;27(12):1837–1844.e2.

58. Pandharipande PV, Mercaldo ND, Lietz AP, et al. Identifying Barriers to Building a Diverse Physician Workforce: A National Survey of the ACR Membership. J Am Coll Radiol 2019;16(8):1091–1101.

59. Grimm LJ, Redmond RA, Campbell JC, Rosette AS. Gender and Racial Bias in Radiology Residency Letters of Recommendation. J Am Coll Radiol 2020;17(1 Pt A):64–71.

60. Lightfoote JB, Fielding JR, Deville C, et al. Improving diversity, inclusion, and representation in radiology and radiation oncology part 2: challenges and recommendations. J Am Coll Radiol 2014;11(8):764–770.

61. Prabhu V, Pascual Van Sant E, Lovett JT, Hindman NM. Current State of Membership Diversity among North American Radiology Societies: Analysis of Public Information on Society Websites. Acad Radiol 2021;28(11):1541–1547.

62. Gosztyla ML, Kwong L, Murray NA, et al. Responses to 10 common criticisms of anti-racism action in STEMM. PLOS Comput Biol 2021;17(7):e1009141.

63. Ray KN, Chari AV, Engberg J, Bertolet M, Mehrotra A. Disparities in Time Spent Seeking Medical Care in the United States. JAMA Intern Med 2015;175(12):1983–1986.

64. Waite S, Scott J, Colombo D. Narrowing the Gap: Imaging Disparities in Radiology. Radiology 2021;299(1):27–35.

65. Neal CD, Weaver DT, Raphel TJ, et al. Patient Navigation to Improve Cancer Screening in Underserved Populations: Reported Experiences, Opportunities, and Challenges. J Am Coll Radiol 2018;15(11):1565–1572.

66. Harrington SG, Harvey HB. Quality Improvement and Reimbursements: An Opportunity to Address Health Disparities in Radiology. J Am Coll Radiol 2019;16(4 Pt B):635–637.

67. LaVeist TA, Gaskin D, Richard P. Estimating the economic burden of racial health inequalities in the United States. Int J Health Serv 2011;41(2):231–238.

68. Vyas DA, Eisenstein LG, Jones DS. Hidden in Plain Sight: Reconsidering the Use of Race Correction in Clinical Algorithms. N Engl J Med 2020;383(9):874–882.

69. Delgado C, Baweja M, Crews DC, et al. A Unifying Approach for GFR Estimation: Recommendations of the NKF-ASN Task Force on Reassessing the Inclusion of Race in Diagnosing Kidney Disease. Am J Kidney Dis 2022;79(2):268–288.e1.

70. Allen B, Dreyer K. The Role of the ACR Data Science Institute in Advancing Health Equity in Radiology. J Am Coll Radiol 2019;16(4 Pt B):644–648.

71. Wang KY, Malayil Lincoln CM, Chen MM. Radiology Support, Communication, and Alignment Network and Its Role to Promote Health Equity in the Delivery of Radiology Care. J Am Coll Radiol 2019;16(4 Pt B):638–643.

72. DeBenedectis CM, Spalluto LB, Americo L, et al. Health Care Disparities in Radiology: A Review of the Current Literature. J Am Coll Radiol 2022;19(1 Pt B):101–111.

73. Allen BJ, Garg K. Diversity Matters in Academic Radiology: Acknowledging and Addressing Unconscious Bias. J Am Coll Radiol 2016;13(12 Pt A):1426–1432.

74. Konuthula D, de Abril Cameron F, Jonassaint N, et al. Perspectives on Anti-Black Racism and Mitigation Strategies Among Faculty Experts at Academic Medical Centers. JAMA Netw Open 2022;5(4):e228534.

75. First African American Elected President of the ACR. ACR News Releases. https://www.acr.org/Media-Center/ACR-News-Releases/2021/First-African-American-Elected-President-of-the-ACR. Published May 18, 2021. Accessed April 1, 2022.

76. Brink JA. Leadership's Role to Encourage Health Equity in the Delivery of Radiologic Care. J Am Coll Radiol 2019;16(4 Pt B):657–659.

*This journal-based CME activity has been approved for **AMA PRA Category 1 Credit**™. See rsna.org/learning-center-rg.*

Volume 43   Number 2 • radiographics.rsna.org

RS

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

C-16-CV-24-003548

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, DC, 20580<br><br>**Plaintiff,**<br><br>v.<br><br>**U.S. ANESTHESIA PARTNERS, INC.**<br>12222 Merit Drive, Suite 700<br>Dallas, TX, 75251<br><br>**and**<br><br>**WELSH, CARSON, ANDERSON &<br>STOWE XI, L.P.,<br>WCAS ASSOCIATES XI, LLC,<br>WELSH, CARSON, ANDERSON &<br>STOWE XII, L.P.,<br>WCAS ASSOCIATES XII, LLC,<br>WCAS MANAGEMENT CORPORATION,<br>WCAS MANAGEMENT, L.P., and<br>WCAS MANAGEMENT, LLC**<br>599 Lexington Avenue, Suite 1800<br>New York, NY, 10022<br><br>**Defendants.** | **Case No.:**<br><br>**Redacted Public Version** |

**Complaint for Injunctive and Other Equitable Relief**

Plaintiff Federal Trade Commission ("FTC"), by its designated attorneys, petitions this

Court pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for a permanent injunction

and other equitable relief, against Defendants U.S. Anesthesia Partners, Inc. ("USAP"); and

Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson,

Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation,

WCAS Management, L.P., and WCAS Management, LLC (collectively "Welsh Carson" or the "Welsh Carson Defendants") to redress and prevent violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## NATURE OF THE CASE

1.      This action challenges USAP and Welsh Carson's multi-year anticompetitive scheme to consolidate anesthesia practices in Texas, drive up the price of anesthesia services provided to Texas patients, and increase their own profits.

2.      Welsh Carson is a New York-based private equity firm. From its Park Avenue offices in Midtown Manhattan, Welsh Carson had observed that anesthesiology in Texas was "fragmented"—that is, full of small physician practices that competed against one another. This dynamic allowed insurers to negotiate lower prices for themselves, for their clients (including Texas businesses), and ultimately for patients. Although Texans benefited from this competition, Welsh Carson saw an opportunity to profit from eliminating it and consolidating these various practices into a dominant provider with the power to extract high prices.

3.      In 2012, Welsh Carson created USAP to execute this consolidation strategy. Specifically, USAP's founding purpose was to pursue an "aggressive" strategy to "consolidat[e] practices with high market share in a few key markets." By doing so, Welsh Carson sought to exploit the fact that anesthesia services are critical to modern surgery; hospitals need to offer anesthesia services, and patients, their employers, and insurers must pay for them, even if choices dwindle and prices go up. Welsh Carson saw that eliminating competitors—by acquiring or conspiring with them, instead of competing on the merits—would give USAP the power to raise prices, raking in tens of millions of extra dollars for USAP, Welsh Carson, and their

executives. Welsh Carson and USAP spent the next decade bringing that consolidation strategy to life through a set of illegal tactics.

4.      First, USAP and Welsh Carson engaged in what they referred to as a "roll-up," buying nearly every large anesthesia practice in Texas. This scheme began in Houston, where USAP entered in December 2012 by purchasing the region's largest practice and then making three further acquisitions. USAP expanded to Dallas in 2014 and quickly acquired other key groups there. Starting in 2016, USAP made significant acquisitions elsewhere in Texas—San Antonio, Austin, Amarillo, and Tyler. All told, USAP's roll-up scheme involved over a dozen practices, 1,000 doctors, and 750 nurses.

5.      USAP's acquisitions have hit Texans' wallets hard. With each deal, USAP raised the acquired group's prices to USAP's (often much) higher price. As one insurance executive summarized, USAP and Welsh Carson used acquisitions to "take the highest rate of all . . . and then peanut butter spread that across the entire state of Texas." Welsh Carson and USAP euphemistically referred to this practice—wielding its increasingly dominant market position to net tens of millions of dollars in additional profits—as "synergies." Before USAP made a single acquisition, Welsh Carson was already bragging to potential financiers about the plan to create a "significant synergy opportunity" at the expense of patients, their employers, and insurers. USAP's and Welsh Carson's executives, in plotting their "roll up," underscored that "captur[ing] significant synergies" was a key part of their scheme. Following one acquisition, a USAP executive put it more bluntly: "Cha-ching!"

6.      Second, USAP supported its "roll-up" strategy by entering or maintaining price-setting arrangements with other, independent anesthesia groups that shared key hospitals in Houston and Dallas. Under these price-setting arrangements, USAP charges its own high prices

3

for services in fact provided by those independent groups that had been charging lower prices. Like its acquisitions, USAP's price-setting arrangements yielded "synergies"—or additional revenues—that USAP then split with each independent group. Despite USAP's own executives recognizing that these price-setting arrangements are "odd from a compliance standpoint," two of them remain in use today and USAP has signed or pursued multiple others.

7. Third, USAP and Welsh Carson entered a market allocation with another large anesthesia services provider. ███████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████. The Welsh Carson partner who acted as USAP's chief negotiator made clear that this market allocation agreement was "what we want," and he later expressed appreciation for █████████ "constructive" attitude towards USAP's and Welsh Carson's interest in sidelining a significant rival.

8. Defendants' consolidation strategy has worked. Thanks to its roll-up, price-setting agreements, and market allocation scheme, USAP is the dominant provider of anesthesia services in Texas and in many of its major metropolitan areas, including Houston and Dallas. No rival comes close to matching USAP's size. As of 2021, USAP was at least four times larger than the second-largest group in Houston; six times larger than the second-largest group in Dallas; and nearly seven times larger than the second-largest group in all of Texas. It is also one of the most expensive, with reimbursement rates that are double the median rate of other anesthesia

providers in Texas. The predictable (and intended) effect is that anesthesia services—from the same anesthesiologists—cost Texans tens of millions of dollars more each year than they did before USAP was created.

9.      In other words, thanks to its anticompetitive conduct, USAP has been able to extract monopoly profits while simultaneously growing its monopoly power. Defendants' scheme was so successful that Welsh Carson has already begun "deploying a similar strategy to consolidate" multiple other physician practice specialties.

10.     The FTC now asks this Court to put an end to Defendants' unlawful scheme, prevent its recurrence, and restore competition across Texas.

# Table of Contents

I.     JURISDICTION AND VENUE .................................................................. 10

II.    THE PARTIES ............................................................................................ 11

       A.   Plaintiff Federal Trade Commission ................................................ 11

       B.   Defendant U.S. Anesthesia Partners ................................................ 11

       C.   Defendant Welsh Carson .................................................................. 12

III.   BACKGROUND ......................................................................................... 18

       A.   Anesthesia is administered to patients by doctors and nurses to prevent pain ......... 18

       B.   Anesthesia services are performed in hospitals or outpatient facilities ................... 19

       C.   Hospitals contract with anesthesia providers to serve their facilities ...................... 20

       D.   Insurers negotiate network status and reimbursement with anesthesia providers .... 22

       E.   To discipline price demands, insurers may refuse to include anesthesia groups
            in their network ............................................................................... 24

IV.    USAP'S AND WELSH CARSON'S ANTICOMPETITIVE SCHEME ................... 26

       A.   Welsh Carson hatches a strategy to consolidate anesthesia practices in Texas ........ 26

       B.   Welsh Carson executes on its consolidation strategy by creating USAP and
            acquiring a large practice in Houston ........................................... 27

       C.   Welsh Carson and the newly-formed USAP develop a plan to roll up
            independent anesthesia practices and raise prices ...................... 31

V.     USAP CONTINUES ITS ANTICOMPETITIVE SCHEME BY ROLLING
       UP ADDITIONAL PRACTICES ............................................................ 33

       A.   After its founding acquisition, USAP makes three additional acquisitions in
            Houston ............................................................................................ 33

            1.   North Houston Anesthesiology – Kingwood Division (2014).......................... 33

            2.   MetroWest Anesthesia Care (2017)................................................ 34

            3.   Guardian Anesthesia Services (2020)............................................. 35

            4.   USAP's consolidation of Houston as it stands today........................ 36

B.   USAP expands its roll-up scheme to Dallas ............................................. 37

    1.   Pinnacle Anesthesia Consultants (2014) .................................... 38

    2.   Anesthesia Consultants of Dallas (2015) ................................... 40

    3.   Excel Anesthesia Consultants (2015) ........................................ 41

    4.   Southwest, BMW, Medical City Physicians, and Sundance (2015-2016) ........................................................................................ 42

    5.   USAP's consolidation of Dallas as it stands today ........................... 44

C.   USAP further expands its roll-up scheme by acquiring other large practices across Texas ........................................................................................... 45

    1.   East Texas Anesthesiology Associates (2016) ........................... 47

    2.   Capitol Anesthesiology Association (2018) ................................ 48

    3.   Amarillo Anesthesia Consultants (2018) ................................... 49

    4.   Star Anesthesia (2019) .............................................................. 50

**VI.   USAP'S OTHER ANTICOMPETITIVE CONDUCT** ................................. **51**

A.   USAP uses price-setting arrangements to charge its own, higher rates for anesthesia services provided by other practices ......................................... 52

    1.   The Methodist Hospital Physician Organization .............................. 54

    2.   Dallas Anesthesiology Associates ............................................. 56

    3.   Baylor College of Medicine ....................................................... 57

    4.   University of Texas .................................................................... 58

B.   USAP's market allocation with ██████████ ............................... 59

**VII.   RELEVANT MARKETS** ............................................................................. **61**

A.   The relevant service market is commercially insured hospital-only anesthesia services .................................................................................................... 61

    1.   Services performed outside a hospital are not part of the relevant service market ....................................................................... 62

    2.   Non-commercial insurance plans are not part of the relevant service market ....................................................................... 65

B.    The relevant geographic markets to assess the competitive implications of the challenged conduct are no broader than the local metropolitan statistical areas ...... 66

    1.    A relevant geographic market is no broader than the Houston metropolitan statistical area ............................................................................ 66

    2.    A relevant geographic market is no broader than the Dallas-Fort Worth metropolitan statistical area ............................................................................ 68

    3.    A relevant geographic market is no broader than the Austin metropolitan statistical area ............................................................................ 69

**VIII.   MARKET POWER AND MONOPOLY POWER .................................................. 71**

A.    USAP has monopoly power in the Houston MSA ................................................. 71

    1.    USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share in Houston ................................................................................................ 71

    2.    USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Houston ............................................... 73

    3.    USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Houston ........................................ 74

B.    USAP has monopoly power in the Dallas MSA ....................................................... 75

    1.    USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share ...................................................................................................................... 75

    2.    USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Dallas ............................................... 77

    3.    USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Dallas ........................................... 78

C.    USAP has a dominant position in the commercially insured hospital-only anesthesia market in Austin ............................................................................................ 79

    1.    USAP and Welsh Carson's roll-up of anesthesia providers has substantially increased concentration, resulting in a dominant market share ...................................................................................................................... 79

    2.    USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Austin ............................................... 81

8

3.    USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its dominance in Austin ...................................................... 82

D.    High barriers to entry to the hospital-only anesthesia markets in Houston, Dallas, and Austin protect USAP's market share ...................................................... 82

IX.    USAP'S DOMINANCE IN TEXAS ................................................................. **84**

X.    HARM TO CONSUMERS AND COMPETITION ........................................ **86**

A.    USAP's conduct has increased its negotiating leverage against insurers, reducing insurers' ability to constrain USAP's demands to raise prices .................. 86

B.    USAP's conduct has increased prices for hospital-only anesthesia services in Texas ................................................................................................................. 89

C.    There are no valid procompetitive justifications for or efficiencies from USAP's conduct .................................................................................................. 91

XI.    LIKELIHOOD OF RECURRENCE ............................................................... **92**

A.    Without appropriate relief, USAP's harmful conduct is likely to recur .................. 92

B.    Without appropriate relief, Welsh Carson's harmful conduct is likely to recur ....... 93

XII.    VIOLATIONS ................................................................................................ **95**

XIII.    PRAYER FOR RELIEF ................................................................................ **105**

# I.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

12.    This Court has personal jurisdiction over USAP because USAP has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

13.    This Court has personal jurisdiction over Welsh Carson because Welsh Carson has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

14.    Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b). Each Defendant resides, transacts business, committed an illegal or tortious act, or is found in this district.

15.    Defendants' general business practices, and the unfair methods of competition alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

16.    USAP, Welsh Carson Associates XI, LLC, Welsh Carson Associates XII, LLC, Welsh Carson Management Corp., and Welsh Carson Management, LLC are, and at all relevant times have been, "corporations," as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

17.    Welsh, Carson, Anderson & Stowe XI, L.P., Welsh, Carson, Anderson & Stowe XII, L.P., and Welsh Carson Management, L.P., are, and at all relevant times have been, "partnerships" within the meaning of 15 U.S.C. § 45(a).

## II.     THE PARTIES

### A.  Plaintiff Federal Trade Commission

18.     Plaintiff FTC is an administrative agency of the United States Government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its principal offices in the District of Columbia. The FTC is vested with authority and responsibility for enforcing, among other things, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

19.     The FTC is authorized to bring this case in federal court because Defendants are violating or about to violate a provision of law enforced by the FTC, and this is a proper case for permanent injunctive relief within the meaning of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

### B.  Defendant U.S. Anesthesia Partners

20.     Defendant U.S. Anesthesia Partners, Inc. is a for-profit Delaware corporation, with its principal place of business at 12222 Merit Drive, Suite 700, Dallas, TX, 75251.[1]

21.     Founded in late 2012, USAP is a physician-service organization that focuses on anesthesia and pain management services. Since its founding, USAP has grown significantly, primarily through acquiring other anesthesia practices. In 2013, approximately 400 USAP anesthesia providers performed 300,000 anesthesia procedures at 45 healthcare facilities. As of late 2021, over 4,500 USAP anesthesia providers performed 2.5 million anesthesia procedures at 1,100 healthcare facilities. Between 2013 and 2021, USAP's revenue increased █████████ ███████████████████████████████████████████████████████████.

---

[1] Except where otherwise specified, "USAP" refers to U.S. Anesthesia Partners, Inc. and all corporate predecessors, successors, parents, subsidiaries, and affiliates.

22.     USAP currently has a presence in eight states: Colorado, Florida, Indiana, Maryland, Nevada, Tennessee, Texas, and Washington. At all times, Texas has been USAP's largest market, accounting for approximately 65% of the company's profit in 2021.

**C.  Defendant Welsh Carson**

23.     Welsh Carson is engaged in the business of private equity investment and management, primarily in the healthcare and technology sectors. Since its founding in 1979, Welsh Carson has raised over $31 billion and invested in over 95 healthcare companies. Welsh Carson's investments include USAP, which it co-founded in 2012 with an approximately $█████ ████ investment.

24.     Like other private equity firms, Welsh Carson uses a complex maze of related entities, including but not limited to the Welsh Carson Defendants, to carry out its business.

25.     Defendant WCAS Management Corporation is a for-profit Delaware corporation founded in 2000. WCAS Management Corporation employs or otherwise compensates investment professionals. This includes both Welsh Carson's "partners," who serve as the officers, directors, and managers of Welsh Carson Management Corp., and more junior investment professionals, whom the partners supervise and direct. These investment professionals raise money from investors such as insurance companies, pension plans, and high-net-worth individuals and pool that money into investment vehicles called "funds," which operate as limited partnerships.

26.     Defendant Welsh, Carson, Anderson & Stowe XII, L.P. (the "WCAS XII fund") is a Delaware limited partnership founded in 2014. The WCAS XII fund, like other Welsh Carson funds before and since, uses money raised from investors to purchase ownership stakes in

12

other companies. The WCAS XII fund holds, and has held since 2017, stock in USAP.[2] USAP and the other companies in which Welsh Carson's funds acquire ownership positions are referred to as "portfolio companies." Eventually, the Welsh Carson funds sell some or all of their stake in portfolio companies and distribute the proceeds to the investors and to Welsh Carson itself.

27.     Defendant WCAS XII Associates, LLC is a for-profit Delaware corporation founded in 2014. WCAS XII Associates, LLC is the general partner of the WCAS XII fund and makes investment and other decisions on its behalf.[3] Welsh Carson's general partners control and direct WCAS Associates XII—and by extension the WCAS XII fund—both in their capacity as the "managing members" of WCAS XII Associates and in their role as the officers, directors, and managers of Welsh Carson Management Corp., which serves as the investment manager for WCAS Associates XII.

28.     Defendant Welsh, Carson, Anderson & Stowe XI, L.P. (the "WCAS XI fund") is a Delaware limited partnership founded in 2008. The WCAS XI fund held USAP stock from 2012 to 2017.

29.     Defendant WCAS Associates XI, LLC is a for-profit Delaware corporation founded in 2008. WCAS Associates XI is the general partner of the WCAS XI fund and makes investment and other decisions on its behalf. As with Defendant WCAS Associates XII, Welsh Carson's partners control and direct WCAS Associates XI—and by extension the WCAS XI fund—both in their capacities as the "managing members" of WCAS Associates XI and in their

---

[2] Technically, the WCAS XII fund is comprised of four separate limited partnerships. Welsh, Carson, Anderson & Stowe XII is the "main" fund that holds most of the USAP stock controlled by Welsh Carson. There are also three "parallel" funds: Welsh, Carson, Anderson & Stowe Delaware, L.P.; Welsh, Carson, Anderson & Stowe Delaware II, L.P.; and Welsh, Carson, Anderson & Stowe Cayman, L.P.
[3] WCAS Associates XII is the general partner of the main fund and one parallel fund. The remaining two parallel funds have a different general partner, WCAS Associates XII Cayman, L.P., but WCAS Associates XII is in turn the general partner of—and controls—WCAS Associates XII Cayman, L.P. As such, WCAS Associates XII is effectively the general partner for the entirety of the WCAS XII fund.

role as officers, directors, and managers of WCAS Management Corp., which serves as the investment manager for WCAS Associates XI.

30.     Defendant WCAS Management, L.P. is a Delaware limited partnership founded in 2017. Welsh Carson has transitioned many (if not all) of the responsibilities and employees of WCAS Management Corp. to WCAS Management, L.P. Welsh Carson's partners control WCAS Management, L.P. in their capacity as directors and managing members of Defendant WCAS Management, LLC.

31.     Defendant WCAS Management, LLC is a for-profit Delaware corporation founded in 2017. WCAS Management, LLC is the general partner of WCAS Management, L.P. and makes all its "[m]ajor decisions." In other words, through both WCAS Associates XII and the WCAS Management entities, Welsh Carson controls the decision-making of the WCAS XII fund. For its other funds, including the WCAS XI fund, Welsh Carson uses or has used a similar structure to achieve the same outcome. The WCAS XI fund operated out of the same office space as the WCAS XII fund, was controlled by largely the same individuals, relied on the same personnel to conduct its operations, was engaged in the same line of business, and even invested in some of the same portfolio companies (including USAP).

32.     The Welsh Carson Defendants operate as a common enterprise. They share a website, www.wcas.com, which refers to "Welsh, Carson, Anderson & Stowe" as "the Firm." They use the same office space and principal place of business, 599 Lexington Avenue, Suite 1800, New York, NY, 10022,[4] and direct that mail sent to any Welsh Carson Defendant be addressed "c/o Welsh, Carson, Anderson & Stowe." They all use the common trademarks "WCAS" and "Welsh, Carson, Anderson & Stowe," which are registered to Defendant WCAS

---

[4] In 2017, Welsh Carson moved its principal place of business from 320 Park Avenue to 599 Lexington Avenue.

Management Corp. And the same individual "partners" serve as officers, directors, or managers of—and thus ultimately control—the different Welsh Carson Defendants. To take just one example: D. Scott Mackesy, described on the Welsh Carson website as the "Managing Partner of the Firm," is a managing member of Defendants WCAS XI and XII Associates, LLC (which, as described above, control Defendants Welsh, Carson, Anderson & Stowe XI and XII, L.P.); President and a director of Defendant Welsh Carson Management Corp.; and a managing member and director of Welsh Carson Management, LLC (which, as described above, controls Welsh Carson Management, L.P.).

33.     Welsh Carson controls many of its funds' portfolio companies. If a Welsh Carson fund directly owns more than 50% of a portfolio company or otherwise has rights to more than 50% of its shares, Welsh Carson has formal control over the company's major decisions. Welsh Carson typically is guaranteed representation—sometimes a majority—on a portfolio company's board of directors, to which the company's management reports. Welsh Carson also identifies, and has its portfolio companies hire, management teams who share the vision of and take direction from Welsh Carson. And Welsh Carson personnel supervise and assist company management and other employees in day-to-day operations.

34.     USAP has been a Welsh Carson portfolio company since 2012, when Welsh Carson created the company for the purpose of rolling up anesthesia practices in Texas.

35.     Welsh Carson's specific ownership stake in USAP has varied over time. At USAP's founding in 2012, Welsh Carson owned 50.2% of the company. Between 2013 and 2017, Welsh Carson's ownership stake was diluted to 44.8% as USAP granted equity to acquired physician groups. In late 2017, Welsh Carson sold about half its stake in USAP to other institutional investors, Berkshire Partners and GIC Capital. Today, it owns approximately 23% of

USAP. Despite the changes in the degree of its formal ownership of USAP, Welsh Carson has actively directed USAP's corporate strategy and decision-making, particularly with respect to mergers and acquisitions of anesthesia practices in Texas.

36.     At all times, Welsh Carson has been guaranteed at least two seats on the USAP board of directors. From 2012 and 2017, Welsh Carson had the right to appoint the majority of USAP's board of directors, including its chair. Between 2013 and 2017, even when its ownership stake dipped below 50%, Welsh Carson—in its own words—maintained control over USAP "in all practical respects" because it held the voting rights of almost all of the company's other shareholders. Indeed, one of the Welsh Carson partners most intimately involved with USAP's business stated in 2014 that "our mandate is to be control investors." Following its partial sale of USAP in late 2017, Welsh Carson remained, as USAP's former CEO and Chairman put it, the "most influential" member of USAP's board. Welsh Carson currently has two directors on USAP's board. In addition, the current board Chairman, though not appointed by Welsh Carson, is affiliated with the firm.

37.     While the Welsh Carson directors on USAP's board sometimes act for USAP, they retain duties to and interests in Welsh Carson. At least one Welsh Carson director on USAP's board, Brian Regan, acted in his Welsh Carson capacity when formulating, directing, and participating in USAP's unlawful conduct. As described below, Regan served on USAP's board from 2012 until 2022. During that time, he facilitated USAP's roll-up scheme by, among other things, signing deal documents for several of the challenged acquisitions—and doing so expressly on behalf of Welsh Carson. He also helped strike deals integral to USAP's consolidation strategy, such as by leading negotiations for its market-allocation agreement with ███████ with the help of a confidentiality agreement he signed on Welsh Carson's behalf. And

Regan often directed Welsh Carson employees (who were not USAP board members) to assist with USAP's consolidation scheme, such as by identifying attractive acquisitions, helping secure funding, and assisting in negotiations with insurers. ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████.

38.     Welsh Carson hired most of USAP's original management team, including the Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, and head of Human Resources, all of whom had previously served in similar capacities at other Welsh Carson portfolio companies. Other senior employees—such as USAP's longtime Vice President of Payor Contracting—were hired in part due to their Welsh Carson connections. USAP's current CEO came from Welsh Carson and ████████████████████████.

39.     Welsh Carson has regularly provided USAP with strategic, operational, and financial support since its founding. Pursuant to a series of management agreements and otherwise, Welsh Carson personnel have provided USAP with services related to corporate finance, acquisition due diligence, and strategic planning (among other things). At USAP's founding, when the company was considerably smaller than it is today, USAP relied extensively on Welsh Carson personnel. Over the years, USAP and Welsh Carson personnel continued to work together frequently and closely.

40.     At all relevant times, Welsh Carson has formulated, directed, controlled, had the authority to control, dictated, encouraged, or actively and directly participated in the anticompetitive conduct describe herein.

III.   <u>BACKGROUND</u>

**A.  Anesthesia is administered to patients by doctors and nurses to prevent pain**

41.   Anesthesia is a type of medical treatment that prevents patients from feeling pain during procedures such as surgery or dental work. Depending on the procedure, a patient may receive general anesthesia—which affects the entire body, often rendering them unconscious while sustaining critical life functions—or local / regional anesthesia, which blocks pain in only part of the body and does not affect a patient's consciousness.

42.   Patients receive general anesthesia through the bloodstream (i.e., intravenously) or by inhaling gas. General anesthesia is typically safe but can pose risks for some patients, such as the elderly or persons with chronic illnesses. Local and regional anesthesia are safer, and patients can typically return home soon after their procedure. For example, local anesthesia is often used in routine dental surgery and regional anesthesia is often used during childbirth.

43.   The practice of administering anesthesia is a specialty medical field known as anesthesiology. Anesthesia providers include physician anesthesiologists as well as nurse anesthetists. Physician anesthesiologists are doctors with a medical degree. After completing medical school, physicians complete a residency in anesthesiology. Most physician anesthesiologists then become "board-certified" by passing an examination administered by the American Board of Anesthesiology. Some physicians also complete an additional "fellowship" year of training in a sub-specialty, such as cardiovascular anesthesia.

44.   Nurse anesthetists must have a year of nursing experience and obtain a specialized certification in anesthesia administration (a training course that lasts two to three years) and then pass a national certification exam. After achieving this certification, a nurse is referred to as a "certified registered nurse anesthetist" or CRNA.

18

45.     Physician anesthesiologists and nurse anesthetists alike must be certified by a state's medical licensing boards to practice within that state. In Texas, the licensing and regulation of anesthesia providers is overseen by the Texas Medical Board for physician anesthesiologists and the Texas Board of Nursing for CRNAs. Each state's medical licensing boards may also decide whether and when CRNAs can administer anesthesia without supervision by a practicing physician anesthesiologist. In Texas, a CRNA can sometimes independently order and administer anesthesia supervised by a physician, but generally cannot administer anesthesia services without such supervision.

46.     Unlike other areas of medical care, patients rarely choose their anesthesia providers. Instead, a patient's chosen surgeon may select the anesthesia provider, or the anesthesia provider may be chosen randomly based on who is assigned to cover the operating room when a patient's surgery occurs. Moreover, anesthesia providers have little personal interaction with patients since their role is often to keep the patient unconscious.

**B.  Anesthesia services are performed in hospitals or outpatient facilities**

47.     Anesthesia providers can treat patients in several healthcare facility settings, including hospitals, outpatient surgery centers, ambulatory surgical centers, and doctors' offices.

48.      Hospitals, unlike ambulatory surgical centers or outpatient surgery centers, perform inpatient surgery—where the procedure requires a patient to stay overnight. Hospitals may be independent or part of a larger system. Hospital systems can include specialty hospitals, such as children's hospitals or heart-care centers, or hospitals across different geographies.

49.     Outpatient surgery centers and ambulatory surgical centers perform only outpatient surgery. Outpatient surgery consists of surgical procedures typically completed without requiring a patient to stay overnight in a hospital. These procedures can be performed in

19

a hospital, but it has become increasingly common to perform them in dedicated clinics. Unlike hospitals, ambulatory surgical centers do not have facilities that can accommodate a patient's overnight stay. In addition, these settings lack the specialized tools and equipment that hospitals possess to perform more complex surgeries that require a hospital setting.

50.     Local anesthesia generally can be performed in outpatient care centers (i.e., facilities where patients do not stay overnight) and doctors' offices because they require less robust medical facilities and fewer staff.

51.     General anesthesia and some regional anesthesia services, by contrast, are typically performed only in hospitals or qualified facilities specifically designed for outpatient surgery, such as ambulatory surgical centers or outpatient surgery centers.

### C.  Hospitals contract with anesthesia providers to serve their facilities

52.     While certain hospitals directly employ anesthesia providers, many rely on independent anesthesiologists or anesthesia groups, such as USAP.

53.     Hospitals that rely on independent anesthesiologists differ in how they staff their operating rooms. Some hospitals select an "open staffing" or "follow the surgeon" model, allowing any credentialed anesthesiologist to practice at the facility and leaving it to individual surgeons to coordinate anesthesia coverage. Many other hospitals choose an exclusive anesthesia provider, whose anesthesiologists cover the entire facility or certain services lines (e.g., trauma) on a 24/7 basis.

54.     Hospitals perceive benefits to exclusive anesthesiology arrangements. For instance, an exclusive arrangement can help secure coverage overnight or during other off-peak hours. Exclusive agreements may also help guarantee treatment for less lucrative patients by ensuring 24/7 coverage.

20

55.     Anesthesia groups often compete for exclusive hospital contracts. By definition, winning a hospital's exclusive contract is necessary to be able to perform anesthesia services at that hospital. Obtaining an exclusive contract thus typically guarantees a provider group not only a certain amount of business—since it will perform all anesthesia at a hospital—but also a degree of control—since with limited exceptions, no other group will perform any.

56.     To win an exclusive contract, an anesthesia group needs enough local providers to staff the hospital around the clock. The larger the hospital, the more providers the group needs. As such, for large hospitals, only certain large local anesthesia groups are viable exclusive providers.

57.     Hospitals often agree to pay a fee—known as a "stipend"—to their exclusive anesthesia providers. Stipends compensate for the fact that providing 24/7 coverage at a hospital is not always lucrative for an anesthesia group. Procedures may occur infrequently during off-peak shifts, and some patients may have government insurance (which typically reimburses at lower rates) or be uninsured or under-insured.

58.     Although in theory many exclusive contracts between hospitals and anesthesia groups are terminable on short notice by either party, in practice these relationships are "sticky" because switching exclusive anesthesia providers is disruptive for hospitals. For instance, switching may interfere with surgical procedure scheduling or even negatively impact patient care. Thus, once a hospital has chosen its exclusive provider, it can be difficult for a competing group to displace that provider and take over the exclusive.

59.     Notwithstanding the difficulties, however, hospitals can—and occasionally do—switch exclusive anesthesia providers. They can do so more easily when there are sufficient alternative providers. Existing local providers tend to be the most significant competitors for

21

exclusive hospital contracts because, for example, they may have established reputations for quality and may not require as much recruiting, temporary hiring, or travel costs as more distant alternatives. But absent sufficient local competitors, a hospital may consider more distant alternatives. That is particularly true for hospitals that are part of larger systems, which may look to anesthesia groups from different parts of the state that reliably serve the system's other facilities.

**D.  Insurers negotiate network status and reimbursement with anesthesia providers**

60.    To control healthcare costs, insurers build networks, which are combinations of hospitals, outpatient facilities, physicians, physician groups, and other providers, including anesthesia providers that are available at a lower cost to the insurer's clients.

61.    In exchange for being included in an insurer's network, providers typically agree to give a discount off the total amount they charge. These discounted reimbursement rates establish how much the payor will pay the provider on behalf of its beneficiaries (referred to as "members"). Services obtained outside of an insurer's network are subject to different—and usually higher—reimbursement rates.

62.    Anesthesia providers are typically paid based upon three factors: (1) 15-minute intervals of time spent on a procedure; (2) a base unit reflective of the difficulty or complexity of the procedure, as established by the American Society of Anesthesiologists; and (3) a dollar-value "conversion factor." Commercial insurers negotiate the conversion factor with the anesthesia providers.

63.    A provider's reimbursement is calculated by adding the number of time units and base units, then multiplying by the conversion factor. For example, a physician who provides

anesthesia during a 90-minute procedure with a base value of 4 and a negotiated conversion factor of $95 will bill $950 for that procedure.

64.     Commercial insurers use their provider networks, and the reimbursement rates they negotiate with participating providers (along with factors such as geographic coverage), to compete for clients. The party responsible for paying in-network anesthesiologists depends on the client.

65.     Although "payor" and "insurer" are often used synonymously, including by USAP and Welsh Carson, the insurer and the payor can in fact be different parties. "Payor" more accurately denotes the party that bears the financial responsibility to reimburse for the healthcare services their members receive. Which party is the payor varies. Some insurance clients—usually smaller employers or individuals—are "fully insured," meaning the insurers themselves are the payors and bear the responsibility for reimbursing members' covered healthcare costs. Other clients—more sizeable employers or other large entities—are "administrative services only" (ASO). ASO clients themselves bear financial responsibility for the members' healthcare costs; they hire insurers for administrative services like negotiating with providers and assembling provider networks, creating plans to offer members, and administering the payments. Ultimately, members finance these endeavors through premiums paid either to the insurer (for fully insured clients) or to the ASO client.

66.     For the four largest insurers in Texas (Aetna, Blue Cross Blue Shield of Texas, Cigna, and United), ▮▮▮ or more of their clients are ASO. This means that in Texas, patients and their employers (not insurers) bear the brunt of higher prices for anesthesia services.

67.     These ASO clients have different demands for network access to anesthesia providers depending on where their members work and reside. Some ASO clients have members

23

concentrated in a single metropolitan area, while others have members in multiple locations throughout the state.

### E. To discipline price demands, insurers may refuse to include anesthesia groups in their network

68.     If an insurer considers the reimbursement rates demanded by an anesthesia group during negotiations to be too high, both sides understand that the insurer's primary alternative to reaching an agreement is to take the group out of network. Whether the threat of network removal can effectively keep prices low depends on how credible it is—that is, whether there are any credible alternative groups and how likely the insurer is to follow through, which would disrupt the relationship between the insurer, anesthesia group, and hospital.

69.     In general, insurers, hospitals, and anesthesia providers each prefer that the anesthesia provider remain in-network.

70.     Hospitals generally prefer to work with anesthesia providers who are in-network with insurers, and hospitals may encourage out-of-network anesthesiologists to reach in-network agreements. Having out-of-network anesthesiologists could result in large bills from the anesthesiologists, which patients and their employers may misattribute to the hospital. Moreover, in some instances, insurers condition portions of their reimbursements to hospitals on the in-network status of the hospital's anesthesia providers. For example, ███ encourages hospitals to include anesthesia providers in-network using a "pay-for-performance" term that offers hospitals better reimbursement rates based on the percentage of its anesthesia providers that are in-network.

71.     Hospitals often retain the right in their exclusive contracts with anesthesia groups to break exclusivity and use other providers if the group goes out of network with insurers. In practice, they do not exercise these rights frequently, but are more likely to do so when an

24

anesthesia group remains out of network for an extended period or when the anesthesia group is out-of-network with multiple large insurers.

72.     Anesthesia providers prefer to remain in-network. The reason is partially financial and administrative. Rather than collect their fees directly from the insurance company, for most of the relevant period, an out-of-network anesthesia group needed to collect money directly from patients, which can be difficult, unpredictable, and ultimately unsuccessful. Today, out-of-network anesthesiologists must obtain payment through costly and uncertain arbitration.

73.     In addition, an out-of-network anesthesia group may also jeopardize some of its hospital relationships. Because hospitals generally prefer to contract with in-network providers, they may ultimately choose to switch to a different provider if a group remains out of network. Insurers may even seek to encourage the hospital to switch by, for example, subsidizing an alternative provider's bid for a hospital contract.

74.     Insurers also prefer to have anesthesia groups in network—especially those that practice at in-network hospitals. Otherwise, their members may be treated by out-of-network anesthesiologists, who will charge much more. Certain ASO clients pay a significant portion of these bills, which can result in their dissatisfaction. And historically, out-of-network anesthesiologists billed patients directly. These "surprise bills" can upset patients—who mistakenly assume that because they went to an in-network hospital they saw an in-network anesthesiologist—and result in them complaining to their hospitals or employers.[5] Insurers can thus be pressured to return out-of-network anesthesia providers to their network by as many as

---

[5] Although certain states and, more recently, the federal government have passed legislation targeted at ending "surprise billing," the ultimate results of these legislative efforts remain uncertain. The arbitration procedures created by state or federal law still involve significant costs and uncertainty as to the amount due. These costs and uncertainties may be disproportionately large when payors arbitrate with larger anesthesia providers due to the volume of claims involved.

four parties: patients, hospitals, existing ASO clients (who may take their business elsewhere), and potential ASO clients (who may keep their business elsewhere).

75.    Insurers view certain anesthesia groups as particularly important to have in-network and, as such, particularly costly to remove from their networks. This essentially boils down to groups that are more likely to treat the insurer's members.

76.    Several factors make an anesthesia group more likely to treat an insurer's members, whether on an in- or out-of-network basis. The more hospitals a given group serves, the more likely it is to see a given insurer's members. This is particularly true at certain hospitals, which are more likely to treat members—and thus especially important to insurers' networks—based on factors like their size, location, system affiliation, or specialty care offered. In addition, a group that holds an exclusive contract at a hospital, especially an important hospital, is all but guaranteed to treat all members that visit that hospital (whereas in an openly staffed hospital, the hospital may try to direct patients towards in-network providers). Eventually, through a combination of size, hospital presence, and exclusive contracts, an anesthesia group may become effectively irreplaceable—even by a combination of multiple groups.

## IV.    USAP'S AND WELSH CARSON'S ANTICOMPETITIVE SCHEME
### A.  Welsh Carson hatches a strategy to consolidate anesthesia practices in Texas

77.    In early 2012, John Rizzo, a former executive at a large national anesthesia group, emailed D. Scott Mackesy, a partner at Welsh Carson, seeking investors for a new anesthesia practice. Rizzo planned to call the practice "New Day Anesthesia." It would have a nationwide presence built through an "aggressive 'buy and build' consolidation strategy."

78.    Mackesy handed Rizzo off to a junior partner, Brian Regan, who soon led the process of evaluating a Welsh Carson investment in New Day. After carefully evaluating Rizzo's

strategy, Regan began working with Rizzo and other Welsh Carson employees on a presentation for Welsh Carson's partnership to secure their approval and obtain funding.

79.     On July 2, 2012, Regan and the team he was supervising at Welsh Carson presented the vision for New Day to the Welsh Carson partnership. The presentation described New Day Anesthesia as pursuing an "anesthesiology consolidation strategy." In Regan's words, the "[g]oal for New Day" would be "to build a platform with national scale by consolidating practices with high market share in a few key markets." Capturing such market share, would, according to Regan, give New Day "[n]egotiating leverage with commercial payors"—in other words, create a monopolist with the ability to raise prices for anesthesia care.

80.     The Welsh Carson partners agreed to invest in New Day. As Regan described the plan, the firm would "devote real time and resources to New Day and the anesthesiology consolidation strategy." For starters, Welsh Carson would "[c]ommit $1-$2 million to set-up shop, develop a market roadmap, and diligence acquisition candidates."

### B. Welsh Carson executes on its consolidation strategy by creating USAP and acquiring a large practice in Houston

81.     The first step was determining which anesthesia group New Day should acquire as a "platform" from which to roll up other practices. Welsh Carson hired Dean & Company as a consultant to develop a methodology for identifying attractive regions for acquisitions and practice groups in each region. Regan provided repeated rounds of feedback to Dean on its methodology, and a more junior Welsh Carson employee working at his direction supervised the relationship with Dean. Ultimately, they collectively developed what they colloquially referred to as the "Dean tool," which USAP would rely on for many years thereafter.

82.     Meanwhile, Welsh Carson found a CEO for the new venture. Welsh Carson selected Kristen Bratberg, the former CEO of one of its portfolio companies, Pediatrix. Pediatrix

is a national group practicing neonatology, which is another hospital-based physician specialty. Mackesy, the Welsh Carson partner initially approached by John Rizzo, had been a Pediatrix board member.

83.    Bratberg had experience with "rolling up" physician practices. During his eight-year stint as CEO, Pediatrix acquired over 100 neonatology practices. Bratberg's experience with "rolling up" independent physician groups was key to Welsh Carson's decision to hire him.

84.    Regan and Bratberg began scoping out potential first acquisitions for New Day. A few months earlier, in April, Greater Houston Anesthesiology had begun searching for a buyer, billing itself as "20 times the size of the second largest local competitor." That piqued Regan's and Bratberg's interest. In June 2012, New Day signed a letter of interest with Greater Houston Anesthesiology. Regan also signed the letter of interest, in his capacity as a "General Partner" of "Welsh, Carson, Anderson & Stowe." Over the summer of 2012, Welsh Carson and executives from New Day (soon to be renamed USAP) met with and ran due diligence on Greater Houston Anesthesiology.

85.    In early August 2012, Welsh Carson and New Day presented to Greater Houston Anesthesiology's physicians about joining together and creating a new company to be named USAP. In their presentation, Welsh Carson and New Day highlighted Welsh Carson's experience investing in healthcare portfolio companies and their plan for aggressive growth through additional acquisitions. Soon after, on August 29, 2012, Welsh Carson and New Day submitted a formal Letter of Intent to acquire Greater Houston Anesthesiology for $███████████ ████████████; Bratberg and Rizzo signed the letter for New Day, and Regan for WCAS Associates XI. To fund the Greater Houston Anesthesiology purchase and roughly $██████ in transaction expenses, Welsh Carson would contribute approximately $████████ from one of

its investment funds, WCAS XI, and New Day would borrow roughly $███████ from third-party lenders.

86.     On August 13, 2012, New Day Anesthesia, Inc. and New Day Anesthesia Holdings, Inc. were incorporated. Both companies had the same board of directors: Brian Regan, D. Scott Mackesy, Kristen Bratberg, and John Rizzo.

87.     Greater Houston Anesthesiology chose the offer from Welsh Carson and New Day out of the several it had received. On August 31, 2012, the parties agreed to a three-month exclusivity period to negotiate the details of the transaction. During that time, Welsh Carson ran extensive diligence, relying on several outside advisors, input from employees at several of its other portfolio companies, and other internal and external sources of information developed during Welsh Carson's history of investing in healthcare.

88.     Three consulting groups examined and blessed the transaction. First, Avalere Health assessed Greater Houston Anesthesiology's reimbursements and found that anesthesiologists "have more power than most specialists," and this power was "magnified" by Greater Houston Anesthesiology's "commanding market share."

89.     Second, Stax, Inc., examined the supply and demand for anesthesia services in Houston, observing that Greater Houston Anesthesiology was "the largest anesthesia physician group in the greater Houston region." Stax saw few threats to Greater Houston Anesthesiology's dominance, noting that "the closest groups to GHA in size are academic in nature, with most independent groups being much smaller" and Greater Houston Anesthesiology was "well-positioned within the [Houston region], and specifically within the four major hospital systems." According to this Stax report, these four hospital systems—Houston Methodist, Memorial Hermann, St. Luke's, and HCA—performed almost 65% of all inpatient surgeries in Houston.

29

90.     Third, consultants at Savvy Sherpa observed that Greater Houston Anesthesiology had "achieved very good levels of reimbursement from commercial payers." Regan heard that Greater Houston Anesthesiology's reimbursement rates were the highest from an ambulatory surgical center executive, who described it as having the "best rates."

91.     Welsh Carson swiftly leveraged these assessments with potential lenders. To make good on their offer to Greater Houston Anesthesiology, Welsh Carson and New Day needed to secure $████████ in loans. In October 2012, Regan and the Welsh Carson / New Day team gave potential lenders a simple pitch: even if USAP simply stopped after acquiring Greater Houston Anesthesiology, it would still have acquired a practice with ████████████ ████████ reimbursement rates ████████████████████████████████████. But the plan did not stop with the Greater Houston Anesthesiology acquisition.

92.     Instead, as Regan had previously explained to his partners and now reiterated to potential lenders: Greater Houston Anesthesiology would be the linchpin in USAP's ultimate plan to "build a platform with national scale by consolidating practices with high market share in a few key markets." Regan repeated that a key goal of this consolidation strategy was to increase "[n]egotiating leverage with" payors, enabling USAP to charge even higher prices.

93.     Lenders liked what they heard. Welsh Carson and USAP secured $████████ in debt financing from a consortium that included General Electric Capital, KeyBank, Bank of America, Wells Fargo, and Ares Capital. And as planned, Welsh Carson committed over $███ █████ in financing from its fund Welsh Carson XI. In a November 2012 memo to Welsh Carson's "Investment Professionals" seeking approval for that investment, Mackesy, Regan, and four Welsh Carson employees working under their direction reiterated that the Greater Houston Anesthesiology acquisition was the first and essential step in USAP's "roll-up strategy."

30

94.     With a deal looking likely, on November 19, 2012, Welsh Carson and Bratberg put out a press release—"Welsh, Carson Forms U.S. Anesthesia Partners"—announcing the creation of the new anesthesiology provider group.

95.     On December 12, 2012, USAP entered into an agreement to acquire Greater Houston Anesthesiology for $█████████. Two weeks later, Greater Houston Anesthesiology's 220 physicians and 180 CRNAs officially joined the new company.

### C.  Welsh Carson and the newly-formed USAP develop a plan to roll up independent anesthesia practices and raise prices

96.     On December 13, 2012—one day after signing the Greater Houston deal—Bratberg and Rizzo met in New York with Regan and the Welsh Carson team to develop an acquisition strategy and discuss potential targets. At Welsh Carson's direction, USAP continued to develop its strategy, with a particular focus on its "value maximization plan." A value maximization plan, according to USAP's longtime CEO Bratberg, is a "tool that Welsh Carson introduced . . . to clarify and focus management's attention."

97.     By January 2013, USAP's strategic plan was set. In a presentation emblazoned with both the USAP and Welsh Carson logos, USAP and Welsh Carson explained that USAP would "Roll Up Houston" through a series of "tuck-in acquisitions." These acquisitions were called "tuck-ins" because they would be folded into USAP's newly acquired Greater Houston Anesthesiology "platform" operation. USAP planned to use both large and small tuck-in acquisitions to expand beyond Houston.

98.     Welsh Carson and USAP's plan exploited the fact that hospitals' contracts with their anesthesia providers are often "sticky." Rather than competing against other anesthesia practices to win their clients, Welsh Carson and USAP planned on buying practices with existing exclusive hospital contracts. Ideally, these hospitals would also be important ones for insurers to

include in their networks. The end goal was to "bolster [USAP's] market share and drive profitability" by buying up more exclusive contracts with hospitals, giving USAP the leverage to charge higher prices.

99.     But that was not all. Regan, Bratberg, and the other Welsh Carson and USAP executives agreed that a key part of USAP's expansion plans—in Houston and beyond—would be spreading Greater Houston Anesthesiology's high reimbursement rates to other practices through tuck-in acquisitions. After acquiring each firm, Welsh Carson and USAP planned to ratchet up the newly-acquired providers' rates to those used by Greater Houston Anesthesiology—which had some of the highest rates in Texas when USAP acquired it. USAP thus planned to supply hospitals with generally the same providers as before, but now at significantly higher reimbursement rates. USAP and Welsh Carson referred to these increases as "synergies," even though they were simply excess profits generated from consolidating the market.

100.    By early 2013, Welsh Carson and USAP had set in motion their consolidation strategy, outfitted USAP with the funding and personnel to execute it, and fleshed out a plan for how to realize that strategy. USAP soon began executing on it.

101.    Welsh Carson continued to play a critical oversight role. USAP's "Business Development Playbook," developed in early 2013, called it "important that [Welsh Carson] remains fully informed" and described how USAP's acquisitions "will typically involve multiple memos/presentation decks and discussions with [Welsh Carson]." Indeed, the Playbook explained, before USAP could send a letter of intent proposing an acquisition, "the deal must be reviewed and approved by Welsh Carson."

## V.     USAP CONTINUES ITS ANTICOMPETITIVE SCHEME
## BY ROLLING UP ADDITIONAL PRACTICES

### A.  After its founding acquisition, USAP makes three additional acquisitions in Houston

102.    In August 2013, less than a year after acquiring Greater Houston Anesthesiology, USAP was already "working to advance discussions with all actionable Houston practices." As the next step in its roll-up scheme, between 2014 and 2020, USAP acquired three of the largest remaining independent anesthesia groups in Houston.

### 1.  North Houston Anesthesiology – Kingwood Division (2014)

103.    In June 2014, USAP acquired a division of North Houston Anesthesiology located in Kingwood for $          . At the time of the acquisition, the Kingwood Division of North Houston Anesthesiology included 21 physicians and 9 CRNAs.

104.    USAP targeted North Houston Anesthesiology because it had "[s]trategic hospital affiliation" with important Houston hospitals, including HCA Kingwood and Memorial Hermann Northeast.

105.    Before USAP acquired North Houston Anesthesiology, the two practices competed head-to-head. For example, survey results included in a 2013 report prepared by a USAP consultant indicated that hospital administrators and surgeons in Houston considered North Houston Anesthesiology among "the best in the area," "along with the likes of [USAP]." And when finalizing the acquisition of the Kingwood division, USAP's Chief Commercial Officer acknowledged internally that North Houston Anesthesiology's Conroe division—which opted not to join USAP—would remain a USAP "competitor."

106.    In August 2014, USAP and Welsh Carson explained to lenders that after uniting with North Houston Anesthesiology's Kingwood Division, USAP had become the "clear leader"

33

in providing hospital-based anesthesiology services in the Houston area. At that point, USAP estimated that the next largest anesthesia group in Houston was "less than 5% the size of USAP."

107.    USAP's acquisition of NHA Kingwood resulted in significantly higher reimbursement rates. For example, before the acquisition, NHA Kingwood's reimbursement rate from ███ was $██ per unit. Following the acquisition, USAP raised NHA Kingwood's reimbursement for the same anesthesia providers to its own contracted rate—$██ per unit for ███, an increase of ██%. Other insurers also saw rate increases: ██% and ██% for Blue Cross and United, respectively. USAP estimated that raising North Houston Anesthesiology's Kingwood Division's rates to USAP levels increased the practice's revenues by about $████ in the first year alone.

## 2. MetroWest Anesthesia Care (2017)

108.    In March 2017, USAP acquired MetroWest Anesthesia Care for $██████. At the time of the acquisition, MetroWest was a group of 51 physicians and 79 CRNAs.

109.    MetroWest was one of USAP's "high-priority" acquisition targets in the Houston market because of its relationships with the Memorial Hermann hospital system, including contracts at Memorial Hermann Katy Hospital and Memorial City Hospital. In addition, USAP recognized that acquiring MetroWest could play an important "defensive" role. In 2014, Sheridan Healthcare—a large, multi-state physician group now part of Envision Physician Services—was targeting MetroWest for acquisition; the parties signed a confidentiality agreement in April 2014. As USAP's Director of Business Development told the CEO and COO, another large player entering into Houston would "spoil the entire market." Instead, USAP planned to encourage MetroWest to consider a deal with USAP to "preserve the protected market" both enjoyed.

34

110.     Before USAP acquired MetroWest, the two practices competed head-to-head. Indeed, MetroWest was one of USAP's largest remaining competitors for hospital contracts left in Houston. In April 2016, USAP worried the Memorial Hermann hospital system (consisting of 11 hospitals) would be "moving to a single source anesthesia provider," meaning an exclusive contract for the entire hospital system. MetroWest and USAP both had exclusive contracts with hospitals in the Memorial Hermann hospital system, so both were positioned to potentially take over an exclusive systemwide contract. Instead of competing with MetroWest to win Memorial Hermann's business, USAP acquired the practice to "further expand its relationship with Memorial Hermann" while earning "synergies."

111.     USAP's acquisition of MetroWest resulted in significantly higher reimbursement rates. For example, before being acquired, MetroWest's reimbursement rate from United was $██ per unit. Six months after the acquisition, MetroWest's reimbursement rate for the same anesthesia providers from United was $████, an increase of nearly ██%. After USAP acquired MetroWest, Blue Cross reported that USAP "[a]ccounted for . . . 69% of cases and 83% of cost in Houston" and that it "leverag[ed] market share" into a reimbursement rate more than double that of other Houston anesthesiologists. USAP estimated that raising MetroWest's rates to USAP levels increased the practice's incremental revenues by about $██████ in the first year.

### 3. Guardian Anesthesia Services (2020)

112.     In January 2020, USAP acquired Guardian Anesthesia Services for $██████. Guardian was a group of 21 physicians and 56 CRNAs.

113.     USAP identified Guardian as an acquisition target in 2013, along with MetroWest and NHA, because of the group's exclusive contracts with three HCA hospitals in Houston. Guardian had declined USAP's offers to merge for several years, until they acquiesced in 2020.

By acquiring Guardian and thus gaining control of its exclusive hospital contracts, USAP grew its presence in the HCA health system and increased its patient volume in Houston.

114.    Before USAP acquired Guardian, the two practices competed head-to-head. For example, in 2014, before opening its new Pearland hospital, HCA requested proposals from anesthesia groups to staff the facility. Both Guardian and USAP responded to this request. Guardian won. Guardian continued to staff HCA Pearland until the group was acquired by USAP in 2020, at which point, USAP assumed the contract.

115.    USAP's acquisition of Guardian resulted in significantly higher reimbursement rates. For example, before the acquisition, Guardian's reimbursement rate from Cigna was $█ per unit. Six months after being acquired by USAP, Guardian's reimbursement rate from Cigna for the same anesthesia providers was $█████, a nearly ██% increase. USAP estimated that raising Guardian's rates to USAP levels increased the practice's incremental revenues by about $████████ in the first year.

### 4.  USAP's consolidation of Houston as it stands today

116.    After acquiring Greater Houston Anesthesiology, but before rolling up additional practices, USAP was already in a strong position. It had about 400 providers in Houston and handled a significant share of the anesthesia services there—nearly 40% of hospital-only cases and roughly half of payors' hospital-only anesthesia costs. It also controlled a majority of the surgical anesthesia volume in the Houston Methodist and St. Luke's systems (73% and 60%, respectively), with strong positions in the Memorial Hermann and HCA systems (32% and 29%).

117.    Today, the Houston market is even more concentrated. USAP now boasts nearly ███ anesthesia providers in Houston and is more than eight times larger than its next largest competitor in Houston in terms of revenue. USAP handles about 60% of the hospital-only

36

anesthesia cases and accounts for almost 70% of payors' hospital-only anesthesia costs. Through its acquisitions, USAP has also grown in key hospital systems, including Memorial Hermann and HCA, where Greater Houston Anesthesiology's presence had been more modest.

118.    USAP also continues to have the highest contracted reimbursement rates of any provider in Houston. That was already the case in 2013, when, for example, its rates with three of the largest commercial insurers were about $█ to $█ per unit. As of December 2022, however, its rates with these insurers ranged from about $██ to $██ per unit. As of February 2020, United reported that it reimbursed USAP at rates 95% higher than its in-network median for Texas and 65% higher than the Houston average, which was calculated including USAP. USAP has maintained its high rates and broad network of exclusive facility contracts in Houston despite an anesthesiology labor shortage, the COVID-19 pandemic, and losing network access to United Healthcare in 2020.

119.    As a result of USAP's acquisitions in Houston, both hospitals and insurers are left without sufficient alternatives to USAP to constrain the group's high rates.

**B.  USAP expands its roll-up scheme to Dallas**

120.    USAP's roll-up strategy was not confined to Houston. Between 2014 and 2016, USAP spent over $████████ to acquire at least seven practices in Dallas.

121.    From the time it founded USAP, Welsh Carson understood that USAP had "room to expand its footprint throughout Texas." The Dallas-Fort Worth area (referred to here as Dallas) was an attractive target. Four major hospital systems accounted for a large share of the surgical case volume in Dallas: Texas Health Resources, Baylor Scott & White, HCA North Texas (operating as Medical City), and Methodist Health System.

### 1. **Pinnacle Anesthesia Consultants (2014)**

122.    At the time of USAP's founding, Pinnacle Anesthesia Consultants was the largest anesthesia group in the Dallas region and anywhere in the state. Per USAP's and Welsh Carson's estimates, Pinnacle accounted for 26% of anesthesia providers in Dallas and about 10% of anesthesia providers in Texas. Those providers performed about 40% of the anesthesia services in Dallas and had a strong presence within each of the four hospital systems: approximately 54% of the case volume in the HCA system, 52% in the Baylor system, 42% in the Texas Health Resources system, and 22% in the Methodist Dallas system.

123.    Initially, USAP questioned whether it could acquire Pinnacle, because a competitor, EmCare, already provided Pinnacle with the same "back office" services that USAP offered its practices (such as insurer contracting and billing). However, Pinnacle reached out to USAP in early 2013 after hearing news of USAP's acquisition of Greater Houston Anesthesiology to "explor[e] potential business opportunities concerning future strategic partnerships." USAP's leadership team—John Rizzo and Kristen Bratberg—met Pinnacle's President and Chairman Mike Hicks and CEO Michael Saunders in January 2013 for an "exploratory discussion." When they met, Hicks had explained that "he has wanted to do what [USAP is] doing for years," which was "roll up" many of the largest anesthesia practices through acquisition.

124.    USAP and Welsh Carson personnel agreed that a Pinnacle acquisition was worth pursuing. Regan called it "an interesting opportunity" and "definitely a worthwhile discussion given the size of their group and market." Bratberg concurred, noting that a deal with Pinnacle "[c]ould be strategically a huge step forward from a Texas and national standpoint." Others on the Welsh Carson team agreed with Bratberg, noting there was "[s]ignificant potential revenue upside applying [USAP's Houston] rates" to Pinnacle's providers.

38

125.    USAP proceeded to "[p]ursue aggressive interaction" with Pinnacle, hoping to close an acquisition toward the end of 2013. In May 2013, EmCare communicated to the Pinnacle physicians that it did not object to USAP acquiring Pinnacle. At that point, USAP and Welsh Carson initiated due diligence, including hiring multiple consultants to review the competitive dynamics in the Dallas anesthesiology market and Pinnacle's position in it. These consultants confirmed Pinnacle's dominance, including the fact that it had managed to negotiate exclusive hospital contracts (which were more unusual in Dallas than Houston). They also confirmed that the other, much smaller anesthesia groups in Dallas "pose[d] no strategic or competitive threat to Pinnacle" and recommended that, after buying Pinnacle, USAP acquire additional groups to help enter "key [hospital] system facilities not served by Pinnacle" and secure more "exclusive contracts over time."

126.    After completing initial due diligence, USAP, Welsh Carson, and Pinnacle signed a letter of intent on September 13, 2013, which memorialized USAP and Welsh Carson's offer to purchase Pinnacle as well as the parties' plan to "expand throughout the state of Texas by acquiring other local anesthesia groups." Brian Regan signed the letter in his capacity as a managing member of WCAS Associates XI, the general partner entity for the WCAS XI fund. After signing the letter of intent, USAP and Welsh Carson personnel, including but not limited to Regan, continued to conduct further diligence and to negotiate the specifics of a transaction with Pinnacle.

127.    In January 2014, USAP acquired Pinnacle for $███████. Welsh Carson purchased approximately $██████ worth of additional shares of USAP to help fund the acquisition. At the time of the acquisition, Pinnacle employed 320 anesthesiologists and 217 CRNAs. ████████████████████████████████

39

███████████████████████████████████████████████

███████████████████████████████████ .

128.    USAP immediately began attempting to apply its existing (higher) reimbursement rates from Houston to Pinnacle providers. Insurers balked at the idea of Houston rates for Dallas anesthesia providers, leading to protracted negotiations. One insurer, ███, even opted to treat the former Pinnacle (now USAP) anesthesia providers as out of network and arbitrate the amount it was required to reimburse for their services. That arbitration, however, ultimately settled in early 2016, with USAP securing for its Dallas providers a roughly ███% retroactive price increase on claims filed during the dispute and a ██% price increase going forward. USAP likewise obtained significant price increases from the other insurers for the same anesthesia providers—██% to ██%, depending on the insurer.

129.    Even before they completed the Pinnacle acquisition, Welsh Carson and USAP started planning further acquisitions in Dallas. They focused on Pinnacle's pre-existing "wish list" of acquisition targets: Anesthesia Consultants of Dallas, Excel Anesthesia Consultants, and North Texas Anesthesia Consultants. USAP and Welsh Carson quickly ticked off the practices on that wish list.

**2.  Anesthesia Consultants of Dallas (2015)**

130.    In January 2015, USAP acquired Anesthesia Consultants of Dallas for $██ ███. Anesthesia Consultants of Dallas included 21 physicians and 29 CRNAs at the time of the acquisition.

131.    USAP targeted Anesthesia Consultants of Dallas largely because of its exclusive contract at Methodist Dallas's flagship facility, an already large and expanding facility that Anesthesia Consultants of Dallas had served for twenty years. Anesthesia Consultants of Dallas

40

covered other Methodist Dallas hospitals as well, and an acquisition would give USAP a dominant share of five of the system's six facilities in Dallas. In addition, Anesthesia Consultants of Dallas had an exclusive contract at the Texas Regional Medical Center facility and significant presence at nine open-staffed hospitals.

132.     Before USAP acquired Anesthesia Consultants of Dallas, the two practices competed head-to-head. Tom Swygert, a leading USAP anesthesiologist in Dallas who serves as a board member today, told USAP's then-CEO Bratberg and Welsh Carson's Regan that, outside of Pinnacle, Anesthesia Consultants of Dallas was one of the two groups (along with Excel) with "the largest number of anesthesiologists with specialized skill sets in the DFW market." By acquiring Anesthesia Consultants of Dallas, USAP would "create a barrier to entry and promote our ability to garner system contracts."

133.     USAP's acquisition of Anesthesia Consultants of Dallas resulted in significantly higher reimbursement rates. For example, before the acquisition, Anesthesia Consultants of Dallas's reimbursement rate from United was $███ per unit. After the acquisition, Anesthesia Consultants of Dallas's United rate went to $███ per unit for the same anesthesia providers, an increase of ███%. USAP estimated that acquiring Anesthesia Consultants of Dallas would yield $███████ per year.

### 3.  Excel Anesthesia Consultants (2015)

134.     In March 2015, USAP acquired Excel Anesthesia Consultants for $████████. At the time of the USAP acquisition, Excel employed 55 physicians and 19 CRNAs, including some providers it added after merging with North Texas Anesthesia Consultants (the other practice that had been on Pinnacle's "wish list").

135.     Excel was an attractive target in part because of its exclusive contract with Texas

Health Presbyterian Hospital Dallas, which is the second largest hospital within the Texas Health

Resources system. Beyond that, Excel had a presence in more than 20 additional hospital

facilities at all four of the area's major hospital systems. USAP and Welsh Carson anticipated

using Excel's "broad reach and relationships across the Dallas market" to "[p]osition[] [USAP]

to obtain exclusive facility contracts." Brian Regan of Welsh Carson called Excel "our most

strategic move in the market next to [Anesthesia Consultants of Dallas]."

136.     Before USAP acquired Excel, the two practices competed head-to-head. In

February 2014, Swygert had highlighted that Excel "compete[s] directly with some of the

[Pinnacle] divisions . . . within the open-staff hospitals." Absent the acquisition, Regan was

concerned that Excel could become an even bigger competitor to USAP. As Regan explained,

Excel could join a different large group, and USAP would face "a 100 doc [sic] competitive

practice with a strong sub specialty orientation in our backyard." Acquiring Excel, however,

would "create a barrier to entry."

137.     USAP's acquisition of Excel resulted in significantly higher reimbursement rates.

For example, before USAP acquired it, Excel's reimbursement rate from United was $▮ per

unit. After the acquisition, USAP raised Excel's reimbursement rate from United to $▮ per unit

for the same anesthesia providers, an increase of ▮%. USAP estimated that raising Excel's rates

to USAP levels increased the practice's incremental revenues between $▮ and $▮▮▮▮ per

year.

### 4.  Southwest, BMW, Medical City Physicians, and Sundance (2015-2016)

138.     Having acquired all the groups on their 2014 "wish list," USAP and Welsh

Carson shifted their focus to smaller groups in Dallas that had exclusive contracts or established

relationships with facilities or health systems. Over five months from December 2015 to April 2016, USAP acquired four additional groups in Dallas: Southwest Anesthesia Associates, BMW Anesthesiology, Medical City Physicians, and Sundance Anesthesia.

139.    First, in December 2015, USAP acquired Southwest Anesthesia Associates. USAP acquired Southwest Anesthesia Associates in part because it was the exclusive provider at Charlton Methodist.

140.    USAP's acquisition of Southwest Anesthesia Associates resulted in significantly higher reimbursement rates. For example, approximately six months before the acquisition, United agreed to increase Southwest Anesthesia Associates' rate to $██ per unit "in hopes to keep them independent from USAP." After the acquisition, USAP raised Southwest Anesthesia Associates' rates with United to $██ per unit rate, a ██% increase.

141.    Next, in January 2016, USAP acquired BMW Anesthesiology and unaffiliated anesthesiologists referred to as the Medical City Physicians. USAP purchased BMW, a group of 9 anesthesiologists for $████████. USAP acquired the Medical City Physicians, a group of 7 anesthesiologists for $████████

142.    Both the BMW and Medical City Physicians acquisitions were intended to expand USAP's presence at HCA's flagship facility, Medical City Dallas. Prior to these acquisitions, USAP covered only 30% of cases at Medical City Dallas and faced rigorous competition from BMW Physicians and Medical City Physicians. USAP recognized BMW's "strategic value due to their strong participation in leadership roles in the Dallas HCA flagship hospital[.]" Similarly, the Medical City Physicians held "a key strategic position within Medical City and HCA," as their group included the newly elected chief of anesthesia. After acquiring both groups, USAP controlled approximately 80% of HCA's flagship hospital.

143.    USAP's acquisition of BMW and Medical City Physicians resulted in significantly higher reimbursement rates. For example, BMW's reimbursement rate with BCBS was $███ per unit. After the acquisition, USAP raised BMW's rate from BCBS for the same anesthesia providers to USAP's contracted rate of $███ per unit, an increase of ███%. USAP estimated that raising BMW's rates to USAP levels increased the practice's incremental revenues by about $███████ per year.

144.    Finally, in April 2016, USAP acquired Sundance Anesthesia. At the time of the acquisition, Sundance consisted of 7 physicians and 24 CRNAs. USAP targeted Sundance because of its exclusive contract to service Texas Health Resources's Southwest Fort Worth hospital, which was immediately assigned to USAP. USAP's Chief Operating Officer remarked "[i]t's a huge win, that's a key THR site we didn't have. Great work[!]"

145.    USAP's acquisition of Sundance resulted in significantly higher reimbursements rates. For example, before USAP acquired Sundance, Sundance's reimbursement rate from United was $███ per unit. After the acquisition, USAP raised Sundance's reimbursement rates to $███ per unit, a ███% increase. USAP estimated that raising Sundance's rates to USAP levels increased the practice's incremental revenues between $███ to $███████ per year.

**5.  USAP's consolidation of Dallas as it stands today**

146.    In 2013, prior to USAP's acquisition spree, at least fifteen small groups accounted for 60% of the anesthesia case volume in Dallas. The competition in Dallas between those groups led to lower prices. Today, USAP has over 900 anesthesia providers and accounts for 57% of the hospital-only cases in Dallas (and 68.5% of the revenue). USAP is six times larger by case volume than the next-largest group in Dallas, and nine times larger by revenue.

147.     In total, USAP is now the exclusive provider at 13 of the largest 25 hospitals in the Dallas area and provides the majority of anesthesia services in another two. USAP is the exclusive provider for the Baylor Scott & White flagship facility—the Baylor University Medical Center—as well as its Grapevine and Irving facilities. USAP entered into an agreement in 2022 with Texas Health Resources to cover nine of its fourteen facilities on an exclusive basis until at least 2027. Finally, USAP is the exclusive provider at Methodist Health System's Dallas, Charlton, Midlothian, Mansfield, and Richardson hospitals and a dominant provider at its McKinney hospital.

148.     USAP also continues to have the highest contracted rates of any anesthesia provider in Dallas. ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████. USAP has maintained its high rates and broad network of exclusive facility contracts in Dallas despite an anesthesiology labor shortage, the COVID-19 pandemic, and losing network access to United Healthcare in 2020.

149.     As a result of USAP's acquisitions in Dallas, both hospitals and insurers are left without sufficient alternatives to USAP to constrain the group's high rates.

## C.  USAP further expands its roll-up scheme by acquiring other large practices across Texas

150.     From its founding, USAP and Welsh Carson's vision for expansion extended across Texas. Their plan was simple: acquire practices throughout the state with exclusive contracts at key hospitals for insurers' networks and extract "synergies" by raising the acquired group's prices to USAP's higher price.

151.     In 2013, USAP and Welsh Carson hired consultants Welsh Carson identified to assess whether Greater Houston Anesthesiology's contracts would allow USAP to incorporate

45

acquired physician groups and bill for their services at Greater Houston Anesthesiology's reimbursement rates. The consultants—Savvy Sherpa—concluded USAP could acquire groups, incorporate them into most of Greater Houston Anesthesiology's contracts that USAP had assumed, then bill for the acquired groups at USAP's reimbursement rates.

152.    USAP and Welsh Carson decided to follow the consultants' approach with the Pinnacle acquisition, but insurers pushed back and USAP ultimately agreed to rates for Dallas that were lower than those in Houston (but still higher than rates that existed before the acquisitions). *See* ¶ 128. USAP was able to secure ██% to ██% price increases, though only after protracted negotiations that lasted months or years. For instance, ████ opted to treat the former Pinnacle anesthesia providers as out of network; USAP arbitrated the amount owed to them, which took almost two years to settle.

153.    To resolve the confusion about whether its insurer contracts covered new acquisitions, USAP worked closely with Welsh Carson to develop a new contract clause—referred to within USAP as the "tuck-in clause"—to eliminate doubt about the rates that would apply whenever USAP acquired a new physician group. ██████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████

154.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████ Welsh Carson

personnel assisted in crafting the contractual language. Eventually, USAP's Vice President of

Payor Contracting, Alan Glenesk, sent a draft to Regan to see "if you approve." Glenesk later

reported to a different insurer that Regan was required to approve all USAP's insurer contracts.

155.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ USAP, however, credibly

threatened to leave (or not join) their networks; USAP's extensive—often exclusive—presence

at key hospitals throughout Texas made taking USAP out-of-network too difficult. ████████

████████████████████████████████████████████████████

██████████

156.    With the █████████████████████, from 2016 to 2019, USAP acquired

four groups—one each in Tyler, Austin, Amarillo, and San Antonio—and then raised their

reimbursement rates well above the median in each metropolitan area.

**1.  East Texas Anesthesiology Associates (2016)**

157.    In June of 2016, USAP acquired East Texas Anesthesiology Associates in Tyler,

Texas for $████████. East Texas Anesthesiology Associates included 23 physicians and 11

CRNAs at the time of the acquisition.

158.    USAP targeted East Texas Anesthesiology Associates because of its dominant

position at the East Texas Medical Center in Tyler, at which East Texas Anesthesiology covered

over 50% of case volume and revenue. East Texas Anesthesiology Associates also provided

near-exclusive coverage at University of Texas Health Science Center at Tyler.

159.    USAP's acquisition of East Texas Anesthesiology Associates resulted in significantly higher reimbursement rates. For example, before the acquisition, East Texas Anesthesiology Associates' rate with HealthFirst was $█ per unit; afterwards reimbursement rates increased to $██ per unit—a ██% increase for the same anesthesia providers. Similarly, East Texas Anesthesiology Associates' rates with ██████ increased from $██ (before the acquisition) to $██ (after the acquisition), an increase of nearly ██%.

**2. Capitol Anesthesiology Association (2018)**

160.    In February 2018, USAP acquired Capitol Anesthesiology Association, the largest group in Austin, for $█████████. Capitol included 80 physicians and 152 CRNAs at the time of the acquisition.

161.    USAP had initially entered the Austin market in July 2013 with its acquisition of Lake Travis Anesthesia for $██████. Lake Travis was a small group that provided local call coverage for Lakeway Hospital. USAP executives referred to the transaction as "points on the board[:] growth in Austin." Although the group was small, it was positioned to help "'Chip away' at the market leader, Capitol" and to "Continue GHA's expansion into [the] Austin MSA," where Greater Houston Anesthesiology was already the fourteenth largest group.

162.    As early as 2013, USAP and Welsh Carson had identified Capitol as an attractive acquisition target because of its "substantial market position in Austin," which they estimated at a 50% share. Capitol also had lucrative contracts with multiple hospitals in Austin, including exclusive contracts with five of the eleven hospitals in the Seton system, the largest hospital system in Austin, and a presence at five others. Capitol also had exclusive contracts at multiple other Austin-area hospitals.

163.    USAP's acquisition of Capitol resulted in significantly higher reimbursement rates. Before the acquisition, Capitol's rates from United were $█ per units. Six months after the acquisition, Capitol's United rates went to $████ per unit, a more than ██% increase for the same anesthesia providers.

164.    USAP estimated raising Capitol's rates to USAP levels would increase the practice's incremental revenues by $██████ within the first five months, and even greater revenues over the next twelve months because the rate escalation USAP had built into its insurer contracts would be applied to the now-acquired Capitol anesthesiology providers. As Capitol's Vice President of Operations, who became a USAP executive post-acquisition, put it: "Awesome! Cha-ching!"

**3.    Amarillo Anesthesia Consultants (2018)**

165.    In July 2018, USAP acquired Amarillo Anesthesia Consultants in Amarillo for $██████. Amarillo Anesthesia included 10 physicians and 10 CRNAs at the time of the acquisition. In addition, at the time of the acquisition, Cigna's internal analysis suggested that Amarillo Anesthesia accounted for as much as 85% of the hospital-based anesthesia cases in Amarillo.

166.    USAP targeted Amarillo Anesthesia because of its exclusive relationship with Baptist St. Anthony's hospital, the largest hospital in Amarillo, and one of only two hospitals in the area. Baptist St. Anthony's is also part of the Ardent Health Services system. USAP was also interested in negotiating exclusive agreements with Ardent in other locations.

167.    USAP was not the only firm that had been interested in entering Amarillo. Metro/IPN, another anesthesia provider with a significant presence in the Dallas market, also sought to enter the Amarillo market through acquisition. According to one insurer, had Metro

succeeded in acquiring an Amarillo anesthesia group, it was expected to raise the practice's rate to $█ per unit.

168.    USAP acquired Amarillo Anesthesia and raised reimbursement rates higher than Metro likely could. For example, before the acquisition, Amarillo Anesthesia's reimbursement rate from Blue Cross was $█ per unit. Six months after the acquisition, Amarillo Anesthesia's reimbursement rate from Blue Cross was $██ per unit, a ██% increase for the same anesthesia providers. Similarly, within six months of the acquisition, Amarillo Anesthesia's rate with United Healthcare increased over ██%. USAP estimated that raising Amarillo Anesthesia' rates to USAP levels would increase the practice's incremental revenues by about $██████ in the first year.

### 4.   Star Anesthesia (2019)

169.    In September 2019, USAP acquired Star Anesthesia, based in San Antonio, for $████████. Star included 182 physicians and 12 CRNAs at the time of the acquisition. At the time of the acquisition, Star was the largest remaining independent anesthesia practice in Texas.

170.    USAP and Welsh Carson identified Star as an attractive target as it considered expanding across Texas as early as 2013 because Star had exclusive contracts with the HCA co-owned Methodist San Antonio hospital system.

171.    In March 2016, Star acquired anesthesiologists that had declined to join USAP when it bought North Houston Anesthesiology in 2014. Because of Star's existing relationship with HCA in San Antonio, USAP viewed Star as a threat to its position in HCA's Houston hospitals. Indeed, when Star announced its entry into Houston, Brian Regan of Welsh Carson's reaction was that USAP "need[ed] to do a system deal with HCA and kick these guys [i.e., Star]

out of town." USAP's head of Business Development met with Star's President just a few months later to discuss the prospect of an acquisition.

172.    Star rebuffed USAP and indicated to at least one insurer that it planned to expand elsewhere in Texas. Buoyed by Star's decision, insurers such as United sought to make Star "a statewide messenger model to be a competitor against USAP," with Star leveraging its planned independence to obtain considerable price increases. USAP eliminated this competitive threat and the largest remaining independent anesthesiology practice in Texas when it acquired Star in 2019.

173.    USAP's acquisition of Star resulted in significantly higher reimbursement rates. For example, before the acquisition, Star's reimbursement rate from Cigna was $██ per unit. After the acquisition, Star's reimbursement rate was $██ per unit, a nearly ██% increase. Cigna projected that it would pay an extra $████—or ██% more—for the same Star anesthesiologists after they joined USAP. Similarly, after the acquisition, Star's rate to United increased ██%, costing United an additional $█████ for the same Star anesthesiologists. USAP estimated that raising Star's rates to USAP levels would increase the practice's incremental revenue by about $█████ per year.

## VI.    USAP'S OTHER ANTICOMPETITIVE CONDUCT

174.    As it was consolidating anesthesia services in Houston, Dallas, Austin, and across Texas by acquiring other practices, USAP extended and defended its growing power through further anticompetitive conduct. That conduct took at least two forms: (1) price-setting arrangements in which USAP charged its own, higher prices for services rendered by anesthesia providers who chose to remain independent; and (2) a market allocation agreement to avoid a head-to-head rivalry ████ with another large anesthesia provider, █████.

**A. USAP uses price-setting arrangements to charge its own, higher rates for anesthesia services provided by other practices**

175.    Unlike the acquired anesthesia practices described in Sections IV-V, some providers did not want to sell to USAP. Academic practices, for example, might lose their affiliation with medical schools or teaching hospitals if bought by USAP, and at least one "d[id] not view USAP employment as a viable option." And even some non-academic providers simply preferred to remain independent.

176.    USAP raised the reimbursement rates for anesthesia services provided by some of these independent practices by using price-setting arrangements. Namely, USAP and another practice would agree that USAP would bill payors for the anesthesia services rendered by both groups using USAP's own provider or tax information. These price-setting arrangements made it appear to payors as if USAP was doing the work of the other group's anesthesia providers. And the arrangements effectively raised the reimbursement rates of the non-USAP providers up to USAP's much higher rates. USAP then paid the non-USAP providers, typically sharing some portion of the mark-up from using USAP's higher rates.

177.    Although USAP nominally gained exclusive contracts at the affected hospitals, the reality was that the other groups continued to work at the affected hospitals. In fact, the hospitals expected (and often expressly required) that they would keep their existing providers. In other words, the effect of these price-setting arrangements was that, at the affected hospitals, payors paid USAP's higher rates for anesthesia services provided by the same doctors as before. These arrangements functioned the same as an agreement between USAP and the non-USAP providers to charge the higher USAP rates.

178.    These price-setting arrangements appeared in contracts styled as "collaboration," "professional services," or "independent contractor" agreements. But the price-setting

arrangements were not necessary for USAP to offer administrative services to non-USAP anesthesiologists or to collaborate with or hire them as subcontractors at facilities where USAP had an exclusive contract. USAP could have cooperated with other providers in any of those ways while still separating USAP and non-USAP claims for billing purposes. Indeed, USAP has on at least one occasion provided administrative services to an anesthesia group without entering into a price-setting arrangement.

179.    Several USAP executives recognized that these price-setting arrangements posed legal risks for the company. One senior vice president wrote that it "seems odd from a compliance standpoint" for USAP to bill on another provider's behalf while "keeping the revenue." And USAP's Vice President of Payor Relations feared that a price-setting arrangement "might possibly compromise" the company by breaching its insurer contracts "due to compliance issues related to pass through billing."

180.    Nevertheless, USAP has price-setting arrangements with at least two anesthesia groups in Texas that remain active to this day: (1) the Methodist Hospital Physician Organization ("TMHPO") in Houston, and (2) Dallas Anesthesiology Associates. At one time, USAP also had a price-setting arrangement with providers affiliated with the Baylor College of Medicine in Houston.

181.    USAP has also sought additional price-setting arrangements. USAP tried, albeit unsuccessfully, to reach a price-setting arrangement with providers affiliated with the University of Texas. USAP at least considered price-setting arrangements with even more anesthesia practices. For example, in 2014, USAP considered an arrangement with cardiovascular anesthesiologists employed at St. Luke's hospital facilities in Houston. And before Guardian was acquired by USAP, USAP had offered it a price-setting arrangement.

### 1. The Methodist Hospital Physician Organization

182.    The Methodist Hospital Physician Organization is a non-profit anesthesia group that is affiliated with Houston Methodist Hospital and Weill Cornell School of Medicine and specializes in providing anesthesia for cardiovascular care.

183.    On July 1, 2005, Greater Houston Anesthesiology (later acquired by USAP) signed a contract with the Methodist Hospital Physician Organization. Greater Houston Anesthesiology agreed to retain certain anesthesia providers employed by the Methodist Hospital Physician Organization so they could provide care at Houston Methodist Hospital. At the time of this contract, Methodist Hospital Physician Organization already provided anesthesia care at Houston Methodist Hospital.

184.    Greater Houston Anesthesiology's contract with the Methodist Hospital Physician Organization contained a price-setting arrangement. The contract provided that "GHA will bill and collect, in the name of GHA and using GHA provider numbers, for Services furnished by" the Methodist Hospital Physician Organization and its providers under the agreement. The Methodist Hospital Physician Organization, in turn, assigned to Greater Houston Anesthesiology any right to bill and receive payment from patients and payors for services rendered under the contract.

185.    Several months later, Greater Houston Anesthesiology signed an exclusive contract with the Houston Methodist Hospital. That contract required Greater Houston Anesthesiology to "provide seamless Anesthesia Services with TMH[PO] physicians." Indeed, Greater Houston Anesthesiology's contract with the hospital expressly contemplated that Houston Methodist would continue to receive anesthesia care from "anesthesiologists employed by TMHPO, including, but not limited to cardiovascular anesthesiologists." And the chair of

54

anesthesia at Houston Methodist—the "ultimate authority" in the department—would remain "an employee of TMHPO."

186.    USAP inherited Greater Houston Anesthesiology's price-setting arrangement with the Methodist Hospital Physician Organization when USAP acquired Greater Houston Anesthesiology in December 2012.

187.    Afterwards, USAP maintained the price-setting arrangement with the Methodist Hospital Physician Organization. USAP has continued billing for anesthesia services provided by the Methodist Hospital Physician Organization and has done so at USAP's reimbursement rates—which are much higher than those previously charged by the other group.

188.    USAP executives also looked for ways to build on the existing price-setting arrangement. A June 2015 internal strategy presentation states that one of USAP's "interim goals" was to "determine avenues for [a] deeper [] relationship" with the Methodist Hospital Physician Organization. USAP executives saw that interim goal as a step towards USAP becoming the "system-wide anesthesia provider" for the Houston Methodist hospital system.

189.    USAP's price-setting arrangement with the Methodist Hospital Physician Organization remains active today. USAP continues to charge higher, USAP reimbursement rates for anesthesia services rendered by the Methodist Hospital Physician Organization's providers. Under their price-setting arrangement, ██████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████.

### 2.    Dallas Anesthesiology Associates

190.    Dallas Anesthesiology Associates is a private anesthesia group of approximately 20 physicians. As of 2021, it was one of the ten largest anesthesia practices in Dallas. It also has a longstanding relationship with Baylor University Medical Center.

191.    In October 2008, Baylor University Medical Center signed a contract making Pinnacle its exclusive provider of anesthesia services. Baylor University Medical Center expected, however, to continue receiving anesthesia services from Dallas Anesthesiology Associates' providers. Indeed, in later versions of their contract, Baylor University Medical Center expressly required Pinnacle to staff the hospital "together with Dallas Anesthesia [sic] Associates."

192.    On December 31, 2008, Pinnacle Anesthesia Consultants (later acquired by USAP) signed a contract with Dallas Anesthesiology Associates. Pinnacle agreed to contract with Dallas Anesthesiology Associates' anesthesia providers to provide care at Baylor University Medical Center.

193.    Pinnacle's contract with Dallas Anesthesiology Associates included a price-setting arrangement. The contract provided that "Pinnacle shall bill and collect, or cause to be billed and collected" charges for all anesthesia services provided under the contract using Pinnacle's own name and tax identification number. Dallas Anesthesiology Associates and its providers assigned to Pinnacle "all of [their] rights and interest in receiving payment" for anesthesia provided at Baylor University Medical Center under the contract.

194.    USAP inherited Pinnacle's price-setting arrangement with Dallas Anesthesiology Associates when it acquired Pinnacle in January 2014.

195.    Pinnacle and USAP were capable of billing their own claims separately from Dallas Anesthesiology Associates' claims. Although they were required to bill Dallas

Anesthesiology Associates' claims to payors in Pinnacle's name, they had to bill the claims "to patients in the service provider Physician's name." So, the two groups remained separate from patients' perspective. In fact, Pinnacle even agreed to "provide a telephone number that will be provided on the billing documents. Calls received at the telephone number will be answered as 'Dallas Anesthesiology Associates' by Pinnacle."

196.    After acquiring Pinnacle, USAP maintained its price-setting arrangement with Dallas Anesthesiology Associates. USAP continued to bill for Dallas Anesthesiology Associates at USAP's higher reimbursement rates, compensating Dallas Anesthesiology Associates at a lower rate based on the other group's billing rate at Baylor University Medical Center before the arrangement, and thereby "collects a nice margin on the business." USAP's price-setting arrangement with Dallas Anesthesiology Associates remains active today.

### 3.  Baylor College of Medicine

197.    Baylor College of Medicine is a medical school based in Houston. It has an affiliated group of practicing physicians that includes anesthesiologists. As of 2012, Baylor College of Medicine had 50 affiliated anesthesiologists and was the second-largest anesthesia group in Houston (behind Greater Houston Anesthesiology) in terms of procedure volume.

198.    As early as August 2013, USAP considered partnering with Baylor College of Medicine. USAP executives and Brian Regan of Welsh Carson saw such a partnership as a way for USAP to become the exclusive anesthesia provider at more hospitals in Houston.

199.    By October 2013, USAP found itself in direct competition against Baylor College of Medicine to provide anesthesia to St. Luke's Health, one of the primary hospital systems in Houston. USAP quickly began sizing up Baylor College of Medicine as a competitor, including by hiring a consulting firm, Stax, to evaluate the academic anesthesia practice.

200.     But USAP soon decided that colluding, rather than competing, with Baylor College of Medicine would be more profitable. In October 2013, as USAP executives strategized over how to beat out Baylor for the contract with St. Luke's, Brian Regan made a proposal: "[I]f Baylor is really pushing for a piece of the anesthesia, get us in a room with them. Maybe we could work something out that would be mutually beneficial and acceptable to everyone."

201.     USAP acted on Regan's suggestion. USAP executives reached out to Baylor College of Medicine about a partnership and on October 23, 2014, USAP and Baylor College of Medicine signed a contract styled as an "Anesthesia Services Collaboration Agreement." Under the terms, Baylor College of Medicine agreed to provide USAP with several providers who would work at two campuses of the Baylor St. Luke's Medical Center hospital.

202.     USAP agreed to bill and collect in its own name and using its own provider numbers—and thus, at USAP's rates—for anesthesia services rendered by Baylor College of Medicine providers under the contract. Baylor College of Medicine and its providers, in turn, assigned to USAP any rights they had to bill and receive payment from patients or payors for anesthesia services rendered under the contract.

203.     For several years, USAP billed anesthesia claims performed by Baylor College of Medicine physicians in USAP's name and at USAP's higher rates. Meanwhile, USAP paid Baylor College of Medicine ██████████████ for its anesthesia providers' time. In 2020, the practices' price-setting arrangement was terminated.

### 4.  University of Texas

204.     Like Baylor College of Medicine, the medical school programs at the University of Texas are affiliated with practicing physicians, including a group of anesthesiologists. As of

2012, that group numbered roughly 84 anesthesiologists and held an exclusive contract with Memorial Hermann's Texas Medical Center, one of the largest hospitals in the state.

205.    When USAP was considering a collaboration with Baylor College of Medicine in 2013, it also identified a similar partnership with the University of Texas anesthesia group as a "significant rate opportunity."

206.    By June 2014, USAP was actively working on an "alliance with UT." That summer, USAP and the University of Texas exchanged term sheets that contemplated UT assigning its exclusive contract at Texas Medical Center to USAP while UT's physicians would continue to work there, now as contractors for USAP. Among the terms proposed by USAP was another price-setting arrangement.

207.    Despite USAP's efforts, it could not secure a price-setting arrangement with the anesthesia group from the University of Texas. Discussions in 2014 petered out. They resumed in 2020, but the two anesthesia practices never came to an agreement.

**B.  USAP's market allocation with** ███████████

208.    In 2013, █████████████████████ USAP learned that █████

████████████████████████████.

209.    At that time, ██████ was a subsidiary of █████████████., a publicly traded nationwide healthcare company that includes, among other things, a physician group providing services in anesthesiology and other hospital-based specialties.[6]

210.    ████████████████████████████████

████████████████████████████████████



████████████████████████████████████████

█████████████████████████████████████ .

211.   ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████ .

212.   In late November 2013, ███████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

█████████████████████ .

213.   ████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████

████████████████████ .

214.   ███████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████.

215.     This agreement had the purpose and effect of keeping ████████—a significant

potential competitor—out of the ████████████ market for anesthesia services.

### VII.    RELEVANT MARKETS

**A.  The relevant service market is commercially insured hospital-only anesthesia services**

216.     The relevant service market to assess the challenged conduct is the market for

hospital-only anesthesia services sold to commercial insurers and their insured members. This

service market encompasses (1) all inpatient anesthesia services, including surgical and obstetric

anesthesia performed while the patient is admitted to a hospital; and (2) any other anesthesia

services that must be provided in a hospital setting because the procedure subjects the patient to

an elevated risk such that it requires quick access to emergency medical services.

217.     Although the conduct's likely effects on competition could be analyzed for each

commercially insured hospital-only anesthesia service, it is appropriate to evaluate the

challenged conduct's likely effects across this cluster of hospital-only anesthesia services

because these services are offered to patients in the relevant geographic markets under similar

competitive conditions. Specifically, all hospital-only anesthesia services require patients to

receive care in a hospital setting. Thus, grouping the various individual hospital-only anesthesia

services into a cluster for analytical convenience enables the effective evaluation of competitive

effects with no reduction in analytical rigor.

218.     The relevant service market, as defined, is conservative (and likely overinclusive) because it includes commercially insured hospital-only anesthesia services provided at academic medical centers by academic anesthesia provider groups in conjunction with their educational mission. Houston, for example, has numerous academic medical centers, including Memorial Hermann's Texas Medical Center facility and Houston Methodist. These academic medical centers employ professors of medicine to teach anesthesiology, as well as residents and fellows, all of whom provide anesthesia services in conjunction with their educational mission.

219.     Anesthesia services at academic medical centers related to their educational mission are not subject to the same competitive conditions as other non-education related hospital-only anesthesia services because they must be provided by academic anesthesia groups. As a result, industry typically views academic anesthesia groups as different than independent anesthesia groups. Thus, including all hospital-only anesthesia services provided by academic anesthesia groups in the relevant market (including those related to the educational mission) understates USAP's actual market share.

**1.   Services performed outside a hospital are not part of the relevant service market**

220.     The relevant service market appropriately excludes anesthesia services that can be provided outside a hospital setting. Patients requiring hospital-only services must receive that service in a hospital setting and cannot obtain it elsewhere.

221.     The Centers for Medicare and Medicaid Services ("CMS") maintain a list that distinguishes between hospital-only and other anesthesia services for governmentally insured patients. The list identifies anesthesia billing codes that may be used for ambulatory surgical centers. All other anesthesia codes must be billed in a hospital setting. Commercially insured patients generally face similar billing rules either formally or because hospitals adopt CMS

policy to remain certified for government insurance programs. In practice, an insignificant amount of anesthesia services provided in a surgical center is billed to commercial insurance using the codes CMS lists as hospital-only.

222.    Competitive realities also differ for hospital-only and other anesthesia services because they are administered to distinct sets of patients. Patients who must be treated in a hospital, based on their specific medical condition, can only receive hospital-only anesthesia. Determining whether a patient must undergo a procedure in a hospital is based on medical considerations, such as the time to recuperate from surgery and the need to use anesthesia that may place the patient at risk for loss of life-preserving protective reflexes. In many cases, this overlaps with the decision to admit a patient overnight—i.e., inpatient care—but there may be medical procedures that must be performed in a hospital but do not require an overnight stay. Thus, even though the anesthesia services that form the hospital-only services may be performed by the same providers as other services, the services themselves are distinct because once a patient requires treatment in a hospital, neither the patient nor their payor can turn to non-hospital anesthesia services. Therefore, patients, their payors, and referring physicians cannot substitute non-hospital services in response to a small but significant non-transitory increase in price for hospital-only services.

223.    Hospital-only anesthesia services also require unique facilities, i.e., hospitals. Hospitals must provide a minimum standard of care, which requires providing appropriate facilities and staffing for recuperation and monitoring following certain procedures. The facilities and staffing required to admit and care for patients overnight differ from those requirements for outpatient care. Similarly, facilities administering general anesthesia may require the capability to admit a patient if an adverse event occurs during the procedure. Accordingly, outpatient

63

facilities are not viable alternatives to hospitals for procedures requiring an overnight stay because of elevated risk of adverse events during anesthesia.

224.    Hospital-only anesthesia services require providers to practice under conditions distinct from outpatient services. Specifically, hospitals often need anesthesia providers to cover long shifts and overnight call. Unlike non-hospital procedures, which are frequently scheduled in advance, procedures performed during overnight call are often hospital-only or inpatient services, such as anesthesia for emergency surgery. Hospitals may also require certain specialized anesthesia services, which can require advanced training or experience and which, in turn, providers practicing only in outpatient settings are less likely to have.

225.    For hospitals, anesthesia groups providing outpatient services with insufficient size to provide 24-hour coverage or without the scope of services, including specialty anesthesia services, to meet hospital needs cannot be reasonable substitutes for anesthesia groups providing hospital-only anesthesia services.

226.    In addition, industry participants recognize hospital-only anesthesia services as distinct. USAP's business documents regularly measure its presence within hospital systems or at individual facilities, without regard to ambulatory surgical centers.

227.    For example, when USAP and Welsh Carson were first planning to acquire Greater Houston Anesthesiology in late 2012, they emphasized its high "wallet share" of anesthesia services at at each of the four largest hospital systems in Houston, separately assessing the practice's inpatient and outpatient procedure shares.

228.    Similarly, when USAP began expanding beyond Houston by acquiring Pinnacle, the company assessed Pinnacle's growth in inpatient and outpatient procedures separately and

highlighted the practice's "stable" position at the four largest hospital systems in Dallas, without focusing on the group's outpatient competitive position.

229.     Finally, from insurers' perspective, hospital-only and non-hospital or outpatient anesthesia services are not substitutes because they are not substitutes from the perspective of insurers' ASO clients or members, or their in-network hospitals and providers.

230.     Narrower relevant service markets may also exist for purposes of assessing the challenged anticompetitive conduct, including one consisting of only inpatient anesthesia services (which, for the same reasons as hospital-only anesthesia services, can be "clustered" for convenience with no reduction in analytical rigor).

### 2. Non-commercial insurance plans are not part of the relevant service market

231.     The relevant service market can be appropriately limited to anesthesia services sold to commercial insurers and their insured members.

232.     Commercial and government-sponsored insurance serve distinct customers. Private health insurance companies offer commercial insurance and plan administrative services to individuals and employers. Commercial insurance plans are typically linked to an insured member's employment. Government-sponsored plans serve individuals who meet specific eligibility criteria, such as age or income level, which are usually unrelated to their employer or employment situation.

233.     Commercial insurers pay distinct prices from government-sponsored plans. Anesthesiologists generally receive significantly higher reimbursement rates for services sold to commercial plans compared to Medicaid, Medicare, or Medicare Advantage plans, which are tied to government fee schedules.

65

234.    USAP, like other provider groups, recognizes the commercial insurance market as separate, tracking its pricing and positioning with commercial insurers without reference to, e.g., Medicare or Medicaid.

**B.  The relevant geographic markets to assess the competitive implications of the challenged conduct are no broader than the local metropolitan statistical areas**

235.    There are three relevant geographic markets to assess the competitive implications of the challenged conduct: (1) the Houston metropolitan statistical area ("MSA"); (2) the Dallas-Fort Worth MSA; and (3) the Austin MSA.

**1.  A relevant geographic market is no broader than the Houston metropolitan statistical area**

236.    The relevant market to address the anticompetitive effects of USAP's conduct within Houston is no broader than the Houston metropolitan statistical area.

237.    The Houston MSA includes the following counties: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

238.    Patients in the Houston MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts—often exclusive—to provide hospital-only anesthesia services at hospitals in the Houston MSA.

239.    Hospitals typically select anesthesia groups for hospital contracts in the Houston MSA from groups with a significant portion of doctors within the Houston MSA. Practices outside the Houston MSA may be less cost competitive due to the need to recruit, hire short-term substitute physicians to fill in for staffing gaps on short notice (known as *locum tenens* physicians), or provide travel and lodging for more distant providers. These groups may also lack

relationships with Houston hospitals or have little established reputation in Houston and may lead to more disruption at the hospital.

240.    To constrain rates charged by an anesthesia group in the Houston MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Houston MSA to construct its network with enough coverage to avoid burdening patients and clients in the Houston MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Houston MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Houston MSA would accept an alternative anesthesia group.

241.    To maintain the ability to make credible out of network threats, insurers may try to support the availability of alternative providers in the Houston MSA. For example, Blue Cross considered subsidizing a specific anesthesia group—MetroWest—to maintain it as an independent competitor for exclusive business at hospitals in the Houston MSA.

242.    Other qualitative evidence confirms that the Houston MSA is a relevant market to assess the competitive implications of USAP's conduct in Houston. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Houston MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

243.    Industry participants, including USAP and payors, recognize metropolitan areas, such as the Houston MSA, as markets for anesthesia services.

244.    Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Houston MSA could profitably impose small but significant non-transitory price increases.

USAP's acquisition of local rivals enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. For example, in Houston, when USAP acquired North Houston Anesthesiology, MetroWest, and Guardian, it significantly raised rates but retained enough volume to increase each practice's annual earnings by over ██%, ██%, and ██%, respectively.

### 2. A relevant geographic market is no broader than the Dallas-Fort Worth metropolitan statistical area

245.    The relevant market to address the anticompetitive effects of USAP's conduct within Dallas is no broader than the Dallas-Fort Worth metropolitan statistical area.

246.    The Dallas MSA includes the following counties: Collin, Dallas, Denton, Ellis, Hood, Hunt, Johnson, Kaufman, Parker, Rockwall, Somervell, Tarrant, and Wise.

247.    Patients in the Dallas MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts (often exclusive contracts) to provide hospital-only anesthesia services at particular hospitals in the Dallas MSA.

248.    Hospitals typically select anesthesia groups for hospital contracts in the Dallas MSA from groups with a significant portion of doctors within the Dallas MSA. Practices outside the Dallas MSA serving Dallas hospitals may be less cost competitive due to the need to recruit, hire *locum tenens* physicians to fill in for staffing gaps on short notice, or provide travel and lodging for more distant providers. These groups may also lack relationships with Dallas hospitals or have little established reputation in Dallas and may lead to more disruption at the hospital.

249.    To constrain rates charged by an anesthesia group in the Dallas MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats

68

depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Dallas MSA to construct its network with enough coverage to avoid burdening patients and clients in the Dallas MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Dallas MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Dallas MSA would accept an alternative anesthesia group.

250.     Other qualitative evidence confirms that the Dallas MSA is a relevant market to assess the competitive implications of USAP's conduct in Dallas. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Dallas MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

251.     Industry participants, including USAP and insurers, recognize metropolitan areas, such as the Dallas MSA, as markets for anesthesia services.

252.     Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Dallas MSA could profitably impose small but significant non-transitory price increases. USAP's acquisition of local rivals enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. For example, in Dallas, after USAP acquired Excel, Anesthesia Consultants of Dallas, and BMW Anesthesiology, it significantly raised rates but retained enough volume to increase each practice's annual earnings by approximately ██%, ██%, and ██%, respectively.

### 3.  A relevant geographic market is no broader than the Austin metropolitan statistical area

253.     The relevant market to address the anticompetitive effects of USAP's conduct within Austin is no broader than the Austin metropolitan statistical area.

254.    The Austin metropolitan statistical area includes the following counties: Bastrop, Caldwell, Hays, Travis, and Williamson.

255.    Patients in the Austin MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts (often exclusive contracts) to provide hospital-only anesthesia services at particular hospitals in the Austin MSA.

256.    Hospitals typically select anesthesia groups for hospital contracts in the Austin MSA from groups with a significant portion of doctors within the Austin MSA. Practices outside the Austin MSA serving Austin hospitals may be less cost competitive due to the need to recruit, hire *locum tenens* physicians to fill in for staffing gaps on short notice, or provide travel and lodging for more distant providers. These groups may also lack relationships with Austin hospitals or have little established reputation in Austin and may lead to more disruption at the hospital.

257.    To constrain rates charged by an anesthesia group in the Austin MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Austin MSA to construct its network with enough coverage to avoid burdening patients and clients in the Austin MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Austin MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Austin MSA would accept an alternative anesthesia group.

258.    Other qualitative evidence confirms that the Austin MSA is a relevant market to assess the competitive implications of USAP's conduct in Austin. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Austin

MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

259.    Industry participants, including USAP and insurers, recognize metro areas, such as the Austin MSA, as markets for anesthesia services.

260.    Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Austin metropolitan statistical area could profitably impose small but significant non-transitory price increases. USAP's acquisition of a local rival enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. Specifically, in Austin, after USAP acquired Capitol, it significantly raised rates but retained enough volume to increase the practice's annual earnings by ██%.

## VIII.   MARKET POWER AND MONOPOLY POWER

### A.  USAP has monopoly power in the Houston MSA

#### 1.  USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share in Houston

261.    USAP and Welsh Carson's "consolidation strategy" combined four significant anesthesia practices in Houston. In 2013, after its initial acquisition, USAP controlled about 50% of the commercially insured hospital-only market, measured by revenue. In 2021, after its roll-up, USAP had a nearly 70% market share by revenue.

262.    USAP also commands a majority share of the commercially insured hospital-only anesthesia volume in Houston. One common way to measure volume is by the number of cases, though this metric may understate USAP's actual volume share to the extent USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless, even by this metric, claims data from one major insurer show that USAP controlled nearly 60% of the commercially

insured hospital-only anesthesia cases in Houston in 2021, compared to roughly 36% in 2013 after its initial acquisition.

263.     USAP's share of the commercially insured inpatient anesthesia market in Houston, under any metric, has been roughly the same as its share of the commercially insured hospital-only market in Houston at all relevant times.

264.     Insurers' ordinary course documents confirm USAP's share. For example, one calculated USAP's share in 2020 at about 63% of the inpatient anesthesia spend in Houston.

265.     The high concentration resulting from USAP's roll-up is also demonstrated by the Herfindahl-Hirschman Index (HHI). HHIs are commonly accepted (including by courts) as a measure of market concentration and are calculated by squaring the market shares of each firm competing in a market and then summing the results. Under this framework, a near-0 HHI indicates a highly competitive market filled with atomistic competitors of roughly equal size; an HHI of 10,000 indicates a pure monopoly in which there is only one firm and no competition whatsoever. Horizontal mergers—that is, mergers between market competitors—result in an increase in HHI, with the difference between the pre- and post-merger HHI often referred to as the "delta."[7]

266.     Following USAP's initial platform acquisition of Greater Houston Anesthesiology, each subsequent transaction in Houston, when measured by revenue, resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI figures for each relevant transaction are summarized in the table below:

---

[7] HHI deltas can be calculated by doubling the product of the merging firms' (unsquared) market shares.

| Table 1: Houston Acquisitions – Hospital-Only Anesthesia Services | | | | | |
|---|---|---|---|---|---|
| Date | Provider Group | Pre-Acquisition Market Share | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 12/27/2012 | Greater Houston Anesthesiology | 39.0% | 50.5% | 1774 (+0) | 2754 (+0) |
| 6/24/2014 | North Houston Anesthesiology | 4.4% | 3.2% | 2115 (+341) | 3081 (+327) |
| 3/1/2017 | MetroWest Anesthesia Care | 7.0% | 6.1% | 2979 (+649) | 3962 (+680) |
| 1/1/2020 | Guardian Anesthesia Services | 4.1% | 3.8% | 3874 (+465) | 4989 (+501) |

**2. USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Houston**

267.    USAP has maintained or grown its market share in Houston year-over-year since it acquired Greater Houston Anesthesiology, the largest group in Houston at the time. At the time of its acquisition, it had the highest average reimbursement rate of any anesthesia group in Houston.

268.    Nevertheless, USAP's reimbursement rates in Houston, aggregated and averaged across all payors, have increased regularly, without any clear improvement in quality. Since its entry in 2013, USAP has raised rates by ▮% or more. Today, USAP charges ▮▮▮▮ ▮▮ the median reimbursement rate for anesthesia services in Houston.

269.    Despite charging the highest rates in Houston, USAP's volume of cases has grown significantly. From 2013 to 2021, USAP's share of case volume grew from 39.0% to

58.5%. During the same period, USAP's share of anesthesia costs in Houston grew from 50.5% to 69.5%.

270.    Despite charging the highest rates in Houston, USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems. Instead, its retention of volume year-over-year was approximately 100%. For example, in 2015, a Welsh Carson associate who was working to secure additional financing on behalf of USAP bragged that USAP's retention of hospital contracts had "effectively been 100%."

271.    USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

### 3. USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Houston

272.    USAP is substantially larger than any other anesthesia group in Houston. Specifically, USAP is more than eight times the size of the next largest group by revenue, and four times the size of the next largest group by number of cases. Table 2 below summarizes USAP's and its rivals' shares of the commercially insured hospital-only anesthesia services market in Houston:

| Table 2: Houston Market Shares (2021) – Hospital-Only Anesthesia Services | | |
|---|---|---|
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 58.5% | 69.5% |
| UT Physicians | 13.3% | 8.3% |
| North American Partners in Anesthesia | 8.1% | 8.2% |
| Texans Anesthesia Associates | 4.8% | 3.1% |
| Compass Anesthesia Providers | 2.5% | 1.9% |
| Baylor College of Medicine | 2.4% | 1.4% |
| Best Choice Anesthesia & Pain | 1.1% | 1.0% |

273.    None of these far smaller rivals has successfully displaced USAP or eroded its market share enough to constrain its ability to charge supracompetitive rates in Houston.

**B.  USAP has monopoly power in the Dallas MSA**

**1.  USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share**

274.    USAP and Welsh Carson's "consolidation strategy" combined seven significant anesthesia practices in Dallas. In 2014, after its initial acquisition, USAP controlled about 46% of the commercially insured hospital-only anesthesia market, measured by revenue. In 2021, after its roll-up, USAP had a 68% market share by revenue.

275.    USAP also commands a majority share of the commercially insured hospital-only anesthesia volume in Dallas. One common way to measure volume is by the number of cases, though this metric has the potential to understate USAP's actual volume share to the extent USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless, even by this metric, claims data from one major insurer show that USAP controlled nearly 60%

75

of the commercially insured hospital-only anesthesia cases in Dallas in 2021, compared to 42% in 2014 after its initial acquisition.

276.    USAP's share of the commercially insured inpatient anesthesia market in Dallas, under any metric, has been roughly the same as its share of the commercially insured hospital-only market in Dallas at all relevant times.

277.    Insurers' ordinary course documents confirm USAP's share. For example, one calculated USAP controls about 70% of the inpatient commercial anesthesia spend in Dallas. Another insurer estimated in 2020 that, excluding academic medical groups' employed providers, USAP controlled "over 80% of anesthesia in Houston. In DFW, similar dominance."

278.    The high concentration resulting from USAP's roll-up is also demonstrated by the HHI. Following its initial platform acquisition of Pinnacle, USAP's acquisitions of Excel and Sundance Anesthesia, when measured by revenue, resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. USAP's cumulative acquisitions in Dallas also resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI figures for each relevant transaction are summarized in the table below:

| Table 3: Dallas Acquisitions – Hospital-Only Anesthesia Services | | | | | |
|---|---|---|---|---|---|
| Date | Provider Group | Pre-Acquisition Market Share | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 1/6/2014 | Pinnacle Anesthesia Consultants | 39.9% | 42.3% | 1609 (+0) | 1890 (+0) |
| 1/20/2015 | Anesthesia Consultants of Dallas | 1.7% | 1.7% | 1954 (+137) | 2381 (+157) |
| 3/3/2015 | Excel Anesthesia Consultants | 5.5% | 5.3% | 2399 (+445) | 2866 (+485) |
| 12/2/2015 | Southwest Anesthesia Associates | 1.1% | 0.8% | 2588 (+106) | 3142 (+86) |
| 1/21/2016 | BMW Anesthesiology | 0.8% | 0.4% | 2762 (+82) | 3387 (+44) |
| 1/25/2016 | Medical City Physicians | 0.5% | 0.3% | 2807 (+45) | 3418 (+31) |
| 4/1/2016 | Sundance Anesthesia | 3.0% | 2.2% | 3254 (+322) | 3886 (+271) |

**2. USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Dallas**

279.    USAP has maintained or grown its market share in Dallas year-over-year since it acquired Pinnacle, the largest group in Dallas at the time. At the time of its acquisition, it had the highest average reimbursement rate of any anesthesia group in Dallas.

280.    Nevertheless, USAP's reimbursement rates in Dallas, aggregated and averaged across all major insurers, have increased regularly without any clear improvement in quality.

Since its entry in 2014, USAP has raised rates by ██% or more in Dallas. Today, USAP charges ████████████ the median reimbursement rate for anesthesia services in Dallas.

281.   Despite charging the highest rates in Dallas, USAP's volume of cases has grown significantly. From 2014 to 2021, USAP's share of case volume grew from 39.9% to 58.6%. During the same period, USAP's share of anesthesia costs in Dallas grew from 42.3% to 68.3%.

282.   Despite charging the highest rates in Dallas, USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems. Instead, its retention of volume year-over-year was, as a Welsh Carson associated boasted in 2015, "effectively . . . 100%."

283.   USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

**3. USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Dallas**

284.   USAP is substantially larger than any other anesthesia group in Dallas. Specifically, USAP is more than nine times the size of the next largest group by revenue, and six times the size of the next largest group by number of cases. Table 4 below summarizes USAP's and its rivals' shares of the commercially insured hospital-only anesthesia market in Dallas.

| Table 4: Dallas Market Shares (2021) – Hospital-Only Anesthesia Services | | |
|---|---|---|
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 58.6% | 68.3% |
| Metropolitan Anesthesia Consultants | 9.0% | 7.4% |
| UT Physicians | 8.3% | 4.9% |
| NorthStar Anesthesia | 4.6% | 2.7% |
| Anesthesia Partners of Dallas | 3.2% | 3.3% |
| Allen Anesthesia Associates | 2.6% | 2.0% |
| Noble Anesthesia Partners | 1.1% | 1.0% |

285.     None of these far smaller rivals has successfully displaced USAP or eroded its

market share enough to constrain its ability to charge supracompetitive rates in Dallas.

### C.  USAP has a dominant position in the commercially insured hospital-only anesthesia market in Austin

#### 1.  USAP and Welsh Carson's roll-up of anesthesia providers has substantially increased concentration, resulting in a dominant market share

286.     As a result of USAP and Welsh Carson's consolidation strategy, USAP is the

dominant anesthesia provider in Austin. In 2013, USAP controlled about 3.5% of the

commercially insured hospital-only anesthesia markets, measured by revenue. In 2021, after its

roll-up, USAP had a greater than 50% market share by revenue.

287.     USAP also commands a majority share of the commercially insured hospital-only

anesthesia volume in Austin. One common way to measure volume is by the number of cases,

though this metric has the potential to understate USAP's actual volume share to the extent

USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless,

even by this metric, claims data from one major insurer show that USAP controlled nearly 44%

79

of the commercially insured hospital-only anesthesia cases in Austin in 2021, compared to 2.5% in 2013 after its initial acquisition.

288.    USAP's share of the commercially insured inpatient anesthesia market in Austin, under any metric, has been roughly the same as its share of the commercially insured hospital-only market in Austin at all relevant times,.

289.    USAP's and payors' ordinary course documents confirm USAP's share. USAP itself characterized its primary acquired group in Austin, Capitol Anesthesiology Association, as having a "[l]arge share of [a] great market in top hospital systems" in Austin. Specifically, USAP claimed Capitol had "significant organic growth for the last 3 years, although they have seen a market share decline from 75% to around 50% today."

290.    The high concentration resulting from USAP's roll-up is also demonstrated by the HHI. Following USAP's initial acquisition of Lake Travis Anesthesia, USAP's subsequent acquisition of Capitol Anesthesia, whether measured by revenue or case volume, resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI figures for the relevant transaction are summarized in the table below:

| Table 5: Austin Acquisitions – Hospital-Only Anesthesia Services | | | | | |
|---|---|---|---|---|---|
| Date | Provider Group | Pre-Acquisition Market Shares | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 7/3/2013 | Lake Travis Anesthesiology | 3.5% | 5.1% | 2480 (+0) | 3220 (+0) |
| 2/1/2018 | Capitol Anesthesiology Association | 33.8% | 42.0% | 2713 (+233) | 3660 (+440) |

**2. USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Austin**

291.    Despite charging the highest rates in Austin, USAP's volume of cases has grown significantly. From 2014 to 2021, USAP's share of case volume grew from 3.5% to 44.2%; during the same period, USAP's share of anesthesia costs in Austin grew from 5.1% to 52.5%.

292.    Since its entry in 2013, USAP has raised prices by at least ███%. After acquiring Capitol and raising its rates, USAP increased Capitol's incremental revenues by $████████ within five months.

293.    USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems in Austin, despite its high reimbursement rates without any clear quality improvements. Instead, its retention of volume year-over-year was approximately 100%.

294.    USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

**3.   USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its dominance in Austin**

295.     USAP has a single rival in Austin, North American Partners in Anesthesia. No other group has more than 4% of the market, whether measured by revenue or volume of cases. Table 6 below summarizes USAP's and its rivals' share of the commercially insured hospital-only anesthesia market in Austin.

| Table 6: Austin Market Shares (2021) – Hospital-Only Anesthesia Services | | |
|---|---|---|
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 44.2% | 52.5% |
| North American Partners in Anesthesia | 37.8% | 37.2% |
| NorthStar Anesthesia | 1.8% | 1.2% |
| Scott & White Physicians | 2.5% | 0.8% |
| UT Physicians | 1.0% | 0.9% |
| Westlake Anesthesia | 2.5% | 0.6% |

296.     USAP's sole rival has not successfully displaced USAP or eroded its market share enough to constrain its ability to charge above-market rates in Austin.

**D.  High barriers to entry to the hospital-only anesthesia markets in Houston, Dallas, and Austin protect USAP's market share**

297.     Anesthesiologists cannot easily increase their productivity and see additional patients in response to competitors' increasing their price. Limited operating room capacity and schedule availability may also prevent anesthesiologists from seeing additional patients. Even if anesthesia groups could see more patients, hospitals face complications and difficulties transitioning from one group to another.

298.     Providing hospital-only anesthesia requires postsecondary education, including either a graduate medical degree or nursing degree, in addition to training and licensing. As a

result, the supply of anesthesia providers is limited and cannot be increased or react quickly to market trends in demand or reimbursement rates.

299.     Attracting higher patient volume can require anesthesia providers to contract with hospitals because anesthesia is provided in conjunction with other medical care, rather than as a standalone service. Providers face an uphill battle to win hospital contracts because those contracts are "sticky" due to high switching costs. In addition, hospitals generally do not change their contracting practices in response to reimbursement rates anesthesia providers charge payors, because hospitals do not pay any part of those rates. Indeed, hospitals often face a disincentive to switch away from anesthesiologists who charge payors high rates, because those anesthesiologists can (and sometimes do) offer to share the spoils with hospitals in the form of a lower subsidy from the hospital.

300.     Even if a group could overcome these structural barriers to winning market share, USAP has erected additional entry barriers in Houston, Dallas, and Austin.

301.     First, USAP uses a network of physician non-compete agreements to prevent physicians from splitting off and forming their own groups or joining other groups looking to challenge USAP's market position. ██████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████. USAP's non-competes prevent rivals from gaining scale by hiring doctors in Houston, Dallas, and Austin.

302.     Second, USAP's equity vesting rules discourage its providers from joining competing practices. ██████████████████████████████████████ ████████████████████████████████████████████████████████████

███████████████████████████████████████████████. This makes individual

physicians reluctant to leave until well after they join USAP, and makes it difficult for a group of

physicians, who may have joined USAP at different times and thus have different vesting

schedules, to leave en masse.

303.    Experience confirms these barriers to entry protect USAP's market share. USAP

has managed to retain its exclusive hospital relationships and insurer contracts despite both sets

of contracts containing clauses that ████████████████████████████████

██████████████████████████████████████████.

## IX.    USAP'S DOMINANCE IN TEXAS

304.    USAP's acquisitions in Texas have combined seventeen anesthesia practices,

growing its presence in a single city into a dominant position across the state. The direct result is

that USAP now controls nearly 60% of hospital-only anesthesia costs statewide, and

approximately 43% of cases. There is no other anesthesia group that comes close to matching

USAP's presence in Texas. USAP is more than ten times larger than the next largest group by

revenue and seven times larger by volume of cases. In fact, USAP is larger than the ten next-

largest groups in Texas combined.

305.    As USAP accumulated practices throughout the state, it has been able to exercise

more leverage in its negotiations with insurers, limiting their ability to constrain pricing.

306.    The experience in Amarillo is illustrative of how USAP's growing presence in

Texas increased its negotiating leverage, even for a group that was already locally dominant.

Before USAP acquired Amarillo Anesthesia—a group with as much as an 85% share of hospital-

only services in that city—insurers successfully resisted Amarillo Anesthesia's demands to

dramatically increase its reimbursement rates. But once USAP acquired Amarillo Anesthesia in

2018, USAP was able to ████████████ its reimbursement rate from Blue Cross, from $██ to $██ per unit, even though the acquisition did not increase market concentration in Amarillo.

307.    The Pinnacle acquisition provides another example of how USAP's growing statewide presence cemented its high prices. When USAP's predecessor Greater Houston Anesthesiology practiced only in Houston, Blue Cross could—and did—exclude Greater Houston Anesthesiology from its network in response to requested rate increases. Once USAP expanded to Dallas through the Pinnacle acquisition, however, Blue Cross concluded that it was too difficult to exclude USAP, even though the Pinnacle acquisition did not increase concentration in the Dallas market. As a result, Blue Cross agreed to raise Pinnacle's reimbursement rate by ██%, at a total cost of over $10 million. That price increase cannot be explained by USAP simply being a more skilled negotiator than Pinnacle, as Pinnacle's contract negotiations had been handled by EmCare, a subsidiary of a large, sophisticated corporation.

308.    USAP effectively exercised this leverage with each acquisition it made in Texas. Each time it acquired a group, even in places where it had no existing presence, USAP raised the target group's rates ████████████ to ██% (depending on the payor), increasing the group's earnings—all without an offsetting loss in patient volume. These so-called "synergies" figured prominently in USAP's planning documents.

309.    Moreover, while raising reimbursement rates for acquired groups, USAP maintained or even raised its own already high rates. As United recounted in an internal strategy discussion, by 2020, USAP's rates were "nearly 40% more expensive than the average cost of all other anesthesia providers in Texas" and "USAP Texas's rates are 96% higher than the median rate we pay other anesthesia groups in Texas, but their quality performance is not meaningfully better than their peers." Another participant in the United strategy discussion later pointed out

that, in fact, USAP was even more expensive—110% of the statewide median. When United attempted to lower USAP's rates, resulting in USAP going out-of-network, United's clients, including ASO clients operating in multiple parts of the state, pushed for United to bring USAP back in-network to avoid disruption to their members. To return USAP to the network, however, United was forced to accept above-market reimbursement rates.

310.    USAP has steadily hiked prices across Texas without ceding—and instead growing—its dominant position. Despite these increases in reimbursement rates, USAP continued to provide the same or greater volume of hospital-only anesthesia services each year. Thanks in part to the high entry barriers that protect its positioning, *see* ¶¶ 297-303, no acquisition or concomitant average price increase resulted in meaningful volume loss for USAP. Rather, USAP successfully increased its presence in Texas, as illustrated in Table 7 below:

| Table 7: USAP Statewide Presence 2013-2021 | | |
|---|---|---|
| Year | By Cases | By Revenue |
| 2013 | 8.8% | 13.0% |
| 2014 | 22.2% | 31.6% |
| 2015 | 25.9% | 36.4% |
| 2016 | 28.8% | 40.0% |
| 2017 | 29.3% | 41.0% |
| 2018 | 34.3% | 45.9% |
| 2019 | 37.0% | 53.8% |
| 2020 | 42.2% | 60.4% |
| 2021 | 43.0% | 57.1% |

## X.    HARM TO CONSUMERS AND COMPETITION

### A.    USAP's conduct has increased its negotiating leverage against insurers, reducing insurers' ability to constrain USAP's demands to raise prices

311.    As a result of Welsh Carson and USAP's roll-up strategy, USAP has amassed exclusive or nearly exclusive contracts at hospitals throughout Houston, Dallas, and across Texas. USAP's resulting war chest of facilities where it dominates anesthesia services includes

all or nearly all of the important hospitals for payors in Houston, Dallas, San Antonio, Austin, and several other Texas cities, and numerous other hospitals throughout Texas.

312.    USAP's price-setting arrangements, although not outright acquisitions, have had a similar effect. By enabling USAP to bill other providers' services at additional hospitals as if they were USAP's own, these price-setting arrangements further extended USAP's hold over anesthesia services in Texas.

313.    Moreover, to the extent that any anesthesia providers might have competed against USAP to displace it at key hospitals or other healthcare facilities, USAP has largely neutralized these competitors by acquiring them outright, by striking price-setting arrangements with them, or by securing their agreement not to enter the market.

314.    USAP's conduct has thus significantly increased its leverage in negotiations with insurers. Indeed, according to an executive at the largest health insurer in Texas, "every time [USAP] folded in a geographic region or every time that they grew, it just strengthened their ability to raise rates and . . . leverage at the negotiating table."

315.    Because of USAP's conduct, insurers' abilities to take USAP out of network—a key way of constraining prices—have substantially diminished. With USAP as the only exclusive provider at many hospitals across Texas, taking USAP out-of-network is now less likely to occur, and in turn, a far less powerful negotiating tool. As a Welsh Carson analyst explained to a potential lender, "if a payor refuses to give us the pricing that we're looking for, then the threat of us going out-of-network would be more painful on the payor than it would be on us. . . . [W]hen we cover every major hospital in the market, it doesn't really have much of an impact on us. All the while, the payor would be responsible for reimbursing at out-of-network rates which are substantially higher than what we see on an in-network basis . . . ." In addition,

taking USAP out of network entails administrative costs for payors. There is also the possibility of backlash from members and actual or potential clients. *See* ¶¶ 74-76.

316.    Even the biggest insurers have had to bow to USAP's dominance. Indeed, one insurer—United—learned this the hard way in a dispute with USAP in 2020. By January 2020, USAP's price increases had become unsustainable for United, which tried to renegotiate USAP's rates by unilaterally amending the United-USAP contract to reduce USAP's rates. Although the unilateral amendment resulted in some negotiations, they failed, and USAP terminated its contract with United in early 2020. At the time, United was one of the largest insurers in Texas.

317.    Over the next 18 months, USAP forced United to come back to the negotiating table and to accept USAP's high rates through a multi-front "pressure" campaign. USAP encouraged hospitals where it provided anesthesia services to lobby United to bring USAP back in-network. USAP persuaded ASO clients that bought insurance from United, ███████ ████, to complain to United ██████████████. USAP had patients complain to state regulators that United no longer met state-prescribed network adequacy requirements after taking USAP out-of-network. And USAP filed a lawsuit against United in Texas state court—which was sent to arbitration—alleging that United had unlawfully diverted patients away from USAP's anesthesia providers.[8] While USAP was replaced for certain procedures at select hospitals during this out of network period, no hospitals ended their exclusive contracts with USAP as a result of United having taken it out of network.

318.    Eventually, United gave in, settled the arbitration, and signed a new contract with USAP in September 2021. Under the terms, USAP's rates decreased, but far less than United was seeking, remaining well above the median rate in Texas. In addition, United had to pay some

---

[8] *See* Pl.'s Original Petition, U.S. Anesthesia Partners of Tex. v. United Healthcare Ins. Co. (DC-21-04104) (Tex. D. Ct. Dallas Cty., Mar. 31, 2021).

of USAP's out of network claims at USAP rates. In sum, United resisted USAP for over a year and had little to show for it. Taking USAP out-of-network had frustrated United's hospitals, clients, and members; incurred large out-of-network costs; and failed to meaningfully decrease USAP's reimbursement rates.

       **B.**      **USAP's conduct has increased prices for hospital-only anesthesia services in Texas**

      319.    With its increased negotiating leverage, USAP has significantly increased prices for hospital-only anesthesia services in Houston, Dallas, and throughout Texas. Just as Welsh Carson and USAP planned, USAP took Greater Houston Anesthesiology's already-high prices, increased them, and extended them across the state of Texas via further acquisitions (███████ ████████████████). As a United executive summarized: "you've basically taken the highest rate of all in one distinct market and then peanut butter spread that across the entire state of Texas."

      320.    For example, before its acquisition by USAP, MetroWest's in-network reimbursement rate with United had been $██ per unit. After USAP acquired MetroWest, it raised that rate to $█████ per unit, an increase of nearly ██%.

      321.    Similarly, before its acquisition by USAP, Anesthesia Consultants of Dallas's in-network reimbursement rate with United was $████ per unit. After USAP acquired the practice, its rate rose to approximately $████ per unit, an increase of over █%.

      322.    The story for Excel Anesthesia is the same. Before its acquisition by USAP, its in-network reimbursement rate with United was $██ per unit. That rate rose to more than $███ per unit—an increase of over ██%—after USAP acquired Excel.

323.    Today, USAP is the largest and most expensive anesthesia provider in Texas across all payors. USAP charges well over $██████████████. For comparison, the median reimbursement rate among other anesthesia providers in Texas is roughly $██ per unit.

324.    The effect of USAP's higher rates has been to raise the costs of anesthesia care in Texas by dozens of millions of dollars every year. For example, one insurer estimated that by 2016, it was spending roughly $119 million in Texas annually on anesthesia services from USAP alone. Even ignoring USAP's rate increases in the years since, that figure suggests USAP's monopoly mark-ups are running up the cost of providing healthcare in Texas every year by tens of millions of dollars. And because—as discussed in ¶¶ 65-66—most clients of the largest insurers in Texas bear financial responsibility for their own members' healthcare costs, the burden of USAP's higher prices is borne largely by Texas businesses and their employees.

325.    USAP's conduct has not only increased its own ability to raise prices—it has led other anesthesia providers to raise their prices, too. Anesthesia practices across Texas have successfully demanded price increases by threatening to otherwise raise their reimbursement rates by selling their practices to USAP. For example, prior to its acquisition by USAP, Capitol Anesthesia in Austin threatened insurers that it would join USAP unless they raised Capitol's rates. One large insurer privately conceded that the "best option" was to accede to Capitol's demands. Guardian Anesthesia in Houston made similar threats. Before successfully acquiring Guardian in 2020, USAP reached out to Guardian in 2014 about a potential acquisition. Guardian rejected the proposal. Nevertheless, it used the USAP offer to seek a 25% increase in reimbursement rates from ████ when it previously had sought only a 3% increase. Star Anesthesia in San Antonio made similar threats. So, too, have other practices that have not yet been acquired by USAP.

326.     Similarly, USAP's price-setting arrangements with other anesthesia practices have contributed to increasing prices. By billing other providers' anesthesia services at USAP's reimbursement rates, USAP has spread its higher rates to additional anesthesia groups—just as if those, too, had been acquired by USAP. And to the extent that any of these independent anesthesia groups might have competed with USAP, thereby constraining its prices, USAP has effectively neutralized them by agreeing to instead share a portion of its monopoly profits.

327.     USAP has also neutralized competition through its market allocation agreement with ███████████████████████████████████████████████████ , USAP stifled any competition from █████ . If not for that unlawful agreement, ████████ competitive presence ████████ , or even the threat of ████████ entering the market, would likely have acted as a constraint on USAP's ability to raise prices.

**C.  There are no valid procompetitive justifications for or efficiencies from USAP's conduct**

328.     USAP cannot justify the substantial harm to competition resulting from its acquisitions with valid procompetitive justifications or efficiencies that could not be achieved through other means less harmful to competition.

329.     For example, USAP holds itself out as a high-quality anesthesia practice. But USAP's own metrics are home-brewed, self-serving, and otherwise flawed. Moreover, even if it were possible to confirm that USAP anesthesiologists offer high-quality services, there is no reason to think that they owe this to USAP. USAP simply acquires physician groups with an already-strong reputation for quality and does little (if anything) to improve their services once they join USAP.

330.     There are no valid procompetitive justifications for or efficiencies from USAP's price-setting arrangements. Indeed, as discussed above, USAP could have collaborated with

91

other anesthesia practices or provided them with back-office services without billing their claims as USAP's own and at USAP's reimbursement rates. *See* ¶¶ 178, 195178195.

331.    There are no valid procompetitive justifications for or efficiencies from USAP's market allocation agreement with ███████████████████. That agreement was not reasonably necessary to ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████."

332.    Nor can the market allocation be justified as safeguarding competitively sensitive business information ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

## XI.    <u>LIKELIHOOD OF RECURRENCE</u>

### A.  Without appropriate relief, USAP's harmful conduct is likely to recur

333.    USAP's course of conduct—and the resulting harm to competition and consumers—remains ongoing. In addition, there is a reasonable likelihood that USAP will engage in similar or related conduct in the future.

334.    USAP's conduct has not been isolated. Instead, USAP has engaged in a whole set of anticompetitive tactics to execute the consolidation scheme Welsh Carson set out. The dozen-plus acquisitions, price-setting arrangements, and market allocation scheme were all designed to

stifle competition and enrich USAP. This conduct has resulted in egregious price increases for patients and their employers, on the order of tens of millions of dollars or more each year.

335.    USAP has never acknowledged the wrongful nature of its conduct. Nor has it offered any assurances against engaging in similar conduct in the future, whether in Texas or in any of the nine other states in which it operates. To the contrary, USAP continues to plan for acquisitions in Texas, as well as elsewhere, and is well-positioned to continue its conduct.

**B.  Without appropriate relief, Welsh Carson's harmful conduct is likely to recur**

336.    Welsh Carson masterminded the plan for USAP to roll up markets across Texas and inflate prices. Since then, it has remained deeply involved in crafting and executing that plan. Welsh Carson itself developed the overarching strategy to consolidate anesthesia markets, recognizing that doing so would yield market power and higher prices. Welsh Carson then carefully directed—and assisted—USAP in following through on the consolidation strategy. Indeed, in internal communications, Welsh Carson has bragged that it is USAP's "primary architect." In other words, the fact that Texans pay considerably more for hospital-only anesthesia services is the direct result of Welsh Carson's conduct.

337.    Welsh Carson continues to play a critical role in USAP's anticompetitive conduct. Welsh Carson personnel still regularly advise USAP on, and assist it with, acquisitions and insurer negotiations. For instance, in 2018, Welsh Carson personnel reported "participat[ing] in commercial payor negotiations" and "due diligence on potential tuck-in acquisitions." As another example, in 2019, USAP consulted with Welsh Carson personnel when considering ███████. In addition, Welsh Carson continues to benefit handsomely from USAP's supracompetitive prices, having received nearly $85 million in dividend payments between 2018 and 2020 (and over $350 million

between 2012 and 2020). Nor does anything prevent Welsh Carson from re-upping its investment in USAP, retaking formal control of the company, and directing yet more anticompetitive acquisitions.

338. Further, there is a reasonable likelihood that Welsh Carson will engage in similar and related conduct in the future. Welsh Carson's conduct has not been isolated. Instead, Welsh Carson planned the consolidation scheme and created USAP for the express purpose of implementing that scheme. This conduct has resulted in egregious price increases for Texans, costing them tens of millions of dollars annually. Yet Welsh Carson has never acknowledged the wrongful nature of its conduct, nor has it offered any assurances against engaging in similar conduct in the future (in Texas or elsewhere). And Welsh Carson remains well-positioned to engage in similar conduct in the future, with its 16 active healthcare investments and frequent search for new investments.

339. In fact, Welsh Carson itself has intentionally repeated its USAP strategy. In 2015 Welsh Carson entered the emergency medicine market and engaged in a similar roll-up strategy to the one it deployed with USAP. Then, in 2017, when preparing to enter the radiology market, Welsh Carson explained that "[g]iven our success to date with USAP and [in emergency medicine], we would like to . . . deploy[] a similar strategy to consolidate the market . . . ." By all appearances, Welsh Carson did just that. Today, U.S. Radiology Specialists, which describes itself as "founded jointly" by Welsh Carson and "one of the nation's largest" radiology groups, covers over 80 hospitals in more than a dozen states. Two of its directors are affiliated with Welsh Carson, and one of them is Brian Regan—the same partner who led Welsh Carson's investment and involvement in USAP.

94

## XII.   VIOLATIONS

### COUNT I

**Monopolization of Houston Hospital-Only Anesthesia Market
Arising Under Section 2 of the Sherman Act**

340.   The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

341.   USAP has monopoly power in the market for commercially insured hospital-only anesthesia services in Houston.

342.   USAP and Welsh Carson have willfully acquired and maintained monopoly power in the market for commercially insured hospital-only anesthesia services in Houston.

343.   In 2012, USAP acquired Greater Houston Anesthesiology. Subsequently, between 2014 and 2020, USAP acquired three additional Houston anesthesia practices: North Houston Anesthesiology, MetroWest Anesthesia Care, and Guardian Anesthesia (collectively, the "Houston Tuck-In Acquisitions").

344.   In addition, USAP entered into, or maintained, agreements with Baylor College of Medicine anesthesiologists and anesthesiologists in the Methodist Hospital Physician Organization in which USAP billed services by their providers at USAP's higher rates.

345.   Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, these acquisitions and price-setting arrangements.

346.   There is no valid procompetitive justification for USAP's exclusionary conduct in the commercially insured hospital-only anesthesia market in Houston.

347.   USAP and Welsh Carson's anticompetitive course of conduct constitutes unlawful monopolization in the commercially insured hospital-only anesthesia services market in

Houston in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Roll-up of Houston Hospital-Only Anesthesia Market
### in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act

348.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

349.    Between 2014 and 2020, USAP and Welsh Carson, directly or indirectly, made the three Houston Tuck-In Acquisitions.

350.    At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Houston.

351.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Houston Tuck-In Acquisitions.

352.    USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their Houston Tuck-In Acquisitions are not likely to be anticompetitive.

353.    USAP and Welsh Carson's Houston Tuck-In Acquisitions substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Houston in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, whether considered individually or as a series of acquisitions.

354.    USAP and Welsh Carson's Houston Acquisitions are an unfair method of competition in the commercially insured hospital-only anesthesia services market in Houston in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), whether considered individually or as a series of acquisitions.

## COUNT III

### Conspiracy to Monopolize Houston Hospital-Only Anesthesia Market
### Arising Under Section 2 of the Sherman Act

355.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

356.    At all relevant times, USAP has had monopoly power, or monopoly power was economically feasible for USAP to achieve, in the commercially insured hospital-only anesthesia services market in Houston.

357.    USAP and Welsh Carson entered into an agreement, understanding, or conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

358.    USAP and Welsh Carson took numerous overt acts in furtherance of their conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

359.    USAP and Welsh Carson had the specific intent to monopolize the commercially insured hospital-only anesthesia services market in Houston.

360.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston has had an effect on a substantial amount of interstate commerce.

361.    There is no valid procompetitive justification for USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

362.    Neither USAP nor Welsh Carson has withdrawn from the conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

363.     USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT IV

**Monopolization of Dallas Hospital-Only Anesthesia Market
Arising Under Section 2 of the Sherman Act**

364.     The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

365.     USAP has monopoly power in the commercially insured hospital-only anesthesia services market in Dallas.

366.     USAP and Welsh Carson have willfully acquired and maintained monopoly power in the commercially insured hospital-only anesthesia services market in Dallas.

367.     In 2014, USAP acquired Pinnacle Anesthesia Consultants. Subsequently, between 2015 and 2016, USAP acquired six additional Dallas anesthesia practices: Anesthesia Consultants of Dallas, Excel Anesthesia Consultants, Southwest Anesthesia Associates, BMW Anesthesiology, Medical City Physicians, and Sundance Anesthesia (collectively, the "Dallas Tuck-In Acquisitions").

368.     In addition, USAP entered into, or maintained, agreements with Dallas Anesthesiology Associates in which USAP billed services by their providers at USAP's higher rates.

369.     USAP also ████████████████████████████████████████ ████████████████████████████████████████████████.

370.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, these acquisitions and price-setting arrangements.

371.    There is no valid procompetitive justification for USAP's exclusionary conduct in the commercially insured hospital-only anesthesia market in Dallas.

372.    USAP and Welsh Carson's anticompetitive course of conduct constitutes unlawful monopolization in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT V

**Roll-up of Dallas Hospital-Only Anesthesia Market
in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act**

373.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

374.    Between 2015 and 2016, USAP and Welsh Carson, directly or indirectly, made the six Dallas Tuck-In Acquisitions.

375.    At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Dallas.

376.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Dallas Tuck-In Acquisitions.

377.    USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their Dallas Tuck-In Acquisitions are not likely to be anticompetitive.

378.    USAP and Welsh Carson's Dallas Tuck-In Acquisitions substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, whether considered individually or as a series of acquisitions.

379.    USAP and Welsh Carson's Dallas Acquisitions are an unfair method of competition in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), whether considered individually or as a series of acquisitions.

## COUNT VI

### Conspiracy to Monopolize Dallas Hospital-Only Anesthesia Market
### Arising Under Section 2 of the Sherman Act

380.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

381.    At all relevant times, USAP has had monopoly power, or monopoly power was economically feasible for USAP to achieve, in the commercially insured hospital-only anesthesia services market in Dallas.

382.    USAP and Welsh Carson entered into an agreement, understanding, or conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas

383.    USAP and Welsh Carson took numerous overt acts in furtherance of their conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

384.    USAP and Welsh Carson had the specific intent to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

385.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas has had an effect on a substantial amount of interstate commerce.

386.    There is no valid procompetitive justification for USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia market in Dallas.

387.    Neither USAP nor Welsh Carson has withdrawn from the conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

388.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII

### Roll-up of Austin Hospital-Only Anesthesia Market
### in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act

389.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

390.    In 2013, USAP and Welsh Carson, directly or indirectly, acquired Lake Travis Anesthesia. Subsequently, in 2018 USAP and Welsh Carson, directly or indirectly, acquired an additional Austin anesthesiology practice: Capitol Anesthesiology Association (collectively "Austin Acquisitions").

391.    At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Austin.

392.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Austin Acquisitions.

393.    USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their acquisition of Capitol is not likely to be anticompetitive.

394.    USAP and Welsh Carson's acquisition of Capitol substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Austin in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

395.    USAP and Welsh Carson's acquisition of Capitol is an unfair method of competition in the commercially insured hospital-only anesthesia services market in Austin in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VIII

### Scheme to Reduce Anesthesia Competition in Texas
### in Violation of Section 5 of the FTC Act

396.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

397.    USAP's acquisition of Greater Houston Anesthesiology, the Houston Tuck-In Acquisitions, the acquisition of Pinnacle, the Dallas Tuck-In Acquisitions, the Austin Acquisitions, and the acquisitions of East Texas Anesthesiology, Amarillo Anesthesia Consultants, and Star Anesthesia (collectively, the "Texas Acquisitions"), its price-setting arrangements, and the ▆▆▆▆ market allocation are all methods of competition. None is an inherent feature of the anesthesia marketplace. Instead, they all result from USAP's and Welsh Carson's deliberate consolidation scheme.

398.    USAP's and Welsh Carson's Texas Acquisitions, price-setting arrangements, and ▆▆▆▆ market allocation are unfair: they go beyond competition on the merits. In making each of the Texas Acquisitions, Welsh Carson and USAP planned that USAP would—and USAP did in fact—accumulate positions at key hospitals across the state. Recognizing that patients will

visit these hospitals regardless of USAP's network participation status with insurers, USAP and Welsh Carson exploited USAP's positioning to extract significant rate increases following each of the Texas Acquisitions. USAP and Welsh Carson likewise used their price-setting arrangements and the ███ market allocation to secure further leverage in their insurer negotiations.

399.    USAP's and Welsh Carson's conduct has had a demonstrated tendency to harm competitive conditions for anesthesia in and across Texas. The Texas Acquisitions, price-setting arrangements, and ███ market allocation resulted in higher prices to patients and their employers for anesthesia groups who joined USAP. Moreover, the conduct has resulted in price increases even for anesthesia groups who remain unaffiliated with USAP.

400.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Texas Acquisitions, price-setting arrangements, and ███ market allocation.

401.    There is no cognizable justification for the Texas Acquisitions, price-setting arrangements, and ███ market allocation.

402.    USAP's and Welsh Carson's course of conduct, whether considered as a whole or each portion in isolation, is an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IX

### Horizontal Agreements to Bill at a Fixed Price
### Arising under Section 1 of the Sherman Act

403.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

404.     At all relevant times, USAP has had market power in Houston and Dallas with respect to commercially insured hospital-only anesthesiology services.

405.     USAP entered into, or maintained, agreements with the Methodist Hospital Physician Organization, Dallas Anesthesiology Associates, and the Baylor College of Medicine in which USAP billed services by their anesthesia providers at USAP's higher rates.

406.     At all relevant times, Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the price-setting arrangements.

407.     These price-setting arrangements violate Section 1 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT X

### Horizontal Agreement to Divide Market
### Arising under Section 1 of the Sherman Act

408.     The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

409.     At all relevant times, USAP had market power or was acquiring market power in Dallas with respect to commercially insured hospital-only anesthesiology services.

410.     USAP engaged in unlawful horizontal market allocation with an actual or potential competitor, ██████, in the market for commercially insured hospital-only anesthesiology services in ████████████████████████████ ████████████████ and USAP agreed that ████████ would not compete in the commercially insured hospital-only anesthesia services market in ████████ in exchange for consideration.

411.    At all relevant times, Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the unlawful horizontal market division.

412.    USAP's anticompetitive acts violate Section 1 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### XIII.   PRAYER FOR RELIEF

WHEREFORE, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act; therefore, the FTC requests that this Court, as authorized by 15 U.S.C. § 53(b), 15 U.S.C. § 26, and its own equitable powers, enter final judgment against Defendants, declaring, ordering, and adjudging:

413.    That USAP's course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18;

414.    That Welsh Carson's course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18;

415.    That Defendants are permanently enjoined from engaging in similar and related conduct in the future; and

416.    That the Court grant other such equitable relief, including but not limited to structural relief, as the Court finds necessary to redress and prevent recurrence of Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18, as alleged herein.

Dated: September 21, 2023                    Respectfully submitted,

Of counsel:                                  */s/ Kara Monahan*

HENRY LIU                                    KARA MONAHAN (NJ Bar No. 011392010)
Director                                     Attorney-In-Charge
                                             Deputy Assistant Director
RAHUL RAO                                    Federal Trade Commission
Deputy Director                              600 Pennsylvania Avenue, N.W.
                                             Washington, D.C. 20580
SHAOUL SUSSMAN                               Tel: (202) 326-2018
Associate Director for Litigation            Email: kmonahan@ftc.gov

Federal Trade Commission                     BRADLEY S. ALBERT (MD Bar)
Bureau of Competition                        Deputy Assistant Director

                                             MICHAEL J. ARIN (CA Bar No. 335693)
                                             DYLAN HERTS (NY Bar)
                                             LEAH P. HUBINGER (CA Bar No. 324976)
                                             TIMOTHY GRAYSON (DC Bar No. 1028502)
                                             PATRICK KENNEDY (IL Bar No. 6332905)
                                             NEAL PERLMAN (NY Bar)
                                             GARY H. SCHORR (NY Bar)
                                             ERIC M. SPRAGUE (NY Bar)
                                             Admissions *pro hac vice* pending

                                             GARTH HUSTON
                                             (TX Bar No. 24041161, SDTX Bar No. 3858253)

                                             Attorneys
                                             Bureau of Competition

                                             *Counsel for Plaintiff Federal Trade Commission*

NEWS > POLITICS

# University of Maryland Medical System paid $115M to companies tied to 27 board members, state review reveals



Jed Kirschbaum / The Baltimore Sun

A review of the University of Maryland Medical System's finances uncovered more financial dealings between board members and their organizations than previously known. The interior of the University of Maryland Medical Center, one of the system's hospitals, is shown in this 2006 photo.



By **KEVIN RECTOR** and **LUKE BROADWATER**

PUBLISHED: March 13, 2020 at 9:05 p.m. | UPDATED: March 14, 2020 at 1:52 a.m.

A new review of the University of Maryland Medical System's finances uncovered more financial dealings between board members and their organizations than previously known ? revealing nearly $115 million in payments to more than two dozen board members and their related businesses in recent years.

The state's Office of Legislative Audits, which conducted the probe after a corruption scandal rocked the hospital network in 2019, sent the findings of the 100-page review Friday to key lawmakers in Annapolis. The auditors did not identify board members by name ? and said they could not definitively determine any transactions were "improper" ? but did include a detailed list of payments made to board members they called "vendors."

"We identified approximately $114.9 million in payments made by UMMS to 27 Board members or their associated businesses between January 1, 2016 and April 18, 2019," the auditors reported. "Approximately 94 percent ($108.2 million) of these payments were made either directly to a Board member or to an entity with which the Board member (or immediate family member) had a direct financial relationship."

System officials took issue with some aspects of the review, arguing auditors counted many aboveboard transactions as conflicts, including dues the network paid to a statewide healthcare association; redacted board member and business names unnecessarily; and falsely accused UMMS of being uncooperative.

They acknowledged the hospital system has worked to reform since last year's scandal and noted it is focused now on fighting the spread of the new coronavirus.

"As evidenced over the last nine months, the reconstituted UMMS Board and new management team have been fully committed to addressing the well-documented historical failings and ensuring the continued adoption of governance best practices," new UMMS chief of staff Kristin Jones Bryce said. "The System remains focused on its mission of providing world-class health care and will continue to lead during this global pandemic."

The board has been under intense scrutiny since exactly one year ago when The Baltimore Sun reported a third of its 30 members had deals with the 13-hospital system, some not competitively bid. Under one of the deals, the system paid Democratic Mayor Catherine Pugh of Baltimore $500,000 to produce her "Healthy Holly" children's books. Those deals, federal prosecutors have said, allowed Pugh to begin a "seven-year scheme to defraud, multiple years of tax evasion, election fraud and attempted cover-ups, including brazen lies to the public."

After The Sun's revelations, Pugh resigned from the board and as mayor. The FBI raided her houses and City Hall in late April, she pleaded guilty to conspiracy and tax evasion in November, and was sentenced last month to three years in prison.

In response to the scandal, state lawmakers last year passed sweeping reform legislation, sponsored by Sen. Jill P. Carter of Baltimore and late House of Delegates Speaker Michael Busch, both Democrats, that included requiring the audit.

The law also mandated several reforms at UMMS, including requiring the resignations of all board members. The auditors' report noted that regarding board members' terms in office, UMMS records varied from those kept by the governor's appointments office. For instance, UMMS listed former state Sen. Francis X. Kelly Jr.'s start date as June 2016; Kelly told auditors he had been a board member since 1984.

The scandal led to the network's CEO and four other executives resigning.

Del. Nic Kipke, an Anne Arundel Republican who is House minority leader, said the audit shows more widespread self-dealing than previously known.

"This audit validates the suspicion many of us in the legislature had when we required an independent forensic audit," Kipke said. "While the report sheds light on new disappointing examples of corruption, I am confident in the new leadership team at UMMS and I believe they are earnestly working to implement industry best ethical standards and procedures. While there is a lot of work ahead for them, I believe UMMS is headed in the right direction."

Carter said the audit underscores the extent to which the previous UMMS board was "shrouded in secrecy and self-enrichment to the detriment of the patients and population with the greatest health care needs in the country."

"The new president and board must completely distance itself from that culture of graft and be completely aboveboard and transparent in all their dealings," Carter said.

Since the scandal, Dr. Mohan Suntha, the system's new CEO, and James C. "Chip" DiPaula Jr., the new chairman of the board, have sought to assure lawmakers the state's largest hospital network is undergoing reforms. The organization implemented a new policy to prevent conflicts of interest, froze bonuses for top executives and commissioned several outside investigations.

But auditors described the organization as less than forthcoming during their review. The auditors wrote "there was a lack of transparency, policies and procedures, and documentation to support the source, nature, and the overall propriety of many of these payments" made to board members.

The review was due in December, but auditors requested an extension until this month, in part based on what they said was interference from UMMS. Legislative Auditor Gregory Hook told lawmakers in November that UMMS "delayed and hindered" his office's work.

That concern was reflected in the final report, in which auditors said UMMS officials refused to make certain documents or employees readily available — so much so that they did not even consider their review an "audit" under the generally accepted standards of their office. They called their product a "Special Review."

"Generally accepted government auditing standards require that we plan and perform an audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions," the auditors wrote. "We believe that the restrictions imposed by UMMS on our access to its employees and records ... precluded us from obtaining such evidence."

In a letter to state officials that accompanied the report, Hook wrote that information not provided to the auditors "was integral" to its work, and that, had the information been provided, it is "possible that additional financial transactions involving Board members might have been identified."

The report noted a lack of cooperation from UMMS in three areas: access to documents, access to employees and access to emails.

For every disbursement by UMMS to a board member or a board member's business, the auditors requested bidding documents, contracts, invoices and other evidence that UMMS received the services or items for which it paid, the auditors wrote. UMMS, however, took months to get back to them on those requests, and even then "could not provide all of the requested documentation for the majority of the transactions."

That prevented the auditors from determining to what extent the board members were aware of or involved in the deals and payments, the auditors wrote.

Requests to interview employees also were met with delay, the auditors wrote, with UMMS telling the auditors it could not determine which employees had been involved in procurements linked to board members "due to the decentralized nature of its operations." UMMS said other employees were no longer employed by the system, the auditors wrote.

Emails the auditors requested from five UMMS employees the auditors selected "for their potential involvement in procuring or paying Board members and their associated businesses" also were not forthcoming, the auditors wrote. They said UMMS' attorneys acknowledged to lawyers representing the state that there were 1.6 million emails responsive to the auditors' initial request, but that UMMS delivered 14,500 emails, some of which were "heavily redacted."

And the report said UMMS provided digital images of emails, rather than documents that auditors could search with software for individual words or phrases, further complicating the review.

UMMS said in its response that it "strongly disagrees" with the auditors' claims that it did not cooperate.

"OLA's criticism appears to stem from the belief that anything less than completely unfettered access to UMMS' records and employees is 'non-cooperation,'" UMMS wrote. "This is unfair and unrealistic."

It said its review of the emails the auditors requested was "in order to ascertain legal privilege and other confidentiality concerns, such as those involving patient privacy" and was in line with its response to other requests for information, including when it "provided documents subpoenaed by the U.S. Attorney's Office" in a related investigation. The auditors redacted the name of the target of that investigation, but federal law enforcement investigated Pugh as part of her prosecution.

UMMS also said it sought to provide auditors "with access to available business records and UMMS employees in a timely and orderly manner that respected both the employees' and UMMS' legal rights and OLA's interest in access to information."

But, it said, businesses "do not responsibly allow third parties, even government agencies, to question their employees without regard for responsible business practices and their legal rights and duties."

**2020** ⟋ **March** ⟩ **13**

**REPORT OF THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS**

**UNIVERSITY OF MARYLAND MEDICAL SYSTEM**

December 11, 2019

**Members of the Special Committee**

Jason Frankl (Chair)
Kathleen Birrane
Wanda Draper
Bonnie Phipps
John T. Williams

LATHAM&WATKINS LLP

# TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ................................................................................1

II.  INVESTIGATION SCOPE AND PROCESS ....................................................4

III. BOARD MEMBER CONFLICTS OF INTEREST ...........................................5

IV.  FINDINGS AND OBSERVATIONS ...............................................................14

    A.   Board Policies Concerning Potential Conflicts Of Interests Failed To
        Foster Rigorous And Effective Board Oversight .....................................14

        1.   2011 Policy Change Permitted Directors To Avoid Full Board
              Review And Approval Of Business Transactions That Benefited
              Them Personally ..........................................................................15

        2.   Existing Policies Were Poorly Understood.................................16

        3.   Board Members Failed To Adequately Engage In Review Of
              Conflicted Transactions ..............................................................16

        4.   The Conflict Of Interest Policies Permitted Board Members To
              Lobby Purchasing Executives On Behalf Of Personal Business
              Interests ......................................................................................18

    B.   Conflicts Of Interest And Structural Defects Rendered Audit And
        Compliance Committee Oversight Ineffective .......................................18

    C.   Failure To Observe Term Limits Allowed A Limited Number Of Board
        Members To Exercise Disproportionate Influence ..................................19

    D.   Purchasing And Disbursement Policies Permitted Management To Engage
        In Significant Transactions Without Board Oversight...........................20

    E.   Transactions With Board Members Eroded The Effectiveness Of Board
        Oversight................................................................................................22

V.   SPECIAL COMMITTEE RECOMMENDATIONS .........................................23

    A.   Board Structure .......................................................................................24
    B.   Conflict Of Interests................................................................................25
    C.   Compliance Training, Education, And Review ......................................26
    D.   Finance Practices ....................................................................................27
    E.   Other Recommendations.........................................................................28

# I.    EXECUTIVE SUMMARY

By resolution adopted September 9, 2019, the University of Maryland Medical System ("UMMS" or the "Company") Board of Directors ("Board") established a Special Committee (the "Special Committee") to conduct a forensic audit of the Board's financial transactions with the Company, review the adequacy and effectiveness of the Board's governance policies and practices, and make recommendations for improvements.  Specifically, the Board delegated authority to the Special Committee to: (1) oversee an internal forensic audit of transactions and financial relationships relating to the scope of recent legislation;[1] (2) analyze transactions and financial relationships identified through the internal forensic audit; and (3) advise the Board regarding governance practices, process improvements, and remediation, recovery, and corrective actions based on the above review and analysis.  The investigation was initiated after a series of reports published by *The Baltimore Sun*, beginning in March 2019, on financial transactions between UMMS and nine (then-current) Board members ("Board members" or "Directors")[2] or their related businesses or a family member's business.

The Special Committee was comprised of five Board members: Jason Frankl (Chair); Kathleen Birrane; Wanda Draper; Bonnie Phipps; and John T. Williams.  All five members, who are also members of the Audit and Compliance Committee ("ACC"), were appointed to the Board in June 2019 and began their service as Directors on July 1, 2019.  The remaining two ACC members, James C. "Chip" DiPaula, Jr. and Barry Gossett, served on the Board prior to June 2019 and therefore recused themselves from serving on the Special Committee.

The Special Committee retained Latham & Watkins LLP ("Latham"), an independent law firm, to conduct the investigation, and Latham retained Ankura Consulting ("Ankura," together with Latham, "Investigating Counsel") and other advisors to conduct research and targeted forensic accounting analysis, including with respect to financial disbursements and accounts payable systems.  Latham and Ankura had no relationship with UMMS at the time of either's retention and acted solely at the direction of the Special Committee and independently of management.  Latham and Ankura did not, and do not, represent any current or former UMMS employee or Board member in connection with this investigation.

The Special Committee's investigation began by gaining an understanding of the Company's policies and control environment, particularly policies over transactions between the Company and Board members (generally referred to herein as "conflict of interest" or "COI" transactions), and policies related to procurement and payment processing.  A detailed discussion of the relevant control environment is presented in Section IV.A.  Investigating Counsel then developed a detailed history of current and former Board members' business and financial interests based on the Directors' disclosure forms and public records.  Investigating Counsel reviewed the procedures and findings of an earlier investigation by management advisory firm Nygren Consulting ("Nygren" and the report produced therefrom the "Nygren Report") and was asked by the Special Committee to expand substantially the nature and scope of the procedures

---

[1] *See* Chapters 18 and 19, Laws of Maryland 2019, Section 3(a).

[2] The nine former Board members are:  August Chiasera, John Dillon, Wayne Gardner, Frank Kelly, Robert Pevenstein, Catherine Pugh, Scott Rifkin, James Soltesz, and Walter Tilley.

1

used by Nygren to identify and analyze transactions with Board members.  Ankura reviewed thousands of transactions recorded in the disbursement systems of UMMS and its affiliates to identify potential transactions between UMMS, its Directors, and their immediate family members.  Latham led a review of more than 100,000 email communications collected from 17 current and former senior executives, including nearly 44,000 communications with Board members.  Following this review, Investigating Counsel conducted more than three dozen interviews of Board members, former Board members, and current and former members of senior management to provide context and explanation for transactions and other matters identified through the investigation.  The Special Committee met in person or telephonically with Investigating Counsel at least weekly during the investigation to receive updates and provide direction.

The Special Committee received cooperation from all current UMMS employees and Board members and received access to all requested corporate records and information, including privileged and confidential business information.  Certain former Board members and former senior executives declined to cooperate.  These individuals either declined or failed to respond to requests for interviews.[3]  The Special Committee did not have subpoena power or other legal process to compel cooperation from non-employees of UMMS.

The results and conclusions of the Special Committee's investigation are contained within this Report of the Special Committee of the Board of Directors ("this Report").  Based on the evidence obtained, the Special Committee found that the vast majority of Board members had no identified conflicts or business relationships with UMMS at all.  Investigating Counsel reviewed the background and business and financial interests of 40 current and former Board members—all members who served on the Board for any part of 2016, 2017, 2018, or through June 2019—and the business and financial interests of their immediate family members.  Those business and financial interests were matched against thousands of records in the payment and vendor databases of UMMS and its nine affiliate hospital systems.  For 30 of the 40 current and former Board members, the Special Committee found no conflicts of interests, business relationships, or inappropriate financial transactions with UMMS.  For the 10 Directors who had some type of conflict, all had reported them as required by the policies in place at the time.[4]

However, the Special Committee determined that, prior to July 2019, significant aspects of the Board's effectiveness as an oversight and decision-making body were deeply compromised, not only by the self-interested transactions of a group of Board members, but by structural and operational flaws in the Board's organization and operation.  The policies governing conflicts of interest were both *ineffective* and *incomplete*.  In fact, the Special Committee did not identify many clear *violations* of UMMS policies; in the majority of cases, the COI transactions technically complied with the policies in force until 2019.  But those policies allowed conflicted transactions to proceed and multiply, without careful or objective review, approval, or oversight of such transactions by the Board.  Specifically, the policies allowed conflicted transactions to be channeled to the ACC, which often struggled to find

---

[3] *See* Attachment A, List of Witnesses.

[4] *See* Attachment B, Lists of Directors Reporting No Conflicts and of Directors Reporting Conflicts.

members to attend its meetings and whose chair had multiple conflicts of interest himself.  As a result, there was very little evidence of Board-level reviews or discussions of COI transactions.  (Tellingly, certain current and former Board members and senior management could not agree whether the failure of the Board to engage in rigorous review of conflicted transactions was because management failed to adequately raise the conflicts for Board review or, on the other hand, because Board members were inattentive to the materials provided to them.)  The evidence obtained during the investigation showed that the written policies were poorly understood, and often misunderstood, by Board members and senior management alike.  While the policies may have been followed at a technical level (the evidence is inconclusive), the inadequate design and understanding of the policies rendered the control environment substantially ineffective.

Furthermore, the policies were *incomplete* in that they seemingly allowed Board members to lobby management on behalf of their financial interests without adequate controls or disclosure.  The Special Committee found that certain Board members frequently contacted members of management to promote potential transactions with businesses in which the Board member had a financial interest.  Although many of these contacts did not result in transactions with the Company, the review and discussion of the potential business relationships occupied significant staff time and resources.  Staff members, including senior management, often felt obligated to review the proposals outside of the normal procurement process even when they knew the business relationship was unlikely to be approved by, or be beneficial to, the Company.  In many cases, these potential business arrangements were pursued by Board members without full disclosure in advance of the particular Board member's relationship to the offering company – though management often assumed that the Board member had a financial interest in the company whose proposal they were reviewing.

The Special Committee's investigation further identified significant deficiencies in the Board's historical structure and operations.  Board member term limits are intended to provide periodic rotation of Board membership and leadership and prevent entrenchment that can pose a risk to effective oversight of management.  The investigation found that senior executives and Board leaders actively pursued strategies that would allow certain Board members to serve beyond the two-consecutive-term limit, while others rotated off the Board after one or two terms.  This practice created a cadre of Board members that many perceived to hold all the policy-setting and decision-making power of the full Board.  In many cases, the Board members with the most significant conflicts of interest had served beyond the two-consecutive-term maximum.  The override of this control fostered the very entrenchment the policy was meant to prevent.  Other deficiencies in Board committee leadership and structure also contributed to control failures, for example, failing to periodically rotate leadership of Board committees and permitting a single individual to chair multiple committees.  Together, these factors undermined the Board's functioning as an effective oversight body.

Importantly, the Special Committee's concern about the Board's conflict of interests and structural flaws is not to say that these Board members acted solely or even primarily out of self-interest.  Even those who reported troubling conflicts of interest demonstrated genuine devotion to the mission of UMMS over many years.  Moreover, some who reported conflicts had not used their Board position to advance or expand their business and personal interests, but had agreed to serve on the Board following the establishment of a business relationship with UMMS.

3

But the real world impact of weak and conflicted governance is not merely theoretical. When an organization's directors, trustees, or leaders give up their independence in exchange for personal interests, the organization loses the benefit of having a body of credible, skilled, experienced, and professional leaders. To be sure, some conflicts of interest on a board of directors, especially a large one, are inevitable and not necessarily detrimental to good governance, when rigorous and effective procedures are followed. Yet when conflicts dominate a board, it no longer acts as a safeguard of the company's values, and management no longer sees it as a helpful partner in making good decisions.

At the end of this Report, the Special Committee has provided recommendations to address the deficiencies observed during the investigation. The recommendations are not intended to be exhaustive, nor are they presented as the only feasible and effective solutions. It should also be noted that many of the recommendations have been or are already in the process of being implemented under the direction of the Board's Nominations and Governance Committee and UMMS management. Nonetheless, the Special Committee believes it is important to note that significant changes should be undertaken to address the deficiencies described below.

## II.   INVESTIGATION SCOPE AND PROCESS

This Section provides a summary of the investigation scope and process. The Special Committee, in consultation with Investigating Counsel, determined the scope of the investigation and the number, type, and purpose of the procedures to be used.

At the Special Committee's direction and supervision, Investigating Counsel assessed historical Board and Company governance practices and policies, including practices and policies regarding the disclosure, review, and approval of transactions or financial relationships implicating conflicts of interest. Investigating Counsel reviewed each of the COI transactions reported on the directors' disclosure forms, as well as transaction and disbursement data from UMMS and its affiliates and email communications between Board members and UMMS senior management for a nearly four-year period. Investigating Counsel paid special attention to senior executive management's involvement in the review and approval of actual and potential COI transactions and whether those transactions complied with applicable policies. The investigation also assessed the operation and effectiveness of corporate controls over conflicts of interest and the procurement-to-payment process. Finally, and as discussed below, the investigation considered other matters, as determined and requested by the Special Committee. Investigating Counsel's investigation included the following procedures:

- Review of UMMS policies and controls, including the UMMS Amended and Restated Bylaws ("Bylaws"),[5] Board and Company conflict of interest policies, Company procurement and disbursement policies and controls, the Company's Code of Conduct, and Company political activity policies;

---

[5] *See* Exhibit 2, the Bylaws. The Bylaws reviewed by Latham and discussed herein have been in place since approximately 2000. These Bylaws are undergoing a revision process that, as of the date of this Report, is anticipated to be finalized in December 2019.

- Review of Board member disclosures for all Board members who served during the past four years (2016-2019);

- Identification of businesses potentially affiliated with Board members or their immediate family members;

- Review of Board and committee meeting minutes (2010-2019);[6]

- Review of files, memoranda, and processes of prior investigations;

- Review of documentation and disbursement records for COI transactions (2016-2019);[7]

- Review of email communications of 17 current or former Company employees, from January 2016 to the date of collection (September or October 2019 depending on the custodian), including all communications between these UMMS employees and any Board member who served from 2016 to June 2019. The review focused on, but was not limited to, communications regarding discussions of businesses potentially affiliated with Board members or their immediate family members. Investigating Counsel collected more than 2.7 million documents, ran search terms to identify potentially relevant communications, and reviewed over 100,000 communications;

- Interviews with 38 witnesses, some multiple times, including current members of UMMS management, former members of UMMS management, current Board members, and former Board members; and

- Forensic accounting, including testing of disbursement, vendor, and corporate credit card data, and review of supporting documentation for certain disbursements and related-party transactions. Investigating Counsel employed a risk-based approach based on a number of factors, including the magnitude of the disbursement, expense patterns and timing, and the nature of the potentially affiliated business or transaction.

At the direction of the Special Committee, the investigation's scope and procedures were regularly modified and expanded as necessary based on the evidence obtained and additional questions raised. Investigating Counsel reported directly to the Special Committee with no obligations to other Board members or management. In addition, Investigating Counsel regularly conferred with the Company's public auditors, KPMG LLP ("KPMG").

## III.   BOARD MEMBER CONFLICTS OF INTEREST

This section provides a summary of the Special Committee's conclusions concerning specific COI transactions with Board members. The COI transactions with Board members included: (1) direct transactions between UMMS and a Director; and (2) transactions between

---

[6] With review of some earlier meeting minutes for specific purposes.

[7] With targeted review of documents predating 2016.

UMMS and entities with which a Director or Director's family member had a financial interest or other affiliation.

**Dillon Consulting Agreement** – In September 2012, then-UMMS President and Chief Executive Officer Robert Chrencik, on behalf of UMMS, entered into a consulting agreement with John Dillon via a letter agreement providing that Mr. Dillon be paid a $13,000 monthly retainer in exchange for engaging in certain fundraising, community outreach, acquisition, and expansion endeavors. The agreement was subsequently renewed annually through 2019. The agreement was not made through a request for proposal ("RFP") bidding process. All payments to Mr. Dillon reviewed by Investigating Counsel were approved by an authorized manager pursuant to the UMMS Authority to Commit Resource Matrix ("Authority to Commit Matrix")[8] (described below). In each of the relevant years, Mr. Dillon disclosed receiving $13,000 monthly on his annual disclosure form. The arrangement was disclosed to the ACC and to the Board as a whole at various times; however, there is no evidence of any discussion of, review of, vote on, or approval of the arrangement by the Board. Despite the annual disclosures, certain members of senior management and most Directors expressed surprise at the existence of the arrangement and insisted that it had not been disclosed.

The letter agreement required Mr. Dillon, who, at that time, was Chair of the Shore Health System Board, to undertake activities that were consistent with the basic expectations for a Board member, including fundraising, strategic planning, and community relations. For example, the 2018 version of the agreement stated his duties as follows:

- Work directly with the Shore Health System (SHS) President, Capital Campaign staff, and other constituencies in meeting the goals of the SHS Capital Campaign, resulting in the construction of a new medical center.

- Assist in SHS strategic planning and serve as community outreach liaison, advising UMMS on matters pertinent to providing high quality medical services to the SHS patient base.

- Communicate and work with the UMMS President and CEO and his staff on matters relating to hospital acquisitions and the expansion of the Medical System.[9]

Payment for services normally expected of Board members would, on its face, violate the Bylaws and governing law. According to interviews with Latham, Mr. Dillon and senior executives who had been aware of the arrangement at the time characterized Mr. Dillon's services as far above what would normally be expected for a volunteer Board member. They stated that Mr. Dillon spent more time on normal Board member duties compared to a typical Board member. Mr. Dillon estimated he spent on average 25 hours per week on these duties, a fact that could not be corroborated by extrinsic evidence. Other than the amount of effort and time, there was no other distinction between Mr. Dillon's "consulting" and a Board member's basic duties. The Special Committee concluded that there was a lack of evidence that the

---

[8] *See* Exhibit 1, Authority to Commit Matrix.

[9] August 1, 2018 Letter Agreement between Robert Chrencik and Mr. Dillon.

consulting agreement with Mr. Dillon was approved by the Board as required and, therefore, violated the volunteer services bylaw and governing law.

**Pevenstein Consulting Agreement** – In January 2018, Mr. Chrencik, on behalf of UMMS, entered into a consulting agreement with Robert Pevenstein via a letter agreement providing that Mr. Pevenstein be paid $15,000 monthly.  The agreement was extended in 2019.  The agreement was not made through an RFP bidding process.  All payments to Mr. Pevenstein were approved by an authorized manager, Jerry Wollman, the then-UMMS Senior Vice President and Chief Administrative Officer, pursuant to the Authority to Commit Matrix.  On his annual disclosure form, Mr. Pevenstein reported receiving more than $100,000 annually from UMMS in both 2018 and 2019.  The arrangement was disclosed to the ACC, which was chaired by Mr. Pevenstein, and to the Company's external auditors, KPMG; however, there is no evidence of any discussion of, review of, vote on, or approval of the arrangement by the Board.[10]  Mr. Pevenstein declined to be interviewed by Latham.

For several years before the agreement, Mr. Pevenstein, while a Board member, had been actively pursuing business opportunities with UMMS, including on behalf of Profit Recovery Partners ("PRP") and the Optimé Group ("Optimé").  Senior executives involved in purchasing stated in interviews that it was widely assumed, if not known, that Mr. Pevenstein had financial ties to the companies that he introduced to UMMS.  Senior executives described the consulting agreement as part of UMMS's cost-reduction goal, as Mr. Pevenstein was knowledgeable about efficiency solutions in health care.  The same executives acknowledged that a consulting arrangement with the ACC Chair was not ideal, but characterized it as an imperfect "work around" to allow Mr. Pevenstein to earn income from UMMS for bringing cost-saving technologies and services to the Company in exchange for forgoing business opportunities that benefited him personally.  The agreement did not make this trade off explicit.  Under its terms, Mr. Pevenstein could—and did—continue to promote companies in which he had a financial interest, for example, Revenew International (discussed below).  At least one senior executive raised concerns about the agreement with Mr. Pevenstein, particularly as the ACC Chair, with another senior executive and was told that such agreement was already approved by Mr. Chrencik.  Finding business partners and vendors who could offer cost-saving technologies and services for the benefit of UMMS would not normally be considered a Board member duty, and thus payment for such work *could* qualify for additional payment if reviewed and approved by the Board.  However, the Special Committee concluded that there was a lack of evidence to

---

[10] It is unclear whether then-Board Chair Stephen Burch was aware of the arrangements with Mr. Pevenstein or Mr. Dillon.  Mr. Burch has previously said he did not know about the consulting agreements.  According to former UMMS Chief Financial Officer ("CFO") Henry Franey, he asked Mr. Chrencik to inform Mr. Burch of the agreement because Mr. Franey understood a consulting agreement with the ACC chair was problematic.  Neither Mr. Burch nor Mr. Chrencik agreed to be interviewed as part of this process.  As such, Mr. Franey's account could not be verified.

indicate that the consulting agreement with Mr. Pevenstein was approved by the Board as required and, therefore, violated the volunteer services bylaw and governing law.[11]

**Profit Recovery Partners** – UMMS entered into a service agreement with PRP on March 1, 2013.  That agreement was extended for an additional 24 months on February 1, 2019.  The agreement with PRP was not made through an RFP bidding process.  All payments to PRP reviewed by Investigating Counsel were made via the purchase order to payment process.  In each of the relevant years, Mr. Pevenstein disclosed commissions received from PRP on his annual disclosure form.  Mr. Pevenstein's relationship with PRP was disclosed to the ACC and to the Board as a whole numerous times; however, there is no evidence of any discussion of, review of, vote on, or approval of the agreement by the Board.  The Special Committee understands that the relationship with PRP was terminated in October 2019 and that PRP is winding down its services.

**The Optimé Group** – In January 2016, UMMS entered into an agreement with Optimé that included services to optimize workforce strategy and deployment at the University of Maryland Rehabilitation and Orthopedic Institute and a licensing agreement for software.  This agreement was not made through an RFP bidding process.  All payments to Optimé reviewed by Investigating Counsel were made via a blanket purchase order.  In each of the relevant years, Mr. Pevenstein disclosed commissions received from Optimé on his annual disclosure form.  Mr. Pevenstein's relationship with Optimé was disclosed to the ACC and to the Board as a whole numerous times; however, there is no evidence of any discussion of, review of, vote on, or approval of the agreement by the Board.

**AFLAC** – UMMS and certain of its affiliates entered into a Business Associate Agreement with AFLAC in 2017.  All payments to AFLAC reviewed by Investigating Counsel were made via the check request process.  Certain of the payments made to AFLAC were approved by an authorized manager pursuant to the Authority to Commit Matrix; however, with regard to certain other payments, it is unclear whether the Authority to Commit Matrix was followed.  In each of the relevant years, Mr. Pevenstein disclosed that his son, Scott, received commission payments related to UMMS employees that voluntarily enrolled in and paid for AFLAC.  Scott Pevenstein's relationship with AFLAC was disclosed to the ACC and to the Board as a whole numerous times; however, there is no evidence of any discussion of, review of, vote on, or approval of the agreement by the Board.

**Revenew International** – UMMS entered into a contract with Revenew International ("Revenew") in July 2018 for a construction audit of Capital Region Medical Center as part of its 2018 Internal Audit plan.  The contract with Revenew was made through a sole source procurement method.  All payments to Revenew were made via the blanket purchase order to payment process.  On his annual disclosure form in August 2019, Mr. Pevenstein disclosed receiving $3,000 from Revenew for the fiscal year ended June 30, 2019.  There is no evidence of any disclosure of this agreement to the Board.  Evidence reviewed by Latham shows that Mr. Pevenstein contacted members of management on numerous occasions on behalf of Revenew and sought multiple engagements for the company with UMMS.  Senior executives

---

[11] As discussed in more detail below, the engagement of the ACC chair as a consultant to UMMS was, in addition to violating Board policy, a critical failure of ACC oversight and governance.

responsible for engaging Revenew assumed Mr. Pevenstein had a financial interest in Revenew, but said they had no direct knowledge of that interest at the time Revenew was engaged.  Upon learning of this role and interest, UMMS terminated the agreement with Revenew.

*Healthy Holly* **Book Purchases –** Beginning in late 2010, and periodically going forward, UMMS agreed to purchase installments of self-published children's books (different volumes of the *Healthy Holly* series) from Catherine Pugh, then a Director, state senator and, from 2017-2019, Mayor of Baltimore.  With respect to the first through fourth installments, Ms. Pugh pitched the purchase of the books by UMMS and their subsequent donation to Baltimore City Public Schools to Mr. Chrencik, who approved the purchases.  The ostensible purpose of the donation to Baltimore City Public Schools was to support UMMS's "population health" initiative by disseminating health-oriented educational materials to children.  However, there is no evidence that any UMMS executive ever read one of the installments to support a belief that the books would serve that population health goal.[12]  After Mr. Chrencik's approval, Mr. Wollman worked with an UMMS employee to create a check request and facilitate payment.  There is no evidence that there was a process in place to evaluate the fair market value of the books or whether other alternative books would be more effective in serving the health education goal.  Mr. Wollman, who cooperated with the Special Committee's investigation, acknowledged that he never saw nor read a *Healthy Holly* book nor confirmed the school system's receipt of them.  With respect to the fifth installment, Ms. Pugh pitched the newest book directly to Mr. Wollman, who then obtained approval from Mr. Chrencik.  As set forth more specifically, the *Healthy Holly* transactions proceeded as follows:

- In December 2010, UMMS agreed to purchase 20,000 copies of the first *Healthy Holly* installment, *Healthy Holly: Exercising is Fun*, from Ms. Pugh for $100,000 on the condition that the purchase be on behalf of, and for distribution to, school children in the Baltimore City Public School system.  Two checks, each in the amount of $50,000, were issued to Amina Communications & Technology Inc. on February 3, 2011 and March 12, 2011, respectively.  UMMS never received any confirmation that the books were delivered pursuant to the agreement.[13]  Investigating Counsel could not separately confirm that the books were ever received as intended.

---

[12] According to a plea agreement entered into between Ms. Pugh and the United States Attorney's Office for the District of Maryland (the "plea agreement"), Ms. Pugh admitted that the *Healthy Holly* sales to UMMS were part of a "scheme to defraud" UMMS.  However, the Special Committee cannot make a conclusion as to Mr. Chrencik's motive or purpose in agreeing to the purchases.  Mr. Chrencik did not respond to requests for an interview.  As noted, there is no evidence of any diligence performed by UMMS in evaluating the usefulness of the *Healthy Holly* books to its "population health" campaign, assessing the fair market value of the books, or ensuring that the books were actually delivered by Ms. Pugh to the Baltimore City Public schools.  Nonetheless, there is no evidence of Mr. Chrencik's intent in approving the purchases or his knowledge of Ms. Pugh's intent.

[13] According to the plea agreement, after initially delivering 20,000 copies of the first *Healthy Holly* installment, without authorization by UMMS or Baltimore City Public Schools, Ms. Pugh

- In August 2012, UMMS agreed to purchase 20,000 copies of a second *Healthy Holly* installment, *Healthy Holly: A Healthy Start for Herbie*, for $100,000 again on behalf of, and for distribution to, Baltimore City Public School children.  On November 6, 2012, UMMS issued a $100,000 check payable to Healthy Holly LLC.  UMMS never received any confirmation that the books were delivered pursuant to the agreement.  However, Mr. Wollman assumed that the first installment of the books had been delivered and received by the school, based on the assumption that the school agreed to accept the delivery of the second installment.[14]  Investigating Counsel could not separately confirm that the books were ever received as intended.

- In January 2015, UMMS agreed to purchase 20,000 copies of a third *Healthy Holly* installment, *Healthy Holly: Fruits Come in Colors Like the Rainbow*, for $100,000, again on behalf of, and for distribution to, Baltimore City Public School children.  On March 18, 2015, UMMS issued a $100,000 check payable to Healthy Holly LLC.  UMMS never received any confirmation that the books were delivered pursuant to the agreement.[15]  Investigating Counsel could not separately confirm that the books were ever received as intended.

- In October 2016, UMMS agreed to purchase 20,000 copies of a fourth *Healthy Holly* installment, *Healthy Holly: Vegetables are not just Green*, for $100,000 again on behalf of, and for distribution to, Baltimore City Public School children.  On November 3, 2016, UMMS issued a $100,000 check payable to Healthy Holly LLC.  UMMS never received any confirmation that the books were delivered pursuant to the agreement.[16]  Investigating Counsel could not separately confirm that the books were ever received as intended.

- In October 2018, UMMS agreed to purchase 20,000 copies of a fifth *Healthy Holly* installment, *Healthy Holly: Walking with My Family is Fun*, for $100,000 again on behalf of, and for distribution to, Baltimore City Public School children.  On November 14, 2018, UMMS issued a $100,000 check payable to Healthy Holly LLC.  UMMS never received any confirmation that the books were delivered pursuant to the agreement.[17]  In early 2019, after negative news coverage reporting on the failure to

---

and her associates arranged for thousands of copies of the book to be removed from Baltimore City Public Schools storage and transported to various locations in Baltimore, including Ms. Pugh's residence, legislative offices, mayoral office, and campaign office.

[14] According to the plea agreement, only 18,600 copies of the second *Healthy Holly* installment were delivered to Baltimore City Public Schools.

[15] According to the plea agreement, only 19,500 copies of the third *Healthy Holly* installment were delivered to Baltimore City Public Schools.

[16] According to the plea agreement, no copies of the fourth installment of *Healthy Holly* were delivered to Baltimore City Public Schools.

[17] According to the plea agreement, no copies of the fifth installment of *Healthy Holly* were delivered to Baltimore City Public Schools.

deliver the fifth *Healthy Holly* installment, Ms. Pugh returned $100,000 to UMMS. She has not returned the remaining $400,000 to date.

There is no evidence of UMMS entering into a contract with Ms. Pugh. All relevant payments were made to Ms. Pugh via the check request process. All payments were approved by an authorized manager (Mr. Wollman) pursuant to the Authority to Commit Matrix. In each of the relevant years, Ms. Pugh disclosed receipt of payments on her annual disclosure form. The relationship was included in management's presentations to the ACC in January 2013, March 2014, January 2016, and January 2018; and Board minutes from March 2013, April 2014, and March 2018 reference a report by the ACC Chair on "Disclosure of Financial Relationships." However, there is no evidence of any discussion of, review of, vote on, or approval of the arrangement by the ACC or the full Board. Although there is some evidence that the Board was told of the initial book purchase, there is no evidence of Board approval of that purchase or any subsequent purchases. Therefore, the Special Committee concluded that the book purchases from Ms. Pugh were payments for services that required but did not receive Board approval and, therefore, violated the volunteer services bylaw and governing law. In addition, the failure to confirm actual receipt of the purchased books exemplifies the risk inherent in such large and irregular purchasing processes, even if the purchases themselves technically complied with the procurement-to-payment policies (described below).

**Kelly & Associates Insurance** – Kelly & Associates Insurance (also known as "Kelly Benefit Strategies" or "KBS") originally contracted with Maryland General Hospital ("MGH") in 2008.[18] That contract was subsequently extended to additional UMMS hospitals in 2012 and was renewed several times. The original 2008 contract was won through a competitive RFP process; however, it does not appear that subsequent renewals were subject to RFP. All relevant payments reviewed by Investigating Counsel were made via the check request process. All payments reviewed by Investigating Counsel were approved by an authorized manager pursuant to the Authority to Commit Matrix. In each of the relevant years, Senator Kelly disclosed the relationship and the value ranges broken down by hospital entity. The relationship was disclosed to the ACC and to the Board as a whole numerous times. On January 26, 2012, management made a recommendation to the ACC to expand KBS services beyond MGH and BWMC.[19] Management explained that, although there was no competitive bid process, they were relying on MGH's 2008 competitive bid process (pursuant to which KBS was selected from a group of seven vendors) and the benefits administration outsourcing recommendations included in a 2009 Aon Consulting report to UMMS management. The ACC discussed and concluded that sufficient work was done by management to support their decision. Mr. Pevenstein motioned for

---

[18] MGH became part of UMMS in 1999 and became University of Maryland Medical Center – Midtown in 2009. KBS contracted with North Arundel Hospital—which would later become University of Maryland Baltimore Washington Medical Center ("BWMC")—and Mt. Washington Pediatric Hospital prior to those facilities becoming part of UMMS in 2000.

[19] On January 26, 2012, UMMS management made a "Benefits Administration" presentation to the ACC discussing current benefits administration providers at UMMS hospitals, disclosing the financial relationship with Senator Kelly and recommending expanding the benefits administration services provided by Kelly Benefits Strategies.

approval to refrain from escalation to the UMMS Board.  The motion was approved.  Senator Kelly was not present at the meeting when this was discussed.

**Real Time/Fundamental Inc. –** UMMS entered into a Master Subscription Agreement to license the use of Real Time software in June 2018.  Business Associate Agreements for protected health information software were executed in May 2018.  These agreements were not made through an RFP bidding process.  Real Time's software is designed to utilize protected health information to manage the readmission risks of patients currently in nursing home facilities.  Both the facility discharging the patient and the nursing home admitting the patient must utilize the software in order to achieve the desired results.  Although Real Time provided its software to UMMS at no cost, and UMMS made no payments to Real Time during the period of time covered by the investigation, affiliated nursing homes were not given a similar discount. In each of the relevant years, Mr. Rifkin disclosed an ownership interest in Real Time on his annual disclosure form.  Mr. Rifkin also disclosed serving as a consultant for Fundamental Inc. ("Fundamental"), which operates skilled nursing facilities.  In 2018, Mr. Rifkin disclosed that the relationship between UMMS and Real Time may affect referrals to skilled nursing facilities operated by Fundamental in his annual disclosure form.  These connections to Real Time and Fundamental were disclosed to the ACC in October 2018; however, there is no evidence of any discussion of, review of, vote on, or approval of the Real Time agreements by the Board.[20]

**Mid-Atlantic Healthcare Acquisitions –** UMMS entered into a ground lease option agreement with Mid-Atlantic Healthcare Acquisitions ("Mid-Atlantic") in February 2019.  There was no bidding on the ground lease option.  In 2019, Mr. Rifkin disclosed an interest in Mid-Atlantic on his annual disclosure form.  There is no evidence of any disclosure of this agreement to the Board.  In addition, there is evidence that Mr. Rifkin lobbied UMMS management to support a State "certificate of need" finding that was necessary to permit Mid-Atlantic to develop a skilled nursing facility.  There is no evidence of payments by UMMS to Mid-Atlantic.  The option agreement terminated effective April 2, 2019 in a letter from Mr. Rifkin to Megan Arthur, the then-UMMS General Counsel.

**Home Paramount Pest Control –** In July 2011, UMMS entered into a three-year agreement with Home Paramount Pest Control ("Home Paramount") with opportunities to extend.  The agreement was amended and extended several times.  The 2011 contract went through a competitive RFP process.  Payments for all UMMS facilities (except Upper Chesapeake Medical Center) to Home Paramount were made via the purchase order to payment process.  In each of the relevant years, Director Walter Tilley (whose family founded and owns Home Paramount) disclosed this interest on his annual disclosure form.  Mr. Tilley's relationship with Home Paramount was disclosed to the ACC and to the Board as a whole numerous times. On at least one occasion, the ACC discussed the Home Paramount contract and sought ACC

---

[20] The provision of the Real Time software without charge to UMMS could be viewed as an inducement or reward for recommending or requiring skilled nursing facilities to purchase the software from Mr. Rifkin's enterprise to be part of the UMMS "preferred network."  To the extent nursing facilities were required to purchase the software as a gateway to access UMMS referrals, the arrangement could violate existing law.

approval for expanding the contract.[21]  Mr. Tilley was present at the meeting when this was discussed, but recused himself during the discussion of the pest control RFP.

**Soltesz, Inc. –** In 2013, UMMS entered into a contract for design services with Soltesz, Inc., a civil engineering company owned by James Soltesz, who subsequently became a UMMS Board member (in 2018).  The 2013 contract went through a competitive RFP process.  Payments to Soltesz, Inc. were made via both the blanket purchase order to payment process and the check request process.  Certain check request payments were approved by an authorized manager pursuant to the Authority to Commit Matrix.  In 2014, Soltesz, Inc. also entered into a contract with Dimensions Health Corporation, d/b/a Dimensions Healthcare System ("Dimensions"), for design professional services on the New Regional Medical Center Project at Boulevard at the Capital Center in Largo, Maryland.  Dimensions subsequently affiliated with UMMS in or around 2017.  Upon joining the Board in May 2018, Mr. Soltesz disclosed the interest on his annual disclosure form.  The Special Committee notes that the legitimate concern about Board members using their position to further their own interests is mitigated when, as with Mr. Soltesz, the relevant business relationship with UMMS long predated his Board tenure.

**Best Care Ambulance –** In 2001, UMMS, entered into a contract with Best Care Ambulance.  That agreement was amended and extended several times.  Although the agreement was not subject to the competitive RFP process, it is the Special Committee's understanding that no alternative services were available for the covered areas—which is an established exception to the competitive bidding requirements under relevant UMMS policies.  The payments that Investigating Counsel reviewed were made through the blanket purchase order to payment process.  In each of the relevant years, Director Wayne Gardner disclosed his relationship to Best Care Ambulance on his annual disclosure form.  The agreement was disclosed to the ACC; however, there is no evidence of any discussion of, review of, vote on, or approval of the arrangement by the full Board.  The Special Committee notes that the relationship between Mr. Gardner and Best Care Ambulance was widely known among the members of the Board and management who were interviewed as part of this process.  Like Mr. Soltesz, Best Care Ambulance's business relationship with UMMS predated Mr. Gardner's Board tenure.

**M&T Bank –** M&T Bank is a primary banking partner for UMMS.  The UMMS relationship generates net interest income and fees for M&T Bank in the range of $3-5 million annually.  M&T Bank won a $250,000,000 Syndicated Line of Credit restructuring in 2016 via a competitive RFP process.  Other bidding practices are unknown.  Payments to M&T Bank that Investigating Counsel reviewed were made via payment request.  All payments to M&T Bank that Investigating Counsel reviewed were approved by an authorized manager pursuant to the Authority to Commit Matrix.  In each of the relevant years, Mr. Chiasera disclosed his relationship with M&T Bank on his annual disclosure form.  Mr. Chiasera's relationship with M&T Bank was disclosed to the ACC, the Finance Committee, and to the Board as a whole.  On at least one occasion, the Finance Committee reviewed and voted to refinance the syndicated line

---

[21] On June 7, 2011, UMMS management made a "Supply Chain Management" presentation to the Audit Committee identifying pest management as an opportunity for standardization and cost savings, discussing an RFP issued to three current suppliers, including Home Paramount, and explaining the decision to award the contract to Home Paramount.

of credit with M&T Bank as the lead firm; however, there is no additional evidence of any discussion of, review of, vote on, or approval by the Board for other services and agreements between M&T Bank and UMMS.  The Special Committee notes that the relationship between Mr. Chiasera and M&T Bank was widely known among the members of the Board and management who were interviewed as part of this process.

**Jones Birdsong LLP** – In September 2018, UMMS-affiliate BWMC purchased a medical malpractice insurance policy for a newly-acquired cardiology group, Arundel Cardiology Associates.  The broker for the policy was Jones Birdsong LLP ("Jones Birdsong") —for whom UMMS Board Member Korkut Onal serves as managing partner.  This was a one-time policy purchase based on a time-sensitive matter.  The policy was necessary to provide standard coverage for any potential claims made after the cardiologists joined BWMC for liabilities that arose before the acquisition.  BWMC obtained one other quote, from the group's insurance carrier prior to joining UMMS, that was substantially higher.  The transaction arose when BWMC contacted Mr. Onal to obtain a second quote on an urgent basis.

Jones Birdsong received a one-time payment in the amount of $213,460, which included the insurance premium, taxes, and fees.  Jones Birdsong's commission was 10% of this payment minus taxes and fees—approximately $20,700.  This payment was made via the check request process and was approved by an authorized manager pursuant to the Authority to Commit Matrix.  Mr. Onal complied with all disclosure requirements with respect to the relationship.  There is no evidence of any discussion of, review of, vote on, or approval of the Jones Birdsong relationship by the UMMS Board; however, there is documentation suggesting that the BWMC Board was aware of the transaction.

\*                \*                \*

For the Directors discussed above, all had reported their conflicts of interest as required by the policies in place at the time.  For the remaining 30 Directors in the scope of the Special Committee's investigation, Investigating Counsel did not identify any conflicts of interest, business relationships, or inappropriate financial transactions with UMMS.

# IV.     FINDINGS AND OBSERVATIONS

This Section provides a summary of the Special Committee's key findings and observations concerning the effectiveness of Board governance and oversight of UMMS.  These findings are based on documents and email review, witness interviews, and forensic review of available financial accounting data.  This section does not attempt to provide an exhaustive account of all facts established through the investigation, nor does it contain a summary of each interview conducted or the substance of all documents and information reviewed.

## A.     Board Policies Concerning Potential Conflicts Of Interests Failed To Foster Rigorous And Effective Board Oversight

In reviewing the COI transactions, the Special Committee found that transactions benefiting Directors were generally reported and disclosed by the Directors, consistent with existing policies.  However, the documentary and witness evidence was inconclusive and conflicting as to whether the transactions were appropriately reviewed and approved by the

ACC.  In addition, the existing policies, as written, were confusing, poorly drafted, and poorly understood by Board members and management, which undermined the control environment by effectively eliminating Board review and approval.  As a result, although the COI transactions were disclosed as required by the written policies, there is no evidence that the disclosures led to rigorous, meaningful review by the Board or the ACC.

      1.     *2011 Policy Change Permitted Directors To Avoid Full Board Review And Approval Of Business Transactions That Benefited Them Personally*

The Bylaws provide that Board members serve in their capacity on the Board without compensation.  The Bylaws permit a Board member to receive compensation for service in any other capacity if the compensation is approved by a resolution of the Board.  Therefore, although the Bylaws do not prohibit Board members from having other relationships with, or providing services to, UMMS, the Bylaws require a Board resolution for Board members to receive any compensation from UMMS.[22]

Since at least 2002, internal UMMS policies also required Board members to disclose any actual or potential conflicts of interest.  The policies requiring those disclosures changed over time.  Pursuant to a Board resolution adopted in 2002 (the "2002 Board resolution"), a Board member was required to disclose to fellow Board members any actual or possible conflicts of interest in a matter before the Board, "at the earliest practicable time." [23]  Following disclosure, the Board member was prohibited from voting on the matter and was required to recuse himself or herself during the vote.  Additionally, when management or a Board member became aware of a potential situation in which a Board member could have a conflict of interest, management or the Board member was required to present the situation to the Board's Finance Committee for guidance.  Finally, management was required to present to the full Board any transaction in which management was aware that a Board member had a conflict of interest.

Those disclosure and approval procedures were significantly altered in 2011, eliminating on its face the requirement of disclosure to and approval by the Board and redirecting the review and approval of conflict transactions to the ACC (hereafter referred to as "the 2011 Board policy").[24]  The 2011 Board policy relied on an annual conflict of interest disclosure.  Specifically, in August 2011, after the end of UMMS's fiscal year, each Board member was required to complete a "Disclosure of Financial Relationships Questionnaire" (or "annual disclosure form") disclosing any actual or proposed financial relationships between the Board member and UMMS from the prior fiscal year.  Board members were also required to disclose to UMMS's general counsel any new relationships that arose between annual reporting requirements.  Under the 2011 Board policy, the UMMS general counsel was responsible for

---

[22] The Bylaws are unclear as to whether the restriction on compensation to Board members applies only to *direct* services personally provided by the director or also to *indirect* services provided by a third-party vendor in which the director has a financial interest.  If the latter, then a Board resolution likely would be required to approve all COI transactions.

[23] Exhibit 3, the 2002 Board resolution at page 3.

[24] *See* Exhibit 4, 2011 Board policy, UMMSCC1104 Disclosure of Financial Relationships.

collecting the annual disclosure forms and summarizing the relevant information to the ACC for its review.  Unlike under the 2002 Board resolution, this information was *not* required to be presented to the full Board.  Rather, the ACC was responsible for determining whether any disclosed financial relationship was "significant," and if so, for reporting any findings of significant financial relationships to the full Board for a vote on further action.[25]

This policy change was significant because it allowed Directors to avoid full Board review and approval of conflicted business transactions.  Placing the responsibility to review and analyze disclosed financial relationships with the ACC was particularly problematic because there were multiple conflicted transactions between UMMS and the then-ACC Chair, Mr. Pevenstein.

In addition to Board-specific policies, UMMS also had corporate compliance policies on conflicts of interest and required disclosures.[26]  These historical corporate policies vary in terms of application, but for the first time in 2017, the corporate policy also applied explicitly to Board members (in addition to all other employees, as prior versions did).  The 2017 corporate policy required annual disclosure of any financial interest that may result in perceived potential conflicts of interest and created a duty to disclose any additional financial relationship that arose in between annual reporting requirements.  The 2017 corporate policy does not include detailed procedures to be followed once a conflict is disclosed by a Director, but defers to the full Board or a committee to decide how to manage the conflict (but at minimum, requires the conflicted member to not participate in that discussion or vote).

### 2. Existing Policies Were Poorly Understood

Several Board members and senior executives, when interviewed, either acknowledged unfamiliarity with the Board's (or UMMS's) COI policies or incorrectly explained what the policies required.  Some members of management responsible for approving purchasing transactions acknowledged they had not read the policies.  No Board member reported having read any COI policy prior to 2019; and when asked, Board members and senior executives often described the policies as requiring only *post hoc* disclosure of completed transactions that provided a personal benefit (on an annual basis).  No one interviewed reported that the Bylaws, or, in some instances, the internal policy required affirmative Board action or approval prior to compensation for at least some conflicted transactions.  Notably, the Bylaws are vague as to whether compensation received indirectly (for example, compensation received from a business in which the Board member has a financial interest) is prohibited without a Board resolution.

### 3. Board Members Failed To Adequately Engage In Review Of Conflicted Transactions

When interviewed, Directors and senior executives differed in their recall of Board-level review of transactions that personally benefited Board members (though none could recall the

---

[25] *Id.* at page 2.

[26] *See* Exhibit 5, Corporate Compliance Policy: Conflicts of Interest, UMMSCC1208.

Board *voting to approve* such transactions). The difference between the Directors' recall of the review process and senior management's amounts to a minor difference in emphasis, likely resulting from the different perspectives of the participants. Directors were aware that they were required to fill out conflict of interest disclosure forms each year and that the General Counsel[27] would collect these for UMMS. Some recalled that a summary of the disclosures was presented to the full Board each year or knew that the conflicts were reported on Schedule L of the Company's tax return (Form 990), which was provided to Board members. Others, including long-time Directors, were unaware of these Board-level presentations; and many said that if and when they occurred, the information was presented quickly, flashed on a screen, and not discussed.

Some members of management described this Board-level presentation as more rigorous and pointedly attributed the Directors' lack of recall of the presentations to a lack of diligence and preparation on the part of those Directors. (Some Board members candidly acknowledged they had not been as diligent in review as they should have been.) In fact, the COI transactions reported in the media were reported on the Forms 990 with just two exceptions.[28] Each Director had access to the forms, and there is some evidence that presentations concerning the COI transactions were made at ACC and Board meetings. For example, while several members of management and the Board expressed shock that UMMS had entered into a consulting agreement with Mr. Dillon, the agreements were disclosed each year by Mr. Dillon and reported on the Company's Form 990s. One former Director described the Pevenstein consulting arrangement as "hiding in plain sight." Of the transactions reported in the media, only the book purchases from Ms. Pugh were not regularly reported on UMMS's Form 990, although, in one instance, a $50,000 payment for the *Healthy Holly* books was reported on the form.[29]

While the evidence of Board review is lacking at best, there is no evidence of Board action or approval prior to Board members receiving compensation for COI transactions. As discussed, the Bylaws are unclear as to whether Board members are prohibited from receiving indirect compensation (profits from companies doing business with UMMS), as well as direct compensation. Board minutes do not reflect any review, vote, or approval of specific COI transactions. ACC and Finance Committee minutes reflect, collectively, three instances of committee-level review and approval of a COI transaction.

Access to the Forms 990 and brief presentations at busy and generally lengthy Board meetings may technically qualify as disclosure to the Board. However, what appears to be a lack of serious discussion and rigorous review and approval of these transactions rendered Board-level review ineffective and essentially *pro forma*. Whether by design or omission, the control process for Board review and approval of self-interested transactions was ineffective.

---

[27] The former General Counsel, Megan Arthur, did not respond to a request for an interview.

[28] In one case, it is arguable whether reporting on the Form 990 was required.

[29] Ironically, this one instance of reporting the Pugh transaction on the Form 990 was deemed a "mistake," because only transactions above $100,000 were considered reportable.

4.    *The Conflict Of Interest Policies Permitted Board Members To Lobby Purchasing Executives On Behalf Of Personal Business Interests*

As understood by Directors and management, the Company's conflict of interest policies permitted Directors to contact, and in some cases lobby, UMMS executives with influence over purchasing on behalf of their personal business interests—without disclosing the fact or nature of their financial interests.  As noted above, the 2011 Board policy, as written and as understood, required only *post hoc* disclosure of business interests.  While the Bylaws permitted a director to receive compensation for "other services" provided to UMMS—pursuant to resolution of the Board—the specific provision did not address when disclosure of a financial interest had to occur.[30]

The Special Committee found evidence of Board members contacting UMMS purchasing executives and other senior officers (for example, in technology) on behalf of companies seeking to do business with UMMS.  In many of those instances, the Director had a personal financial interest, and in some cases, failed to disclose the nature of that interest.  So routine were many of these contacts, that UMMS executives involved in purchasing decisions said that, depending on the Director making the approach, they assumed the Director contacting them had a financial interest in the transaction.  For example, in 2018, UMMS engaged Revenew for a contract monitoring costs in the construction of a hospital in Prince Georges County.  Revenew was introduced to UMMS by Mr. Pevenstein, who repeatedly contacted UMMS senior executives about using Revenew's services.[31]  UMMS executives assumed, but said they did not know at the time of contracting with Revenew, that Mr. Pevenstein would receive a commission for generating business for Revenew.  Mr. Pevenstein disclosed his relationship with Revenew in August 2019.  The Company subsequently terminated the contract.  Evidence showed that Mr. Pevenstein also lobbied UMMS executives with purchasing authority to increase the use of other companies with whom he had financial relationships, including Optimé, but in most cases, UMMS executives resisted these efforts.  Regardless, Board members' requests for meetings with businesses connected to them, or their family or friends, led to frequent distraction and misuse (or overuse) of management's time—as executives acknowledged during interviews.

## B.    Conflicts Of Interest And Structural Defects Rendered Audit And Compliance Committee Oversight Ineffective

The Special Committee found numerous practices that, while not technically a violation of any bylaw, rule, or policy, created conditions that rendered the ACC oversight function ineffective.  Since at least 2004, Mr. Pevenstein served as ACC Chair.  He continued to serve in that role until his resignation from the Board in 2019.  During periods of that time, Mr. Pevenstein served concurrently as Chair of the Finance Committee and the Investment Committee.  Several witnesses noted that attendance at ACC meetings was frequently sparse, sometimes "embarrassingly" so.  The ACC struggled to attract members and maintain routine attendance, with the exception of Mr. Pevenstein.

---

[30] Exhibit 2, Section 2.11.

[31] Mr. Pevenstein declined to be interviewed by the Special Committee's counsel.

In the best circumstances, this record of dominance by a single individual, lack of rotation of leadership and members, and lack of regular engagement by members would suggest a weak control environment and a heightened risk of control override by members or management.  In the UMMS Board environment, this risk was compounded by the acknowledged conflicts of interests of the Chair, Mr. Pevenstein, and several ACC members.  At certain times, a full majority of the formal ACC membership reported conflicts of interest. Mr. Pevenstein, as noted above, reported several of his own, including a consulting agreement in 2018 that essentially put him on the payroll of the senior management that the ACC was supposed to oversee.

The dominance of the ACC by one individual and the many conflicts of interests of the Chair and ACC members rendered the oversight function control fatally flawed.  Yet the situation continued for several years.  The real world impact of this weakness was felt throughout the executive levels of UMMS.  Because either Mr. Pevenstein or those perceived to be closely aligned with him were often in situations that undermined effective oversight, executives saw no point in raising issues with them, as the reporting would have been circular.  For example, one member of senior management said she separately raised concerns about Mr. Pevenstein's consulting agreement with another senior executive only to have the issue dismissed as a *fait accompli*.[32]  In another instance, concerns about management pressure on the internal audit department went unaddressed because of the tight relationship between Mr. Pevenstein and senior management.

### C.   Failure To Observe Term Limits Allowed A Limited Number Of Board Members To Exercise Disproportionate Influence

Under Maryland law, UMMS Board members may not serve more than two consecutive full terms.[33]  The term of a member is five years and begins on the first Monday in June of the year of the appointment.  At the end of a term, a Board member continues to serve until a successor is appointed and qualifies.  A Board member appointed to fill a vacancy in an unexpired term serves only for the remainder of that term and until a successor is appointed and qualifies.  Consistent with this law, the Bylaws state that, at the end of a term, a Board member continues to serve until a successor is appointed and qualifies.

The Special Committee observed that several Board members served more than two consecutive five-year terms, while others rotated off after one or two terms.  Through interviews and review of documents, the Special Committee found that efforts to work around the term limit policy were well known and actively participated in by numerous former members of senior management and the then-key members of the Board.  Strategies to avoid the legislatively-mandated term limits included switching the method by which he/she came to serve on the Board, brief breaks in service followed by reappointment to a new term, and continuing to serve so long as he/she was not replaced.  Board members' political connections, special skills, or knowledge were given as reasons.  The longest serving Board members were typically the most

---

[32] According to interviews, the issue of Mr. Pevenstein's consulting agreement was raised with Mr. Franey.  Mr. Franey confirmed the senior executive's account.

[33] MD Educ. Code § 13-304(d).

powerful (or perceived to be) and had the most significant conflicts of interest. Although this was not a blatant violation of Board policy (given the open-ended nature of the Bylaws that allows service to continue until a successor is appointed), it constituted an override of the statutory control and showed a lack of concern with quality corporate governance.

Term limits are intended to provide periodic rotation of Board membership and leadership and prevent entrenchment that can pose a risk to effective oversight of management. Where, as here, those limits were not followed, that risk was borne out. The result was an inner circle of long-time Board members that many perceived to hold all of the decision-making power. Those long-serving Board members were able to exercise disproportionate influence over Board policies and ultimately failed to exercise appropriate oversight over those in management who worked to keep them on the Board. As reflected in the chart below, many of the longest-serving Board members were also ones with the most significant conflicts of interest.

| Board Member | Approximate Length of Board Service |
|---|---|
| Senator Frank Kelly | 33 years |
| State Senator/Mayor Catherine Pugh | 17 years |
| Robert Pevenstein | 16 years |
| John Dillon | 13 years |

Senior members of management frequently strategized internally and also with Board Chair Burch, Mr. Kelly, Mr. Pevenstein, and Mr. Dillon, on strategies to keep key Board members beyond their terms. The Special Committee found no evidence of any discussion or acknowledgement that *rotation* of Board members was a priority. Given the negative effects of Board member entrenchment, the Special Committee recommends reforms to the membership rotation rules governing membership on the full Board as well as committees and chairperson roles.

### D.    Purchasing And Disbursement Policies Permitted Management To Engage In Significant Transactions Without Board Oversight

At UMMS, payments are generally processed through (1) purchase orders and invoices, (2) check requests, or (3) recurring payments. Purchases of supplies and/or services should, generally, be obtained through the purchase order process and must be awarded through a competitive bid process, with certain defined exceptions (*e.g.*, sole source purchases).[34]

---

[34] Other defined exceptions include:  items available through a group purchasing contract; no known alternate source; and products and/or services that would benefit UMMS if acquired through a negotiated purchase. *See* Exhibit 6, Use of Bids and Quotations, UMMSSC03; *see also* Exhibit 7, Central Procurement, UMMSSC01. The specific mechanics and procedures in place at Upper Chesapeake and Capital Region vary from the general UMMS procedures, since these two affiliates have not yet or have only recently been integrated into UMMS's shared services process.

Furthermore, all requests for goods and services from a vendor must have a purchase order before delivery of goods and services are provided.[35]  UMMS's Disbursement/Check Request Policy ("Check Request Policy") states that check requests should be used for limited transactions and provides a non-exclusive list of examples (*e.g.*, conference deposits or professional licenses).[36]  The Check Request Policy states that purchase of supplies and goods should be made using a purchase order requisition and follow the normal procurement process (described above).  The policy also states that it is the responsibility of the person granting authorization to assure that services have been provided and at the agreed-upon rate.  A request for disbursement is to be made using a completed check request form and must include related documentation and or receipts.  The Authority to Commit Matrix operates as the main "control" on the check request process.  If the appropriate person with the right level of authority to commit approves a check request, that check will generally be processed without further inquiry.  As written, however, this control permits large disbursements to be approved by a single manager or executive without any documentation of a business purpose or further evidence of the transaction's need or value.  The Chief Executive Officer ("CEO") and CFO have the authority to approve a check request of any amount, with no upper limit.

Many of the COI transactions that the Special Committee and its advisors reviewed involved the purchase of goods or services, but were processed through check requests rather than purchase orders, which was inconsistent with UMMS policies (however, those policies did not expressly prohibit the use of check requests, in part because the policies provided only a non-exhaustive list of examples in which a check request would be appropriate).  These check requests were accompanied by supporting documentation (for example, an invoice) and signed by a member of senior management with the authority under the Authority to Commit Matrix to approve the amount of the disbursement.[37]  Furthermore, several of the COI transactions were initiated via a recurring check request; and once that recurring request was established in the system, there was no additional review or assessment of those payments moving forward.  As such, senior management engaged in significant transactions without Board oversight and, often times, without other members of senior management's knowledge.  For example, the consulting arrangements with Mr. Pevenstein and Mr. Dillon and the purchases of *Healthy Holly* books were all approved by members of senior management with the appropriate authority to commit those resources and accompanied by supporting documentation.  As such, and without any

---

[35] *See* Exhibit 8, Supply Chain Shared Services Procedure Manual, UMMSPR08.

[36] *See* Exhibit 9, Disbursement/Check Request Policy, UMMC 4931881.  We understand this policy is applicable UMMS-wide.

[37] UMMS has a policy requiring approval of disbursements and payments by either a manager, director, Vice President, Senior Vice President, or CEO/CFO, based on four different budget levels and specific check request, purchase order, or invoice amounts.  The Authority to Commit Matrix has been in place since 2006 and generally applies across all UMMS entities.  Upper Chesapeake has separate Financial Delegation of Authority Guidelines that have been in place since 2012 (*see* Exhibit 10, Upper Chesapeake Delegation of Authority Post-2012), and Capital Region Medical Center has a separate Financial Authority to Commit Matrix (*see* Exhibit 11, Capital Region Authority to Commit Resources Matrix).

additional oversight or questions asked, those payments were processed by Accounts Payable and checks went out on a recurring basis.

Finally, UMMS makes charitable donations to other organizations and non-profits who perform community and healthcare-related services consistent with UMMS's own mission. There is nothing improper about making such contributions, and the Special Committee did not view a contribution made to a charity in which a Director might have a personal interest (*e.g.*, sit on the Board) as a conflict of interest *per se*. The Special Committee also did not observe any instances of UMMS being defrauded through a charitable contribution, other than the *Healthy Holly* book deal. However, it is clear that UMMS lacked a policy governing charitable contributions, and there was a lack of clarity regarding required processes and approvals for such contributions. Historically, the CEO or the Chief Administrative Officer made all decisions on charitable giving at the corporate level, and their decision-making process was not formally documented (although, a corporate budget for charitable giving was set at the beginning of the fiscal year). Charitable donations reviewed by Investigating Counsel were generally made by check request. The check requests were made and approved by members of management with the appropriate authority to do so under the Authority to Commit Matrix. The Board did not have a role in those decisions, and UMMS did not have a committee or formal process for requesting and approving charitable contributions. The absence of such controls around the significant expenditure of funds for charitable purposes creates a risk of abuse, which was borne out in the *Healthy Holly* payments.

### E.  Transactions With Board Members Eroded The Effectiveness Of Board Oversight

UMMS's culture reflected a concentration of power at the top, where members of management sought excessively to keep the peace. As described above, the structure of the UMMS's procurement and payment policies allowed the CEO to exercise almost unchecked power within the management structure for purposes of entering into contracts with Board members and disbursing funds to them.

Numerous emails reviewed by Latham also reflected instances of certain Board members contacting members of senior management to refer friends and family members for employment positions at UMMS or an affiliate hospital, or to request that special care and attention be given to a friend or family member who was a patient in an UMMS hospital (in addition to the business referrals described above). Members of management acknowledged the volume of these requests and a general sense that it was part of their job to review such resumes or attend to such requests, but also stated that they did not feel pressure to hire someone who was not qualified for the job just because they had a connection to a Board member. Nonetheless (and while not against any specific Company policy), these frequent requests for special attention created a sense of management responsibility for catering to certain Directors.

Additionally, certain Board members were often invited by senior management to attend social events and outings, including sporting events in and outside of Maryland. From the perspective of some members of senior management, these opportunities came to UMMS because of the medical services that it provided to the athletes and their community and were in turn provided to Board members in appreciation for the Directors' voluntary service to

22

UMMS.  Some Board members interviewed expressed their perception that favoritism was involved in selecting who to invite to these events and that these social interactions between a subset of management and select Directors reinforced a culture of concentration of power amongst a few.  While it is certainly the case that social activities can serve an important role in helping form a cohesive organizational culture, when those opportunities are unreasonable and meted out by management to select members of its Board, the risk of management "capture" and of a breakdown in effective oversight roles grows.

## V.   SPECIAL COMMITTEE RECOMMENDATIONS

The primary goal of the Board of Directors in unanimously creating this Special Committee was to undertake a broader and deeper investigation of the conduct that was the subject of the Nygren Report than had been undertaken as of the time that Report was issued.  In addition, and significantly, the Special Committee was directed to "advise the Board of Directors regarding governance practices, process improvements and remediation, recovery, and corrective actions based on the above investigation and analysis[.]"[38]

The Special Committee has completed its investigative work and delivered its findings. This document sets forth the observations and recommendations of the Special Committee related to governance, process improvements, and remedial or corrective actions.  These recommendations address deficiencies in the existence or enforcement of governance policies and procedures observed by the Special Committee during its investigation that likely contributed to the findings.  In making these observations and recommendations, the Special Committee is mindful of the substantial and significant work undertaken by the Nomination and Governance Committee over the last many months in the promulgation and/or revision of policies and procedures that are designed to strengthen governance processes and infrastructure and institute best practices.  The Special Committee's work, though separate, complements and is intended to assist and inform that ongoing effort.

In submitting this document, the Special Committee wishes to emphasize that the conduct that is at the center of our investigative efforts was conduct undertaken by a small number of corporate officers and former Directors who are no longer with UMMS and whose actions were wrongful by any standard—regardless of the sufficiency of the governance policies and processes in place.  The existence and enforcement of appropriate and transparent rules, policies and standards that foster an environment where everyone knows what is expected and what will not be tolerated is necessary.  Such rules are not, however, a substitute for integrity in leadership. A culture of compliance starts with the commitment of leadership to best governance and corporate practices as a means of safeguarding and assuring the mission of UMMS.  To that end, during the course of the Special Committee's investigation, the Board, primarily through the Nominations and Governance Committee and current senior management, has been laser focused on establishing clear and comprehensive governance and corporate practices, some of which have been implemented exclusive of the Special Committee's recommendations below.

It should also be noted that the failings identified in the past *governance* of UMMS do not in any way suggest failings in the *care* provided by UMMS to many thousands of

---

[38] Resolution (September 9, 2019).

Marylanders and others each year.  Simply put, the Special Committee recognizes that the failings in the UMMS Boardroom were *not* failings in the emergency rooms or examining rooms or elsewhere throughout the hospitals, clinics, and outpatient facilities by the more than 28,000 UMMS employees and physicians.

### A.    Board Structure

1.    *Size of the Board* – A 30-member Board is large by most standards, and many Board members expressed concern that the Board size was unwieldy and made effective meetings difficult.  Some Board members described meetings as essentially information sessions where active participation while not discouraged, was impractical.  A change to the maximum board membership would require a change in state law.  The Special Committee recommends that UMMS approach the General Assembly and the Governor to discuss reducing the size of the Board over an appropriate period of time to promote the effectiveness and accountability of its members.

2.    *Term Limits* – Existing state law and the Bylaws limit Board members to two five-year terms, although exceptions to that limit were broadly and easily made.  The Special Committee recommends that the General Assembly and Governor consider limiting the tenure of a Board member to no more than two five-year terms, as currently allowed by statute, or no more than 10 years total for whatever reason, such that any extension beyond a 10-year service period is permitted only in extraordinary circumstances.

3.    *Board and Committee Chair Rotation* – There is currently no limit on the length of time a Board member can serve as Chair or a Committee Chair. The Special Committee recommends that the Nominating and Governance Committee consider an amendment to the Bylaws to limit the length of time a director can serve as either a committee chair or Board chair and to prohibit a director from concurrently serving as chair of more than one committee.

4.    *Implementation Oversight* – The Special Committee notes that substantial work has been undertaken by the Board and management to strengthen, expand, and remediate governance processes and procedures.  The Special Committee believes that it is important to establish a schedule for the implementation of these efforts and changes, to assure that such efforts are being undertaken on schedule, to evaluate and oversee the implementation, and to report progress to the Board.

5.    *Annual Board Review* – The Special Committee recommends that the Board be required to review annually the steps taken by management to conduct compliance training, establish compliance priorities, and review the effectiveness of training throughout UMMS.

6. *Compensation* – The Special Committee recommends the Executive/Compensation Committee of the Board adopt, as a vital part of its review of executive compensation, a formal practice considering senior management's record of fostering a strong compliance culture throughout UMMS. Deficiencies in any area under the executive's responsibility, however identified, should be taken into account in determining base compensation increases as well as at risk compensation. The Executive/Compensation Committee should also establish a "claw-back" policy to permit UMMS to recover previously paid bonus compensation for past periods where a deficiency is subsequently identified.

## B.    Conflict Of Interests

Some of the Special Committee's recommendations regarding COI transactions are reflected in the revised COI policy adopted in July 2019.[39] Others have been more recently prepared by the Nominations and Governance Committee for consideration by the Board. The Special Committee repeats them here for completeness and to endorse maintaining those changes.

1. *Annual Board Approval for COI Transactions* – The Special Committee recommends that the Nominations and Governance Committee establish standards and procedures for full, annual Board review and approval of related-party transactions or relationships. Related-party transactions should be defined broadly to include direct and indirect relationships that provide a personal, financial, or business benefit, including those for family members.

2. *Approval Through Supply Chain* – The Special Committee recommends that all related-party transactions involving Board members be approved through the supply chain procurement process, including a bid process when possible (unless an identified exception applies). The ability of senior executives outside of the supply chain to approve COI transactions should be eliminated.

3. *Check Requests* – The Special Committee recommends that payments made by the check request method for COI transactions, and that are approved outside of the normal supply chain process, also be approved by the Board Chair, or designee, and the Chief Compliance Officer of UMMS prior to payment. The Special Committee further recommends that UMMS revise the Check Request Policy to more explicitly prescribe the instances when a purchase order is required and when a check request can be used. The revised Check Request Policy should apply to all UMMS entities.

---

[39] *See* Exhibit 12, University of Maryland Medical System Corporation Conflicts of Interest, BOARD-01.

4.   *Advance Disclosure* – The Special Committee recommends that Board members be required to disclose any personal, financial, or business benefit that they could receive from a business transaction with UMMS at the time of the contact by the prospective business partner, vendor, or service provider, at the earliest time either the Board member or the prospective transaction counterpart become aware of the interest.

5.   *Management Reporting Obligation* – The Special Committee recommends that UMMS employees, and all affiliates, be required to notify the Chief Compliance Officer ("CCO") of any potential business transaction(s) (whether a new business relationship or an expansion or modification of an existing relationship) in which (a) a Board member has a personal, financial, or business interest, or (b) a Board member made direct contact with an UMMS employee about a potential business transaction involving a third party.  The CCO shall be required to review all such potential transactions to determine whether a potential conflict of interest exists and all rules and procedures have been followed.

6.   *Board Member Advocacy* – The Special Committee recommends that Board members be required to direct all proposals, questions, or recommendations regarding business relationships between UMMS and third parties (regardless of whether there is a potential Board conflict) to the ACC Chair, or his/her designee, who will be responsible for directing the business relationship to the appropriate department or manager for review and recommendations.  Once the Board member's initial referral is made, that Board member should recuse themselves from any further consideration of the proposal, unless further assistance is requested of that Board member by the ACC Chair or the designee.

7.   *Periodic Internal Audit* – The Special Committee recommends that the Internal Audit department be required to design and execute a periodic audit of Board member COI disclosures based on a work plan and timetable approved by the ACC.  At a minimum, the work plan should test the completeness of Board member disclosures, verify Board member income related to UMMS and its affiliates, and review compliance with the COI reporting policies.

C.   **Compliance Training, Education, And Review**

1.   *Annual Training and Policies and Procedures* – The Special Committee recommends that the Board require annual, in-person training to senior management, employees, and Board members regarding conflicts of interest and other policies.  For the Board, the completion of the training should be recorded in the Board minutes.

2.   *Management Leadership Training* – The Special Committee recommends that the Board require senior management to develop and implement a

26

program of leadership training for executive management focused on topics and areas most germane to the leaders being trained, but with consideration given to creating an ethical business culture and strong corporate governance principles.  Senior management should be asked to report back to the Board annually on the status of the training program.

3.    *Promote an Effective Whistleblower Process* – The Special Committee recommends that senior management develop and communicate multiple avenues (including to management and/or the ACC) for lodging complaints of potential violations of law or corporate policy throughout UMMS, and ensure that reported incidents, including follow-up, are communicated at least quarterly to the ACC.

**D.    Finance Practices**

The Special Committee is aware that the Nominations and Governance Committee has developed policies and procedures relating to financial practices for consideration by the Board that address all of the significant recommendations included in this section.  The Special Committee records its recommendations here to affirm and support the need for such policies.

1.    *Review and Revise Authority to Commit Matrix* – The Special Committee recommends that the Board, or its designee, review the Authority to Commit Matrix with a focus on establishing checks on individual executives' ability to authorize material transactions, requiring documentation of a business purpose for transactions, and requiring review and approval by a second member of senior management for transactions above a minimum threshold to be specified by the Finance Committee.  Furthermore, the Special Committee recommends that there be one comprehensive Authority to Commit Matrix for all UMMS entities. This comprehensive Authority to Commit Matrix should include all relevant employee titles.

2.    *Finance Committee and Board Review of High-Dollar Transactions* – To ensure that all non-budgeted, high-dollar transactions receive appropriate Board-level review, the Special Committee recommends that the Board establish a policy requiring that transactions with total value in excess of $10 million be reviewed and approved by the Finance Committee.  The review and approval requirement should apply to all types of transactions outside of the ordinary course, including, but not limited to, purchases, sales, leases, financings, rebates, or debt.  The disbursement apparatus of UMMS and the affiliates shall also be instructed to reject payment for transactions above $5 million absent written approval of the Finance Committee.

3.    *Vendor Selection and Bidding* – The Special Committee recommends that UMMS develop a formal policy for sourcing, bidding, and purchasing that requires all transactions over a certain dollar threshold to be competitively

27

bid and approved by the Board, with specific exceptions included in said policy.  Consideration should be given to including a lower threshold for transactions with unrelated third parties to be approved by management and establishing a minimum number of bids based on a set purchase amount.  In addition, bidding support documents and vendor estimates should be retained for all transactions.

4.    *Establish Centralized Accounts Payable* – The Special Committee recommends that UMMS complete the migration of all affiliates under the Shared Services model, creating one centralized Accounts Payable to strengthen internal controls.  UMMS should consider incorporating certain detective controls as part of the vendor and customer master data setup process—for example, using an identifier within the enterprise resource planning system when establishing a new vendor or customer to identify possible related party relationships.  A report of potential related party relationships could then be generated on a periodic basis and reviewed by the appropriate personnel in Finance and/or Legal.

**E.    Other Recommendations**

The Special Committee is aware that the Nominations and Governance Committee has developed policies and procedures relating to most of the recommendations included in this section.  The Special Committee records its recommendations here to affirm and support the need for such policies.

1.    *Establish Procedure for Review and Approval of Charitable Contributions* – The Special Committee recommends that the Board develop a policy and process on charitable contributions that at a minimum ensures that an appropriate business or community service purpose is documented.

2.    *Ban on Partisan Campaign Activity* – UMMS's existing policies prohibit the use of UMMS facilities, resources, or employee time on campaign activity.[40]  The Special Committee recommends that the Board review, and, if appropriate, update and enhance those policies.  Further, the Special Committee recommends that all payments to entities connected to government or political leaders at any level, and that are not approved through the normal supply chain, be reviewed and approved by the CCO, at a minimum, and require documentation of a valid business purpose.

3.    *Establish Procedure for Review and Approval of Expenditures on Tickets, Travel and Entertainment for Board Members and Senior Executives* – The Special Committee recommends that the Board develop policies for how such expenses are reviewed and approved, require documentation of the business purpose of the expense, and allow for regular review by the

---

[40] *See* Exhibit 13, Standards of Business Conduct, CC-1306A.

CCO to assure that all such expenses are not excessive and support UMMS's overall mission.  Frequent or excessive expenditures by or on behalf of any individual or group of individuals should be discouraged.

4.    *Hiring Policy* – UMMS currently has a policy against hiring the family members of officers and employees.[41]  The Special Committee recommends revising the policy to include the family of Board members. In addition, to provide a fair and objective means for reviewing employment, internship, and other applicants, the Special Committee recommends establishing a policy that requires all referrals or recommendations by Board members to be handled by a designee of the ACC, who will be responsible for ensuring the application is processed fairly and with reasonable transparency.

---

[41] *See* Exhibit 14, Employment of Relatives and Minors, S-106.

## Attachment A - List of Witnesses

| | Completed Interviews | |
|---|---|---|
| | **Name** | **Title/Role** |
| 1 | John Ashworth | Chief Executive Officer |
| 2 | Georges Benjamin, MD | Former Board Member |
| 3 | Kristin Jones Bryce | Chief of Staff to CEO; Vice President, External Affairs and Systems Integration |
| 4 | Jon Burns | Chief Performance Improvement Officer |
| 5 | R. Alan Butler | Board Member |
| 6 | John Coale | Former Board Member |
| 7 | Alicia Cunningham | Senior Vice President, Corporate Finance and Revenue Advisory Services |
| 8 | John Dillon | Former Board Member |
| 9 | James DiPaula, Jr. | Board Member (Chair) |
| 10 | George L. Doetsch, Jr., Esq. | Board Member |
| 11 | Henry Franey | Former Chief Financial Officer, Senior Advisor to the President and CEO |
| 12 | Wayne Gardner | Former Board Member |
| 13 | Louise Michaux Gonzales, Esq. | Board Member |
| 14 | Barry Pascal Gossett | Board Member |
| 15 | Michelle Gourdine, MD | Interim Chief Medical Officer |
| 16 | James Harkins | Former Board Member |
| 17 | Louis P. Jenkins, Jr., Esq. | Board Member |
| 18 | Orlan M. Johnson, Esq. | Former Board Member |
| 19 | Hon. Francis Xavier Kelly, Jr. | Former Board Member |
| 20 | Michelle Lee | Chief Financial Officer |
| 21 | Belkis Leong-Hong | Former Board Member |
| 22 | Bethany Mezzara | Director, Disbursements |
| 23 | Sara Middleton | Former Board Member |
| 24 | Kenneth V. Moreland | Board Member |
| 25 | Korkut Onal | Board Member |
| 26 | Alfred A. Pietsch | Senior Vice President and Chief Financial Officer, BWMC |
| 27 | Louis M. Pope | Board Member |
| 28 | Robert Schneider | Former Board Member |
| 29 | Hon. James Smith, Jr. | Former Board Member |
| 30 | James Soltesz | Former Board Member |
| 31 | Jeffrey Stavely | Vice President, Chief Audit Executive and interim Chief Compliance Officer |
| 32 | Leonard Stoler | Board Member |
| 33 | Walter A. Tilley, Jr. | Former Board Member |
| 34 | Sara Middleton | Vice President, Supply Chain |
| 35 | Mark Wasserman | Senior Vice President, External Affairs |
| 36 | Hon. Alexander Williams, Jr. | Board Member (Vice Chair) |
| 37 | Jerry Wollman | Former Senior Vice President and Chief Administrative Officer |
| 38 | Ed Wuenschell | Vice President, Finance and System Controller |

| | Not Interviewed: No Response | |
|---|---|---|
| | **Name** | **Title/Role** |
| 1 | Megan Arthur | Former Senior VP and General Counsel |
| 2 | Christine Bachrach | Former Vice President and Chief Compliance Officer |
| 3 | Robert Chrencik | Former Chief Executive Officer |
| 4 | August Chiasera | Former Board Member |
| 5 | Gilberto De Jesus | Former Board Member |
| 6 | Alan H. Fleischmann | Former Board Member |
| 7 | Edward J. Kasemeyer | Former Board Member |
| 8 | Kevin O'Connor | Former Board Member |
| 9 | Keith Persinger | Former Senior Vice President and Chief Performance Improvement Officer |

| | | |
|---|---|---|
| 10 | Bruce Poole | Former Board Member |
| 11 | Robert Rauch, PE | Former Board Member |
| 12 | Antonio P. Salazar | Former Board Member |
| 13 | R. Kent Schwab | Former Board Member |

| | Not Interviewed: Declined | |
|---|---|---|
| | **Name** | **Title/Role** |
| 1 | Stephen Burch | Former Board Member (Former Chair) |
| 2 | Robert Pevenstein | Former Board Member |
| 3 | Catherine Pugh | Former Board Member |
| 4 | Scott Rifkin | Former Board Member |

## Attachment B - Lists of Board Members Reporting No Conflicts and Board Members Reporting Conflicts

| | Board Members Reporting No Conflicts | |
|---|---|---|
| | **Name** | **Title/Role** |
| 1 | Georges Benjamin, MD | Former Board Member |
| 2 | Stephen Burch | Former Board Member (Former Chair) |
| 3 | Michael Erin Busch | Former Board Member |
| 4 | R. Alan Butler | Board Member |
| 5 | John Coale | Former Board Member |
| 6 | Gilberto De Jesus | Former Board Member |
| 7 | James DiPaula, Jr. | Board Member (Chair) |
| 8 | George L. Doetsch, Jr., Esq. | Board Member |
| 9 | Alan H. Fleischmann | Former Board Member |
| 10 | Louise Michaux Gonzales, Esq. | Board Member |
| 11 | Barry Pascal Gossett | Board Member |
| 12 | Michelle Gourdine, MD | Former Board Member |
| 13 | James Harkins | Former Board Member |
| 14 | Louis P. Jenkins, Jr., Esq. | Board Member |
| 15 | Orlan M. Johnson, Esq. | Former Board Member |
| 16 | Edward J. Kasemeyer | Former Board Member |
| 17 | Belkis Leong-Hong | Former Board Member |
| 18 | Sara Middleton | Former Board Member |
| 19 | Kenneth V. Moreland | Board Member |
| 20 | Kevin O'Connor | Former Board Member |
| 21 | Bruce Poole | Former Board Member |
| 22 | Louis M. Pope | Board Member |
| 23 | Robert Rauch, PE | Former Board Member |
| 24 | Antonio P. Salazar | Former Board Member |
| 25 | Robert Schneider | Former Board Member |
| 26 | R. Kent Schwab | Former Board Member |
| 27 | Hon. James Smith, Jr. | Former Board Member |
| 28 | Leonard Stoler | Board Member |
| 29 | Joseph D. Tydings | Former Board Member |
| 30 | Hon. Alexander Williams, Jr. | Board Member (Vice Chair) |

| | Board Members Reporting Conflicts | |
|---|---|---|
| | **Name** | **Title/Role** |
| 1 | August Chiasera | Former Board Member |
| 2 | John Dillon | Former Board Member |
| 3 | Wayne Gardner | Former Board Member |
| 4 | Hon. Francis Xavier Kelly, Jr. | Former Board Member |
| 5 | Korkut Onal | Board Member |
| 6 | Robert Pevenstein | Former Board Member |
| 7 | Catherine Pugh | Former Board Member |
| 8 | Scott Rikfin | Former Board Member |
| 9 | James Soltesz | Former Board Member |
| 10 | Walter A. Tilley, Jr. | Former Board Member |

Case 8:24-cv-02548-ABA  Document 1-4  Filed 09/02/24  Page 248 of 286

**E-FILED; Prince George's Circuit Court**
**Docket: 7/31/2024 11:59 AM; Submission: 7/31/2024 11:59 AM**
**Envelope: 17421611**

# CITY OF LAUREL
# OFFICE OF THE MAYOR

**8103 Sandy Spring Road, Laurel, MD 20707-2502**
**Phone: 301-725-5300 ext. 2124 • Fax: 301-725-6831**

**Craig A. Moe**
Mayor

April 4, 2023

Mr. Nathaniel Richardson, Jr
President and Chief Executive Officer
University of Maryland Capital Region Health
Largo, Maryland 20774

Dear Mr. Richardson,

I have been holding off on sending you this letter, but it is important for me to express my displeasure with the actions taken by the University of Maryland Capital Region Health and your office regarding what I was told at the time, would be our one-on-one quarterly meetings, which to my knowledge, have never occurred or days proposed. As the closest local government to the Laurel Medical facility, it would seem that these quarterly meetings would have greatly benefited you, the Capital Region Health Board of Directors, and the City of Laurel community. But as you will read, my displeasure has only grown with Capital Region Health and its actions.

As you are aware, the University of Maryland Capital Region Health, of which you are in charge, continues to speak of working with the community. Still, when you had the chance to prove that claim, your system failed our community. Even after reviewing your website, which stated, "*University of Maryland Capital Region Health is a not-for-profit healthcare system serving the citizens of Prince George's County and surrounding area. Our mission is to provide high-quality, accessible healthcare services in partnership with our community*" One would argue that your system has failed in this area.

Additionally, I would like to bring to your attention the many businesses in the Greater Laurel area, businesses that have been established for many years and have supported the Healthcare System at the Laurel Regional Hospital. Yet, in return, the University of Maryland Capital Region Health pushes them aside and provides no support to help them gain access to the Capital Region Health contracts, services, or even support their business.

It seems everyone wants to talk about supporting small, local, and minority-owned businesses. Yet, the University of Maryland Capital Region Health had the opportunity to do just that, but again, in my opinion, failed. This was one of the concerns I wanted to sit down and discuss directly with you, but instead, I received a call from your staff. I can't help thinking that if I were the County Executive, Senator, or Delegate calling, they would have been extended the courtesy of receiving a response back from you personally. I find it insulting that when a local Mayor calls, you do not extend the courtesy of returning my call. I hoped that with your 34 years of experience as a Chief Executive Officer, you would have shown better

**Email**: laurelmayor@laurel.md.us   **Twitter**: @LaurelMayor   **Website**: www.cityoflaurel.org

judgment. I know members of my staff and yours have been meeting periodically regarding community matters and the new medical center, but those meetings are not the place to discuss important matters such as the ones I wanted to discuss with you first!

The University of Maryland Capital Region Health talks about diversity, equality, and inclusion, yet its actions seem to suggest otherwise. I have grave concerns about the way one of Laurel's long-time supporters of the hospital and community is being pushed aside by the RADNET group, a group the University of Maryland Capital Region Health supports, even after this group abandoned Laurel Regional Hospital and the Laurel community, which should tell you a lot about them.

Capital Radiology was formed in 2005 and has long been a pillar in this community, meeting the needs of many. This business, Capital Radiology, continued to operate even as "Dimensions Leadership" tore the Laurel Regional Hospital apart and failed the community. Capital Radiology is a small business, a local business, and the only black and women-owned radiology business in the Mid-Atlantic. The University of Maryland Capital Region Health System has failed to protect and support this local minority-owned business, in fact, with no support from Capital Region Health, they may even begin to fail due to Capital Region Health taking business from them.

It concerns me that even Dr. Stephen Bartlett, whose name is no longer mentioned as part of the University of Maryland Healthcare System, saw that a small Laurel business such as Capital Radiology had to be protected. What has changed? Dr. Bartlett many times said to me that "Laurel Businesses would not be impacted" and that the University of Maryland Capital Region Health was committed to further diversity; what has changed?

The University of Maryland Capital Region Health has shown to me that my concerns are valid with regards to the proposed "Main Street" development on the current, what I will call a Doc in a box location. My concern, as stated in the past, is that Laurel's commercial real estate will be enticed to move out of the City of Laurel and relocate to the hospitals "Main Street", or that you will bring in other businesses that will affect Laurel's current commercial base. As you know, Laurel continues to feel the impact of the hospital's growth, however getting nothing in return, which is why I wanted to talk directly with you on this matter months ago; but unfortunately, my request for a meeting with you has yet to occur. This is why I support the City of Laurel annexing this property, to protect Laurel's interests, which is not being done by anyone else.

I stopped attending the monthly meetings because they became nothing but Capital Region Health, providing only the information that you want out to the public, nothing substantial or of fundamental importance is discussed. I guess it only allows you to tell your Board that you are keeping Laurel up to date. The quarterly meetings that were proposed to me would have helped address some of the issues I have raised and would have made good on your statement of your desire to tour Laurel. I am hopeful that in the future, when promises are made, those promises will be kept.

It's important that the communication the University of Maryland Capital Region Health has shown improves because, unfortunately, this is the same type of communication "Dimensions Healthcare" provided to the community and elected officials, and look where it got them!  There was a lack of leadership and vision, and a Board of Directors that did not do its job! Unless you redirect your efforts, you are headed, along with the University of Maryland Capital Region Health Board of Directors, in the same failing direction as Dimensions Healthcare.  When that occurs, the community suffers!

I look forward to the University of Maryland Capital Region Health opening better lines of communication with the City of Laurel and support small local minority-owned businesses like Capital Radiology, a Laurel business with a long history of supporting healthcare needs in the Greater Laurel area and have already demonstrated that they are a business that will not abandon Laurel Hospital and the community.

Respectfully,

Craig A. Moe
Mayor

cc:     The Honorable James Rosapepe, Senator, District 21
        The Honorable Ben Barnes, Delegate, District 21
        The Honorable Mary Lehman, Delegate, District 21
        The Honorable Joseline Peña-Melnyk, Delegate, District 21
        The Honorable Angela D. Alsobrooks, County Executive
        The Honorable Thomas Dernoga, County Council Chair
        Laurel City Councilmembers
        The Honorable Alexander Williams, Jr., Chairman, UM Capital Region Health Board of Directors
        The Honorable Robert J. DiPietro, UM Capital Region Health Board of Directors
        Kristin Jones-Bryce, Senior Vice President and Chief External Affairs Officer, University of Maryland Medical System
        Christian Pulley, CPM, City Administrator, City of Laurel
        Joanne Barr, Deputy City Administrator, City of Laurel

E-FILED: Prince George's Circuit Court
Docket: 7/31/2024 11:59 AM; Submission: 7/31/2024 11:59 AM
Envelope: 17421611



**University of Maryland Capital Region Health**
**901 Harry S Truman Drive North, Upper Marlboro, MD 20747**

April 18, 2023

Dear Representative Ivey,

UM Capital Region Health ("UM Capital") and The University of Maryland Medical System ("UMMS") received your inquiry regarding UM Capital's contract for the expansion of outpatient radiology services in Prince George's County. We write to provide you with the information you requested and to respond to the representations made by Capital Radiology and its agents.  Below, we provide broader context for the outpatient radiology expansion, the development of the existing joint venture, and UM Capital's deep commitment to diversity, equity, and inclusion.

### A.  UM Capital Investment in Access to Quality Health Care in Prince George's County

UM Capital has made, and continues to make, substantial investments in Prince George's County. In furtherance of its strategic plan to transform and expand the health care landscape in Prince George's County, UM Capital is actively developing the following practice areas: cardiology and cardiac surgery, cancer and oncology, orthopedics, neurology and women's services. Using safety, quality, and patient experience as guideposts, UM Capital is also investing in the clinical personnel, support services, and equipment needed to deliver these services. To ensure that residents living and working in Prince George's County receive high quality and efficient health care close to home, UM Capital has expanded its footprint and updated its facilities by investing significantly in the County:

- In July 2020, UM Capital opened a new Medical Pavilion at National Harbor.  The National Harbor location offers multiple specialties, including family medicine, women's services (including urogynecology), bariatrics, general surgery, vascular and pulmonology.

- In June 2021, UM Capital opened its new University of Maryland Capital Region Medical Center in Largo, Maryland. It is the first brand-new hospital in the region in more than 30 years. The Regional Medical Center represents a combined $543 million investment by Prince George's County, the State of Maryland, and UMMS. The 600,000 square foot flagship facility includes, among other features, 205 private inpatient rooms and eight operating rooms. In addition to promoting improved access to primary and ambulatory care services in Prince George's County, the Medical Center in Largo has served, and will continue to serve, as a vital asset to assist with successfully recruiting physicians in an array of specialties to build on the high quality, clinically advanced medical care UM Capital provides to Prince George's County residents.

- In April 2022, UM Capital broke ground on its new Regional Cancer Center on the Regional Medical Center campus in Largo. The Cancer Center is expected to open in spring 2024 to provide comprehensive cancer care services.

- In June 2023, UM Capital will open a new facility in Laurel, Maryland, –the Laurel Medical Center. In addition to offering full service 24/7 emergency care, along with



To: Representative Ivey
April 18, 2023
Page 2

short stay observation, outpatient surgery, outpatient behavioral health services, the Laurel Medical Center also offers lung health and pulmonary function testing, primary care, pain management, women's health and maternal fetal medicine.

**B.    UM Capital Joint Venture for Imaging Technology and Services**

Access to radiology and medical imaging is key to delivering high quality services in many of the specialty areas described above. UMMS, and its member organizations like UM Capital, have historically contracted with unaffiliated imaging providers that supply imaging hardware, technology, and personnel to meet the imaging requirements of patient care. These facilities have then contracted separately with radiologists affiliated with University of Maryland School of Medicine ("UMSOM"), who read and interpret the images taken by the unaffiliated imaging providers.  This division of imaging and diagnostics facilitates the efficient and economical delivery of radiology and medical imaging services that patients need.

In keeping with the model described above, UM Capital made plans to undertake a joint venture for the development of two Outpatient Imaging Centers to be located in Laurel, Maryland and Largo, Maryland. Among other advantages, using one imaging provider for all of UM Capital's facilities would help to improve patient safety and quality. This plan is a key part of the larger investment in Prince George's County described above. UM Capital would need a partner to contribute capital, personnel, and technology and provide imaging services only. UMSOM radiologists would provide the professional radiologist services to read and interpret images. In January 2020, UM Capital issued a Request for Information seeking proposals from experienced and qualified imaging providers to partner in the joint venture, and awarded the contract to RadNet.

UM Capital decided to issue the RFI to imaging services companies that met several key criteria. First, the partner would need to show demonstrated ability to meet the ambitious goals of the joint venture through existing relationships with UMMS. Second, the partner needed to have the financial wherewithal to develop, outfit, and staff two new imaging centers. Finally, UM Capital would only consider partnering with an imaging services provider with appropriate licenses and a record of compliance with applicable regulatory authorities. After evaluating responses received from qualified candidates, UM Capital determined that RadNet would be the most advantageous partner. To date, UM Capital has invested substantial time and money in furtherance of the joint venture, which is already underway.

Unhappy with this development, Laurel-based radiology practice Capitol Radiology has been spreading misinformation in an attempt to disrupt UM Capital's plans. UM Capital did not maliciously or improperly exclude Capitol Radiology from the RFI process. Capitol Radiology simply does not meet the

**University of Maryland Capital Region Health**
**901 Harry S Truman Drive North, Upper Marlboro, MD 20747**



To: Representative Ivey
April 18, 2023
Page 3

standards that UM Capital applied when selecting a partner: Capitol Radiology did not have an existing contractual relationship or proven track record with UMMS; it does not have the human, equipment, or financial resources sought; and it does not have experience developing and constructing imaging centers, partnering with hospitals in a joint venture, or providing imaging services at the scale contemplated by the joint venture.

Moreover, shortly after the RFP process concluded, Capitol Radiology was sanctioned by the FDA in connection with its radiology services. It is therefore unable to provide mammography services at least until May 6, 2024. [See https://www.fda.gov/medical-devices/safety-communications/mammography-problems-capitol-radiology-llc-doing-business-laurel-radiology-services-laurel-maryland and https://www.fda.gov/medical-devices/safety-communications/update-mammography-problems-capitol-radiology-llc-doing-business-laurel-radiology-services-laurel last viewed March 30, 2023].

### C.  UM Capital Commitment to Diversity, Equity, and Inclusion

UM Capital is deeply committed to and engaged in the furtherance of diversity, equity, and inclusion in all aspects of its operations. This includes supporting the development and growth of Minority and Women Owned Business Enterprises (MWBE). The fact that Capitol Radiology is a local, minority-owned business and was not considered for the imaging services joint venture, does not invalidate UM Capital's RFI process and joint venture or minimize our deep commitments to diversity, equity, and inclusion ("DEI"). We are committed to delivering quality healthcare in an environment that embraces the diversity of patients, employees, and community partners. UM Capital has further emphasized DEI principles as UM Capital implements its strategic plan to transform and expand the healthcare landscape in Prince George's County—a County with a majority Black population. Both UMMS and UM Capital have put their commitment to DEI into practice in multiple ways:

- The UMMS corporate entity is committed to having a diverse leadership team and workforce. UMMS President and CEO Dr. Mohan Suntha initiated a DEI program that includes supplier diversity and minority business enterprise development. In 2021, UMMS welcomed Dr. Roderick King, Chief Diversity, Equity, and Inclusion Officer. This DEI program encompasses all of the medical system's affiliate hospitals.

- The DEI program includes the development and delivery of a MWBE capacity building program in partnership with the University of Maryland Smith School of Business. The program was designed to help increase the capacity of MWBE's to provide services to UMMS as well as familiarize them with the UMMS procurement process. Program participants were also connected with UMMS personnel that procure the goods and services that they sell. To date, 18 MWBE companies have completed the program.

compassion  |  discovery  |  excellence  |  diversity  |  integrity



**University of Maryland Capital Region Health**
**901 Harry S Truman Drive North, Upper Marlboro, MD 20747**

To: Representative Ivey
April 18, 2023
Page 4

- UM Capital is also committed to having a diverse leadership team and workforce. As an equal opportunity employer, UM Capital recruits talented employees at all levels of the organization from different races, religions, genders, sexual orientations and other protected classes. Finally, UM Capital trains its employees in culturally compassionate care.

- UM Capital contracts with entities that share UM Capital and the State of Maryland's Minority Business Enterprises ("MBE") goals. For instance, the prime contractor for UM Capital's Regional Medical Center in Largo, Maryland awarded $30.9 million in project contracts to County Based Minority Business Enterprises ("CMBE") for a total percentage participation of 13.5%, exceeding the goal of 10%. The prime contractor also awarded a total of $177.9 million, or 77.86% to CMBE, MBE, and Locally-based Business Enterprises (LBE) vendors, surpassing the goal of 35%.

- UM Capital actively seeks out vendors who represent minority-, woman- and service-disabled-veteran-owned businesses for clinical services.

We hope that this letter addresses any concerns regarding UM Capital's partnership with RadNet, our commitment to DEI, or our continued investment in the health care landscape of Prince George's County. If you have any additional questions, please do not hesitate to contact us.

Sincerely,

Bradford L. Seamon
Vice President of Gvt.and Public Affairs for
Prince George's County
University of Maryland Medical System

compassion | discovery | excellence | diversity | integrity

7/9/24, 2:43 PM

Self-referral for imaging leads to overuse, higher costs, studies show - OnRad Inc.

Case 8:24-cv-02548-ABA   Document 1-2   Filed 09/03/24   Page 255 of 286

E-FILED; Prince George's Circuit Court
Docket: 7/31/2024 11:59 AM; Submission: 7/31/2024 11:59 AM
Envelope: 17421611

# 13 Dec Self-referral for imaging leads to overuse, higher costs, studies show

Posted at 06:12h in Health Insurance and Reimbursement, Healthcare Legislation, Radiology Practice Management, Radiology Services News by · 0 Comments · 0 Likes

**Diagnostic Imaging | December 10** – Self-referral of imaging services by non-radiologists doesn't necessarily benefit patients, and can lead to overuse and increased spending. Those are the conclusions of a series of studies published this week in the December issue of *Health Affairs*.

The findings bolster the arguments against other specialists purchasing and using imaging equipment. Proponents say self-referral provides convenience for patients and often improved quality of care.

Not so, researchers found.

"The publication of these articles in a concentrated fashion by the country's most prestigious health policy journal should put an end to any doubt on the part of patients and payers and fair-minded physicians that the in-office ancillary service exception needs to be eliminated," said Alan Kaye,

7/9/24, 2:43 PM                    Self-referral for imaging leads to overuse, higher costs, studies show - ONRAD, Inc.

Case 8:24-cv-02548-ABA   Document 1-4   Filed 09/03/24   Page 257 of 286

MD, chair of the radiology department at Bridgeport Hospital, Yale New Haven Health System, in Bridgeport, Conn. "I really do think this is the tipping point."

The self referral issue was also raised in an article this week in the *Wall Street Journal*, which examines urologists' use of IMRT (intensity-modulated radiation therapy) for the treatment of prostate cancer. Use of the radiation therapy has spiked in recent years, and the newspaper's analysis shows IMRT use (which brings in big money) is higher in states where most of the urology groups that own the equipment are located.

"It's becoming pervasive," Kaye said of imaging self referral, adding that studies have shown "virtually all" diagnostic imaging growth has come from self-referred situations.

Read more at DiagnosticImaging.com.

## No Comments

Sorry, the comment form is closed at this time.

Innovate Healthcare

# RADIOLOGY BUSINESS

## FOR LEADERS NAVIGATING VALUE-BASED CARE

MANAGEMENT    IMAGING    TECHNOLOGY    VIDEOS    CONFERENCES    CUSTOM CONTENT

SUBSCRIBE

# RSNA apologizes for organization's contributions to structural racism in radiology

*Marty Stempniak* | *March 03, 2023* | *Radiology Business* | *Leadership*

    



The RSNA Board of Directors issued a statement Thursday, apologizing for the influential imaging group's contributions to structural racism in the specialty.

Published across the Radiological Society of North America's collection of scientific journals, the announcement came in response to a scathing history account published in its own _Radiographics_ in January. The piece connected the specialty's "disturbing past" to today's low representation of Black doctors in radiology, along with persisting healthcare disparities in the African-American community.

"As leaders of a professional medical society that strives for inclusion, equity and diversity, we read this historical account with sadness and remorse," Curtis P. Langlotz, MD, PhD, chair of the RSNA board, and his colleagues wrote March 2. "We applaud the authors' important work gathering the facts and telling the unsettling story of our past. The events presented in the article likely do not represent a full accounting of RSNA's harmful actions, but these examples are representative of actions and a time when our organization failed."

The society said it is committing to take action and ensure a commitment to "listening and learning" following the publication. Its response will include ensuring that everything the organization does is free from discriminatory practices and unconscious biases, along with prioritizing diversity, equity and inclusion throughout its work.

"We write this statement to acknowledge our historical contribution to structural racism in radiology and to apologize for RSNA's actions that perpetuated systemic racism, both through omission and commission," Langlotz et al. wrote. "We also deeply regret RSNA's past policies and practices that have contributed to the healthcare disparities and

inequities we see today. We recognize the profound and lasting impact these failures have had on communities of color and Black radiologists, as well as on the field of radiology."

Read the full statement from RSNA below.

*Truth and Transformation: RSNA's Journey Toward Equity*

## More on race and radiology

*Is structural racism preventing Black and Latina patients from receiving the best breast cancer care?*

*Noted radiology department denounces recent violence against Asians: 'Another stark reminder'*

*3 lessons learned from a radiologist on the front lines of Black Lives Matter protests*

*T: RSNA apologizes for organization's contributions to structural racism in radiology.*

*Fb: RSNA apologizes for organization's contributions to structural racism in radiology. @RSNAfans*

*Li: @RSNA apologizes for organization's contributions to structural racism in radiology.*



**Marty Stempniak**

Marty Stempniak has covered healthcare since 2012, with his byline appearing in the American Hospital Association's member magazine, Modern Healthcare and McKnight's. Prior to that, he wrote about village government and local

business for his hometown newspaper in Oak Park, Illinois. He won a Peter Lisagor and Gold EXCEL awards in 2017 for his coverage of the opioid epidemic.

 

RELATED CONTENT

## [Diagnostic radiology applicants significantly less likely to 'match' than peers in other specialties](#)

## [Fresh off private equity partnership, radiology provider creates new CEO role, plus more leadership moves](#)

## [Miami-based IntelliRad Imaging and its 37 physicians join Strategic Radiology](#)

## [Radiology and imaging staff wages continue to rise in 'perpetually tight labor market'](#)

## [Hospital system forms new radiology group after relationship with Rad Partners dissolves](#)

## [How Massachusetts General increased outpatient MRI time slot capacity by 50%](#)

Home

Custom Content

Content Studio

Contact Us

News

Advertising

Terms of Use

Sitemap

Webinars

Submit Press Release

Privacy Policy

Press Releases

AI in Healthcare

Cardiovascular Business | HealthExec | Health Imaging | Radiology Business

© 2023 Innovate Healthcare | All Rights Reserved. | Terms of Use | Privacy Policy





## MAGAZINE

**RACE IN AMERICA**

## Racist Doctors and Organ Thieves: Why So Many Black People Distrust the Health Care System

It's more than just Tuskegee. Racism still poisons American health care.



Photograph of Participants in the Tuskegee Syphilis Study. NARA; Photographs by Cheriss May for POLITICO

By JOANNE KENEN and ELAINE BATCHLOR
12/18/2022 07:00 AM EST

head injury.

The next afternoon, May 25, his heart was sewn into the chest of a white business executive named Joseph Klett, also 54, at the Medical College of Virginia. It was one of the first heart transplants in the country, and it gave the med school the status it had sought at the forefront of transplant science.

Advertisement

Tucker's family hadn't consented. In fact, they didn't even learn about the transplant until the funeral home in Stony Creek, Va., told them that there was something peculiar about the dead man's body. It was missing its kidneys and its heart.

The case of the "The Organ Thieves," as local writer Chip Jones entitled his 2020 book about it, is not broadly known outside Richmond. But it is one of countless incidents across the decades of abusive and exploitative practices directed at, or performed on, Black Americans in the name of science. The most famous, of course, is the "Tuskegee Experiment," where the government conducted a 40-year study that withheld treatment for syphilis from Black men.

Case 8:24-cv-02548-ABA   Document 1-4   Filed 09/03/24   Page 265 of 286



Dr. Robert Winn is the director of the Virginia Commonwealth University's Massey Cancer Center and one of the few Black oncologists to lead a National Cancer Institute-designated cancer center anywhere in the country. | Cheriss May for POLITICO

With that kind of history, it should not be surprising that there is still broad distrust in the Black community toward medical professionals. As recently as October 2020, a poll by the Kaiser Family Foundation and Undefeated found 70 percent of Black Americans believe people seeking care are treated unfairly based on race or ethnicity.

AD

Yet blaming suspicions and distrust on long-ago atrocities lets the current health care system — still rife with inequities and injustices — off the hook.

Like many areas in American life, health care is in the midst of a reckoning on racial justice. It was catalyzed, of course, from the 2020 police murder of George Floyd that galvanized millions of people across the country. But it was

Case 8:24-cv-02548-ABA Document 1-4 Filed 09/03/24 Page 266 of 286



Discrimination against Black patients still persists today and has given rise to myths, conspiracy theories and skepticism. To help repair trust in the system, Virginia Commonwealth University hosts "Faith and Facts Friday" to combat misinformation within the community. | Cheriss May for POLITICO

The last few years have seen a burst of initiatives popping up to tackle health equity and racial disparity and distrust in American health care. But it will take profoundly honest and sustained efforts to bring about real change. In interviews and conversations with several dozen Black Americans across the country, including policymakers, medical professionals and ordinary people, young and old, some of whom have been hurt by the system itself, it's clear that skepticism in the Black community toward the health care system is pervasive — and warranted.

AD

need and deserve — including Covid tests, vaccines and boosters. (A concerted national effort narrowed the racial gap on takeup of the initial round of Covid vaccinations, but CDC data shows it has re-emerged on who's getting boosters.)

The "theft" of Bruce Tucker's heart has not been forgotten in Richmond, the one-time capital of the Confederacy, which is still grappling with racism in its past and present. The big medical system, now part of Virginia Commonwealth University, which absorbed the Medical College that same year, has embarked on a host of equity and trust-repairing programs within the institution and the community. That includes a "health hub" providing access to medical and social services in a poor part of town and regular "Faith and Facts Friday" Zoom calls bringing together VCU doctors and Black clergy to combat health myths and misinformation — on Covid, cancer and more.

Regular participants like the Rev. Todd Gray, a community fixture who's spent nearly 30 years at the Fifth Street Baptist Church, come out of those meetings better equipped to help congregants distinguish between fearmongering and misinformation, on one hand, and facts and science, on the other. "Conversations lead to trust, which leads to more folks accessing medical care," he says. "We have saved many, many lives."

Dr. Robert Winn, director of VCU's Massey Cancer Center, one of the very few Black oncologists to lead a National Cancer Institute-designated cancer center anywhere in the country, is a convener of "Faith and Fridays," and a leader of many of the VCU community outreach efforts.

Upbeat and energetic, Winn sees progress. "At my institution, we're going beyond talk. We're making real efforts," he says. But he's also a realist. "I have grown up in racism since the day I was born," he says. He understands that when a Black patient walks into his clinic, they bring with them not just a fear of cancer, but fear, or at least suspicion, of the health system itself. Our history, he notes, is our history.

██████████

**Ronald Wyatt, 68, a physician** and nationally recognized expert on patient safety, grew up on a dirt road with an outhouse in Perry County, Ala. Wyatt remembers hearing of a Black woman nearby who took her child to get a bad cut stitched up. When the white doctor learned she couldn't pay, he took out the stitches — and a veterinarian ended up treating the kid. He remembers another white doctor who would treat Black people but wouldn't touch them — not even with a stethoscope. The doctor had a Black woman assistant do all

"A lot of people didn't know a damn thing about Tuskegee. But they knew what was happening to *them*," Wyatt says.

It's not so blatant nowadays, but Wyatt still sees condescending and inferior treatment of Black patients — including members of his own family — over and over again. It makes him distrustful. It makes him mad. He says he is what people used to call "an angry Black man" until that term went out of style; now they'd call him "passionate."

Experiences like his may sound like random anecdotes. Mountains and mountains of data show they are an ongoing reality. And it all leads to much worse medical outcomes.

Black people have higher rates of uninsurance and less access to care. They are less likely to have a regular primary care provider, and when they do have a primary care doctor, they are less likely to be referred to a specialist. Their doctors write about them more critically or skeptically in their medical records. Their pain is undertreated, whether for a child with a broken bone or for someone at end of life. As recently as 2016, a study of medical students and residents found that nearly half of them believed that Black people tolerate pain better than white people. Some of these very highly educated people, at an elite university, actually believed the nonexistent pain differential was because Black people have thicker skin.

Black people have higher maternal mortality rates (triple that of white women), higher rates of preterm birth and higher rates of infant mortality. They have more lead poisoning. They have higher rates of asthma, diabetes and advanced (i.e. often late detected) cancer.

They live sicker. They die younger.





A nursing assistant takes a community health worker's blood pressure at the Virginia Commonwealth Health Hub, which also provides access to medical and social services in a lower-income part of town. | Cheriss May for POLITICO

Discrimination, lack of access, mistrust and mistreatment aren't unique to Black Americans; Latinos and other minority groups experience it, too. Poor people often wait longer for worse care in underfunded, understaffed — and often de facto racially segregated — public hospitals and clinics than richer, better-insured people. And they know it.

AD

Growing up in Detroit, Michael Winans, now in his early 40s, was "too busy getting by" to pay attention to a syphilis experiment that ended before he was born. But distrust of the medical establishment flowed in his family. His grandmother survived a stroke but died during routine follow-ups; the family suspected sub-par care. Later, his mother hesitated when she needed fibroid surgery. When she finally went in, she ended up with an unexpected hysterectomy. Winans knows that sometimes happens, that the less invasive operation isn't always enough. But was it necessary for his mother? He wonders.

"When you grow up in a predominantly Black town like Detroit, you can go much of your life without really interacting with someone of another race," he says. "If the first time is when you have a health issue … you ask yourself, 'Does this person care for me? Or see me as a number?' It's another level of potential trepidation or concern."

The Black American experience is getting particular scrutiny right now, along with hopes for change. Some of the people interviewed for this story were more optimistic than others about progress. But none saw the health system as color-blind.

"People see that I'm Black before they notice — if they ever get to the point that they notice — that I have a PhD.," says Cara James, who ran the Office of Minority Health at the Centers for Medicare and Medicaid Services during the Obama administration. James, who also previously led work on racial disparities at the Kaiser Family Foundation, is now the president and CEO of Grantmakers in Health, which works with foundations and philanthropies to improve health care.

Things may have gotten better since the days when James would carefully select which suit to wear as she accompanied her grandmother, an agricultural worker in the South with little formal education, to medical appointments. But they haven't improved enough.

"We are human," she says, "We have perceptions and biases about others."

Those biases can be subtle — or not.

When Matthew Thompson, a financial officer at a reproductive health organization in Texas, fell ill soon after relocating to Austin a few years back,

AD

"He was a white doctor … he gave the whole speech about genetics and race," Thompson recalls.

But most health differences between Black people and white people are not genetic; many are socioeconomic or the result of inequality or the lingering distrust that might deter a Black patient from seeking care earlier.

That doctor was right that hypertension is common in Black men. The problem is that Thompson didn't have it. The doctor treated a stereotype, not a person.



Freddie Lee Tyson, left, had congenital syphilis and was recruited into the "Tuskegee Experiment" after believing the study was for free health care. Henrietta Lacks, right, was an impoverished Black woman whose cancer cells were taken unbeknownst to her, and was the source of the HeLa cell line which is used in countless medical research programs, creating untold wealth for biotech but none for her descendants. | Courtesy Lillie J. Head; AP

went forth thinking they would be treated. And they were still trusting for over

It wasn't only Alabama. For generations, in cities with medical schools, including here in Richmond, Black children were afraid to venture out after dark for fear that the "night doctors" would snatch and dissect them in a med school class. There was no such thing as murderous "night doctors," but there were graverobbers furtively working for med schools, obtaining cadavers of Black people (and poor white people) without consent for anatomical study. VCU has found bones dumped in wells.

The aftereffects linger, generations later and far from Richmond. One warning occasionally passed down in the Black community is not to check the box to be organ donors, amid fears that hospitals would let Black people die if they were injured in order to take their organs.



The Egyptian Building is a historic college building and the first medical school at Virginia Commonwealth University in Richmond, Va. built in 1845. | Cheriss May for POLITICO

A legacy of forced sterilization, often ordered or encouraged by governments or public agencies, also still reverberates for the Black community. Sterilizations without consent went on for decades, targeting people who were "feebleminded," "promiscuous," disabled, poor — and disproportionately Black women (as well as women in Puerto Rico, which had the highest sterilization rate in the world). The practice, upheld by the Supreme Court in 1927, declined in the 1960s and 70s but did not disappear. In California prisons, for instance, 1,400 women underwent forced sterilization between 1997 and 2013. That

7/17/24, 7:27 PM
Racist Doctors and Organ Thieves: Why So Many Black People Distrust the Health Care System - POLITICO
Case 8:24-cv-02548-ABA   Document 1-4   Filed 09/03/24   Page 274 of 286

programs, saving untold numbers of lives and producing untold wealth for biotech — but not for her impoverished descendants.

Meanwhile, new modern miracles — ranging from the pulse oximeters used on Covid patients to all sorts of algorithms that fuel high-tech medicine and artificial intelligence — turn out to have racial biases baked in because they drew upon old data riddled with health disparities. The Food and Drug Administration is now looking into whether the oximeters' faulty readings on dark skin may have elevated the Black death toll from the coronavirus. Critics wonder why it took so long.






Students at the Virginia Commonwealth University's School of Medicine watch a presentation in class. Experts say diversifying the health care workforce is a key step to bridging the gap within the Black community, and it starts by building pipelines at early grades in school. | Cheriss May for POLITICO

Case 8:24-cv-02548-ABA   Document 1-4   Filed 09/03/24   Page 275 of 286

could see if he had tracks on his arms.

AD

"Now, as a nurse, I understand, there *are* drug-seeking patients," she adds. But there are protocols for identifying that. And they don't involve leaving a retired cop in severe pain, just sitting there until he got hot enough to take off the hoodie so someone could sneak a look at his bare arms.

Case 8:24-cv-02548-ABA   Document 1-4   Filed 09/03/24   Page 276 of 286



An ambulance sits outside the Virginia Commonwealth University Medical Center in Richmond, Va. | Cheriss May for POLITICO

Sometimes the legacy of distrust manifests in unexpected ways.

A 75-year-old woman who goes by "Miss Jacquie" and lives in a senior housing complex in Baltimore, spent the first 20 years of her life getting care in medical facilities that were segregated, officially or de facto. Now, on Medicare, she has choices, and she often intentionally chooses white doctors. Not because she thinks they are better listeners or more respectful (though she adores her own ultra-attentive physician, affectionately calling him Dr. Dracula because he's always drawing her blood). But because she still can't shake off suspicions — incorrect but implanted earlier in her life — that white doctors just got better medical education than Black ones.

"If you are sane, if you are smart, you will go into things with some skepticism," says Derek Griffith, a health management professor at Georgetown and founding co-director of the Georgetown Racial Justice Institute. "Some of that can be passed down. But it's also usually people's own experiences." Griffith defines *mistrust* as something like not trusting a doctor or a hospital, while *distrust* is more of a "lingering skepticism, I can't put my finger on why." Both are an issue, with huge consequences.

**There's a fair amount of** agreement on what the solutions look like, on how to actually break down the distrust and mistrust of the health care system within the Black community. Whether meaningful action will be taken, and how quickly, is another question.

Hospitals can't unilaterally address all the economic inequality in America that fuels health disparities, but they can invest in their communities. That includes diversifying the health care workforce, so it looks more like the country it serves, and patients feel there are people who understand them. Doing so will

change won't come easy, but it's doable over the long term.



Dr. Stephanie Crewe, a pediatrician at the Virginia Commonwealth University's Children's Pavilion, says she became suspicious of the health care system herself when her aunt died of breast cancer in her 30s. | Cheriss May for POLITICO

Stephanie Crewe, a pediatrician who practices adolescent medicine at VCU, grew up poor in a tough neighborhood on the south side of Richmond and attended schools that, while legally desegregated, were still all Black. She learned suspicion of the health system at a young age, when her aunt died of breast cancer in her late 30s. Yet she was drawn to medicine herself. So devoid of role models in her real life, she turned to a 1980s TV sitcom about a young white physician prodigy. "Doogie Howser did a lot of stuff, and it was fascinating to me," she recalls.

AD

Now, she works both in traditional clinical settings through the med school and health system, and out in the community, including with kids in juvenile detention and those with behavioral health problems. "What makes the difference? How did I make it?" she wonders. It's important, she notes, for kids not to have to rely on some TV fiction but "to see someone like me." That in itself is a trust builder. "People start to trust when they have a shared experience, shared language, shared history." She can build those bridges.

And rebuilding trust means reckoning with the past.

When the U.S. Public Health Service syphilis study began in Tuskegee in the 1930s, one thing was missing from the budget: money for funerals. The government asked a private philanthropy, the Milbank Memorial Fund, to cover the cost of burying these men. It quietly did so.

Decades later, Christopher Koller, a tall, lanky white man, became president of the foundation and learned about its past. He began exploring what had happened, what it had meant, and how wrong it felt. In time, that led him to the Tuskegee descendants and Lillie Tyson Head.

Their dialogue was not an easy one, not on either side. But for Tyson Head, it was a chance for enlightenment — not for the descendants, who knew the story, but for others. She wants to transform the legacy of that study from "shame and trauma, to honor and triumph."

For Koller, talking with Tyson Head and other descendants became a privilege. The foundation issued a formal, public apology and participated in a Tuskegee ceremony this past June, everyone together under a tent singing "Lift Every Voice."

Case 8:24-cv-02548-ABA   Document 1-4   Filed 09/03/24   Page 279 of 286



A speaker holds a candle at the podium during a ceremony near Tuskegee, Ala. in 2017 to commemorate the roughly 600 men who were subjects in the Tuskegee syphilis study. Their descendants held their first public ceremony to honor the men and step forward to tell their stories. | Jay Reeves/AP Photo

It was a profound trust-building experience, Koller says, and a glimpse of what a more just future could be. And it was a relief for him and the foundation he leads: "We could finally come clean."

Recalling that ceremony a few months later, Tyson Head says it was "surreal. ... My emotions went in a lot of different directions."

AD

about what was in the past." But that doesn't break its power or release its grip on the present.

When you move forward, as she believes the Milbank Foundation has done, and the Tuskegee descendants are doing, you move ahead while keeping your eye on the past. And that, she says, lets you move on not with shame, or fear, or denial but with understanding toward something better.

**FILED UNDER:** HEALTH CARE REFORM, BLACK PEOPLE, RACE IN AMERICA



**Playbook**

The unofficial guide to official Washington, every morning and weekday afternoons.

**EMAIL**

Your Email

**EMPLOYER**                          **JOB TITLE**

Employer                              Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.                          SIGN UP

SPONSORED CONTENT                                         Recommended by Outbrain



**Maryland Will Cover the Cost to Install Sol…**

Find out if you qualify. Get your free quote today!

EasySolar



**How Hamas Is Fighting in Gaza: Tunnels, Tra…**

IGAA



**The Average Walk-In Shower Cost in 2024**

Home Forever Baths

**This married couple asked for my because they made the "mistake" buying different plane seats.** "Can do us a favor, please?" the woman I just looked at her unimpressed a said, "Okay." **They looked relieved** I switched seats with her. All of a the flight attendant rushed to me worry, "Sir, you were just scamme I smirked, "I know. **Give them 5 m**

**[Gallery] Passenger's Genius Move Against…**

https://travellergazette.com/



**At 55, Jennifer Aniston Revealed She Was…**

http://parentinfluence.com/

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

———————————————

© 2024 POLITICO LLC

Case 8:24-cv-02548-ABA   Document 1-4   Filed 09/03/24   Page 282 of 286

E-FILED: Prince George's Circuit Court
Docket: 7/31/2024 11:59 AM; Submission: 7/31/2024 11:59 AM
Envelope: 17421611

HUMAN RIGHTS

# Implicit Bias and Racial Disparities in Health Care

by Khiara M. Bridges

Share:

   



Why are black people sicker, and why do they die earlier, than other racial groups? Many factors likely contribute to the increased morbidity and mortality among black people. It is undeniable, though, that one of those factors is the care that they receive from their providers. Black people simply are not receiving the same quality of health care that their white counterparts receive, and this second-rate health care is shortening their lives.

In 2005, the Institute of Medicine—a not-for-profit, non-governmental organization that now calls itself the National Academy of Medicine (NAM)—released a report documenting that the poverty in which black people

disproportionately live cannot account for the fact that black people are sicker and have shorter life spans than their white complements. NAM found that "racial and ethnic minorities receive lower-quality health care than white people—even when insurance status, income, age, and severity of conditions are comparable." By "lower-quality health care," NAM meant the concrete, inferior care that physicians give their black patients. NAM reported that minority persons are less likely than white persons to be given appropriate cardiac care, to receive kidney dialysis or transplants, and to receive the best treatments for stroke, cancer, or AIDS. It concluded by describing an "uncomfortable reality": "some people in the United States were more likely to die from cancer, heart disease, and diabetes simply because of their race or ethnicity, not just because they lack access to health care."

Scores of studies buttress NAM's findings by documenting that providers are less likely to deliver effective treatments to people of color when compared to their white counterparts—even after controlling for characteristics like class, health behaviors, comorbidities, and access to health insurance and health care services. For example, one study of 400 hospitals in the United States showed that black patients with heart disease received older, cheaper, and more conservative treatments than their white counterparts. Black patients were less likely to receive coronary bypass operations and angiography. After surgery, they are discharged earlier from the hospital than white patients—at a stage when discharge is inappropriate. The same goes for other illnesses. Black women are less likely than white women to receive radiation therapy in conjunction with a mastectomy. In fact, they are less likely to receive mastectomies. Perhaps more disturbing is that black patients are *more likely* to receive *less desirable* treatments. The rates at which black patients have their limbs amputated is higher than those for white patients. Additionally, black patients suffering from bipolar disorder are more likely to be treated with antipsychotics despite evidence that these medications have long-term negative effects and are not effective.

# Black people simply are not receiving the same quality of

# health care that their white counterparts receive.

In light of these studies, some scholars have concluded that racial disparities in health can be explained by looking to the individuals who are choosing not to prescribe the most effective, health- and life-conserving treatments to racial minorities. The argument is that if people of color are sicker and are dying at younger ages than white people, this may be because physicians have racial biases. Their biases cause them to give their patients of color inferior health care and, in so doing, contribute to higher rates of morbidity and mortality.

If physicians harbor racial biases, these biases can either be consciously held or unconsciously held. Dayna Bowen Matthew's book, *Just Medicine: A Cure for Racial Inequality in American Healthcare* (2015), explores the idea that unconscious biases held by health care providers might explain racial disparities in health. She notes that precious few physicians, like the general public, admit to harboring negative attitudes about any particular racial group. And we probably do not gain much by disbelieving their accounts. Thus, physicians' *explicit* racial biases likely cannot account for racial disparities in health. That is, if physicians' choices around which treatments to prescribe and which care to offer are harming their patients of color, it is unlikely that physicians are intentionally doing so; nor is it likely that physicians are aware that they have beliefs about people of color that negatively impact the way they practice medicine.

However, Matthew notes that there is little reason to believe that physicians have not been exposed to the negative narratives about racial minorities that circulate in society—discourses that become the stuff of unconscious negative attitudes about racial groups. Matthew proposes that physicians, like the rest of the American public, have *implicit* biases. They have views about racial minorities of which they are not consciously aware—views that lead them to make unintentional, and ultimately harmful, judgments about people of color. Indeed, when physicians were given the Implicit Association Test (IAT)—a test that purports to measure test takers' implicit biases by asking them to link images of black and white faces with pleasant and unpleasant words under intense time

constraints—they tend to associate white faces and pleasant words (and vice versa) more easily than black faces and pleasant words (and vice versa). Indeed, research appears to show that these anti-black/pro-white implicit biases are as prevalent among providers as they are among the general population. Matthew concludes that physicians' implicit racial biases can account for the inferior health care that the studies discussed above document; thus, physicians' implicit racial biases can account for racial disparities in health.

A number of experiments support her claim. One study showed that physicians whose IAT tests revealed them to harbor pro-white implicit biases were more likely to prescribe pain medications to white patients than to black patients. Another study administered an IAT test to physicians and then asked them whether they would prescribe thrombolysis—an aggressive, yet effective treatment for coronary artery disease—to patients presenting symptoms for coronary artery disease. The experiment revealed that physicians whom the IAT tests revealed harbor anti-black implicit biases were *less likely* to prescribe thrombolysis to black patients and *more likely* to prescribe the treatment to white patients.

Proposing that implicit biases are responsible for racial disparities in health might seem dangerous if one believes that individual and structural factors can never operate simultaneously. But this is not the case. United States' policies make public health insurance unavailable to undocumented immigrants as well as documented immigrants who have been in the country for less than five years. Our residential neighborhoods remain dramatically segregated. We have a two-tiered health care system that provides wonderful care to those with private insurance and mediocre care to those without. The list of structural factors that make people of color sicker than their white counterparts is long. If providers' implicit racial biases contribute to excess morbidity and mortality among people of color, we must recognize that individuals with implicit biases practice medicine within and alongside structures that compromise the health of people of color.

---

**Khiara M. Bridges** is a professor of law and professor of anthropology at Boston University. She is the author of *Reproducing Race: An Ethnography of Pregnancy as a Site of Racialization* (2011) and *The Poverty of Privacy Rights* (2017). This

piece is an excerpt from her forthcoming book, *Critical Race Theory: A Primer*, under contract with Foundation Press.

